Exhibit F

KENNETH P. ACHTYL, JR.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

NICHOLAS H. BELSITO,

                              Plaintiff,

        -vs-

COUNTY OF ERIE,
SHERIFF TIMOTHY B. HOWARD,
KENNETH P. ACHTYL,
JAMES W. FLOWERS,

                              Defendants.

---------------------------------------------------

                              Remote Examination Before

Trial of KENNETH P. ACHTYL, JR., Defendant, taken pursuant

to the Federal Rules of Civil Procedure, at SUE ANN SIMONIN

COURT REPORTING, 421 Franklin Street, Buffalo, New York,

taken on April 14, 2021, commencing at 12:35 P.M., before

SUE ANN SIMONIN, Notary Public.

2

1                           INDEX TO EXHIBITS

2

3

4    Exhibits                                    For Identification

5    1        Administration General Order A-5        6
              dated June 1, 2016
6
     2        Administration General Order A-1        6
7             dated June 1, 2016

8    3        Administration General Order A-36       6
              dated July 1, 2015
9
     4        Training General Order T-2             6
10            dated June 1, 2016

11   5        Administration General Order A-42       6
              dated March 14, 2018
12
     6        Operations General Order O-47          6
13            dated June 1, 2016

14   7        twelve Information/Complaint            6
              Documents
15
     8        Certificate of Disposition            6
16
     9        ten Misdemeanor Complaint             6
17            Documents

18   10       Update Employment - Acadis            6
              Portal Printout
19
     11       Body Camera Footage of Arrest          6
20            of Nicholas Belsito by Erie
              County Sheriff's Office
21
     12       Photograph                          296
22

23

3

INDEX TO REQUESTS

Page, Line                    Description

27     8        Instagram screen name information

265    19       Keep calls or texts with Sheriff Howard
                 and not delete any of those from your
                 phone

4

INDEX TO MARKED QUESTIONS

Page, Line                    Question

 69    14        Did you ever walk down a street with an
                 open container of beer yourself?

124    20        Do you recall how much it was?

281     4        Has the County advised you whether they
                 will cover you for punitive damages if a
                 punitive verdict is rendered?

281     9        Are you aware that you have no insurance
                 coverage for punitive damages?

282     6        Are you aware that if a jury returns a
                 punitive award against you, that the
                 money will have to be paid by you
                 personally?

5

1    APPEARANCES:

2    GIBSON, McASKILL & CROSBY, LLP,
     By AARON F. GLAZER, ESQ.,
3    69 Delaware Avenue,
     Suite 900,
4    Buffalo, New York 14202,
     Appearing for the Plaintiff.
5
     BLOOM & BLOOM, P.C.,
6    By KEVIN D. BLOOM, ESQ.,
     530 Blooming Grove Turnpike,
7    New Windsor, New York 12553,
     Appearing for the Plaintiff.
8
     GOLDBERG SEGALLA, LLP,
9    By ALBERT J. D'AQUINO, ESQ.,
     665 Main Street,
10   Buffalo, New York 14203,
     Appearing for the Defendants.
11
     PRESENT:   Nicholas Belsito (until page 114)
12              Joseph Belsito (with Kevin Bloom, Esq.)
                David Parrotta, videographer
13

14

15        (The following stipulations were entered

16   into by both parties.)

17        It is hereby stipulated by and between counsel

18   for the respective parties that the oath of the

19   Referee is waived, that filing and certification

20   of the transcript are waived, and that all

21   objections, except as to the form of the

22   questions, are reserved until the time of trial.

23

6

1           (An Administration General Order A-5 dated

2      June 1, 2016 was received and marked as Exhibit 1,

3           an Administration General Order A-1 dated

4      June 1, 2016 was received and marked as Exhibit 2,

5           an Administration General Order A-36 dated

6      July 1, 2015 was received and marked as Exhibit 3,

7           a Training General Order T-2 dated June 1,

8      2016 was received and marked as Exhibit 4,

9           an Administration General Order A-42 dated

10     March 14, 2018 was received and marked as

11     Exhibit 5,

12          an Operations General Order O-47 dated June

13     1, 2016 was received and marked as Exhibit 6,

14          twelve Information/Complaint Documents were

15     received and marked as Exhibit 7,

16          a Certificate of Disposition was received

17     and marked as Exhibit 8,

18          ten Misdemeanor Complaint Documents were

19     received and marked as Exhibit 9,

20          an Update Employment - Acadis Portal

21     Printout was received and marked as Exhibit 10,

22          and Body Camera Footage of Arrest of

23     Nicholas Belsito by Erie County Sheriff's Office

7

1      was received and marked as Exhibit 11, for

2      identification.)

3

4  THE VIDEOGRAPHER:  It is twelve-thirty-five p.m.

5      Today is Wednesday, April 14th, 2021.  I am David

6      Parrotta of Parrotta Studio, located at 350

7      Merchants Road in Rochester, New York.  We are

8      conducting this deposition via videoconference.

9          We are about to begin the video recorded

10      deposition of Kenneth P. Achtyl in the matter of

11      Nicholas H. Belsito, Plaintiff, against County of

12      Erie, Sheriff Timothy B. Howard, Kenneth P.

13      Achtyl and James W. Flowers, Defendants.  In

14      attendance is the court reporter, Sue Ann Simonin

15      of Sue Ann Simonin Court Reporting, located at

16      421 Franklin Street in Buffalo, New York.

17          At this time the attorneys will identify

18      themselves and the parties they represent, after

19      which our court reporter will swear in the

20      witness and we may proceed.

21  MR. GLAZER:  Aaron F. Glazer, Gibson, McAskill and

22      Crosby, for the Plaintiff.

23  MR. D'AQUINO:  Albert D'Aquino, Goldberg Segalla, for

8

1    Defendants.

2    MR. BLOOM:  Kevin Bloom, Bloom and Bloom P.C., on

3       behalf of the Plaintiff.

4    MR. D'AQUINO:  We'd like thirty days for Mr. Achtyl

5       to be able to read and sign his deposition.

6    THE REPORTER:  Do all parties involved agree to this

7       deposition being conducted by remote video and to

8       the witness being sworn in remotely?

9    MR. GLAZER:  Yes.

10   MR. D'AQUINO:  Yes.  Our magistrate judge indicated

11      that it should be conducted by video, so that's

12      probably the best way to characterize it.

13        Sue Ann, before you do that, I just want to

14      ask on the record and have it on the record, all

15      of the appearances that were just stated, did you

16      type that down?

17   THE REPORTER:  So I have Nick Belsito present, with

18      Mr. Bloom is Joseph Belsito.

19   MR. D'AQUINO:  Right.  I just want to make sure that

20      is going to be on the transcript.

21   THE REPORTER:  Yes.  I was going to put those in the

22      transcript, yes.

23   MR. D'AQUINO:  Okay.  I only ask because I wasn't

9

1       sure if that was notes you were making.  I just

2       wanted to ensure that it reflects it on the

3       transcript.

4    THE REPORTER: Yes, I will put that in the transcript.

5    MR. D'AQUINO:  Last question, for the videographer.

6       I would like it stated on the record what is

7       going to be on the video that is being taken.  Is

8       it just the screen with Mr. Achtyl or is it

9       anything else?

10   THE VIDEOGRAPHER:  No.  It is just Mr. Achtyl, with

11      the time and date added.  That's all that will be

12      recorded.

13   MR. D'AQUINO:  Okay.  So when we go on -- did you put

14      that on, Sue Ann?

15   THE REPORTER:  Yes.

16   MR. D'AQUINO:  Great.  Sorry to interrupt.  Go ahead.

17

18          K E N N E T H   P.   A C H T Y L,  J R.,

19         5438 George Drive, Hamburg, New York, 14075,

20            after being duly called and sworn,

21         testified via videoconference as follows:

22

23   EXAMINATION BY MR. GLAZER:

1  Q.  Good afternoon, Mr. Achtyl.  My name is Aaron

2      Glazer, I'm one of the attorneys that represents

3      Mr. Belsito with regard to a December the 3rd of

4      2017 incident at New Era Field.  I have some

5      questions for you regarding that incident.

6      Accept my apology in advance, I may not always

7      look at you, I'll be taking notes at the same

8      time as we're having our question and answer.

9          I do have some requests for you that I

10     assume Mr. D'Aquino has gone over prior to this

11     conversation.  The first is to please allow me to

12     ask my full question, to get all the words out of

13     my mouth before you start to answer.  Miss

14     Simonin, who is on top of you on the screen

15     there, will not be able to take us both down at

16     the same time.  You may anticipate questions that

17     I'm going to ask, you may start to answer in the

18     middle of a question.  That's going to be a

19     problem, so just let me get all the words out of

20     my mouth before you start to answer.  In that

21     regard, please give verbal responses like yes,

22     no, I don't know or whatever else you think might

23     be an appropriate answer to the question.

11

1     Shoulder shrugs, head nods, uh-huhs and uh-uhs

2     don't translate onto the record.  So if you say

3     uh-huh or uh-uh, someone in here is probably

4     going to say Mr. Achtyl, was that a yes, was that

5     a no, et cetera.

6          Is that all clear so far?

7  A.  Yes.  Good afternoon, Mr. Glazer.  That is clear.

8  Q.  Thank you.  I'm going to start with some

9     background questions, probably some questions

10    about your employment, and I'll move on at some

11    point to the incident in question.  I may follow

12    up after that with some questions, but as long as

13    you abide by what we just discussed, I think that

14    this will go efficiently and seamlessly.

15         So I'll start by asking you where you are

16    right now.

17  A.  I am currently located at my residence, which I

18    stated the address earlier, specifically sitting

19    in my dining room.

20  Q.  Do you have any documents in front of you right

21    now?

22  A.  I do not, no.

23  Q.  Do you have a cell phone with you?

12

1   A.   I do have a cell phone next to me, yes.

2   Q.   Okay.  Can you turn that cell phone off for us?

3   A.   Yes.

4   Q.   Thank you.

5   A.   Yes.

6   Q.   Are you using any other device, electronic or

7        otherwise, to communicate with anyone else while

8        you are answering these questions?

9   A.   No.

10  Q.   Do you own the home that you live in?

11  A.   Yes, I do.

12  Q.   And whom do you live there with?

13  A.   My fiancee and --

14  Q.   What's her --

15  A.   Elizabeth Ferreri.

16  Q.   What's your fiancee's name?

17  A.   Elizabeth R. Ferreri.

18  Q.   You started to say and, and I interrupted you,

19       which is what I asked you not to do, so I

20       apologize for that.

21            Is there someone else living in the home?

22  A.   Yes.  My daughter resides with me part-time,

23       between here and her mom's house.

1  Q.  What's her mom's name?

2  A.  Elizabeth -- I'm sorry.  Lisa, and I'm not sure

3      of her -- Daoust is her married name.

4  Q.  Could you spell that for Miss Simonin?

5  A.  I believe the last name is spelled D-A-U-S-T

6      (sic).

7  Q.  Are you divorced from Miss Daoust?

8  A.  Yes.  She is remarried.

9  Q.  Okay.  When were you divorced?

10 A.  2010, August of 2010.

11 MR. D'AQUINO:  Mr. Glazer, I'm sorry to interrupt.  I

12     apologize.  I should have asked this question

13     earlier.  I just want to confirm on the record

14     that the only person who is videotaping or

15     audiotaping this deposition is our videographer.

16     Is everyone on this call in agreement that no one

17     else is audiotaping or videotaping this?

18 MR. GLAZER:  Confirmed.

19 THE REPORTER:  Al, I also have it recording just on

20     the Zoom, but it is just Mr. Achtyl's face and it

21     is just as a backup.

22 MR. D'AQUINO:  Okay.  So the only two recordings are

23     yours, Sue Ann, and our videographer.  Thank you.

14

1        Sorry to interrupt, Mr. Glazer.

2  MR. GLAZER:  No problem.

3  BY MR. GLAZER:

4  Q.  You indicated, Mr. Achtyl, that you were divorced

5      from Miss Daoust in August of 2010, is that

6      correct?

7  A.  That is correct.

8  Q.  Have you ever given sworn testimony before today?

9  A.  Yes, I have.

10  Q.  Is that in the context of your prior employment

11      in law enforcement?

12  A.  Yes.

13  Q.  Okay.  Can you describe for me how many times

14      over the course of the last twenty years you've

15      given sworn testimony?

16  A.  I'm not sure of an exact number.  I would say

17      probably hundreds, if not more than hundreds of

18      times.

19  Q.  All right.  We'll talk about this a bit more

20      later, but were you primarily a patrol deputy

21      during your time with the sheriff's department?

22  A.  I held some different titles, but yes, mainly I

23      was a patrol deputy with the sheriff's office.

15

1    Q.   Okay.  So having experience in the DA's office
2         myself, can I assume that most of the times that
3         you gave sworn testimony it would be in the
4         course of DWI's or misdemeanor offenses and
5         things like that?
6    A.   Yes, for the most part.
7    Q.   Okay.  What else?
8    A.   I have testified at various felony trials.
9    Q.   Do you know when the last time you gave testimony
10        in a felony trial was?
11   A.   I am not certain.
12   Q.   Was it in the last five years?
13   A.   I would say yes, in the last five years.
14   Q.   Did you review any documents in preparation for
15        your testimony today?
16   A.   Only the exhibits this morning that were
17        forwarded to me by the attorney.
18   Q.   When you say the attorney, do you mean Mr.
19        D'Aquino?
20   A.   Mr. D'Aquino, yes.
21   Q.   Have you reviewed any other documents other than
22        those that were forwarded to you this morning?
23   A.   No, I have not.

16

1   Q.  Have you reviewed the footage of Officer Flowers'
2       body camera from 12/3 of '17?
3   A.  Have I reviewed it?
4   Q.  Have you watched it?
5   A.  Yes, I've watched it.  I saw parts of it during
6       my trial --
7   Q.  Okay.
8   A.  -- my criminal trial, and --
9   Q.  Have you watched -- go ahead.  I'm sorry.  Go
10     ahead.
11   A.  And that's when I saw the video of that, during
12     my criminal trial, and obviously prior to my
13     criminal trial with my defense attorney.
14   Q.  You're speaking about Mr. Personius?
15   A.  Correct.
16   Q.  I don't want to know about any communication that
17     you had with your attorneys, but I will ask you
18     how many times you and Mr. Personius reviewed
19     that body cam footage.
20   A.  From what I recall, it was -- we reviewed it one
21     time in full.
22   Q.  All right.  And since then have you reviewed it
23     again in full?

17

1   A.   No, I have not.

2   Q.   So we've established that you looked at the

3        exhibits that were forwarded today, we've

4        established that you watched the body cam

5        footage.  Have you reviewed anything else in

6        preparation for your testimony today?

7   A.   No, I have not.

8   MR. D'AQUINO:  Let me just object to that.  I think

9        he made a distinction that he last reviewed the

10       body cam footage at his trial, not in preparation

11       for this deposition.

12  BY MR. GLAZER:

13  Q.   Okay.  Let me just ask, when is the last time you

14       watched any portion of the body cam footage?

15  A.   It would be the week of my trial in September of

16       2019.

17  Q.   Are you the Defendant in any other lawsuit that's

18       pending right now other than this one?

19  A.   Not that I'm aware of.

20  Q.   Have you ever brought a lawsuit as a Plaintiff?

21  A.   Yes, I have.

22  Q.   When was that?

23  A.   I believe the year was 2011.

18

1   Q.   What was that lawsuit regarding?

2   A.   It was resulting -- leaving the New Era Field or

3        the stadium, and I was rear-ended by a drunk

4        driver in my personal vehicle while on County

5        time.

6   Q.   Okay.  Have you ever been a Plaintiff in another

7        personal injury lawsuit other than that one?

8   A.   No, I have not.

9   Q.   Is that lawsuit that you're referring to when you

10       were rear-ended by Mr. Kelly, does that ring a

11       bell?

12  A.   I believe his name was Mr. Kelly, yes.

13  Q.   And if I told you that was 2014, would you have

14       reason to disagree with that?

15  A.   My memory, I believe it was, from what I can

16       recall, I believe it was 2011, but I'm not sure.

17       It could be 2014.

18  Q.   I'm asking a bad question, let me be more clear.

19       Was the lawsuit brought in 2014?

20  A.   I'm not sure when the lawsuit was brought.  The

21       incident occurred in 2011.

22  Q.   Okay.  Can you give me your date of birth?

23  A.   ████████████

19

1   Q.   And that makes you how old today?

2   A.   Forty-eight.

3   Q.   Where were you born?

4   A.   Buffalo, New York.

5   Q.   Did you attend high school?

6   A.   Yes, I did.

7   Q.   Whereabouts?

8   A.   I graduated from Eden Central High School, Eden,

9        New York.

10  Q.   What year?

11  A.   1991.

12  Q.   Do you have any education post high school?

13  A.   Yes, I do.

14  Q.   Can you describe it for me, please?

15  A.   I completed a two-year Associate's degree at Erie

16       Community College, it was from the fall of 1991,

17       August I believe of 1991, to -- I believe it

18       would be December of 1994.

19  Q.   Any education or courses beyond that?

20  A.   Yes.   In 1995, in April of -- excuse me.   In

21       April of -- let me correct myself.   I'm sorry.   I

22       would have started the police academy in April of

23       1994, so in December or January of 1995 I would

20

```
 1        have finished ECC.
 2   Q.   I appreciate that answer.  Let me just tell you
 3        this.  You're giving me these dates from
 4        twenty-some-odd years ago, and I appreciate that.
 5        I just want you to know that I'm not here to take
 6        you to task over things that happened twenty-five
 7        years ago or dates, and I'm not here to try to
 8        jam you up on that stuff.  But to the extent that
 9        you do remember these dates, I appreciate it.
10   A.   You're welcome.
11   Q.   Have you ever been known by a name other than
12        Kenneth Achtyl?
13   A.   I would be -- have been called Kenny or Ken, I
14        guess the shortened version of Kenneth, but no
15        other names other than that.
16   Q.   All right.  You haven't changed your name for any
17        reason?
18   A.   No, I have not.
19   Q.   Is your middle name Paul?
20   A.   Yes, my middle name is Paul.
21   Q.   How tall are you?
22   A.   I am approximately five seven to five eight.
23   Q.   How much do you weigh?
```

21

1   A.   Approximately two hundred and twenty-five pounds.

2   Q.   Do you have any nicknames?

3   A.   Not that I'm aware of, aside from my deceased

4        grandfather when I was a kid used to call me

5        Bummer, but that -- you know, I haven't been

6        called that in probably over twenty-five years.

7   Q.   Do you have any nicknames that you're aware of

8        within the sheriff's department?

9   A.   No, I do not.

10  Q.   Other than the convictions of January the 23rd of

11       2020, which we'll get into later, have you ever

12       previously been convicted of a felony or a

13       misdemeanor?

14  A.   No, I have not.

15  Q.   We talked about some dates regarding your

16       education, and then I think you said in April of

17       '94 you went to the police academy.  So I'm just

18       going to ask you, when you went into the police

19       academy, what was the first job that you took

20       after that?

21  A.   I would have completed the police academy in

22       January of '95, and the first police job that I

23       took after the academy would have been in January

22

1           of '95 with the Village of Gowanda, New York

2           Police Department as a part-time police officer.

3      Q.   What does a part-time police officer in Gowanda

4           do?

5      A.   General patrol work.

6      Q.   How long did you work for Gowanda?

7      A.   Gowanda, I worked probably on and off up to

8           roughly -- I'm going to say around 2005, 2006.

9      Q.   Did you work anywhere else while you were working

10          for Gowanda?

11     A.   In 1997 I was hired part-time for the City of

12          Salamanca as a part-time police officer.  I -- at

13          that time when I was working part-time for the

14          Village of Gowanda and for the -- and to include

15          the City of Salamanca time, I also worked for

16          HSBC Bank in a full-time position as a security

17          council operator.

18     Q.   Can you give me the approximate dates of

19          employment for HSBC?

20     A.   1992 to 1997 or '98.

21     Q.   So was there a time that you were working for

22          Gowanda, Salamanca and HSBC at the same time?

23     A.   Yes.

23

1   Q.  When did you cease to work for Salamanca?

2   A.  Salamanca, I worked for Salamanca for six months.

3       I was then offered a full-time position with the

4       City of Salamanca, at which time I declined the

5       full-time offer because I did not want to

6       relocate due to my current wife's position at the

7       time, so I unfortunately gave that position up

8       and stayed with HSBC Bank.

9   Q.  Okay.  So then at that point you would have been

10      working for Gowanda and HSBC, is that correct?

11  A.  That's correct.

12  Q.  Okay.  You ceased to work for HSBC in '97 as

13      well, is that correct?

14  A.  It was '97 or '98 when I was offered a full-time

15      position with the Niagara Frontier Transit

16      Authority Police Department.

17  Q.  And you accepted?

18  A.  Correct.  And around that time I was also offered

19      a part-time position with the Village of Arcade

20      Police Department.

21  Q.  And did you accept that?

22  A.  Yes.

23  Q.  So then was there a time when you were working

24

1     for the NFTA, Arcade and Gowanda at the same

2     time?

3  A.  Correct.

4  Q.  Okay.

5  A.  And I can also add one more to that.  Somewhere

6     in that time frame I also continued as a

7     volunteer reserve with the Town of Eden Police

8     Department.  And then some point in time around

9     '96 or '97 I was offered a part-time position to

10    fill in as needed on their schedule as well.

11  Q.  For whom was that?

12  A.  The Town of Eden Police Department.

13  Q.  So can you just tell me how you ceased to be

14    employed by each of those entities up until the

15    time that you stopped working for Gowanda in

16    2006?

17  A.  Well, the part-time positions were sometime once

18    a week, sometimes it was once a month, sometimes

19    it was as needed based upon availability.  Some

20    of the positions -- like Salamanca was mainly

21    like weekends and maybe once or twice during the

22    week in the afternoon or evening hours.  It was

23    just based upon my schedule and availability with

25

1       my full-time job at that time.

2   Q.  So as of 2006 when you ceased to work for

3       Gowanda, whom were you working for?

4   A.  The Erie County Sheriff's Office.

5   Q.  So is that when you started with the sheriff?

6   A.  Started with the sheriff's office in June of

7       2000.

8   Q.  What did I miss?  How did we get from the

9       sheriff's department after Gowanda to June of

10      2000?  Did you start some sort of part-time

11      employment with the sheriff in 2000?

12  A.  No.  I worked full-time for the sheriff's office

13      in 2000.  Prior to that, as I stated earlier, I

14      worked for the Niagara Frontier Transit Authority

15      Police Department, I believe it was from

16      somewhere in 1997 or '98, I believe it was '98,

17      until I was hired full-time in June of 2000 with

18      the sheriff's office.

19  Q.  All right.  So were you working for the sheriff's

20      office and the Gowanda Police at the same time?

21  A.  Yes.

22  Q.  All right.  And then in 2006, obviously you were

23      still working for the sheriff's department?

26

1   A.  Correct.

2   Q.  And then you ceased to be employed at that time

3       with Gowanda?

4   A.  Correct.

5   Q.  Refresh my recollection.  What was the reason for

6       that?

7   A.  Family related issues.  I wouldn't say issues.

8       Family related; two kids, a lot of time away from

9       -- a lot of additional time away from the family

10      when the kids were young.  So at that point in

11      time I felt financially secure with the sheriff's

12      office to not have a part-time job.

13   Q.  So from 2006 on, you worked only for the Erie

14      County Sheriff?

15   A.  Correct.

16   Q.  Do you have any social media accounts?

17   A.  Yes, I do.

18   Q.  What accounts do you have?

19   A.  I have a Facebook account and an Instagram

20      account.

21   Q.  What's the Facebook name that you use?

22   A.  Kenneth Paul.

23   Q.  What about Instagram?

27

1   A.   I am not sure how Instagram really works.  I do

2        have an account.  I'm not sure exactly what the

3        -- if it's like Facebook or not, if it's Kenneth

4        Paul, I honestly couldn't tell you.

5   MR. GLAZER:  Sue Ann, can you create an index for

6        requests?

7   THE REPORTER:  Yes.

8   MR. GLAZER:  Thank you.  And can you put number one

9        as Instagram screen name information.

10  THE REPORTER:  Yes.

11  MR. GLAZER:  Thank you.

12  BY MR. GLAZER:

13  Q.   Other than Facebook and Instagram, do you have

14       any other social media accounts?

15  A.   I do not.

16  MR. D'AQUINO:  Mr. Glazer, sorry to interrupt.  Just

17       for the record, so I don't have to say it any

18       more than one time, I will just reserve any

19       objections to requests for other information, or

20       what sound like requests for other information,

21       until I receive them in writing from you as part

22       of a discovery demand.  Just wanted to note that

23       on the record.  Sorry to interrupt.

28

1    MR. GLAZER:  No problem.  I understand that.  And the

2         only reason I do this is because if I don't, I

3         forget.  This is for my own information.  And

4         whatever we need to send to you, we'll send in

5         writing and we'll expect you to respond or not.

6         That's up to you.

7    BY MR. GLAZER:

8    Q.  Mr. Achtyl, have you ever posted profanities on

9         any of your social media accounts?

10   A.  Not that I'm aware of.

11   Q.  Have you made racist comments on your social

12        media accounts?

13   A.  Not that I'm aware of.

14   Q.  Have you deleted any posts since the date of this

15        incident on any social media account?

16   A.  I have deleted posts, but not related to this

17        incident.

18   Q.  Why did you delete the posts?

19   A.  No specific reason.

20   Q.  Was it because they had racist content?

21   A.  No, not because it was racist content.  I'm not a

22        racist person.

23   Q.  That wasn't my question.  My question was, did

29

```
 1      you delete any posts because it had racist
 2      content?
 3   A. No, I did not.
 4   Q. Did you delete any posts because it was laced
 5      with profanity?
 6   A. No, I did not.
 7   Q. Have you ever posted the following?  Quote, were
 8      you at one of those rallies where you have to
 9      lick the shoes of black people for repatriations?
10   A. Not that I'm aware of.
11   Q. Okay.  Is your screen name Kenneth Paul on
12      Facebook, as you told me about two minutes ago?
13   A. Yes.
14   Q. And at some point did you have your profile
15      picture as a snake with a don't tread on me
16      indication underneath it?
17   A. I did, yes.
18   Q. Okay.  And if I told you that that same Kenneth
19      Paul posted, quote, were you at one of those
20      rallies where you have to lick the shoes of black
21      people for repatriations, would you have reason
22      to disagree that that was posted on your account?
23   A. I am not sure.  I don't recall posting it.
```

30

1   Q.   Does anyone else have access to your Facebook
2        account?
3   A.   Not that I'm aware of.
4   Q.   Can we still find the post that I just mentioned
5        on your social media?
6   A.   I'm not sure.
7   Q.   I can tell you when it was.
8             June 11th, 2020.  Did you delete anything
9        from your Facebook page from June 11th of 2020?
10  A.   Not that I'm aware of.
11  Q.   Does the sheriff's department have a social media
12       policy?
13  A.   I believe they do.
14  Q.   Does that policy encourage the use of profanity
15       online?
16  A.   Not when it's related to speaking of the
17       sheriff's office, no.
18  Q.   Is there a policy in the sheriff's department
19       that says that you're a sheriff twenty-four hours
20       a day, seven days a week?
21  A.   I believe there is, but it doesn't infringe upon
22       your opinion when it comes to social media.
23  Q.   Does it infringe upon your opinion or right to

1        post racist ideologies on social media?

2    MR. D'AQUINO:  Object to the form.

3    BY MR. GLAZER:

4    Q.  You can answer if you understand the question.

5    A.  Can you repeat that, please?

6    Q.  I can ask it a different way.  Do you think the

7        sheriff would support a member of the Erie County

8        Sheriff's Department posting racist ideologies on

9        their social media profile?

10   A.  I'm kind of confused by your question.  If the

11       comment was made in 2020, I'm no longer a member

12       of the Erie County Sheriff's Office.

13   Q.  Just listen to the question and answer the best

14       you can.  Do you think, when you were a sheriff,

15       that the sheriff would have condoned the posting

16       of racist ideologies on your social media?

17   MR. D'AQUINO:  Object to the form.

18   THE WITNESS:  Repeat it?

19   BY MR. GLAZER:

20   Q.  Is the sheriff a racist?

21   A.  No, I don't believe the sheriff is a racist, nor

22       am I.

23   MR. D'AQUINO:  Object to the form.  Sorry, Mr.

32

1       Glazer.  What does this have to do with the

2       complaint that you filed, with respect to race?

3   MR. GLAZER:  Well, with regard to the question, if

4       you're objecting to the form, I guess it's noted

5       for the record.

6   MR. D'AQUINO:  I'm objecting on the basis that this

7       sounds like harassment of the witness with an

8       issue that is not within the four corners of your

9       complaint.

10  MR. GLAZER:  Okay.  Well, I'm going to continue to

11      ask the questions unless you want to call the

12      judge.

13  MR. D'AQUINO:  We may get to that point.  What's your

14      pending question?

15  MR. GLAZER:  My question is, is the sheriff a racist?

16  MR. D'AQUINO:  Okay.  That's an opinion question.  I

17      do object to that.  I don't know why you would be

18      asking him that question in this case.  We should

19      just call the judge if those are going to be the

20      tenor of the questions.

21  MR. GLAZER:  I have a few more questions, but I'm

22      happy to call the judge if you'd like to do that.

23      So I'll ask my few more questions and then I

33

1       guess we'll get to whether or not you want to

2       call the judge.

3   BY MR. GLAZER:

4   Q.  Do you believe the sheriff is a racist?

5   MR. D'AQUINO:  Same objection and same direction not

6       to answer.  We'll put that on the list for

7       calling the judge.

8   MR. GLAZER:  Okay.

9   MR. D'AQUINO:  If you have others in this vein, maybe

10      we should just call the judge.

11  MR. GLAZER:  Well, I'm going to ask him further about

12      his social media.  So if you think that's an

13      issue you want to talk to the judge about, we can

14      do that.

15  MR. D'AQUINO:  Right now I'm just asking you about

16      you asking him opinion questions about whether

17      other people are racists.

18  MR. GLAZER:  Okay.  Well, the other person is a party

19      and the other person is somebody that obviously

20      he's had contact with and he's conceded that

21      there is a policy.  So yes, I am going to ask the

22      questions, but I think it's not going to go on

23      that much longer, so it may be a waste of time to

34

1   call the judge, but I've got nothing but time.

2   So if you want to do that, it's okay with me.

3 MR. D'AQUINO:  Ask your questions, I'll make

4   directions, and then I guess we can determine at

5   that point whether you want to call the judge

6   since I'm objecting.

7 MR. GLAZER:  I'll just reserve my right to recall the

8   witness if I don't get the answers to my

9   questions.

10 MR. D'AQUINO:  Well, about recalling the witness,

11   that's why I'm saying we're going to call the

12   judge, so we don't have to do that.

13 MR. GLAZER:  Okay.  Well, I'm not at the point right

14   now where I think it's necessary, but I guess you

15   and I will have a conversation if it continues.

16 MR. D'AQUINO:  Yeah.  My suggestion is, you know, ask

17   whatever questions, and then when you have the

18   questions that I'm directing him not to answer

19   to, if you want to call the judge, let's do so,

20   so that there won't have to be a continuation at

21   a different time, since the judge offered to take

22   calls.

23 BY MR. GLAZER:

35

1   Q.   Mr. Achtyl, do you feel that it's okay for you to
2        post racist ideologies online now that you're no
3        longer a sheriff?
4   A.   I post my opinion.  I don't believe it's a racist
5        comment in the contents of the post that was
6        made.
7   Q.   So now you do remember the post?
8   A.   From now that you've brought it up and in the
9        general sense of the post, I believe I remember
10       what you're referring to, yes.
11  Q.   I'll ask you again just so we can be clear.  Do
12       you now recall posting, quote, were you at one of
13       those rallies where you have to lick the shoes of
14       black people for repatriations?  Is that what you
15       posted?
16  A.   I believe so, yes.
17  Q.   You started working, again, for the sheriff's
18       department in June of 2000, is that right?
19  A.   I started my employment with the sheriff's office
20       in June of 2000.
21  Q.   Who was the sheriff when you started?
22  A.   Patrick Gallivan.
23  Q.   Who was the undersheriff?

36

```
 1   A.   Tim Howard.
 2   Q.   Did you know Patrick Gallivan personally before
 3        you started?
 4   A.   I did not, no.
 5   Q.   Did you know Tim Howard personally before you
 6        started?
 7   A.   I did not, no.
 8   Q.   Was there an interview process in connection with
 9        your hiring at the sheriff's department?
10   A.   Yes, there was.
11   Q.   What did that entail?
12   A.   From what I recall, I believe it was -- the
13        process took approximately anywhere from nine to
14        twelve months, background check.  I believe there
15        was an interview, I'm not sure, I don't remember
16        who it was with.  And that's pretty much what I
17        can recall of the hiring process.
18   Q.   Were you provided with any sort of written
19        handbook or other written materials when you
20        started in June of 2000?
21   A.   Yes.
22   Q.   What materials were you provided with?
23   A.   Policy and procedure manual.
```

1   Q.   And did you have to sign any of those documents
2        to indicate that you had reviewed them?
3   A.   Yes.
4   Q.   Did you do that?
5   A.   Yes.
6   Q.   Do you know what a general order is?
7   A.   I do, yes.
8   Q.   Could you tell me what it is, please?
9   A.   It is a general -- or, a directive to follow a
10       certain rule, which could be permanent or it
11       could be for a period of time.
12  Q.   All right.  I'm going to pull up an exhibit and
13       I'm going to ask you some questions while the
14       exhibit is up.
15           Are you able to see the document up on the
16       screen, Mr. Achtyl?
17  A.   I see a part of it, yes.
18  Q.   And at the top of the document, is it referenced
19       as Exhibit 1 on the right-hand corner?
20  A.   I do see part of that yellow tag; however, the
21       cameras are covering the rest of that document.
22  Q.   I understand that, but can you see the top half
23       of the first page of this document?

38

1   A.   The top half, yes.

2   Q.   And is this document titled administration

3        general order A dash five?

4   A.   Yes.

5   Q.   I'm going to scroll down to page four.  I suppose

6        I should ask you first, is the subject of this

7        document written orders, bulletins and memoranda?

8   A.   Yes.

9   Q.   I'm going to go down to page four of this

10       document.  Do you see where it says procedures?

11  A.   Yes.

12  Q.   I'll scroll down a little further.  I was

13       actually on page three.  Excuse me.

14          Now, do you see at the top of the screen on

15       page four, it's indicated by number three and it

16       says distribution and retention of written orders

17       and bulletins?

18  A.   Yes.

19  Q.   All right.  Do you see where it says general

20       orders?

21  A.   I do.

22  Q.   It says general orders will be issued to all

23       members.

39

1           Is that a fair statement as to your

2      understanding of what happens to general orders?

3  A.   Yes.

4  Q.   Okay.  And then the document indicates that the

5      members will acknowledge receipt, initial the

6      receipt log and return the log to their

7      supervisor who, in turn, will submit the receipt

8      log to the administrative services division or as

9      otherwise directed by the sheriff or the

10     undersheriff.

11          Does that sentence reflect your

12     understanding of what's supposed to happen after

13     you review these general orders?

14 A.   Yes.

15 Q.   Okay.  So would it be fair to say that from time

16     to time general orders are provided to the

17     membership of the Erie County Sheriff's

18     Department and it is incumbent upon the deputy

19     sheriffs to review those materials and those

20     orders?

21 A.   Yes.

22 Q.   And during the time that you were employed with

23     the Erie County Sheriff's Department, do you

40

1       recall receiving general orders and reviewing

2       those orders as you were required to do?

3   A.  Yes.

4   Q.  And do you recall initialing the order and then

5       giving it back to your supervisor or whomever the

6       appropriate person was?

7   A.  I believe so, yes.  I'm not sure exactly how the

8       process was handled because at some point it went

9       from being a paper handbook to where everything

10      was done online.

11  Q.  Okay.  Are you familiar with the mission

12      statement of the Erie County Sheriff's

13      Department?

14  A.  Yes.

15  Q.  What's the mission statement?

16  A.  I can't -- I could not recite it off the top of

17      my head.  I'm familiar with it.

18  Q.  Can you tell us in general what it says?

19  A.  I'm not, I'm not sure.  I'm not going to

20      speculate.

21  Q.  Do you know what the general mission of the Erie

22      County Sheriff's Department is?

23  A.  Honestly, not at this time, no, I don't.

41

1   Q.   All right.  Well, you worked there for twenty-one

2        years, is that right?

3   A.   That's correct.

4   Q.   Okay.  Is there anything that you can tell me

5        about the goals or the mission or the duties of

6        the Erie County Sheriff's Department?

7   A.   There was words used I believe in that mission

8        statement, if I'm correct, of duty and honor and

9        I believe maybe integrity.  I cannot word for

10       word tell you now what that mission statement

11       says.

12  Q.   If I told you that the mission statement

13       indicates that only through the establishment,

14       maintenance and enforcement of a thorough set of

15       policies and procedures can any agency hope to

16       effectively obtain the objectives of prompt,

17       efficient, fair and equitable delivery of

18       professional public safety services to Erie

19       County, does that sound like what it might say?

20  A.   I believe so, yes.

21  Q.   Okay.  And if I told you that the first line of

22       the mission statement was, quote, to provide

23       quality public safety services to our community

42

1      by promoting a safe environment through police

2      and citizen interaction, with an emphasis on

3      integrity, fairness and professionalism, does

4      that sound like what the mission statement says?

5   A. I believe it does.  I mean, if I could see it and

6      read it, I probably could agree with you.

7   Q. Are you familiar with the Erie County Sheriff's

8      Department rules of conduct?

9   A. I am familiar that there are rules of conduct,

10     yes.

11  Q. Do you know what they are?

12  A. Not off the top of my head I do not.

13  Q. Were they provided to you in writing?

14  A. Yes.

15  Q. Can you tell me anything about what the rules of

16     conduct say?

17  MR. D'AQUINO:  Object to the form.  What is the

18     specific question, what do you want him to tell

19     you?

20  MR. GLAZER:  I want to know if he knows one sentence

21     of the rules of conduct of the Erie County

22     Sheriff's Department.

23  THE WITNESS:  At this time I cannot give you a

43

```
 1        sentence from the rules of conduct of the

 2        sheriff's office.  It's been quite -- it's been a

 3        few years since I've been there, so I don't know

 4        what specific sentence you're looking for.

 5   BY MR. GLAZER:

 6   Q.   I'm looking for any topic described by the rules

 7        of conduct.

 8   MR. D'AQUINO:  That's a different question.  Now he's

 9        asking for a topic covered by the rules of

10        conduct from your recollection, since you don't

11        have the document to read.

12   BY MR. GLAZER:

13   Q.   Do you recall any single topic from the rules of

14        conduct?

15   A.   I do not recall anything from the -- that

16        document at this time.

17   Q.   All right.  Let me show you the document.

18             Are you able to see the document on your

19        screen?

20   A.   Yes, aside from the portion that's just

21        obstructed due to the video windows.

22   Q.   Can you see a document that has a right-sided

23        exhibit tab that says Exhibit number 3?
```

44

| | | |
|---|---|---|
| 1 | A. | I can see the exhibit tag, yes. |
| 2 | Q. | All right.  That exhibit is up on your screen, is |
| 3 | | that correct? |
| 4 | A. | That is correct. |
| 5 | Q. | The top of the document says administration |
| 6 | | general order A dash 36, is that true? |
| 7 | A. | That's correct. |
| 8 | Q. | And the subject is rules of conduct, correct? |
| 9 | A. | Correct. |
| 10 | Q. | I'm going to ask you some questions about page |
| 11 | | one, paragraph two.  Page one, paragraph two, |
| 12 | | starts with each and every employee, is that |
| 13 | | correct? |
| 14 | A. | Correct. |
| 15 | Q. | Okay.  Does it read that each and every employee |
| 16 | | of the Erie County Sheriff's Office is a member |
| 17 | | of a team which works together with a primary |
| 18 | | objective of serving the residents of the County? |
| 19 | A. | That's correct. |
| 20 | Q. | So the primary function of a member of the |
| 21 | | sheriff's department is serving the residents of |
| 22 | | Erie County, is that correct? |
| 23 | A. | That is correct. |

45

```
 1   Q.  As a sheriff, are you required to be courteous to
 2       the public?
 3   A.  Yes.
 4   Q.  Okay.  Is there a specific guideline regarding
 5       courtesy in the rules of conduct?
 6   MR. D'AQUINO:  Well, if you want him to comment on
 7       that, I think you should allow him a chance to
 8       read this fourteen-page document, of which he's
 9       seen the top half of page one.  So if you want to
10       take a break for him to read it if you want to
11       ask him about it.
12   MR. GLAZER:  More power to you if that's what you
13       think, but it's my deposition, I'm going to ask
14       him how I see fit to ask him.
15   BY MR. GLAZER:
16   Q.  So my question is -- I'll try to ask you a very
17       simple question.  Do the rules of conduct contain
18       guidelines on being courteous to the public?
19   MR. D'AQUINO:  Okay.  So that's my objection, Mr.
20       Glazer.  You're asking him about an exhibit you
21       noted on the record but he has not had a chance
22       to read.
23   MR. GLAZER:  Okay.  Well, he testified earlier that
```

46

1          he received the exhibits this morning and that he

2          reviewed the exhibits.  I've asked him a

3          question, it's a fair question, it doesn't invoke

4          any privilege and it's certainly not palpably

5          improper.  So are you going to direct him not to

6          answer it or are you going to allow him to answer

7          it?

8    MR. D'AQUINO:  I'm not asking him not to answer.  I'm

9          asking you to give him a chance to read it since

10         you're asking a specific question about the

11         content of the document but he hasn't had a

12         chance to read the document yet.  Pretty routine

13         deposition approach.

14   MR. GLAZER:  Again, he testified earlier that he did

15         receive the document this morning, it was one of

16         the exhibits.  So I'm going to just ask my

17         question again.  And if we have to call the

18         judge, we'll call him.

19   MR. D'AQUINO:  Listen, Mr. Glazer.  It's a

20         fourteen-page document, he got those exhibits

21         briefly before the deposition, because that's

22         when you gave them to me, probably an hour

23         before, and I moved them to him by e-mail.  So I

47

```
 1      don't think he's memorized this fourteen-page
 2      document out of the other eleven exhibits that
 3      you provided us with about an hour before the
 4      deposition.  All I'm asking is if you're going to
 5      ask him does a document say such and such, let
 6      him read the document.
 7  MR. GLAZER:  I'm not -- go ahead.  I'm sorry.
 8  MR. D'AQUINO:  I'm done.
 9  MR. GLAZER:  I'm not asking him what it says.
10  MR. D'AQUINO:  I thought that's exactly what the
11      question was.
12  MR. GLAZER:  If I ask him what it says, I'll let him
13      see the document.
14  BY MR. GLAZER:
15  Q.  All I want to know is, do the rules of conduct
16      contain directives on courtesy?
17  A.  Yes.
18  MR. D'AQUINO:  And that is exactly the question.
19      Does this document, Exhibit 3, refer to what you
20      just asked him.  Let him read the document and he
21      can answer you.  That's all I'm asking.
22  MR. GLAZER:  And I'm saying no.  The question stands.
23  MR. D'AQUINO:  That's not fair at all.
```

48

1   MR. GLAZER:  Well, the fact that you --

2   MR. D'AQUINO:  You give him a document, an exhibit,

3       and say here it is but you can't read it, and now

4       answer and tell me if such and such is in it?  We

5       don't do it that way.

6   MR. GLAZER:  Was his yes on the record, Miss Simonin?

7   THE REPORTER:  Yes.

8   MR. GLAZER:  Okay.  That's all I need.  I can move on

9       now.

10  BY MR. GLAZER:

11  Q.  Mr. Achtyl, are there directives in the rules of

12      conduct on how sheriffs are supposed to respond

13      to requests for information or advice from the

14      public?

15  A.  Without looking at the document, I am not sure.

16  Q.  You caught on there.  So now I'm going to show

17      you the document.

18  A.  Thank you.

19  MR. D'AQUINO:  Excuse me.  There's no need for

20      comments like you caught on there.  And I think

21      you recognize that, so let's just knock that off

22      right now.

23  MR. GLAZER:  You know what I also recognize, is that

49

1     I'm asking a fair question that could have been

2     answered with an easy answer.  And you've

3     interrupted me now for about three minutes, so I

4     recognize that too.  Now I'm going to show him

5     the document.

6   MR. D'AQUINO:  I'm objecting to comments like you

7     caught on, and I ask that that be stricken from

8     the record.

9   BY MR. GLAZER:

10  Q.  I'm showing you now, Deputy Achtyl -- or, excuse

11      me, Mr. Achtyl, Exhibit 3 for identification.

12      Again, I'm going to scroll down to paragraph

13      twenty-seven.  Can you see paragraph twenty-seven

14      at the top of your screen?

15  A.  Yes.

16  Q.  Okay.  Does that paragraph say when any person

17      requests assistance or advice, makes a complaint

18      or report, either in person or by telephone, all

19      pertinent information shall be obtained in a

20      courteous and official manner and shall be

21      properly and judiciously acted upon in a manner

22      consistent with official procedures?  Is that

23      what it says?

50

1   A.   That's what the document says.

2   Q.   And that's part of the rules of conduct, is that

3        correct?

4   A.   Yes.

5   Q.   And you're bound by the rules of conduct when

6        you're an Erie County Sheriff, is that also

7        correct?

8   A.   There are rules of conduct, yes.

9   Q.   Okay.  Let's scroll up to twenty-six.  Do you see

10       twenty-six there, it says courtesy?

11  A.   Yes.

12  Q.   Does it say employees shall be courteous to the

13       public?

14  A.   Yes.

15  Q.   So as an Erie County Sheriff, you're supposed to

16       be courteous to the public, correct?

17  A.   That's -- yes.

18  Q.   It's one of your duties?

19  A.   That's one of the rules of conduct, yes.

20  Q.   Do you disagree with that, you shouldn't have to

21       be courteous to the public?

22  A.   I would say it warrants the situation at hand.

23  Q.   I don't understand what you mean by that.  So

51

1      there's situations where if a citizen comes up

2      and asks you for information, you should be

3      discourteous?

4  MR. D'AQUINO:  Object to the form.

5  THE WITNESS:  I'm going to say in regards to my

6      answer that if a citizen comes running at you

7      with a shotgun yelling he's going to kill you, I

8      don't think I'm going to say sir, please put the

9      gun down and be courteous.  I think that

10     situation dictates that rule of conduct.

11  BY MR. GLAZER:

12  Q.  All right.  Did I ask you anything about a man

13      running at you with a shotgun?

14  A.  You asked me in regards to the question of rules

15      of conduct in regards to courtesy, and I

16      indicated that my understanding is that situation

17      dictates that.

18  Q.  But did I ask you -- I'm sorry.  Again, just so

19      that we're clear, and this is a pretty easy

20      question, did I ask you anything about a man with

21      a shotgun?

22  A.  You did not.  You asked me -- the question that I

23      believe you asked me, if it could be read back to

52

1      me or you could restate it, indicated if I -- I
2      believe the way you stated it was in regards to
3      courtesy and being courteous at all times.
4   Q.  Okay.  My next question is, does paragraph
5      twenty-six indicate that employees shall control
6      their tempers and exercise the utmost patience
7      and discretion?  Does it say that?
8   A.  It does say that, yes.
9   Q.  You're bound by that sentence when you're a
10      member of the Erie County Sheriff's Department,
11      is that right?
12   A.  I would say that is the rule of conduct that is
13      listed there.
14   Q.  So that is yes?
15   A.  The rule of conduct, that's what it says.   It
16      says -- yes.
17   Q.  Okay.  The question is, if you're an Erie County
18      Sheriff, you're bound by that sentence, is that
19      correct?
20   A.  Maybe if you could rephrase it in regards to
21      bound.
22   Q.  Okay.  Are you supposed to follow this direction
23      as an Erie County Sheriff?

53

1   A.  In ideal situations, yes.

2   Q.  And are you supposed to control your temper and

3       exercise the utmost patience and discretion and

4       not engage in argumentative discussions, even in

5       the face of extreme provocation?  Is that a fair

6       reading of what it says in paragraph twenty-six?

7   A.  Yes, that's what it says.

8   Q.  Does it say in the performance of their duties,

9       employees shall not use coarse, violent, profane

10      or insolent languages -- language, rather, or

11      gestures and shall not express any prejudice

12      concerning race, religion, politics, national

13      origin, lifestyles or similar personal

14      characteristics?  Did I read that properly?

15  A.  Yes.

16  Q.  Okay.  Have you been provided with any training

17      materials from the Erie County Sheriff's

18      Department that I have not asked you about or

19      that we have not discussed?

20  A.  Maybe if you could rephrase your question.  I

21      have had a lot of --

22  Q.  It's a bad question.  It's a bad question.  Let

23      me ask you another question.  Have you had

54

```
 1      firearms training?
 2   A.   Yes, I have.
 3   Q.   Have you had baton training?
 4   A.   Yes, I have.
 5   Q.   Have you had defensive tactics training?
 6   A.   Yes.
 7   Q.   Have you had de-escalation training?
 8   A.   Yes.
 9   Q.   When was the last time you had de-escalation
10        training?
11   A.   I am not sure when that would be.
12   Q.   Was it within the last five years?
13   A.   I am not sure.
14   Q.   Was it within the last ten years?
15   A.   It would be probably sometime over the course of
16        my employment as a police officer.  I am not sure
17        when.  I'm not sure if it was as part of the --
18        part of a separate class in the academy or if it
19        was something related to multiple facets training
20        day at the sheriff's office.  I'm not sure when
21        it was.
22   Q.   All right.  So is your answer that at some point
23        in the last twenty-seven years you've had
```

1      de-escalation training, you just don't know when?

2  A.   Yes.

3  Q.   Are you familiar with the term use of force

4      continuum?

5  A.   Yes, I am.

6  Q.   What does that mean?

7  A.   Use of force continuum, at one time the way it

8      was trained to me was a triangle.  It started off

9      at the bottom of the triangle, if you can picture

10     a triangle with various -- whether it be verbal

11     commands, and then you would move up the triangle

12     to various other techniques while using your

13     hands, and then into necessary -- whether it was

14     baton or some sort of a non or less lethal use of

15     force category.  Then up to the top of the

16     pyramid, which would have been use of deadly

17     physical force.

18  Q.   Directly related to the use of force continuum,

19     would you agree that there are certain levels of

20     force, as you just described?

21  A.   Yes.

22  Q.   Okay.  And if I told you that in some schools of

23     thought there are four levels of force and in

56

1    some schools of thought there are five levels of

2    force, would you disagree with that?

3  A.  I would not.

4  Q.  And if I told you that the first level of force

5    was the mere presence of law enforcement, would

6    you agree with me?

7  A.  Yes.

8  Q.  Okay.  And the second level would be verbal

9    commands, is that fair?

10 A.  Yes.

11 Q.  And then the third and fourth levels I suppose

12    together are hand control and less lethal force,

13    is that fair?

14 A.  I believe so.  Without looking at an actual use

15    of force continuum, yes, I would say you are

16    somewhat correct, yes.

17 Q.  All right.  Well, am I somewhat correct or am I

18    correct?

19 A.  From what I recall, I believe that is, that is

20    part of the force continuum.  I'm just not

21    certain how they stack up on the pyramid when it

22    comes to -- obviously the pyramid is -- can be

23    rapidly evolving at various times.

57

1    Q.   Do we agree that the top level of force, the most

2         serious level of force, is deadly physical force?

3    A.   Yes.

4    Q.   Are you familiar with the term positional

5         asphyxia?

6    A.   Yes, I am.

7    Q.   Would you tell us what it is?

8    A.   It is the position that a person is put in that

9         they could lose their ability to breathe.

10   Q.   Did you receive training in positional asphyxia

11        as part of your employment with the Erie County

12        Sheriff's Department?

13   A.   I believe so, yes.

14   Q.   Do you know when that was?

15   A.   I do not.

16   Q.   Was it within the last five years?

17   A.   I am not sure when it was.

18   Q.   Was it within the last ten years?

19   A.   I honestly could not answer that question.  I'm

20        not sure when it was.  I don't want to take a

21        guess at.

22   Q.   That's a fair point that we should probably talk

23        about.  I'm not asking you to guess and I'm not

58

1          asking you to speculate, so I don't remember and

2          I don't recall are perfectly reasonable answers.

3          Okay?

4     A.   Okay.

5     Q.   As lawyers we have what are called continuing

6          legal education, we have to go on a yearly basis

7          for sort of follow-up trainings.  As a member of

8          the Erie County Sheriff's Department, did you

9          have any sort of yearly follow-up trainings or

10         follow-up trainings at some other interval that

11         were required?

12    A.   Yes.

13    Q.   Can you describe those, please?

14    A.   The -- usually the first training was, if I

15         recall, sometime in January, based upon schedule.

16         I -- when we started working a twelve-hour shift,

17         it was a twelve-hour training day, maybe a

18         ten-hour training day, I'm not sure exactly the

19         length, but it would start off with anything in

20         regards to policy and procedure updates, various

21         topics.  It would vary year to year.  Whether it

22         was first aid or CPR training or whatever the

23         training may be, it would be utilized into that

59

1    first phase of training, I believe in January or

2    February.  Usually the second phase was firearms

3    training, from what I recall.  And then there

4    would have been a third phase of training that

5    would have dealt with the range and firearms,

6    whether it was use of the -- training on the

7    shotgun or the rifle.

8         So usually there was three, from what I

9    recall, three phases throughout the year at the

10   sheriff's office.

11 Q.  So can we agree that you had follow-up training

12   on a yearly basis of some sort?

13 A.  Yes.

14 MR. D'AQUINO:  Mr. Glazer, I'm sorry to interrupt.

15   Is this a good time for a short break, five

16   minutes?

17 MR. GLAZER:  Sure.  Fine.

18 THE VIDEOGRAPHER:  One-thirty-six p.m.  We are going

19   off the record.

20       (Whereupon, a short recess was then taken.)

21 THE VIDEOGRAPHER:  It is one-forty-three p.m.  We are

22   back on the record.

23       (Whereupon, the above-requested previous

60

1      question and answer were then read back by the

2      reporter.)

3  BY MR. GLAZER:

4  Q.   Mr. Achtyl, are you generally familiar with the

5      New York State Penal Law?

6  A.   Yes.

7  Q.   As part of your employment with the Erie County

8      Sheriff's Department, did you receive training in

9      the Penal Law of New York State?

10 A.   Yes.

11 Q.   Can you tell me what that training entailed?

12 A.   It would include refreshers.  If you're inquiring

13     in regards to Article 35, yes.

14 Q.   Well, we'll talk about Article 35 in some detail

15     later on, but would you agree that it's important

16     for a deputy sheriff to have some familiarity

17     with the New York State Penal Law?

18 A.   Yes.

19 Q.   That's why they train you, fair?

20 A.   Yes.  I guess I'm just trying to understand your

21     question.  Can you rephrase it?  Usually the

22     training for the Penal Law, the majority of it is

23     done in the academy.

61

1   Q.   That's my question.  So let me try to make it a
2        little more easy to understand.  What training
3        did you receive in the academy regarding the New
4        York State Penal Law?
5   A.   We received a certain number of hours in regards
6        to the Penal Law and the various sections of the
7        Penal Law.
8   Q.   Okay.  During those hours, what do they tell you?
9   A.   There's various discussion in regards to what --
10       certain laws, how they apply, how certain things
11       pertain, how -- what -- in regards to like the
12       use of force section and what is considered use
13       of force and various -- how to -- what laws can
14       be -- force can be used against.  It's just
15       general training on the Penal Law.
16  Q.   Do they talk to you about probable cause to
17       arrest?
18  A.   Yes.
19  Q.   Can you tell me what they tell you about probable
20       cause?
21  A.   That you have a reason to arrest somebody.
22  Q.   Is a more specific statement that you have to
23       have probable cause to make an arrest in New York

62

1       State?

2   A.   Yes.

3   Q.   Do you know what the term probable cause means?

4   A.   Yes.

5   Q.   What does it mean?

6   A.   You have a reason to effect an arrest.

7   Q.   That's your understanding of the term probable

8        cause, a reason to arrest?

9   A.   Yeah.  You have a reason to arrest somebody.

10       There's evidence or there's something that

11       substantiates the arrest.

12  Q.   Does the Erie County Sheriff's Department require

13       a deputy sheriff to be familiar with the Penal

14       Law?

15  A.   I would have to say yes.

16  Q.   Does the Erie County Sheriff's Department require

17       deputy sheriffs to have familiarity with the New

18       York State criminal case law?

19  A.   Are you asking for Criminal Procedure Law?

20  MR. D'AQUINO:  No.  Excuse me.  Ken, just tell him

21       you don't understand the question.  Don't

22       rephrase it yourself.

23  THE WITNESS:  All right.  Fair enough.

63

1   BY MR. GLAZER:

2   Q.   Do you understand the question?

3   A.   No.  If you could rephrase it.

4   Q.   Okay.  You were a deputy sheriff for decades, is

5        that fair?

6   A.   Yes.

7   Q.   And you know that criminal cases are litigated up

8        through the courts, is that also true?

9   A.   Yes.

10  Q.   All right.  And you know that sometimes cases go

11       up to Appellate Courts and there are appeals and

12       things like that, correct?

13  A.   Correct.

14  Q.   And do you know that sometimes those cases and

15       the decisions made by those courts color what

16       you're allowed and not allowed to do as a law

17       enforcement officer?

18  A.   Correct.

19  Q.   So what I'm asking you is, are you required by

20       the sheriff's department to be familiar with

21       those cases that say what you can and cannot do?

22  A.   Do --

23  Q.   It's not a trick question.  I'm just asking --

64

1    A.   I understand it's not a trick question.  I guess
2         I'm just trying to explain it in a way -- you're
3         kind of asking a blanket, open-ended question.
4    Q.   Let me rephrase the question and try to make it
5         simpler.  Does the sheriff's department require
6         you as a deputy sheriff to be familiar with
7         developments in criminal case law?
8    A.   They provide updates on case law from time to
9         time, yes.
10   Q.   All right.  Let me get you back to my question.
11        My question is, do they require you to monitor
12        developments of criminal case law in New York
13        State, yes or no?
14   MR. D'AQUINO:  Object to the form.
15   BY MR. GLAZER:
16   Q.   You can answer.
17   A.   I'm sorry.  Could you rephrase?  Not rephrase it
18        but repeat the question?
19   Q.   Yes.  Does the sheriff's department require
20        deputy sheriffs to be familiar with developments
21        in New York State criminal case law?
22   A.   With the updates they provide us, yes.
23   Q.   So they provide you updates of criminal case law?

65

1    A.  If things change, from time to time, yes.

2    Q.  So they provide you with updates.  And are you

3        expected to read the updates that they provide

4        you?

5    A.  Yes.

6    Q.  All right.  So can we agree, then, that the

7        sheriff's department does provide you with

8        updates of New York State criminal case law?

9    A.  Yes.

10   Q.  Okay.  And that you have to read those updates so

11       you'll know what you can and cannot do?

12   A.  Correct.

13   Q.  Just give me one second.  I have to try to pull

14       up an exhibit.

15           I'm showing you what's been marked as

16       Deposition Exhibit 4 for identification.  Can you

17       see the top half of the first page up on your

18       screen?

19   A.  Yes.

20   Q.  Does that say Exhibit 4 on the right-hand side?

21   A.  I believe it says 4, yes.

22   Q.  Does the subject state Erie County Sheriff's

23       Office training procedures?

66

1   A.   Yes.

2   Q.   I'm going to scroll down to page six of the

3        document.   Do you see the top of the page where

4        it says C?

5   A.   Yes.

6   Q.   All right.   I'm going to read this, and tell me

7        if I'm reading it correctly.   All employees shall

8        be required to complete a minimum of twenty-one

9        hours of annual in-service training which may

10       address the follow topics depending upon their

11       individual job assignments.   Number one, annual

12       review of statutory or case laws affecting law

13       enforcement, jail operations, civil enforcement,

14       et cetera.

15           Did I read that properly?

16  A.   Yes.

17  Q.   So annually there's a review of statutory or case

18       law affecting your area of law enforcement, is

19       that fair?

20  A.   Yes.

21  Q.   And number two, is there also an agency policy on

22       the use of force, including the use of deadly

23       force, that you have to refresh yourself on every

```
 1        year?
 2   A.   I would say yes, but it's part of the training
 3        that they provide to you.
 4   Q.   But the answer to my question is yes?
 5   A.   Yes.
 6   Q.   Well, let me ask you this.  Is it important for a
 7        law enforcement officer to be able to properly
 8        determine when a citizen has committed a crime?
 9   A.   Yes.
10   Q.   And is it likewise important for a law
11        enforcement officer to be able to determine when
12        a citizen has not committed a crime?
13   A.   Yes.
14   Q.   Do you agree with me that a law enforcement
15        officer cannot make an arrest unless there is a
16        violation or a crime committed as regards the
17        Penal Law of New York State?  Was that a
18        confusing question?
19   A.   It was kind of confusing because there's other
20        things than just the Penal Law.
21   Q.   Well, is it fair to say that concerning the New
22        York State Penal Law, you can't arrest somebody
23        unless they commit a non-criminal violation or a
```

68

| | | |
|---|---|---|
| 1 | | crime? |
| 2 | A. | Correct. |
| 3 | Q. | Okay.  Can you tell us the difference between a |
| 4 | | violation and a crime? |
| 5 | A. | A violation level offense has to do with the fine |
| 6 | | and the number of days they may spend in jail |
| 7 | | versus being -- it's a non-criminal offense |
| 8 | | versus being a criminal matter, and then your |
| 9 | | serious criminal matters. |
| 10 | Q. | Okay.  So can we agree that a violation of the |
| 11 | | New York State Penal Law is not even a crime? |
| 12 | A. | That is correct. |
| 13 | Q. | Unserious, true? |
| 14 | A. | I would say it has -- there's a reason why it |
| 15 | | exists.  Is it as serious as a misdemeanor or a |
| 16 | | felony?  No, it is not. |
| 17 | Q. | So on the grand scale of violations, |
| 18 | | misdemeanors, felonies, it's the least serious, |
| 19 | | correct? |
| 20 | A. | Correct. |
| 21 | Q. | Is there any level of offense that is lower than |
| 22 | | a violation? |
| 23 | A. | Are you referring to just the Penal Law? |

69

1  Q.  Any law in New York State.

2  A.  Yes, there is.

3  Q.  Which is?

4  A.  An infraction.

5  Q.  So a traffic infraction, a speeding ticket,

6      literally is the only level of offense lower than

7      a violation in New York State?

8  A.  To get technical, yeah.  You have ordinances and

9      infractions, yes.

10 Q.  Ordinances are town laws, village laws?

11 A.  Correct.

12 Q.  Walking down the street with an open container of

13     beer is an ordinance usually, is that fair?

14 A.  Yes.

15 Q.  Did you ever walk down a street with an open

16     container of beer yourself?

17 MR. D'AQUINO:  Object to the form.  Excuse me, Ken.

18     You've got to hold on so I can object.

19 THE WITNESS:  Sure.  Okay.

20 MR. D'AQUINO:  What does that have to do with

21     anything?

22 MR. GLAZER:  I'm asking him about ordinances and he's

23     telling me what's serious and not serious, so I

70

 1       think it's relevant to ask him if he's ever done

 2       it.

 3   MR. D'AQUINO:  His conduct in this case is

 4       categorized and characterized by the complaint

 5       against him, it doesn't have anything to do with

 6       whether he's walked down the street with an open

 7       can of beer.  So I don't understand the question,

 8       why it would be asked.

 9   MR. GLAZER:  Well, I guess with all due respect, it's

10       not my job to explain to you why I'm asking the

11       questions.  So I'll just ask you, are you

12       directing him not to answer it or can I move on?

13   MR. D'AQUINO:  It is your job to ask relevant

14       questions.  And whether he's ever walked down the

15       street with an open can of beer has nothing to do

16       with this case, I think we can agree on that

17       point.  So why would you ask him that question?

18   MR. GLAZER:  We can't agree on that point.  And at

19       this point I'm asking you just to either direct

20       him not to answer the question or to finish your

21       objection so that I can move on with my

22       examination.

23   MR. D'AQUINO:  I think you are beyond the proper

71

1    range of questioning to ask him an open-ended
2    question about his personal conduct at any point
3    in time in his life that has nothing to do with
4    your complaint.
5   MR. GLAZER:  Is that a direction not to answer the
6    question?
7   MR. D'AQUINO:  Yes.
8   MR. GLAZER:  Okay.  Miss Simonin, could you index
9    that for a ruling from the Court?
10  THE REPORTER:  Yes.
11  MR. GLAZER:  Thank you.
12  BY MR. GLAZER:
13  Q.  Mr. Achtyl, can we agree that a sheriff cannot
14   arrest a citizen simply because the citizen made
15   the sheriff angry?
16  A.  Yes.
17  Q.  Is it a crime to make a sheriff angry?
18  A.  Is it a crime to make the sheriff angry, is that
19   the question?
20  Q.  The question is, is it a crime to make a sheriff
21   angry?
22  A.  Maybe if you could rephrase that, because I think
23   there's crimes that are committed that could make

72

```
 1        anyone angry.
 2   Q.   That's not my question and I won't rephrase it,
 3        but I will ask it again.  My question is, is it
 4        in any way violative of the New York State Penal
 5        Law to make a sheriff angry in and of itself?
 6   A.   Not in the Penal Law, no.
 7   Q.   Is it a violation of something else to make the
 8        sheriff angry -- or, a sheriff angry?
 9   A.   No.
10   Q.   So making a sheriff angry is not against the law?
11   A.   That is correct.
12   Q.   Making any law enforcement officer angry is not
13        against the law?
14   A.   That is correct.
15   Q.   Not a felony, is that correct?
16   A.   Correct.
17   Q.   Not a misdemeanor, true?
18   A.   Correct.
19   Q.   Not even a violation, is that fair?
20   A.   Fair.
21   Q.   Is it a crime in New York State to use a swear
22        word toward a sheriff?
23   A.   No.
```

73

1   Q.  You referenced earlier in your testimony Article

2      35 of the New York State Penal Law.  And I'll

3      take that to mean that you are generally familiar

4      with Article 35?

5   A.  For the most part, yes.

6   Q.  Okay.  And again, I'm going to ask you some

7      questions about this article.  And if you can't

8      answer the questions without me pulling it up,

9      then I'll pull it up.

10  A.  Okay.

11  Q.  So you're allowed to say I don't recall.

12  A.  Fair enough.

13  MR. D'AQUINO:  Just so we can get through that, my

14     only concern is that the question reflects

15     whether you're asking him from his recollection

16     or just what does the document say.  And if it's

17     the latter, then just let him see it.

18  MR. GLAZER:  I understand what you're saying.

19  BY MR. GLAZER:

20  Q.  When you were a sheriff, Mr. Achtyl, were you

21      required to familiarize yourself with Article 35?

22  A.  Yes.

23  Q.  What's Article 35 about?

74

1   A.   Justification of use of force in New York State.

2   Q.   So Article 35 applies to every law enforcement

3        officer in New York State, is that fair?

4   A.   That's fair.

5   Q.   So it applies to a deputy sheriff in Erie County,

6        is that true?

7   A.   Yes.

8   Q.   And just so that we're clear, if I said to you

9        Erie County Sheriff's, the Erie County Sheriff's

10       Department, does require you to be familiar with

11       Article 35, would you agree with that?

12  A.   Yes.  The Erie County Sheriff's Office would

13       require you to be familiar with Article 35.

14  Q.   When you started with the sheriff's department,

15       what was your assignment, were you patrol, were

16       you jail or something else?

17  A.   I was assigned to patrol.  I believe my first

18       assignment was orientation, as with any job,

19       paperwork and assignment of equipment.  I believe

20       there was a week-long orientation process.  From

21       there I was then assigned to the Rath Building

22       for a certain period of time downtown as a patrol

23       officer, which was probably within maybe three

75

1      months.  And then from there I was assigned to

2      patrol, still assigned to patrol, in the various

3      districts throughout the county.

4   Q.  How long were you a patrol officer?

5   A.  Nineteen years.

6   Q.  So that would have been from 2000 to 2019?

7   A.  Yes.

8   Q.  What happened in 2019?  Is it just this incident

9      or is it something else?

10  A.  There was a few reasons that I chose.  But I

11     guess getting back to your question, what is your

12     question?

13  Q.  My question is, how did your assignment change in

14     2019 from patrol to something else?

15  A.  I was always a patrol officer with the sheriff's

16     office.  At a certain point in time in I believe

17     -- I'm not sure of the specific year, but I was

18     assigned to the domestic violence office as a

19     domestic violence sheriff's deputy and followed

20     up on domestic violence and dealt with victims of

21     domestic violence reports.  That would have been

22     roughly, roughly six years.  In addition to being

23     a patrol officer, I was also assigned to the

76

```
 1        underwater recovery team as a level -- PADI level
 2        three rescue and recovery scuba diver.
 3   Q.   Hold on one second.  PADI is P-A-D-I?
 4   A.   Correct.  Professional Association of Divers
 5        Institute I believe it is.
 6   Q.   Sorry for interrupting you.  Go ahead.
 7   A.   So those for the most part were all under patrol,
 8        as a patrol deputy.
 9   Q.   Okay.  Can you tell me what your duties were as a
10        patrol deputy?
11   A.   General patrol of a specific area or a district,
12        enforcement of laws, traffic laws, answering 911
13        calls and non-emergency calls, enforcement of
14        laws or ordinances within that town or village.
15        That generally sums up what -- you would follow
16        up and also investigate certain crimes or
17        offenses.  That's, generally speaking, the job of
18        a patrol officer.
19   Q.   Is it fair to say that you handled many, many,
20        many traffic stops?
21   A.   Yes.
22   Q.   Would you say thousands?
23   A.   I would say, yes.
```

77

1   Q.  Were you ever assigned to the jail?

2   A.  No, I was not.

3   Q.  Have you worked continuously for the Erie County

4       Sheriff from June of 2000 until the time that you

5       resigned in 2020, I believe it was?

6   A.  I resigned in September of 2019.  So I worked

7       nineteen years for the sheriff's office, yes.

8   Q.  Nineteen.  I apologize.  So you worked for the

9       sheriff continuously for that nineteen years?

10  A.  Yes.

11  Q.  During that time, did you ever get a promotion?

12  A.  A promotion to a different rank, no.

13  Q.  Did you get a raise?

14  A.  Raises were based -- contractual.

15  Q.  Did you receive appropriate raises commensurate

16      with your contract with the County?

17  A.  Yes.

18  Q.  You said that you've made thousands of traffic

19      stops in your career, is that accurate?

20  A.  I would say yes.

21  Q.  In your experience, how long should a stop

22      related to a simple traffic infraction take from

23      beginning to end?

78

1   A.   That's kind of an open-ended question.

2   Q.   I understand that.

3   A.   I mean, I will give you my -- I guess I will give

4        you my understanding of it.  It should be, based

5        upon the situation at hand, it should be as short

6        as possible.

7   Q.   Okay.

8   A.   But things do come up in that time that you have

9        a person stopped.

10  Q.   All right.  Well, let me ask you about a speeding

11       ticket.  How long should a driver speeding take?

12  A.   I would say probably within fifteen minutes, as

13       long as you can get the information back, as long

14       as dispatch is not busy.  There's various things

15       that apply I guess to your question.  It's not --

16       hopefully it can be done within fifteen minutes.

17  Q.   And again, it's not a trick question.

18  A.   Sure.

19  Q.   And I understand that every traffic stop is not

20       the same, but I appreciate the answer that you

21       gave.  Correct me if I'm wrong.  Unless some

22       aggravating thing happens, that a routine traffic

23       stop should take in the area of fifteen minutes?

79

1   A.   A routine traffic stop, minus any kind of
2        additional things that could arise, whether it's
3        equipment or whether it's computer related,
4        dispatch related, yes, fifteen minutes.
5   Q.   How common is it in your experience for a traffic
6        stop to take over an hour?
7   A.   It could happen, yes.
8   Q.   How common is it?
9   A.   How common?  It's based upon the, it's based upon
10       the circumstances.  It's based upon what's going
11       on during that traffic stop.  If it's a DWI, it
12       could obviously take longer.  If it's a situation
13       where you have a person that's not cooperating or
14       listening to what's going on, it definitely can
15       take longer.  Yes, a traffic stop could last that
16       long.
17  Q.   All right.  Let's just take simple traffic
18       infractions like speeding tickets and failure to
19       yield and things like that.
20  A.   Sure.
21  Q.   With regard to those infractions, how many of
22       those out of ten would you expect to take an hour
23       or more on average?

80

1    A.   I really can't answer that question.  It's based

2         -- I mean, if you're saying it's a simple traffic

3         stop for a speeding ticket, I would say, if it's

4         simple as you say, fifteen minutes.

5    Q.   Okay.  Do you know a woman named Julie Marinaro?

6    A.   Yes, I do.

7    Q.   Do you remember pulling over Miss Marinaro with

8         her nanny and two children for a traffic

9         infraction after a sledding outing in 2014?

10   A.   Driving the wrong way out of Chestnut Ridge Park

11        coming straight at me, yes, I do.

12   Q.   A traffic infraction?

13   A.   Yes.

14   Q.   She didn't hit you, is that correct?

15   A.   No, she did not.

16   Q.   No one was injured, is that true?

17   A.   That's correct.

18   Q.   And am I correct that she was with a nanny and

19        two children?

20   A.   I believe so, yes.

21   Q.   Okay.  Did Miss Marinaro have any outstanding

22        warrants?

23   A.   From what I recall, no.

81

1   Q.   If I told you that Miss Marinaro was at the side

2        of the road with her nanny and children for over

3        an hour during that traffic stop, would you have

4        reason to disagree with that?

5   A.   I recall the traffic stop and I knew it took some

6        time because of Mrs. Marinaro's actions.

7   Q.   Okay.  So if I told you that it took an hour or

8        more, would you have a reason to disagree with

9        that?

10  A.   Under those circumstances, no, I don't have a

11       reason to disagree with you under -- in regards

12       to that.

13  Q.   Do you remember Miss Marinaro asking you to use

14       the bathroom?

15  A.   Not that I recall.  No, I don't.

16  Q.   Well, I guess I'll skip ahead, then, and ask you

17       if you remember her urinating on herself?

18  A.   No, I do not.

19  Q.   Okay.  If I told you that she did ask you to use

20       the bathroom and that you refused, would you have

21       a reason to disagree with that?

22  A.   If -- I do not.  No, I don't.  I don't believe --

23       I don't recall telling her she could not use the

82

1      bathroom.  There was no bathroom around to use,

2      so I would have to say that I did not tell her

3      she couldn't go to the bathroom.

4  Q.  Where was the stop again?

5  A.  It was at the entrance to Chestnut Ridge Park in

6      Orchard Park, New York.

7  Q.  How many times have you been to Chestnut Ridge

8      Park?

9  A.  Many times.

10  Q.  Are you familiar with the shelter right at the

11      front where there's a lavatory?

12  A.  Yes.

13  Q.  So there is a bathroom at Chestnut Ridge Park, is

14      that correct?

15  A.  There's many bathrooms at Chestnut Ridge Park,

16      yes.  After hours, I'm not sure what the status

17      of -- if they're locked or not.

18  Q.  What was the traffic infraction for?  I'm sorry?

19      Did I miss something?  Did I cut you off, Mr.

20      Achtyl?

21  A.  No, you didn't cut me off.  I wasn't sure if

22      someone else was talking.

23  Q.  What was the traffic infraction that you stopped

83

```
 1        Miss Marinaro for violating on that day?
 2   A.   If memory serves me correctly, I stopped her --
 3        if it was her babysitter driving the vehicle, for
 4        driving the wrong way out of the one-way
 5        entrance.
 6   Q.   So it sounds like you remember this incident
 7        well.  Is that correct?
 8   A.   I remember the incident, yes.  I can't say I
 9        remember it well.
10   Q.   Well, do you remember that Miss Marinaro was a
11        passenger?
12   A.   Yes.
13   Q.   And do you remember that the babysitter was
14        driving?
15   A.   Yes, I do.
16   Q.   And do you remember that there were two little
17        kids in the back?
18   A.   I do, yes.
19   Q.   Do you remember at some point taking Miss
20        Marinaro out of the vehicle and putting her in
21        the back of your squad car in front of her kids?
22   A.   I remember Miss Marinaro going in and out of her
23        vehicle numerous times, going into the trunk
```

84

```
1        numerous times, after she was informed not to go
2        into the trunk nor rummage through her trunk, as
3        it created some officer safety issues.  And I do
4        recall that at that point in time.  Eventually, I
5        believe at the time it was my sergeant who showed
6        up and instructed me further on the outcome of
7        that scenario.
8   Q.   All right.  So referring you back to my question,
9        do you recall at some point bringing Miss
10       Marinaro into the back of your squad car in front
11       of her kids?
12  A.   I don't recall bringing her -- at some point,
13       yes, she was brought into the back of the patrol
14       car, yes.
15  Q.   Do you recall taking her to jail that day?
16  A.   I am not sure if it was myself or if it was the
17       other deputy who took her to jail.  I'm not sure.
18  Q.   Do you recall -- I'm sorry.  Go ahead.
19  A.   I don't recall.
20  Q.   Do you recall charging her with a crime?
21  A.   I believe I recall charging her with obstruction,
22       yes.
23  Q.   So she got charged with a crime, at some point
```

1      she got taken to jail, is that correct?

2   A.  Correct.

3   Q.  You don't have any reason to disagree that she

4       urinated on herself, is that correct?

5   A.  I am not sure what she did to herself.  I don't

6       know.  I don't remember that.

7   Q.  Okay.  If I told you that she alleges that she

8       asked you to go to the bathroom, you said no, and

9       then she urinated on herself, would you have a

10      reason to disagree with that?

11  A.  No.

12  Q.  You indicated to us that she was charged with a

13      crime and taken to jail.  Do you know what

14      happened to the charges against her?

15  A.  I do not, no.

16  Q.  Would it surprise you to learn that they were all

17      dismissed?

18  A.  Not that I'm aware of, no.

19  Q.  Well, I'm not asking you what you're aware of.

20      I'm asking you if I told you that --

21  A.  Would it surprise me?  Charges get dismissed all

22      the time for various reasons, and I am not privy

23      to why charges are dismissed and we really don't

86

1      get a follow-up with what happens with our

2      charges.

3  Q.  So if I told you that all of those charges were

4      dismissed, you'd have no reason to disagree with

5      me, would you?

6  A.  I would not, no.

7  Q.  Okay.  And that's because charges get dismissed

8      all the time for a variety of reasons, as you've

9      testified, correct?

10 A.  That's correct.

11 Q.  Do charges get dismissed sometimes if the DA

12     believes that they're insufficient or improper?

13 A.  Could be, yes.

14 Q.  Do charges get dismissed if the DA determines

15     that the individual didn't do what the officer

16     claims they did, does that happen?

17 A.  I believe anything would be possible, yes.  I

18     don't know what the -- where you're trying to go

19     at with your question.

20 Q.  Do you know a retired corrections officer named

21     Timothy Michaels?

22 A.  I do not, no.

23 Q.  Well, do you recall pulling over a woman named

87

1      Michelle Grover in August of 2010?

2   A.   I do not, no.

3   Q.   And August of 2010 we've established was sort of

4        a rough period for you, is that right, you were

5        getting divorced, et cetera?

6   MR. D'AQUINO:  Object to the form.

7   BY MR. GLAZER:

8   Q.   You can answer if you understand.

9   A.   Yes.  That's the -- yes.

10  Q.   And I'm not trying to delve into your personal

11       life.  I'm just saying -- I've never been

12       divorced, but I assume that the period of time

13       during which you're getting divorced is a rough

14       time.  Is that fair?

15  A.   For me personally, if you're asking that

16       question, yes, it was.

17  Q.   Okay.  Let me give you some more information

18       about Michelle and let's see if you can remember

19       who she is.  Do you remember pulling over a woman

20       named Michelle Grover on Waverly Road in August

21       of 2010?  Miss Grover would have had her son

22       Zander, who was four years old, in the car at the

23       time.

88

1    A.   I do not remember, no.

2    Q.   Okay.  And if I told you that Michelle was

3         stopped for speeding on Waverly near Pinewood in

4         the Village of Springville, would you recall

5         that?

6    A.   As we established earlier, there was thousands

7         and thousands of traffic stops that I conducted.

8         Specifically, I don't recall the stop that you're

9         speaking of.

10   Q.   Okay.  Is Waverly near Pinewood in the Village of

11        Springville an area that you've patrolled over

12        the course of your employment with the sheriff's

13        office?

14   A.   Waverly Street, yes.  I'm not sure if there's --

15        if Pinewoods (sic) is down there.  It's probably

16        a smaller street maybe.  I'm not sure.

17   Q.   Okay.  But yes to Waverly?

18   A.   Yes.

19   Q.   And yes to Springville?

20   A.   Yes.

21   Q.   Okay.  Well, if I told you that Miss Grover was

22        pulled over and you determined -- strike that for

23        one second.  Let me give you some background.

89

1       I'm trying to give you more information to see if
2       you will remember this.  If I told you that Miss
3       Grover was found by you to have an outstanding
4       warrant for a traffic ticket, do you recall that?
5   A.  I don't recall the stop.
6   Q.  If I told you that retired Corrections Officer
7       Timothy Michaels is Miss Grover's father, would
8       you remember that?
9   A.  No, I would not.
10  Q.  Okay.  If I told you that Mr. Michaels arrived on
11      the scene and asked you if he could take the
12      child home since you were going to take Miss
13      Grover to jail, do you recall that?
14  A.  I don't recall your specific instance.  However,
15      if the person you're referring to has a warrant,
16      then usually it's out of our hands, that person
17      does go to jail or to the agency that's -- that
18      wants them.  And if a child is involved, the
19      child is eventually turned over to a family
20      member, once that family member -- it can be
21      established who that family member is and if they
22      have legal reason to have that child.
23  Q.  All right.  Fair enough.  So let me ask you this

90

1    as a follow-up.  If you pull over a driver and

2    determine that that driver is going to jail and

3    there is a four-year-old in the back seat, if you

4    can determine that the four-year-old's

5    grandfather has shown up, would it be within your

6    discretion to allow the four-year-old to leave

7    with his grandfather?

8 A.  Yes.  When it's a proper and safe time to do so,

9    yes.

10 Q.  Okay.  So as long as it's proper and safe to do

11    so, it would be appropriate in that circumstance

12    to allow a four-year-old child to leave with his

13    grandfather?

14 A.  Yes.  Usually it would be directed by the

15    supervisor, who would be notified since there was

16    a warrant, and that they would be advised and it

17    would be properly recorded and dispatched as to

18    what's going on with the child who's with that

19    parent at that time.

20 Q.  Do you know a deputy named Deputy Neil, N-E-I-L?

21 A.  Deputy Neil Held, yes.

22 Q.  If I told you that that deputy was present, would

23    that refresh your recollection at all?

91

1  A.  In regards to which stop are you talking about?

2      The Orchard Park stop, Deputy Neil Held was

3      present.  I believe at the time he was either the

4      deputy assisting me or the supervisor on scene

5      that made a collective judgment call to place the

6      lady in Orchard Park under arrest.

7  Q.  Do you know if Deputy --

8  A.  I don't believe Deputy Held was -- honestly, I

9      don't recall in regards to the traffic stop

10     you're talking about in 2010.

11 Q.  Do you know what deputy was present with you in

12     the traffic stop in 2010?

13 A.  I do not.

14 Q.  Do you know that there was another deputy present

15     with you in 2010 on Waverly near Pinewood?

16 A.  Under normal circumstances when there is a

17     warrant or something extenuating involved, yes,

18     usually another deputy or an officer, police

19     officer from another jurisdiction, does usually

20     arrive on the scene to help out.

21 Q.  In general, would you say that you try to refrain

22     from using profanity toward citizens during

23     arrests?

92

1   A.   Absolutely.

2   Q.   Okay.  Do you remember telling Corrections

3        Officer Michaels to, quote, fuck off, unquote?

4   A.   There would be no reason for me to tell Mr.

5        Michaels that, absolutely none.

6   Q.   Okay.  So my question is, do you recall telling

7        him that?

8   A.   I do not telling him that.

9   Q.   Do you recall telling him do you want to go to

10       jail?

11  A.   If it's perceived where he's interfering with the

12       arrest of another person, that is absolutely

13       possible.

14  Q.   Okay.  Did you perceive that he was interfering?

15  A.   I don't recall the traffic stop.  I'm just

16       telling you that if a person does interfere in a

17       traffic stop, there is a possibility, a traffic

18       stop or any other arrest, that that person could

19       be told that he could be arrested.  He could be

20       causing more issues at the time during the

21       situation than what's warranted.

22  Q.   Would it ever be appropriate to tell a

23       four-year-old you're going to jail too with your

93

1      mom?

2  A.  Mr. Glazer, at that time you had indicated I was

3      going through a divorce.  I had young kids of my

4      own.  I would never tell a child that they would

5      be going to jail with their mother, absolutely

6      not.

7  Q.  So you don't recall that?

8  A.  I do not recall that.

9  Q.  So then I'll take it that you don't recall a

10     Susan Michaels, the mother of Michelle Grover,

11     coming to the scene of that stop as well?

12 A.  I do not recall the traffic stop from 2010.  I do

13     not.

14 Q.  So then you don't recall telling Susan Michaels

15     get the fuck out of here or you're going to jail

16     too?

17 A.  I would not say that to somebody just as they

18     show up at the scene of an incident unless there

19     was something pertaining to where there may be

20     something that could occur because of their

21     presence, whether it would be a domestic or

22     something related out of the scope of the normal

23     coming by to pick up a child if they're requested

94

1       to be there, or nothing related to a simple

2       indication that you stated earlier about picking

3       up a child.

4   Q.  And if Mr. Michaels and Mrs. Michaels have given

5       affidavits to the contrary of what you're saying,

6       do you have an explanation for that?

7   MR. D'AQUINO:  I'm going to object to -- hold on,

8       Ken.  Hold on.

9   THE WITNESS:  Sure.

10  MR. D'AQUINO:  I'm not sure what you're asking him.

11      That somebody else said something and does he

12      have an explanation of what they thought?  I'm

13      not understanding the question.

14  MR. GLAZER:  That's not my question.  I can repeat

15      it.

16  MR. D'AQUINO:  You said does he have an explanation

17      for that.  That's what I'm not understanding.

18  MR. GLAZER:  Okay.  I can rephrase it.

19  BY MR. GLAZER:

20  Q.  Do you have any idea why Susan and Timothy

21      Michaels would say that you said all these

22      things?

23  MR. D'AQUINO:  Object to the form.

95

```
 1   BY MR. GLAZER:
 2   Q.  Do you have any idea why they would say that you
 3        said these things?
 4   MR. D'AQUINO:  He heard the question.  Just give him
 5        a chance to answer.
 6   MR. GLAZER:  Oh, okay.  I thought he was waiting for
 7        you to direct him.
 8   THE WITNESS:  I was waiting for you guys to finish
 9        talking.  I wasn't sure.  Sorry.
10   BY MR. GLAZER:
11   Q.  Let me ask you again.  Do you have any reason --
12        strike that.
13   MR. GLAZER:  Sue Ann, will you just repeat my
14        question?  Thank you.
15            (Whereupon, the above-requested question at
16        page 95, line 2, was then read back by the
17        reporter.)
18   THE WITNESS:  I could give various reasons on why
19        they may say something like that.
20   BY MR. GLAZER:
21   Q.  Why don't you give them to me.
22   MR. D'AQUINO:  Wait a minute, Ken.  Wait.
23   THE WITNESS:  Sure.
```

96

1   MR. D'AQUINO:  Was your question if he has any idea

2       why they did say those things?

3   MR. GLAZER:  Yes.

4   THE WITNESS:   I have no idea why they said those

5       things.

6   BY MR. GLAZER:

7   Q.   Okay.  Do you even know who Timothy Michaels is?

8   A.   I do not know Timothy Michaels, no.

9   Q.   Do you know Susan Michaels or Michelle Grover?

10  A.   I do not.

11  Q.   Okay.  Do you know Zander Grover?

12  A.   I do not.

13  Q.   So you don't even know these people?

14  A.   Not that I recall from 2010.  As I stated

15       earlier, dealing with thousands of traffic stops

16       and thousands of people, sometimes certain things

17       stand out and sometimes they don't.

18  Q.   So this just might be something that didn't stand

19       out to you?

20  A.   Not that I recall.

21  Q.   I guess if I asked you would it surprise you that

22       all of the charges relative to that incident were

23       dismissed, you wouldn't have any information

97

1          about that, is that fair?

2     A.   I have no information in regards to when charges

3          are dismissed, I do not.

4     Q.   Do you frequently use profanity during contact

5          with citizens of Erie County, or at least did you

6          when you were a sheriff?

7     A.   Frequently?

8     Q.   Yes.

9     A.   No.

10    Q.   From time to time did you use profanity?

11    A.   Profanity was used maybe at times of certain

12         situations, yes.

13    Q.   Such as?

14    A.   Such as the guy in Springville who pointed a

15         loaded sawed-off shotgun at me and told me he is

16         reloaded, after firing two rounds off and chasing

17         people around a gas station and store and chasing

18         employees into a freezer, that he's reloaded and

19         ready to go, did I use profanity in describing to

20         him to put the gun down?  Yes, I did.

21    Q.   So have you used profanity in situations where

22         someone is not holding a firearm or shooting at

23         you?

98

1   A.  I would say yes.

2   Q.  Tell me about those situations.

3   A.  I can't recall a specific situation.  A person

4       maybe -- I don't recall a specific situation.

5       Have I used profanity?  To answer your question,

6       yes.

7   Q.  Would you use profanity with a citizen if they

8       made you angry?

9   A.  No, I would not.

10  Q.  Would that be appropriate to do?

11  A.  No, it would not.

12  Q.  Okay.  I'm going to ask you some questions about

13      Sheriff Howard.

14  A.  Okay.

15  Q.  I'm going to apologize because I believe I asked

16      you this question already.  Did you know Sheriff

17      Howard before you started working for the Erie

18      County Sheriff's Department?

19  A.  Did I know Sheriff Howard before?

20  Q.  Personally.

21  A.  No.  I did not know him personally, no.

22  Q.  Did any family member or friend of yours know him

23      personally before you started working at the

99

```
 1        sheriff's department?
 2   A.   Well, I worked part-time in the Town of Eden and
 3        I was a volunteer police officer since I
 4        graduated from high school in 1991.  His brother
 5        Pat Howard was the chief of police in the Town of
 6        Eden.
 7   Q.   So Pat Howard would -- go ahead.  I'm sorry.
 8   A.   Pat Howard was his brother.  Did I know Tim
 9        Howard?  No, I did not.
10   Q.   So you worked for Pat Howard at that time, is
11        that fair?
12   A.   That is fair.
13   Q.   And Pat Howard is Tim Howard's brother?
14   A.   Correct.
15   Q.   Did Pat Howard ever introduce you to Sheriff
16        Howard?
17   A.   No, he did not.
18   Q.   Did you guys ever talk about Sheriff Howard?
19   A.   No, we did not.
20   Q.   Prior to your first day of employment with the
21        Erie County Sheriff's Department, did you ever
22        speak to Sheriff Howard?
23   A.   Prior to my employment, during the interview
```

100

```
 1        process or the process that led up to the
 2        position and being hired, I spoke with him on the
 3        phone as in regards to the status of my
 4        application.
 5   Q.   Okay.  Before you submitted an application with
 6        the Erie County Sheriff's Department, did you
 7        ever speak to Sheriff Howard for any reason?
 8   A.   Not that I'm aware of, no.
 9   Q.   During your employment with the Erie County
10        Sheriff's Department, how often would you see the
11        sheriff in person?
12   A.   I hardly saw the sheriff being employed as a
13        sheriff's deputy.
14   Q.   Okay.
15   A.   I would say -- when he was the sheriff I don't
16        think I saw him at all until he came to the
17        Village of Springville where I was honored, a
18        proclamation was put in place for the incident
19        that occurred that I discussed earlier.  From
20        what I recall, that would be the first time that
21        I actually had an opportunity to speak with him
22        one on one.
23   MR. GLAZER:  I don't even know what my question was.
```

101

1     Can you repeat my question?  Can you read it

2     back, Sue Ann?  I think it was about when he

3     would see the sheriff.

4         (Whereupon, the above-requested question at

5     page 100, line 9, was then read back by the

6     reporter.)

7  BY MR. GLAZER:

8  Q.  Can you give me an answer to that question?

9  A.  I just did.

10  MR. D'AQUINO:  He told you hardly ever.  I'm not sure

11     why you're asking him again.

12  MR. GLAZER:  He told me about a proclamation or

13     something like that.

14  MR. D'AQUINO:  You might not have heard the first

15     part of his answer.

16         Sue Ann, would you mind reading his answer

17     back, please?

18         (Whereupon, the above-requested answer at

19     page 100, line 12, was then read back by the

20     reporter.)

21  MR. GLAZER:  Okay.  Thank you.

22  BY MR. GLAZER:

23  Q.  So, Mr. Achtyl, you chose to add the part about

102

1          the proclamation, is that correct?

2     MR. D'AQUINO:  Object to the form.

3     BY MR. GLAZER:

4     Q.  Is that right?

5     A.  You had asked me -- my understanding of your

6          question was how often I spoke with the sheriff.

7          And I answered hardly ever, and I explained to

8          you the first time that I actually did speak to

9          him was during that event, yes.

10    Q.  Did I ask you about the first time you spoke to

11         him?

12    MR. D'AQUINO:  Object to the form.

13    BY MR. GLAZER:

14    Q.  Did I ask you about the first time you spoke to

15         him?

16    A.  No.

17    Q.  Okay.  Well, just try to confine your answers to

18         my questions and we'll get through this a lot

19         faster.

20    A.  I understand that.

21    MR. D'AQUINO:  I object to the colloquy.  I don't

22         think he's going beyond your question to tell you

23         the first time he saw the sheriff when your

103

```
 1       question was how often did you speak to or see
 2       the sheriff.  It's pretty much exactly what you
 3       were asking him.
 4  MR. GLAZER:  You don't think -- him going into the
 5       proclamation that he received in the Village of
 6       Springville was responsive to my question, you
 7       think that was responsive to my question?
 8  MR. D'AQUINO:  The question was how often he saw or
 9       spoke with the sheriff, and in answering it he
10       told you the first time he saw him, which was
11       many years after he had been with the department.
12  MR. GLAZER:  Fine.  Can we agree the answer --
13  MR. D'AQUINO:  It's totally relevant.
14  MR. GLAZER:  The answer was hardly ever, that was the
15       answer, right?
16  MR. D'AQUINO:  But my position is you can't edit his
17       answers based on what you like or don't like.
18  MR. GLAZER:  His answers are going to be on the
19       record no matter what I said.  I'm asking him
20       questions and trying to keep this from going
21       seven hours long as a favor to him.  I don't care
22       how long we're here.  I'll just move on.
23  BY MR. GLAZER:
```

104

1    Q.   Have you ever been inside the sheriff's office?

2    A.   Can you please rephrase that?  Because -- you're

3         speaking specifically of Sheriff Howard's office?

4    Q.   That's correct.

5    A.   Have I ever been inside the sheriff's -- not his

6         office, no.

7    Q.   Have you ever had a private conversation with the

8         sheriff?

9    A.   Yes.

10   Q.   When was the last time you had a private

11        conversation with the sheriff?

12   A.   I would say when he appeared at my trial in

13        September of 2019.

14   Q.   Okay.  Let's start from the last private

15        conversation you had.  So the last private

16        conversation you had with the sheriff was at your

17        trial in September of 2019, is that accurate?

18   A.   Yes.

19   Q.   What day of the trial was it?

20   A.   The last time -- that's the question you're

21        asking, the last time?

22   Q.   Right.

23   A.   So it would have been the Friday I believe, the

105

```
 1        day of the verdict, if I recall correctly.
 2    Q.  If I told you that the verdict was September the
 3        27th of 2019, would you have reason to disagree
 4        with that?
 5    A.  No, I would not.
 6    Q.  So your indication is that you had a private
 7        conversation with the sheriff on that date, is
 8        that fair?
 9    A.  Could you please be more specific in regards to a
10        private conversation?  Simply saying hello and
11        how are you, one on one, yes.
12    Q.  Okay.  What else was said between you and the
13        sheriff?
14    A.  To be honest, I don't recall, I mean, what was
15        specifically said other than his support.  I
16        mean, I don't know specifically what his words
17        were other than generally characterized it was
18        his support.
19    Q.  Okay.  So is it fair to say that the sheriff
20        indicated to you on the 27th of September of 2019
21        that he was there to support you?
22    A.  He offered support and he indicated he'd be at my
23        trial to know what was transpiring, to see
```

106

1          firsthand what was taking place and what had
2          developed out of the investigation, what was
3          transpiring.
4     Q.   All right.  Well, I want to talk specifically
5          about the support.  What did he say to you with
6          regard to being there to support you?
7     A.   I don't want to sound -- I guess I just answered
8          this question for you.
9     MR. D'AQUINO:  Ken, the question is what did he say
10         specifically.  So if you recall, say so.
11    THE WITNESS:  I do not recall.  I do not recall what
12         he specifically said other than it was just
13         characterized generally as what I interpreted as
14         support.
15    BY MR. GLAZER:
16    Q.   Okay.  So you know that he was there to support
17         you, but you don't remember what he said?
18    A.   I don't remember.  It was a very difficult time.
19         As you indicated, my divorce was, and I would
20         have to say that was right up there with my
21         divorce.
22    Q.   Just so that I have an answer to my question, you
23         indicated on the record that the sheriff was

107

1   there to support you and that was what your

2   conversation was about, but now you're telling us

3   that you don't remember what was said, is that

4   fair?

5   A.  Yes, that's fair.  I don't remember specifically

6       what was said.

7   Q.  Did you speak to him in the courtroom or in a

8       private room or somewhere else?

9   A.  In the courtroom prior to the start of any

10      proceedings, yes.

11  Q.  Every day?

12  A.  I don't recall if it was every day.  I don't

13      recall.

14  Q.  Do you know if he was there every day?

15  A.  I don't believe he was there every day.

16  Q.  Do you know how many days he was there?

17  A.  If I remember correctly, I believe it was -- it

18      was a five-day event, I believe he was there

19      maybe four.

20  Q.  The first day was primarily jury selection, is

21      that fair?

22  A.  From what I recall, yes.

23  Q.  Okay.  During the course of that five days, how

1       many private conversations did you have with the

2       sheriff, just the two of you?

3    A.   I'm not -- I really don't know.  I'm not sure how

4       many conversations we had.  He would -- I would

5       approach him and thank him for being there, I

6       would shake his hand.  He was my boss, or is my

7       boss at the time.  There was really no in-depth

8       conversation per se I guess, as you're saying,

9       personal conversation, that I can recall.

10   Q.   When you would say thank you to him and shake his

11      hand, what would he say back to you?

12   MR. D'AQUINO:  You're asking him what did he say

13      back?

14   MR. GLAZER:  Yes.

15   THE WITNESS:  I don't recall what he said back to me.

16      I don't -- all I can do is generally summarize it

17      as what I interpreted as his support during this

18      very difficult time that I was going through.

19   BY MR. GLAZER:

20   Q.   He at some point wrote a letter of support on

21      your behalf, is that correct?

22   A.   He did, yes.

23   Q.   Okay.  You said that you don't know how many

109

1       conversations you had in private with the sheriff

2       during the five days of your trial, but do you

3       know if there were more than one conversation?

4   A.  Yes, there was more than one conversation.

5   Q.  Were there more than two?

6   A.  I would say yeah.  I would say that he was there

7       -- if he was there for four days, I talked to

8       him, saying hello to him, four times.

9   Q.  Okay.

10  MR. D'AQUINO:  But he's asking you about

11      conversations, not just saying hello.

12  THE WITNESS:  I don't recall what kind of

13      conversations -- the conversations I had with the

14      sheriff, I don't recall.

15  BY MR. GLAZER:

16  Q.  Did you speak to the sheriff privately each and

17      every day that he was present at your trial?

18  A.  I don't recall.

19  Q.  Were there ever conversations between you and the

20      sheriff and Mr. Personius?

21  A.  Were there ever --

22  Q.  Let me ask you a better question.

23  A.  Sure.

110

1   Q.  I'm talking about anytime, not just the five days
2       of trial.  Was there ever a time when you and
3       Sheriff Howard and Mr. Personius had a
4       conversation together, just the three of you?
5   A.  I don't recall if that occurred.
6   Q.  You don't recall?
7   A.  I don't recall.
8   Q.  Do you recall if you and Mr. Personius and
9       Sheriff Howard ever spoke together during the
10      five days of your trial?
11  A.  I mean, I would say yes, we probably did.
12  Q.  What did you talk about?
13  A.  I don't recall what we talked about aside from
14      saying hello or if my attorney said hello to him.
15      I don't recall conversations.  It was a pretty
16      chaotic week.  I wasn't focused on -- I don't
17      recall conversations that we had.  I honestly
18      can't tell you.  I don't recall.
19  Q.  Did Mr. Personius ever speak privately with Mr.
20      Personius?  I'm sorry.  That's the same person.
21      Did Mr. Personius ever speak privately with
22      Sheriff Howard?
23  A.  I'm not sure.

111

1   Q.  Did you ever have conversation in private with

2       the sheriff, Deputy Flowers and Mr. Personius?

3   A.  Not that I recall, no.

4   Q.  Did you ever have conversation privately with

5       Mr. Flowers and his attorney?

6   A.  Not that I recall, no.  There was -- pretty much

7       once the situation started, there was no

8       conversation with Deputy Flowers in regards to

9       the series of events that you're talking about.

10  Q.  Let me ask you about that.  Did you speak to

11      Deputy Flowers at all during the course of your

12      five-day trial in September of 2019?

13  A.  I did not, no.

14  Q.  Did you speak to him at all on the phone or text

15      with him?

16  A.  I did not, no.  At that point in time, those five

17      days, is that the question you're asking me?

18  Q.  Correct.

19  A.  I just want to make -- okay.  Yes.  The answer is

20      no.

21  Q.  Just so that we have a clear record, there were a

22      lot of yeses and nos there --

23  A.  I understand that.  Just that your question, I

112

1        apologize, was kind of open-ended and I just want

2        to clarify.

3    Q.  Let me clarify it for you so that there's no

4        confusion.  Your testimony is that you did not

5        speak to Deputy Flowers in any form from

6        September the 23rd of '19 until -- I'm sorry,

7        from September 17th of '19 to September the 23rd

8        of '19, is that fair?

9    A.  I will -- that is fair, and it was probably

10       longer than that, yes.

11   Q.  Okay.

12   MR. D'AQUINO:  Can we go off the record for a second?

13   MR. GLAZER:  Sure.

14   THE VIDEOGRAPHER:  Two-forty-four p.m.  Going off the

15       record.

16           (Whereupon, a short recess was then taken.)

17   THE VIDEOGRAPHER:  Two-fifty-two p.m.  We are back on

18       the record.

19   MR. D'AQUINO:  Can I, before you start, Mr. Glazer,

20       just use this moment to again confirm that no one

21       participating in this Zoom call has or will audio

22       or videotape any part of this other than the

23       videographer?

113

1          Everyone agree?

2    MR. GLAZER:  Yes.

3    THE WITNESS:  Yes.

4    MR. BLOOM:  Confirm.

5    MR. D'AQUINO:  Thank you.  And both Mr. Belsitos

6        confirming?

7    MR. BLOOM:  Yes.  On behalf of Mr. Belsito, yes.

8    MR. D'AQUINO:  And it looks like Nicholas Belsito is

9        no longer on.  Is that correct?

10   MR. GLAZER:  It looks like he's muted.  I don't know

11       if he can still hear us.  I know he was leaving

12       for work at three.

13          Nick, if you're on the call, can you unmute

14       and confirm that you're not recording the

15       proceedings in any medium whatsoever?

16   NICHOLAS BELSITO:  Sorry about that.  Can you hear

17       me?

18   MR. GLAZER:  Yes.  Go ahead.

19   NICHOLAS BELSITO:  Yes.  I am not recording, and I'm

20       actually about to leave for work.

21   MR. GLAZER:  Okay.  Have a good day.

22   MR. D'AQUINO:  Thanks, Mr. Glazer.  Sorry for the

23       interruption.

114

```
 1   MR. GLAZER:  No, sir, no problem.
 2        (Whereupon, Nicholas Belsito left the remote
 3        deposition.)
 4   MR. GLAZER:  Sue Ann, could I have the last question,
 5        please?
 6        (Whereupon, the above-requested question and
 7        answer at page 112, lines 3 through 10, were then
 8        read back by the reporter.)
 9   BY MR. GLAZER:
10   Q.  Mr. Achtyl, I'm going to ask you some questions
11        now about Deputy Flowers, and then a few
12        questions about the sheriff and Deputy Flowers
13        probably a little bit later on.  And I apologize
14        if some of it is repetitive because we sort of
15        veered off a second ago, but I'll do my best to
16        keep it from being so.
17   A.  Okay.
18   Q.  We talked about the sheriff being present at your
19        criminal trial.  Did you see the sheriff talk to
20        the prosecutors at all during the criminal trial?
21   A.  Not that I recall, no.
22   Q.  All right.  And I don't remember how Orchard Park
23        Court is set up, but were you on the left side of
```

1          the courtroom if you're facing the judge?

2     A.   Facing the judge, yes, I was on the left side.

3     Q.   And that would be the side furthest from the

4          jury, is that correct?

5     A.   Correct.

6     Q.   Okay.  And when the sheriff sat in the courtroom

7          during the time that he was there, was he sitting

8          on your side of the courtroom?

9     A.   I don't recall, because my, for the most part, my

10         back was to the audience and I was facing the

11         judge and the jury.  I'm not sure where people

12         sat.  I didn't even realize that there was like a

13         -- what you're trying to say is like sides.  I

14         didn't realize there was sides in a courtroom.  I

15         thought it was just one -- from what I recall, I

16         thought it was just all one courtroom.

17    Q.   Do you remember seeing him sitting at all in the

18         gallery, at any point during the trial?

19    A.   I remember maybe once he was sitting behind me, I

20         would say positioned behind me.  I don't recall

21         how far back or where he was at.  I don't recall.

22    Q.   So behind you on your side of the courtroom?

23    A.   If there's a side of the courtroom that you're

116

```
 1        referring to, he was sitting behind me, yes.
 2   Q.   Let me try to make it a little bit more clear.
 3        If you would have stood up and turned around and
 4        faced directly toward the back of the courtroom,
 5        would you have seen the sheriff?
 6   A.   Yes.
 7   Q.   How long have you known James Flowers?
 8   A.   I don't recall a certain time frame.  I probably
 9        would have known of James Flowers when he was
10        initially hired.  I never worked with Jim Flowers
11        aside from -- that I can recall, I never worked
12        with Jim Flowers aside from the stadium events.
13   Q.   Okay.  You indicated that you think you would
14        have known of him when he was hired.  Is there a
15        particular reason that you would have known of
16        him when he was hired?
17   A.   The only reason I would say that is you just kind
18        of keep -- you just kind of know who new people
19        are, who's coming and who's going, where people
20        were.  So generally speaking, yes, I would have
21        probably known of him.  And I'm not sure, I don't
22        recall when he was hired.
23   Q.   Do you know what general time period in which he
```

117

1     was hired, was it ten years ago, fifteen, twenty,

2     something else?

3  A.  From which date are we speaking?  I'm sorry.

4  Q.  I'm just asking you if you know approximately

5     when Mr. Flowers became an Erie County Sheriff's

6     Deputy.

7  A.  I don't know of the exact date.  Possibly 2000 --

8     maybe '8, 2009, somewhere in that time frame.

9     I'm not sure.

10 Q.  Do you remember how long after he became employed

11    by the sheriff's department that the two of you

12    met?

13 A.  I do not, no.

14 Q.  Do you remember approximately when the two of you

15    met?

16 A.  I do not, no.

17 Q.  Did you ever work together aside from Bills

18    games?

19 A.  Not that I'm aware of, no.

20 Q.  Do you know what his assignment was when he

21    started working for the sheriff's, whenever he

22    started working?

23 A.  I do not, no.

118

1    Q.    At any time have you socialized with Mr. Flowers
2          outside of work?
3    A.    No.  Not that I'm aware of, no.
4    Q.    Well, I'm going to follow up because you said not
5          that you're aware of.  Is there a reason that you
6          wouldn't be aware of socializing with Mr. Flowers
7          outside of work if you'd done that?
8    A.    When you are saying socializing, I'm not sure if
9          Mr. Flowers was at -- I never socialized with Mr.
10         Flowers outside of work.  Could he have been at a
11         union meeting or something?  Yes.
12   Q.    That's fair.  That's fair.  Let me ask you a
13         better question.  Without regard to whether you
14         guys were at a party together with a hundred
15         people there, have you guys ever socialized with
16         just the two of you or just the two of you and
17         your spouses or in a tight, small group?
18   A.    Not that I recall, no.
19   Q.    Prior to December the 3rd of 2017, had you ever
20         spoken to Deputy Flowers on the phone?
21   A.    Prior to December 3rd, yes.
22   Q.    Okay.  Did you have his cell phone number prior
23         to December the 3rd of 2017?

119

1    A.   Yes.

2    Q.   Do you know his cell phone number offhand just

3         sitting here?

4    A.   I do not, no.

5    Q.   Do you have his cell phone number saved in your

6         phone?

7    A.   I believe I do, yes.

8    Q.   Did you ever call Deputy Flowers on his cell

9         prior to December the 3rd of '17?

10   A.   Prior to December 3rd of 2017, yes.

11   Q.   Did you ever text with him prior to December the

12        3rd of 2017?

13   A.   Yes.  I'm just trying to understand.  I mean,

14        your question, just to specify, we worked

15        together at the stadium, so there was work

16        related issues we would discuss during working

17        hours, yes.

18   Q.   That's fine.  I'm not trying to confuse you.  My

19        question simply is, did you guys communicate via

20        cell phone prior to December the 3rd of '17

21        without regard to whether it was work related?

22   A.   Yes.

23   Q.   Okay.  Did you ever communicate via cell phone

120

1       prior to December the 3rd of 2017 for un -- I
2       should say, for non-work related reasons?
3   A.  No.
4   Q.  Have you called Deputy Flowers on the telephone,
5       on the cell phone, since December the 3rd of
6       2017?
7   A.  Yes.
8   Q.  Has he called you on the cell phone since
9       December of 2017?
10  A.  I'm not sure.  I'm not sure.
11  Q.  Have the two of you texted back and forth since
12      December 3rd of 2017?
13  A.  Since December -- yes.  Yeah.  There's a
14      possibility, yes.
15  Q.  And is it your testimony that all of these calls
16      and texts were work related?
17  A.  Yes.
18  Q.  And I messed this up before and I apologize, but
19      your criminal trial was the week of September the
20      23rd -- I'm sorry, September the 17th -- I don't
21      know why I can't get that right.  I'll start
22      again.  Your criminal trial was the week of
23      September the 17th of 2019, is that correct?

121

1  A.  Now that you have me thinking this, I believe

2      that is correct.

3  Q.  I should have it written down in front of me, but

4      it's in another folder.

5  A.  I believe those were the dates.  You had said

6      something about the 26th or 27th earlier.

7  Q.  With the understanding that I'm not trying to

8      trip you up --

9  A.  I understand.

10 Q.  Okay.

11 A.  I just don't want to -- fair.  I want to make

12     sure I'm accurate and correct with what you're

13     asking me.

14 Q.  For maybe the third time in the last, I don't

15     know, two and a half, three hours, we're making

16     Sue Ann mad.

17         So let's get back to it.  Is it fair to say

18     that if I told you that the trial was 9/17 of '19

19     to 9/23 of '19, do you have any reason to

20     disagree with that?

21 A.  I do not, no.

22 Q.  And you've indicated that you didn't speak to

23     Officer Flowers or Deputy Flowers at all during

1      that week, either in person, on the telephone or

2      via text, is that fair?

3   A.  Yes, that's fair.

4   Q.  Okay.  Prior to September 17th of 2019, did you

5      discuss the upcoming trial with Deputy Flowers?

6   A.  I'm sorry.  Could you just rephrase the question?

7      Not rephrase it but repeat it in regards to the

8      dates?  I'm sorry.  I didn't catch the dates.

9   Q.  Prior to the first day of your trial, did you

10     discuss the trial with Deputy Flowers?

11  A.  No, I did not.

12  Q.  Prior to the first day of your trial, did your

13     attorney discuss the matter with Deputy Flowers?

14  A.  Not that I'm aware of, no.

15  Q.  Prior to the first day of your criminal trial,

16     did Deputy Flowers discuss the matter with

17     Sheriff Howard that you're aware of?

18  A.  Not that I'm aware of.

19  Q.  Has there ever been a time when you and Deputy

20     Flowers discussed the criminal trial?

21  A.  No.

22  Q.  Do you have a cell phone?

23  A.  Do I have a cell phone?

123

1    Q.  Yes.

2    A.  Yes, I do.

3    Q.  Do you have a home phone?

4    A.  I do.

5    Q.  Could I have the cell phone number and provider,

6        please?

7    A.  It's Verizon and the cell phone number is

8        716-574-0829.

9    Q.  And the home phone number and provider?

10   A.  I believe that's Verizon also and it's

11       716-649-1487.

12   Q.  When was the first Bills game you ever worked?

13   A.  I believe it would have been 2000 or 2001.

14   Q.  So that would have been well before Deputy

15       Flowers was employed by the sheriff's department?

16   A.  Yes.

17   Q.  Would you tell me how it was that you came to

18       work Bills games?  And here's what I mean.  Did

19       you request to work the games, were you compelled

20       or something else?

21   A.  From what I recall, the Bills games were

22       considered an overtime deal.  I believe it was

23       frowned upon at that time if you didn't work

124

```
 1          them.  I was called last minute to fill in for a
 2          deputy that I believe had called off sick, if I
 3          recall correctly.  I believe the phone call was
 4          ten minutes prior to the start of the shift.
 5     Q.   Was it something that you wanted to do because of
 6          the overtime?
 7     A.   Yeah.  Yes.
 8     Q.   Okay.  I'm not asking you about your personal
 9          income right now because it's probably not
10          appropriate and I'm not looking to bust your
11          chops, but can you give me an indication of what
12          you get paid for overtime in terms of is it time
13          and a half, is it double time or something else?
14     A.   I believe it's time and a half for the stadium
15          detail.
16     Q.   And incidentally, I forgot to ask you, the
17          lawsuit that you brought regarding Mr. Kelly and
18          the rear-end DWI thing, did you receive a
19          settlement in that case?
20     A.   There was a settlement received, yes.
21     Q.   Okay.  Do you recall how much it was?
22     MR. D'AQUINO:  Hold on a second.  I'm really going to
23          direct him not to answer.  This is getting into a
```

125

1      personal matter that has nothing to do with the

2      lawsuit.

3   MR. GLAZER:  Okay.  Will you just index that, Miss

4      Simonin?  Thank you.

5   MR. D'AQUINO:  While we're -- I'm hearing a lot of

6      feedback.

7         (Discussion off the record.)

8   MR. D'AQUINO:  What I was about to say was, on the

9      record, if there's any matter you need to call

10     the judge about, we should do so while the judge

11     is still in chambers today.  It's now three-ten

12     p.m.  I just don't want to get past when he's not

13     there and not be able to get a ruling.

14  MR. GLAZER:  Well, you know, I think it's better off

15     if I just move on, and because if something else

16     arises I'd rather just have a list.  You know

17     what I mean?  And if there's a situation where we

18     have to have another Zoom call, it's going to be

19     five minutes.  You know what I mean?  And I

20     would, of course, do it at your and your client's

21     convenience.

22  MR. D'AQUINO:  Okay.  Fair enough.  I get you.  That

23     covers it.

126

1    MR. GLAZER:   Thank you.

2         We were talking about overtime.  Was there a

3    question and answer, Miss Simonin, about the --

4    can you read it to me, please?

5         (Whereupon, the above-requested question and

6    answer at page 124, lines 8 through 15, were then

7    read back by the reporter.)

8    BY MR. GLAZER:

9    Q.  Mr. Achtyl, do you know how many Bills games

10   you've worked in total?

11   A.  I do not have a total number, but I rarely never

12   not worked a Bills game unless I was injured or

13   something and not working.  I worked pretty much

14   all the Bills games.

15   Q.  Okay.  So would it be a fair statement, then, to

16   say that you worked most of the home games from

17   the time you started in early 2000's until 12/3

18   of '17?

19   A.  Yes.

20   Q.  Okay.  So if we multiply eight, give or take, by

21   twenty years, we'd get approximately a hundred

22   and sixty, give or take?

23   A.  I would say it's less than a hundred and twenty,

127

1      because you're multiplying by twenty.  It was
2      eighteen or nineteen years, yes.
3   Q.  Fair enough.  Over a hundred?
4   A.  If the math adds up to over a hundred for those
5      number of years, I would say yes.
6   Q.  Had you ever made an arrest at a Bills game prior
7      to December the 3rd of 2017?
8   A.  Yes.
9   Q.  Can you approximate how many arrests you've made
10     over the years at Bills games since you started
11     working them?
12  A.  I'm really not sure of an approximate number.  It
13     was numerous.  Hundred or hundreds maybe.
14     Depending on the position at the stadium that you
15     were doing would determine that answer to your
16     question.
17  Q.  I understand.  If you're working where all the
18     drunks are, you arrest more people, fair?
19  A.  Well, that's not a fair question because there's
20     usually drunks all over the place at the stadium.
21     I would have to more elaborate in regards to the
22     specific assignment at the stadium itself.  If
23     you need me --

128

1   Q.  I don't need you to.  We can move on.

2   A.  Okay.  Fair enough.

3   Q.  What's the most serious offense you've ever

4       arrested somebody for at a Bills game, if you can

5       recall?

6   A.  I was dragged down the road, Abbott Road, in

7       front of the stadium by an intoxicated female

8       driver who was urinating in the middle of Abbott

9       Road, who was not responding to questions.  And

10      in an attempt, while traffic was stopped, to get

11      her off the roadway --

12  Q.  I was just asking about the offense.  What did

13      you charge her with?

14  A.  It was a DWI offense.

15  Q.  So a misdemeanor?

16  MR. D'AQUINO:  Excuse me.  Can he finish his answer?

17      You just cut him off mid answer.

18  MR. GLAZER:  I'm just trying to get the answer to my

19      question, but okay.  Go ahead.

20  MR. D'AQUINO:  Well, sure, but you've got to let him

21      answer.  You can't just say I don't want to hear

22      the rest of it.

23  MR. GLAZER:  I understand.  We're going to be here

1      all day if I don't get specific answers to my

2      questions, but okay.

3  BY MR. GLAZER:

4  Q.   If you want to continue, go ahead.

5  A.   I'm just going to leave it at that I was dragged

6      down the road, it was a serious offense, she was

7      charged with DWI.  And I'll leave it at that.

8  Q.   So if I ask you what offense is the most serious

9      offense you ever charged at a Bills game, the

10      answer is DWI, is that fair?

11  A.   I would say there would be other charges, not

12      just DWI.  Assaults, harassments, disorderly

13      conducts.  There's a multitude of different

14      offenses that you would charge at the stadium.

15  Q.   Let me ask it another way.  Have you ever charged

16      anyone with a felony at the stadium?

17  A.   I would have to say yes.

18  Q.   What kind of felony?

19  A.   I would say possibly could have been a DWI type

20      of felony.  I don't recall.  I don't recall the

21      specifics of each and every incident that

22      occurred at the stadium.  There's some that stand

23      out, yes.  Could I have charged a felony at the

130

1          stadium?  Yes.

2    Q.   So it sounds like the answer is maybe you charged

3          a felony, is that fair?

4    A.   I would say most likely, yes.

5    Q.   Prior to December the 3rd of 2017, had you ever

6          arrested someone at a Bills game solely because

7          that person used a curse word toward you?

8    A.   No.

9    Q.   And we agree that in New York State it's not

10         against the law to curse at a law enforcement

11         officer, is that fair?

12   A.   Under those set of circumstances, just cursing,

13         it's a no.

14   Q.   And you got a little wordy there on me, so I just

15         want to make sure --

16   A.   I apologize.  I'm just trying to -- go ahead.

17   Q.   I'm just asking, can we agree that in New York

18         State it's not illegal in any fashion to curse at

19         a law enforcement officer solely?

20   A.   Yes.

21   Q.   Let's get to December the 3rd of 2017.  You were

22         assigned to work the Bills game that day, is that

23         fair?

131

1   A.  Yes.

2   Q.  And Deputy Flowers was also assigned to work the

3       game, is that fair?

4   A.  He was assigned as my partner, yes.

5   Q.  Did you at some point have to go and pick up a

6       sheriff's vehicle?

7   A.  Yes.

8   Q.  Did you drive together with Deputy Flowers to do

9       that or did you arrive separately?

10  A.  I believe at that point in time we were assigned

11      a car out of Chestnut Ridge Park, and we would

12      meet at the start of our shift to get into

13      service in that car.

14  Q.  Okay.  So to the best of your recollection, on

15      December the 3rd of '17, you and Flowers would

16      have met at Chestnut Ridge and picked up your

17      cruiser at that point?

18  A.  Yes.

19  Q.  Do you know what time you would have done that,

20      approximately?

21  A.  Probably -- the detail started at ten a.m., so I

22      would have to say probably within the, plus or

23      minus, five to, five after range.

132

1   Q.   Do you know how many deputies are typically

2        assigned to what is now New Era Field for a Bills

3        game?

4   MR. D'AQUINO:  What is now Highmark.

5   MR. GLAZER:  Oh, yeah.  You're right.  Good point.

6        Boy, what a crummy Bills fan.

7   BY MR. GLAZER:

8   Q.   Do you know -- well, why don't you just answer

9        with the information that Mr. D'Aquino gave us.

10  A.   I do not, no.

11  Q.   Is it a hundred, two hundred, more?

12  A.   There are separate details.  There is an outside

13       detail that all the road patrol deputies work at,

14       and then there's an inside detail that holding

15       center deputies, correctional officers, various

16       other police officers from other agencies work

17       at.  I do not know the number combined.  The

18       outside detail, roughly seventy-five to a

19       hundred.

20  Q.   Okay.  And were you the outside detail on 12/3 of

21       '17?

22  A.   Yes.

23  Q.   Had you worked Bills games prior to December the

133

1      3rd of '17 with Deputy Flowers?

2  A.  Yes.

3  Q.  Do you know how many you'd worked with him prior

4      to December the 3rd of '17?

5  A.  I do not know a number.  We were usually assigned

6      together as a partner.  I'm not sure of an exact

7      number or even an estimate.  I'm not sure when he

8      started working the detail in regards to working

9      with me as a partner.

10 Q.  Do you know if it was more or less than five?

11 A.  I would say it would be around maybe five years,

12     maybe a little less.  I'm not absolutely sure.

13 Q.  So we can agree that it was, give or take, five

14     years of home games that you worked with Flowers

15     prior to December the 3rd of '17?

16 A.  From what I recall, yes.

17 Q.  When you and Flowers got to what was New Era

18     Field on December the 3rd of '17, were the two of

19     you in an Erie County Sheriff's Department

20     vehicle?

21 A.  In a marked patrol unit, yes.

22 Q.  And I'll call it a cruiser.  I don't know if it's

23     called something else because it's an SUV, but is

134

1           a cruiser an appropriate term for that?

2    A.   I would say marked police unit, yes.

3    Q.   Marked police unit.  Okay.  I'll use your term.

4         Do you recall if you had worked the day before,

5         which would have been 12/2 of '17?

6    A.   I do not recall.  There's a good possibility.  We

7         worked every other weekends.  And there's a

8         possibility that if I did work the night before,

9         normally I would take a couple hours off to go

10        home and sleep.

11   Q.   So if you -- go ahead.  I'm sorry.

12   A.   For some -- to get some sleep.

13   Q.   If you had worked the night before, what would

14        have been the shift?

15   A.   The shift that I was assigned to was six p.m. to

16        six a.m., and it would have been Friday, Saturday

17        and Sunday.  The detail normally would start at

18        ten a.m. unless it was an oddball time, then you

19        would have to actually utilize your time to work

20        overtime, put it I guess that way.

21   Q.   If you worked the night before, you get off at

22        six a.m., you've got to get home, get some sleep

23        and get to Chestnut Ridge by ten, is that fair?

135

1    A.   Yes.

2    Q.   So you had to be tired, true?

3    A.   Yes.  And then normally, as I indicated earlier,

4         I would take some paid time off to go home early

5         to get -- try to get some sleep, yes.  The

6         weekends you worked, it was a difficult thing to

7         do under the set of circumstances.

8    Q.   Do you think being tired made you quick to anger?

9    A.   I would say no.  I would say not being tired made

10        me quick to anger, no.

11   Q.   I'm sort of confused by your answer.  We've

12        established that you probably were tired given

13        the shift that you worked, is that fair?

14   A.   Yes.

15   Q.   So I'm asking you, when you got to the stadium a

16        few hours later on 12/3 of '17, do you think the

17        fact that you had gotten very little sleep made

18        you quick to anger?

19   A.   I don't want -- how can I -- I'm going to give

20        you this answer.  I don't want to answer the

21        question because I'm not sure if I worked that

22        weekend.  If I worked the night before, I'm not

23        sure what time I went home.  As for in regards to

136

1        if I was tired and angry or not, I just can't

2        give you that answer.  I don't recall.

3   Q.   Are you a guy that needs eight hours or can you

4        function on less?

5   A.   I can function on under less hours.  Numerous

6        years, as we discussed earlier, I had part-time

7        jobs, full-time jobs, and had always been a hard

8        worker I guess you could say.

9   Q.   You're a human being.  Does lack of sleep affect

10       you in any way whatsoever?

11  A.   It could, yes.

12  MR. D'AQUINO:  I think we're getting a little far

13       afield just with respect to that last question.

14       Maybe you can just get back to the issue of the

15       weekend?

16  MR. GLAZER:  That's fine.

17  MR. D'AQUINO:  I think all he was trying to say was

18       he wasn't sure if he was tired or not because he

19       wasn't sure if he worked before.

20  MR. GLAZER:  Okay.  Well, his answer is on the

21       record, so I'll move on from that particular

22       line.

23  BY MR. GLAZER:

137

1   Q.   Are you a person that is quick to anger if you

2        don't get enough sleep?

3   A.   I would say no, I do not anger quickly if I don't

4        get enough sleep, depending on your idea of

5        what's enough sleep.

6   Q.   I'm talking about you personally.  It sounds like

7        you hesitated a little bit.  So for you

8        personally, if you don't get enough sleep, do you

9        become more quick to anger?

10  MR. D'AQUINO:  I'm going to object to it sounds like

11       you hesitated a little bit, and ask that that be

12       stricken.  That's my only comment.

13  BY MR. GLAZER:

14  Q.   I'm just talking about you personally, Mr.

15       Achtyl.

16  A.   At times if I'm awoken two minutes after I fall

17       asleep, I can be a little upset, yes.  If I fall

18       asleep and I sleep for a short period of time,

19       no, I am usually not easy to be angered.

20  Q.   When you picked up the marked patrol unit on

21       December the 3rd of '17, do you typically do a

22       walk-around to make sure there's no damage to the

23       vehicle?

138

1   A.   Yes.

2   Q.   Can you tell me in general terms what that

3        walk-around entails?

4   A.   Well, at the start of any shift you do a

5        walk-around of the vehicle, make sure there's no

6        damage.  You ensure that the equipment is

7        operating properly.  You ensure that you have the

8        necessary equipment, whether it's in the glove

9        box or the trunk of the vehicle.  You ensure that

10       there's nothing that's left in the back of the

11       vehicle.  You do a quick check of everything.

12       It's for officer safety, it's for your own safety

13       to ensure there's no previous damage and to make

14       sure everything is working properly.

15  Q.   Can we agree that there was no previous damage to

16       your vehicle when you picked it up on 12/3 of '17

17       before you got to the Bills stadium?

18  A.   From what I recall, there was no damage to that

19       patrol car, not from what I can recall.

20  Q.   You know what I'm getting at.  Was there a dent

21       in the right front fender when you picked up the

22       vehicle?

23  A.   There was not a dent in the right front fender.

139

1   Q.   So you and Deputy Flowers get to whatever the
2        name of the stadium was on 12/3 of '17 together
3        in a marked patrol vehicle, is that correct?
4   A.   Yes.
5   Q.   Do you know what time you got there?
6   A.   The usual routine would be to get to the area,
7        let the dispatch at the stadium know that we're
8        in our general area.  Normally we were assigned
9        to the same location, being the bus lot.  And
10       then we would try to grab some coffee and some
11       breakfast from Tim Horton's and then get -- you
12       know, which is across the street from the
13       stadium, and then be back in the bus lot.
14  Q.   Were you assigned to the bus lot on 12/3 of '17?
15  A.   Yes.
16  Q.   And do you know what time you had finished up
17       with all the coffee and all that stuff and been
18       at the stadium ready to work?
19  A.   I don't recall a specific time.  I would say
20       sometime between maybe ten-thirty-ish to eleven,
21       sometime in that time frame.
22  Q.   Could you describe for us where the bus lot is
23       relative to the stadium?

140

1   A.   It would be south of the stadium, it would be

2        across the street on Abbott Road.

3   Q.   So after you had gotten the coffee done and after

4        you had gotten to the stadium, did you at some

5        point park your vehicle?

6   A.   No.  We're a patrol unit, so we remain inside our

7        vehicle unless we need to exit it for a reason.

8   Q.   Well, I suppose what I meant was, did you move

9        your vehicle to a certain location and stop it?

10   A.   I would say normally we would be within the bus

11        lot, in those general parking lot areas

12        somewhere, ready to respond to anything we needed

13        to respond to.

14   Q.   In the parking lot?

15   A.   Yes.

16   Q.   So do you get there and you sit in your vehicle

17        until there's reason to move?

18   A.   You patrol around.  You're assigned a specific

19        zone, there's four cars assigned to patrol.

20   Q.   When you say -- go ahead.  I'm sorry.  Go ahead.

21   A.   They are two-man cars, they're assigned to the

22        north end, the south end and then the opposite

23        end of the stadium.  So they try to make it into

141

```
 1        quadrants, that each two-man car is specific to
 2        that area.
 3   Q.   Okay.
 4   A.   So you have an assigned area to try to stay in
 5        unless something is happening where you need to
 6        leave that area or if you need to assist a deputy
 7        who's directing traffic or is on some sort of
 8        other patrol.
 9   Q.   So when you say you patrol, do you get out of the
10        vehicle and walk around, do you stay in the
11        vehicle, do you drive the vehicle around or
12        something else?
13   A.   It's a combination of what you've just stated.
14        Sometimes, depending on the circumstances, you'd
15        get out and walk around, if it's too heavy to
16        drive through.  You would try not to venture too
17        far from your patrol car because you may need to
18        assist somebody else.  And again, you still need
19        to have a presence in the crowd.  So to answer --
20   Q.   When you --
21   A.   I'm sorry.
22   Q.   Go ahead.
23   A.   To answer your question, it's a little bit of
```

142

1        both.  You're in the car, you're out walking

2        around, you're doing both of what you had stated.

3    Q.  We're going to talk more about this in a little

4        bit.  And I think we're moving along here and

5        shouldn't be a ton longer.  But can we agree that

6        at some point Mr. Belsito came up to your patrol

7        vehicle and knocked on your window?

8    A.  Yes, he did.

9    Q.  Okay.  Can you give me an estimate of how long

10       you were parked in that same spot for prior to

11       the time that Mr. Belsito came up and tapped on

12       your window?

13   A.  Well, from what I recall, a few minutes earlier,

14       couple minutes earlier, we had arrested his

15       acquaintance, friend, somebody who was observed

16       with him, that had been seen by an undercover

17       deputy that was throwing a beer can and throwing

18       cans of beer into the crowd of people.  And the

19       crowd of people prior to this was very

20       rambunctious, if not almost close to riotous,

21       being a riot.  I recall that there was a lady, a

22       drunk lady, who punched a sheriff's horse that

23       day.

143

1    Q.  I apologize, but I've got to interrupt you.  It's

2        just so non-responsive.

3    A.  Sure.

4    MR. GLAZER:  Could you please read back my question?

5            This question should take a one-word answer.

6    THE WITNESS:  The answer to your question is yes.

7    MR. GLAZER:  It's not responsive.

8            Could you please read the question?  He

9        doesn't even know what the question was.

10   THE WITNESS:  I know what the question is.

11   MR. GLAZER:  Okay.  We'll see if yes is responsive.

12           Go ahead, please.

13           (Whereupon, the above-requested question at

14       page 142, line 9, was then read back by the

15       reporter.)

16   BY MR. GLAZER:

17   Q.  Can you answer that question?

18   A.  The vehicle was parked, I'm not sure how long the

19       vehicle was parked there.  I do not know a time

20       frame.

21   Q.  More or less than five minutes?

22   A.  More.

23   Q.  More or less than ten minutes?

144

1   A.   There was numerous incidents going on, and I
2        would say it was definitely more than ten or
3        fifteen minutes.
4   Q.   That your car was parked in that spot before
5        Mr. --
6   A.   That spot, yes.
7   Q.   Okay.  You've got to let me finish my question.
8   A.   Sorry.
9   Q.   It was more than ten or fifteen minutes that your
10       vehicle was parked in that location before Mr.
11       Belsito came up and tapped on your window, is
12       that true?
13  A.   From what I recall, yes.
14  Q.   Okay.  Was it more than a half hour?
15  A.   I don't believe it was that long.  I'm not sure.
16  Q.   So you gave me a bunch of information about your
17       surroundings at that time, and I want to ask you
18       about that now.
19  A.   Sure.
20  Q.   Were your surroundings loud?
21  A.   Yes.
22  Q.   I believe you referred to them as almost riotous?
23  A.   Yes.

145

1    Q.   Okay.  Was it very crowded?

2    A.   Yes.

3    Q.   How crowded was it?

4    A.   At a certain point in time it was -- I don't know

5         how to describe it.  It was a sea of people.  It

6         was -- various spots, there was a lot of activity

7         going on.

8    Q.   Thousands of people?

9    A.   Oh, easily, yes.

10   Q.   And were there different groups of people sort of

11        congregating together in different places?

12   A.   Yes.

13   Q.   And did several different groups of people have

14        their own music playing?

15   A.   Yes.

16   Q.   Which I assume led to the noise.  Correct?

17   A.   I would have to say yes, aside from just in

18        general the thousands of people in that area, the

19        music, yes.

20   Q.   So there were a ton of contributing factors to

21        how raucous the atmosphere was, fair?

22   A.   Yes.

23   Q.   Hard to hear?

146

1   A.   I guess your question is a little open.  Hard to

2        hear --

3   Q.   Let me ask you a different question.

4   A.   Sure.

5   Q.   You just told us how riotous and loud and packed

6        it was.  Okay?

7   A.   Sure.

8   Q.   Do all those factors cause a person to have a

9        tougher time hearing or is it easier to hear when

10       there's a riot going on?

11  A.   It's a tougher time in general, yes.

12  Q.   That's fine.  Let's talk about your weaponry and

13       gear.  Could you tell me all the weapons that you

14       had on your physical person just prior to the

15       incident?

16  A.   I had a departmental assigned Glock handgun,

17       which consisted of I believe three magazines.  I

18       had a wooden baton.  I had a canister of pepper

19       spray on my belt, handcuffs.  Aside from (sic)

20       weapons, that would be it.

21  Q.   Did you have any backup weapon?

22  A.   No.

23  Q.   Any vehicle shotgun or weapon that stays with the

147

1   vehicle?

2 A. I believe there was -- I don't recall if there

3   was a shotgun in the vehicle that day, or a

4   rifle.  There may very well have been a rifle in

5   the vehicle, yes.

6 Q. Was the Glock a nine millimeter pistol?

7 A. Forty caliber.

8 Q. Let's talk briefly about the baton.  You said a

9   wooden baton, is that correct?

10 A. Correct.

11 Q. Does the sheriff's department require you to

12   carry a certain kind of baton?

13 A. It's a standardized baton.  And then you can

14   carry an extendable baton if you were trained in

15   the extendable baton.  So there's I guess

16   different options, to answer your question

17   properly.

18 Q. Is your -- well, strike that.  Let me ask you,

19   was the baton that you were carrying on 12/3 of

20   '17 consistent with batons that you are allowed

21   to carry as a member of the Erie County Sheriff's

22   Department?

23 A. Yes.

148

1   Q.   Are you able to describe the baton for me in

2        somewhat more detail in terms of thickness or

3        length or anything else?

4   A.   Length, maybe, as an estimate here, less --

5        around two feet maybe.  I'm not sure of the

6        length.  Roughly twenty-four inches maybe, maybe

7        a little bit more, maybe a little bit less.

8        Somewhere between a quarter and a half dollar in

9        diameter in size.  One end consisted of a handle,

10       like a grip, and a piece of leather through there

11       as like a loop to attempt to obviously help you

12       from losing control of the baton.

13  Q.   Is it made of solid wood?

14  A.   Yes.

15  Q.   Do you know what kind of wood?

16  A.   I do not, no.

17  Q.   Have you always carried the same baton?

18  A.   Yes.  For the most part, yes.

19  Q.   Do you have a nickname for the baton?

20  A.   I do not, no.

21  Q.   Have you ever referred to it by any other name?

22  A.   Aside from -- I'm sorry.  Your question, aside

23       from the name of baton?

149

1   Q.  Correct.

2   A.  Stick, wooden stick.

3   MR. GLAZER:  Okay.  Where is that coming from, does

4       anybody know?

5           (Discussion off the record.)

6   BY MR. GLAZER:

7   Q.  You indicated, Mr. Achtyl, that you may have

8       referred to your baton as some sort of stick, is

9       that true?

10  A.  Yeah.  Yes.

11  Q.  Did you ever call it a sausage?

12  A.  No.

13  Q.  Are you sure about that?

14  A.  I am positive about that.

15  Q.  Showing you what's been marked Deposition Exhibit

16      11 for identification, I'll tell you it's the

17      body cam footage that you're extremely familiar

18      with.  I'm going to show you what starts around

19      eighteen thirty-two at the upper right-hand

20      corner of the body cam footage.

21          (Whereupon, video footage was played.)

22  BY MR. GLAZER:

23  Q.  Is that you right there, Deputy Achtyl?

150

1    A.   That's me, yes.

2            (Whereupon, video footage was played.)

3    BY MR. GLAZER:

4    Q.   When you said don't do it, what were you

5         referring to there?

6    A.   Not sure.

7    Q.   Let me ask you another question.

8    A.   Sure.

9    Q.   Are you referring to the fact that you heard

10        Deputy Flowers tell you not to get out of the

11        vehicle?

12   A.   I don't recall Deputy Flowers telling me not to

13        get out of the vehicle.

14   Q.   Do you recall Deputy Flowers saying nah ah ah

15        before you got out of the vehicle?

16   A.   I do, yes.

17   Q.   Let's get back to this snippet of film here.  I'm

18        going to play it again.

19            (Whereupon, video footage was played.)

20   BY MR. GLAZER:

21   Q.   Now I'm at eighteen thirty-one fifty-eight.  Do

22        you see that on the upper right-hand corner?

23   A.   Yes.

151

1   Q.   Do you see yourself coming into view?

2   A.   Yes.

3   Q.   Who were you talking to at that time?

4   A.   I'm not sure.

5   Q.   Well, who was wearing the body cam?

6   A.   Deputy Flowers is wearing the body cam.  This is

7        Deputy Flowers' body cam footage.

8   Q.   If I represent to you that this is Deputy

9        Flowers' body cam footage, would you be talking

10       to Deputy Flowers?

11  A.   Yes.

12  Q.   Okay.  Let's play it.

13            (Whereupon, video footage was played.)

14  BY MR. GLAZER:

15  Q.   Did you say I heard you, don't do it?

16  A.   I didn't hear what I said.  I heard I said don't

17       do it.

18  Q.   Let's play it again.

19            (Whereupon, video footage was played.)

20  THE WITNESS:  I heard don't do it.

21  BY MR. GLAZER:

22  Q.   So you're representing under oath that you didn't

23       hear yourself say I heard you, don't do it?

152

1    A.   I do not hear I heard you.

2    Q.   Okay.  Let's play a little more.  We're now at

3         eighteen thirty-two o four.

4              (Whereupon, video footage was played.)

5    BY MR. GLAZER:

6    Q.   Did you say don't eat the sausage this morning?

7    A.   Yeah, I did.

8    Q.   Okay.  What were you referring to?

9    A.   I was referring to the awful Tim Horton's sausage

10        sandwich that I had for breakfast.

11   Q.   Okay.  So when Deputy Flowers said to you don't

12        do it, and then you said don't do it, don't eat

13        the sausage, you were referring to sausage from

14        Tim Horton's?

15   A.   Absolutely, yes.

16   Q.   Okay.  How did you pay for the sausage that you

17        got at Tim Horton's that morning?

18   A.   Probably cash.

19   Q.   Probably cash or definitely cash?

20   A.   Definitely cash.

21   Q.   Who paid?

22   A.   I'm not sure.  I would imagine I did or -- I'm

23        not sure.

153

1    Q.   What exactly did you purchase at Tim Horton's?

2    A.   Probably a sausage sandwich, most likely at that

3         time on a bagel, and most likely a large coffee,

4         double double.

5    Q.   What about Deputy Flowers?

6    A.   I don't recall what he purchased.

7    Q.   Did he purchase anything?

8    A.   I'm not sure.

9    Q.   Do you remember if he had coffee that morning?

10   A.   I don't recall.

11   Q.   Would it have been typical for him to have coffee

12        and a sandwich?

13   A.   Not necessarily, no.  It depended on the -- his

14        work schedule I would say.

15   Q.   I'll go back to Deposition Exhibit 11, starting

16        the video from eighteen thirty-one fifty.  I'm

17        going to ask you to watch the video.

18            (Whereupon, video footage was played.)

19   BY MR. GLAZER:

20   Q.   Did you hear Deputy Flowers at eighteen

21        thirty-two eighteen refer to you getting out of

22        the vehicle?

23   A.   I did not catch that.  I heard what I said.

154

1  Q.  Okay.  Did you hear anybody say anything about
2      Tim Horton's before you talked about eating the
3      sausage?
4  A.  No.
5  Q.  Ever hear anybody else from the sheriff's
6      department refer to a baton as a sausage?
7  A.  No.
8  Q.  I'm going to show you what's been marked as
9      Deposition Exhibit 6 for identification.  Same as
10     always, can you see the top half of the first
11     page with an exhibit tab on the right?
12 A.  Yes.
13 Q.  Okay.  Does it say police baton on the top?
14 A.  Yes.
15 Q.  Okay.  I'm going to scroll down to where it says
16     policy and procedure.  Do you see that?
17 A.  I see policy and procedure, yes.
18 Q.  Okay.  Where it says policy, does it say it is
19     the policy of the Erie County Sheriff's Office
20     that the police baton be used in instances where
21     a non-lethal weapon is required and its use is
22     justified?  Do you see that?
23 A.  Yes.

155

1   Q.   Did I read that properly?

2   A.   You did, yes.

3   Q.   And that applies to you, correct, when you were a

4        deputy sheriff?

5   A.   Yes.

6   Q.   Scrolling down to procedure.  Do you see where it

7        says procedure?

8   A.   Yes.

9   Q.   Okay.  Section one A, use of police baton, as a

10       supplement to the use of normal force where an

11       individual is resisting arrest or otherwise not

12       able to be subdued with mere physical force.

13           Do you see that?

14  A.   Yes.

15  Q.   Okay.  Scrolling down to C.  It is not

16       recommended, underlined, that the police baton be

17       used to strike an individual in the area of the

18       head, temple, back of neck, throat or spine.

19           Did I read that properly?

20  A.   Yes, you did.

21  Q.   Did that apply to you when you were a deputy

22       sheriff?

23  A.   Yes, it did.

156

1    Q.   In the course of your employment with the

2         sheriff's department, was it part of your job

3         duties to draft accusatory instruments in the

4         event that you made an arrest?

5    A.   Yes.

6    Q.   And would you agree that it's important to be

7         accurate when you draft accusatory instruments?

8    A.   Yes.

9    Q.   Would you agree with me that it's important to

10        include all of the details that you think are

11        relevant to an arrest?

12   A.   Yes.

13   Q.   Is it important to take your time in drafting

14        these accusatory instruments to make sure they're

15        correct?

16   A.   Ideally, yes.

17   Q.   When was the first time that you saw Mr. Belsito

18        on December 3rd of 2017?

19   A.   During the arrest of his friend, acquaintance,

20        Mr. Lowry.

21   Q.   When were you aware for the first time that

22        Belsito and Lowry were friends, is your term?

23   A.   I'm not sure when I knew they were friends or

157

```
 1        acquaintances, but Mr. Belsito was very

 2        interested during the arrest of what was

 3        happening to Mr. Lowry.

 4   Q.   So would it be fair to say, then, that during Mr.

 5        Lowry's arrest you noticed that Mr. Belsito

 6        appeared to be very interested in Mr. Lowry's

 7        arrest?

 8   A.   Yes.

 9   Q.   Okay.  When you say very interested, what exactly

10        did Mr. Belsito do to make you believe that he

11        was very interested?

12   A.   Well, from what I recall, he reached into the

13        handcuffing area.  He might have even touched Mr.

14        Lowry, and offered a plea I guess you could say,

15        that Mr. Lowry would not be arrested.

16   Q.   You said he reached into the handcuffing area, is

17        that correct?

18   A.   Yes.

19   Q.   Would reaching into the handcuffing area be a

20        crime?

21   A.   Yes.  It could be construed as a crime, yes.

22   Q.   What crime?

23   A.   It would be -- obstructing it could be or in
```

158

1      different ways it could be resisting.

2  Q.  Did you charge Mr. Belsito with obstructing or

3      resisting based upon reaching into the

4      handcuffing area?

5  A.  I believe I did as the total set of

6      circumstances.

7  Q.  What does that mean?

8  A.  Well, Mr. Belsito had -- did certain actions

9      prior to him coming up to the patrol car window.

10  Q.  All right.  Well, I just asked you if you charged

11      Mr. Belsito with a crime relative to reaching

12      into the handcuffing area, and you said yes, is

13      that correct?

14  A.  I did, yes.

15  Q.  Okay.  And you told me a few minutes ago that it

16      is important to include all of the details that

17      you believe are relevant to the offense when

18      drafting an accusatory, is that correct?

19  A.  Yes.

20  Q.  Did you mention anywhere in the accusatories that

21      you drafted that Mr. Belsito reached into the

22      handcuffing area?

23  A.  Not that I'm aware of.

159

1    Q.   Did you mention anywhere in your use of force

2         report that Mr. Belsito reached into the

3         handcuffing area?

4    A.   Not that I recall.

5    Q.   Can you see anywhere on Deputy Flowers' body cam

6         Mr. Belsito's hands reaching into the handcuffing

7         area?

8    MR. D'AQUINO:  Are we talking about a different video

9         than he's been shown so far?

10   MR. GLAZER:  I apologize.  Let me ask a better

11        question.

12   BY MR. GLAZER:

13   Q.   Does Deputy Flowers' body cam footage, which

14        you've told us you reviewed, show in any way Mr.

15        Belsito's hands reaching into the handcuffing

16        area?

17   A.   From what I recall, his hand came forward towards

18        the area that Mr. Lowry was being handcuffed.

19   Q.   Okay.  I'm going to need to ask that question

20        again.  Does the Flowers body cam footage in any

21        way show the hands of Mr. Belsito reaching into

22        what you've termed the handcuffing area?

23   A.   I would have to see the video to recall.

160

1    Q.   Refresh my recollection as to when is the last

2         time you saw the video?

3    A.   When I saw the video?

4    Q.   When was the last time?

5    A.   At my trial, 2019.

6    Q.   Okay.  Let's play it for you.

7             Can you see the footage up there on the

8         screen?

9    A.   I do not.

10   Q.   Hold on one second.

11            Can you see it now?

12   A.   I can see it now, yes.

13   Q.   I'm going to scrub it back to one thirteen o

14        three on the lower left and seventeen nineteen

15        sixteen on the upper right.  Do you see that?

16   A.   I do.

17   Q.   All right.  And that's Mr. Lowry being arrested,

18        is that correct?

19   A.   Correct.

20   Q.   All right.  Let's watch from here.

21            (Whereupon, video footage was played.)

22   BY MR. GLAZER:

23   Q.   There's Mr. Belsito, correct?

1    A.  Right.

2    Q.  Okay.

3           (Whereupon, video footage was played.)

4    BY MR. GLAZER:

5    Q.  Has he reached into the handcuffing area yet?

6    A.  I'm not sure.  I don't believe so.

7           (Whereupon, video footage was played.)

8    BY MR. GLAZER:

9    Q.  Has he reached into the handcuffing area yet?

10   A.  I would have to say not at this time, no.

11   Q.  Because we can see your hands right there, is

12       that correct?

13   A.  Yes, that's correct.

14          (Whereupon, video footage was played.)

15   BY MR. GLAZER:

16   Q.  Has he reached into the handcuffing area yet?

17   A.  Not on the video, no.

18   Q.  Okay.  And I'm at seventeen nineteen

19       twenty-eight.

20          (Whereupon, video footage was played.)

21   BY MR. GLAZER:

22   Q.  Has he reached into the handcuffing area yet?

23   A.  Not that I see, no.  Not on the video.

162

1    Q.   I'm at seventeen nineteen thirty-seven.

2            (Whereupon, video footage was played.)

3    BY MR. GLAZER:

4    Q.   Okay.  Has he reached into the handcuffing area

5         yet?

6    A.   No.

7    Q.   Okay.  And this is where you indicate that Mr.

8         Belsito made a plea for his friend?

9    A.   It would be prior.  I think it was towards the

10        start of your video, from what I recall, during

11        the --

12   Q.   What was the plea that he made?

13   A.   I'm not sure of his exact words.  Something to

14        the effect of you don't have to do this, don't

15        arrest him.  Something along that lines.

16   Q.   That's pretty benign, would you agree?

17   MR. D'AQUINO:  Object to the form.

18   BY MR. GLAZER:

19   Q.   You can answer if you understand.

20   A.   I do understand.

21   Q.   Okay.

22   A.   The don't arrest my friend or you don't need to

23        do this, I would understand that as he doesn't

163

1          want whoever is being arrested arrested.

2     Q.   Okay.  Fair.  I'm not disagreeing with you.  I'm

3          asking you a straightforward question.  Did he

4          curse at you?

5     A.   Not at that time, aside from -- no, he did not.

6     Q.   Okay.  That's what I'm asking.  He didn't curse

7          at you at that time?

8     A.   No.

9     Q.   He didn't put his hands on you at that time, is

10         that correct?

11    A.   That's correct.

12    Q.   Didn't put his hands on Deputy Flowers, is that

13         correct?

14    A.   That's correct.

15    Q.   Okay.  And you saw no reason to charge him for a

16         crime up to this point in the video, is that

17         fair?

18    A.   Earlier it was my interpretation of the events

19         that day, as I did not have the opportunity to

20         review the video, that he came up and interjected

21         himself in that arrest process.

22    Q.   Okay.  And when you say interjected, you mean

23         reached into the handcuffing area, correct?

164

1   A.   He reached towards the area where the handcuffs

2        were.  Did he make it to the handcuffing area?

3   Q.   Since you brought it up, let's ask you.  Did he

4        make it to the handcuffing area?

5   A.   He was in the general area where the handcuffs

6        were being put on Mr. Lowry by the side of the

7        police car.

8   Q.   How big is the general area of where the

9        handcuffs were being put on?

10  A.   Well, there's two deputies trying to get a

11       subject handcuffed.  I would not want to be, if I

12       was a citizen, I would not want to be standing to

13       -- near those deputies.

14  Q.   How big is the general area of the handcuffing

15       area?

16  A.   It varies.

17  Q.   How big was it in this particular situation, how

18       big was it?

19  A.   In this situation, in this situation, ideally a

20       handcuffing scenario, with all these people

21       around, should have been feet.

22  Q.   How many feet?

23  A.   In a situation like this, ideally there should be

165

1      a few feet between people under the set of these

2      circumstances.

3   Q.  Okay.  So is it your testimony under oath that

4      the general handcuffing area is a few feet away

5      from the person being handcuffed?

6   A.  When it pertains to citizens under this set of

7      circumstances, I would say a safe area would be,

8      yes, what I just stated.

9   Q.  Okay.  So I don't understand that, so I need to

10     ask you.  In this particular situation, this

11     arrest --

12  A.  Yes.

13  Q.  -- are you saying under oath that the general

14     handcuffing area is approximately two feet away

15     from the person being handcuffed?

16  A.  For safety reasons, yes.  There should not be

17     people next to the person being taken into

18     custody.

19  Q.  All right.  So is it your testimony, then, that

20     at seventeen nineteen forty-three of this video,

21     Mr. Belsito was within the handcuffing area?

22  A.  At seventeen -- at this, seventeen nineteen, this

23     point in time, forty-three?

166

1   Q.   Correct.

2   A.   He was in the -- yeah, at this point in time.

3        Right prior to this point in time, yeah, he was

4        in the way.

5   Q.   He was in the way now.

6   A.   He was in the way or in the area where Mr. Lowry

7        was being handcuffed.

8   Q.   How is the way different than the general

9        handcuffing area?  Explain that to me.

10  A.   Well, when you have an individual that stands in

11       front of a person being arrested to impede taking

12       that individual under arrest back to a police

13       car, I would say that he's in an area that he's

14       causing issues.

15  Q.   He's causing issues?

16  A.   Causing issues while someone else is being

17       arrested, yes.

18  Q.   So it's your testimony under oath that Mr.

19       Belsito committed a crime at this juncture of Mr.

20       Lowry's arrest because he was in the general area

21       of where you were handcuffing Mr. Lowry?

22  MR. D'AQUINO:  Object to the form.

23  BY MR. GLAZER:

167

1    Q.   Is that your testimony?

2    A.   What I'm testifying to is that just immediately

3         prior to this when Mr. Belsito stood in my way

4         and I used my baton to move him out of the way so

5         we could get by him, then yes, Mr. Belsito was

6         trying to hinder the process that was being

7         taking place of Mr. Lowry.

8    Q.   Can we agree that up until seventeen nineteen

9         forty-three of the video, you cannot see anywhere

10        on this video that Mr. Belsito reached into the

11        handcuffing area?  Can we agree on that?

12   A.   I'm not going to agree on that.  I'm not -- what

13        I would call him doing earlier is being in that

14        area and reaching in towards the handcuffs.

15   Q.   You've got to listen to my question.

16   A.   Okay.  I'm sorry.

17   Q.   My question is very simple.  Can we agree that as

18        of seventeen nineteen forty-three of this video,

19        we have not seen at all any footage of Mr.

20        Belsito reaching into the handcuffing area?

21   MR. D'AQUINO:  Okay.  Let me just say two things.

22        Excuse me.  Number one, you don't need to shout

23        at the witness.  That can stop.  He's answering

168

1       your question, he's not being difficult.  And

2       number two, I think it would be important for you

3       to put the start point of this video, the

4       sequence where you started this, because you're

5       just saying up to.  It sounds like you've played

6       the entire thing.

7   MR. GLAZER:  Okay.  Well, let me make it simple.

8   BY MR. GLAZER:

9   Q.  From the beginning of the video up until

10      seventeen nineteen forty-three, can we agree that

11      the video does not show Mr. Belsito reaching into

12      the handcuffing area?

13  A.  I don't recall what was played or the video that

14      occurred prior to this.

15  Q.  I'll play it again.  I'll start at the beginning,

16      seventeen nineteen sixteen.  And you know what?

17      Maybe it will help if you tell me where Mr.

18      Belsito is reaching into the handcuffing area,

19      and I'll stop the video.

20          (Whereupon, video footage was played.)

21  THE WITNESS:  Right when his -- if you saw in the

22      video, when his hand came forward, there was

23      another deputy that reached to pull his arm back.

1    My interpretation of him reaching in towards the

2    handcuffs occurred right at that moment in time

3    where he reached in towards the handcuffing area.

4    And I don't know if this is the complete video

5    you're showing me or just a clip in time per se,

6    but at that point where I saw him reaching in was

7    when his arm was being pulled back by the other

8    deputy.

9    BY MR. GLAZER:

10   Q.   Okay.  So it is now --

11   MR. D'AQUINO:  The time signature we're looking at

12       right now is seventeen colon nineteen colon

13       twenty.

14   BY MR. GLAZER:

15   Q.   So, Mr. Achtyl, is it now your testimony that as

16       of seventeen nineteen twenty, Mr. Belsito has, in

17       fact, reached into the general handcuffing area?

18   A.   If the video is at the beginning, then yes,

19       that's the time.

20   Q.   Okay.  That's not my question.  My question is, I

21       just played you the video from the beginning up

22       until seventeen nineteen twenty, and now you're

23       telling us that as of seventeen nineteen twenty,

170

1      Mr. Belsito has already reached into the, what

2      you called, general handcuffing area, is that

3      true?

4   A. Yes.

5   Q. Okay.  And you saw him do this?

6   A. I did.

7   Q. Did you discuss that with anyone during the time

8      that you were at the stadium?

9   A. No.

10  Q. Did you put it anywhere in your accusatory

11     documents?

12  A. Not that I recall.

13  Q. Did you put it in the use of force report?

14  A. I don't recall my use of force report, so I'm not

15     sure what's -- if it's in there or not.

16  Q. If I told you it's not in there, would you have a

17     reason to disagree with that?  I can show it to

18     you if you like.

19  A. I would not have a reason to disagree with you if

20     you're saying it's not in there.

21  Q. And you're indicating to us that Mr. Belsito had

22     committed a crime for which you could have

23     charged him that was relevant to your eventual

171

```
 1      arrest by seventeen nineteen twenty of the video?
 2   MR. D'AQUINO:  Object to the form.
 3   BY MR. GLAZER:
 4   Q.   Do you understand that question?
 5   A.   I do.  Yes.
 6   Q.   The answer is yes?
 7   A.   Yes.
 8   Q.   Okay.  You told us a little while ago that Mr.
 9        Belsito was charged arising out of conduct that
10        happened during Mr. Lowry's arrest, is that
11        true?
12   A.   That's correct.
13   Q.   When did you first tell someone that Mr. Belsito
14        had interfered with Mr. Lowry's arrest?
15   A.   I believe I placed it in my police report, that
16        there was -- that he was arrested for
17        interfering, in that complaint number that's
18        relative to Mr. Lowry's arrest.
19   Q.   Okay.
20   A.   Referring back to Mr. Lowry's arrest.
21   Q.   So you charged Mr. Belsito with which offense
22        relative to the conduct with Mr. Lowry?
23   A.   I don't recall what my information states in
```

172

1        regards to which charge you're referring to.

2    Q.   Okay.  Let me show you the accusatories.

3           Showing you Deposition Exhibit 7 for

4        identification.  Do you see that?

5    A.   Yes.

6    Q.   Okay.  And that's the accusatories, am I right?

7    A.   That's correct.  It's for criminal mischief.

8    Q.   That's not the one, correct?

9    A.   Correct.

10   Q.   Okay.  Next one is obstructing governmental

11       administration.  Is that the one?

12   A.   It may be.  I'm not sure.

13   MR. D'AQUINO:  Do you want him to read it to answer

14       the question?

15   MR. GLAZER:  No, I don't, but I'll ask him another

16       question.

17   BY MR. GLAZER:

18   Q.   If I were to tell you, with this document in

19       front of you, that it doesn't mention anywhere

20       that you were reaching into the handcuffing area

21       while Mr. Lowry was being arrested, would you

22       have a reason to disagree with that?

23   MR. D'AQUINO:  Well, in that case, let him take time

173

1       to read the document.

2   MR. GLAZER:  It's right up on the screen.  He's

3       welcome to it.

4   BY MR. GLAZER:

5   Q.  Take as long as you need.

6   A.  I would say it does not.

7   Q.  Okay.

8   A.  Because in regards to --

9   Q.  I'm not looking for the reasons.

10  A.  Okay.  Fair enough.

11  Q.  Next information, disorderly conduct.  Did Mr.

12      Belsito's conduct while you were arresting Mr.

13      Lowry play into your decision to arrest him for

14      disorderly conduct?

15  A.  At this point in time, no.

16  Q.  Well, at any point in time did it play in?

17  A.  Mr. Belsito interfered with an earlier arrest, he

18      was part of the problem at the stadium.  And yes,

19      his actions prior resulted in what I decided to

20      do.

21  Q.  Okay.  I'm going to ask you that again.  I just

22      asked you did Mr. Belsito's actions and conduct

23      during your arrest of Mr. Lowry play a part in

174

1       your determination to charge him with disorderly

2       conduct, and you said at this time, no, is that

3       correct?

4   A.  The --

5   Q.  Yes or no?

6   A.  Okay.  Rephrase your -- not rephrase your

7       question.  Repeat your question so I understand

8       what you're asking me, please.

9   Q.  Simple question.

10  A.  Sure.

11  Q.  My question is, did Mr. Belsito's conduct during

12      your arrest of Mr. Lowry play into your decision

13      to charge him with disorderly conduct?

14  A.  His actions did play a role in him eventually

15      being charged with these three offenses, yes.

16  Q.  So when I asked you that two minutes ago and you

17      said not at this time, what did you mean by that?

18  A.  If you were specifically relating -- or,

19      referring to this -- these charging instruments,

20      that's what I meant.  However, his actions -- it

21      was a total set of circumstances that resulted in

22      him finally being -- or -- yeah.  Finally being

23      arrested at the stadium that day, yes.

175

1   Q.   So you're now telling us under oath that Mr.

2       Belsito's reaching into the handcuffing area

3       played a role in your determination to arrest him

4       for disorderly conduct, is that true?

5   A.   What I am saying is that his set of circumstances

6       that day, from when he started in regards to the

7       reaching towards the handcuffing area and

8       standing in my way where he had to be pushed

9       away, yes, it played up to the final incident of

10      what occurred and the charges that were placed.

11  Q.   Did Mr. Belsito's reaching into the handcuffing

12      area play a role in your decision to charge him

13      with disorderly conduct, yes or no?

14  MR. D'AQUINO:  I think he just answered that question

15      very thoroughly.

16  MR. GLAZER:  He absolutely did not answer it.

17      Absolutely did not.  It's a yes or no question.

18      It's a yes or no question.

19         Miss Simonin, could you read back my

20      question, please?

21  MR. D'AQUINO:  And the answer.

22  MR. GLAZER:  There was no answer to the one I just

23      asked.

176

1   MR. D'AQUINO:  No.  No.  I'm referring to the prior

2       question that ended in the word yes, that's why

3       I'm saying he answered it, but go ahead.

4   MR. GLAZER:  Can you just read back my last question

5       so we can put this to an end?

6           (Whereupon, the above-requested previous

7       question was then read back by the reporter.)

8   MR. D'AQUINO:  And that was the prior question that

9       you asked and that he answered.  Let's read those

10      back.

11  MR. GLAZER:  Fine.  I mean, he can answer it very

12      easily right now without a narrative, but if you

13      want to read them all back, it's okay with me.

14  MR. D'AQUINO:  I just want the prior question and

15      answer read back because he answered this

16      question.

17  MR. GLAZER:  Okay.  He absolutely did not, but go

18      ahead.

19          (Whereupon, the above-requested question and

20      answer at page 174, lines 16 through 23, were

21      then read back by the reporter.)

22  MR. GLAZER:  I've got some ground left to cover here,

23      so my preference would be either direct him not

177

```
 1        to answer this question and state the grounds,
 2        please, or let him answer my last question and
 3        let me move on.
 4   MR. D'AQUINO:  Let's do the latter.
 5   MR. GLAZER:  Okay.
 6            Can you read my question, Miss Simonin, my
 7        last question?
 8            (Whereupon, the above-requested previous
 9        question was then read back by the reporter.)
10   BY MR. GLAZER:
11   Q.  Please answer the question.
12   A.  Yes.
13   Q.  Okay.  And yet nowhere in this accusatory
14        instrument charging disorderly conduct did you
15        mention Mr. Belsito reaching into the handcuffing
16        area, is that true?
17   A.  Yes.
18   Q.  So we know now that you assumed at the time Mr.
19        Lowry was being arrested that Belsito and Lowry
20        at least knew each other, is that fair?
21   A.  Yes.
22   Q.  Okay.  And you used the word friend.  Did you
23        assume they were friends?
```

178

1    A.   I used the word friends or acquaintances, yes.

2    Q.   Did there come a time after Mr. Belsito was in

3         custody that you discussed this incident with a

4         Deputy Dusza?

5    A.   Deputy Sergeant Dusza, yes.

6    Q.   Okay.  That was my next question.  Can you give

7         us his full name and spell his last name and tell

8         us his rank?

9    A.   At the time of the incident it was Sergeant

10        Timothy Dusza, if that answers everything in your

11        question.

12   Q.   I just need his full name and spelling.

13   A.   I believe the last name Dusza is spelled D-U-Z --

14        D-U-Z-A maybe, I believe.

15   Q.   There may be a C in there somewhere?

16   A.   S or C maybe, yes.

17   MR. GLAZER:  We'll figure that out for you, Sue Ann.

18   THE WITNESS:  C?  I'm not sure.  I don't recall.

19        Something like that.

20   BY MR. GLAZER:

21   Q.   Did you discuss with, we'll call him Sergeant

22        Dusza, what had happened between you and Mr.

23        Belsito?

1    A.   I believe I did, yes.

2    Q.   And that obviously was after the events that took

3         place at your patrol car?

4    A.   Yes.

5    Q.   Were you truthful with him?

6    A.   Yes.

7    Q.   Did you change any of the details of the incident

8         when you told Sergeant Dusza about it?

9    A.   No, I did not.

10   Q.   Did you tell Sergeant Dusza about Mr. Belsito's

11        reaching into this handcuffing area?

12   A.   I don't believe so, no.

13   Q.   Let's talk about Dylan Lowry.  Dylan Lowry was

14        arrested for throwing a beer can, is that

15        correct?

16   A.   Yes.  Full can of beer, yes.

17   Q.   It's your testimony that it was a full can of

18        beer?

19   A.   Yes.

20   Q.   Did you see this can of beer being thrown at you?

21   A.   I did not see it, no.

22   Q.   Was it open or closed?

23   A.   I believe it was closed.

180

1   Q.  So Mr. Lowry and his friends were just hurling

2       full cans of closed beer at the police?

3   A.  Yes, they were.

4   Q.  Okay.  And you know that how?

5   A.  Because I was hit in the elbow by the can of

6       beer.

7   Q.  Take me through the clothing that you were

8       wearing on your upper body on the date of the

9       incident.

10  A.  I believe it was a long-sleeved shirt and my

11      ballistic vest.  May have been a light jacket.

12      I'm not sure.  I believe, if I recall from the

13      video, it was a jacket and my ballistic vest.

14  Q.  I'm sorry if I'm taking a step back here, but how

15      do you know that Dylan Lowry threw a full closed

16      beer can at you?

17  A.  Because the undercover deputy, Granville, told me

18      to watch out for Mr. Belsito.  As he also, Deputy

19      Granville, also I believe, if memory serves me

20      correctly, gave a -- testimony to the effect that

21      Mr. Lowry threw that can of beer that hit me in

22      the elbow, and may have also signed a supporting

23      deposition.  I'm not sure.

181

1    Q.   Now your testimony is that Mr. Belsito threw the

2         full can of beer that hit you in the elbow?

3    A.   No.  Mr. Lowry threw the full can of beer, that

4         was explained to me by Deputy Granville.

5    Q.   Okay.  And what was --

6    A.   That's why Mr. Lowry was brought out of the

7         crowd, because he threw the full can of beer that

8         hit me in the elbow.

9    Q.   Okay.  And then you said something about Deputy

10        Granville telling you to keep your eye on Mr.

11        Belsito at that time?

12   A.   Yes, because he was --

13   Q.   Okay.  And what was that all about?

14   A.   He was with Mr. Lowry and he was following Mr.

15        Lowry around.

16   Q.   Okay.  Were you injured by this full can of beer

17        that was thrown at you?

18   A.   Was I injured?

19   Q.   Yes.

20   A.   No.  Did I have a sore elbow?  Yes.

21   Q.   Do you know a person named Kara Massotti?

22   A.   I'm not sure.  I don't know --

23   Q.   Do you remember --

182

1   A.   I'm sorry.  I don't know who you're referring to.

2   Q.   So when I ask you if you know who Kara Massotti

3        is, your answer is no, you don't?

4   A.   No, I don't.

5   Q.   Okay.  Do you recall a person named Kara Massotti

6        testifying at your criminal trial?

7   A.   Yes.  Now that you mentioned the connection, yes,

8        I do.

9   Q.   Is she a nurse with no criminal record?

10  A.   I'm not sure what her occupation is.  I don't

11       recall.

12  Q.   If I told you she was a health care worker with

13       no criminal record, would you have a reason to

14       disagree with that?

15  A.   No, I don't.

16  Q.   And if I told you that she didn't know Mr.

17       Belsito before 12/3 of '17, would you have a

18       reason to disagree with that?

19  A.   No, I would not.

20  Q.   Did you hear Miss Massotti testify at trial that

21       Mr. Lowry threw an empty can of beer over his

22       shoulder in reverse?

23  A.   I don't recall what her testimony was.

183

1   Q.   If I told you that Miss Massotti testified that
2        Mr. Lowry threw an empty can of beer over his
3        shoulder behind him, would you have a reason to
4        disagree with that?
5   A.   I would not have a reason to disagree with her
6        testimony.  No, I do not.
7   Q.   Do you recall what Mr. Lowry was charged with as
8        a result of the can throwing incident?
9   A.   I believe it was disorderly conduct.
10  Q.   There is no allegation that Mr. Belsito threw a
11       can of beer, is that correct?
12  A.   That's correct.
13  Q.   Did you use your baton at all during the arrest
14       of Mr. Lowry?
15  A.   Yes.
16  Q.   Why?
17  A.   Because the baton was in my hand and I used it on
18       his back to keep him secure against the patrol
19       car so we could handcuff him.
20  Q.   Did you use it on his head at all?
21  A.   Did not, no.
22  Q.   Okay.  Let's watch Deposition Exhibit 11 for
23       identification.  Do you see that?

184

1  A.  Yeah.  Using the baton to hold his head down,

2      yes.

3  Q.  So the baton is on his head, is that correct?

4  A.  Yes.  It's on his head, yes.

5  Q.  You felt that you needed to use the baton on his

6      head why?

7  A.  To get him secured.  He was lifting and trying to

8      get off the car.

9  Q.  Was he charged with resisting arrest?

10 A.  I don't recall.

11 Q.  Do you recall what happened to all of the charges

12     against Mr. Lowry?

13 A.  I do not know.

14 Q.  If I told you that each and every single one of

15     those charges was dismissed, would you have a

16     reason to disagree with me?

17 A.  No, I would not.

18 Q.  So someone was alleged to have thrown a full can

19     of beer at a law enforcement officer and his

20     charges were dismissed, that's what you're

21     telling me?

22 MR. D'AQUINO:  Wait.  Wait.  Wait.  Wait.  Wait.

23     He's not telling you anything.  You asked him if

185

```
 1      he had a reason to disagree with your statement
 2      that that's what happened.
 3  MR. GLAZER:  Fine.  I can rephrase it.
 4  BY MR. GLAZER:
 5  Q.  Do you have any reason to believe that those
 6      charges weren't dismissed?
 7  A.  No, I do not.
 8  Q.  Okay.  Do you find it surprising the DA's office
 9      would dismiss charges against somebody that was
10      alleged to have thrown a full can of beer at a
11      law enforcement officer?
12  MR. D'AQUINO:  I'm going to object on the basis that
13      surprise or his reaction to something like that
14      isn't really relevant.
15          But go ahead and answer.
16  THE WITNESS:  I'm sorry.  Could you just repeat the
17      question?
18  MR. D'AQUINO:  She'll read it back.
19  MR. GLAZER:  Okay.
20          (Whereupon, the above-requested previous
21      question was then read back by the reporter.)
22  THE WITNESS:  I do find it surprising, yes.
23  BY MR. GLAZER:
```

186

1    Q.   A unique situation, would you agree?

2    MR. D'AQUINO:  Object to the form.

3    THE WITNESS:  I don't know why the district

4         attorney's offices -- the district attorney

5         office, why they dismiss charges.  I do not have

6         -- I do not know why they do that.

7    BY MR. GLAZER:

8    Q.   Do you remember telling us about two hours ago

9         that sometimes DA's dismiss charges if they don't

10        believe the conduct actually took place?

11   A.   I said that, from what I recall, that there's

12        various reasons why charges are dismissed, yes.

13   Q.   Was that one of the reasons?

14   A.   Very well could be, yes.

15   Q.   Did you call Mr. Lowry an asshole during the

16        course of his arrest?

17   A.   Not that I recall.

18   Q.   If I told you that I have the video and I hear

19        you calling him an asshole, would you have a

20        reason to disagree with that?

21   MR. D'AQUINO:  Wait.  Wait.  Wait, Ken.

22        If you refer to the video, let's just watch

23        it as opposed to asking him if he agrees or he

187

1       disagrees with your opinion.

2   MR. GLAZER:  I'm just trying to make it easy for him,

3       but okay.

4           You know what?  Do you want to take two

5       minutes?

6   THE WITNESS:  Sure.

7   THE VIDEOGRAPHER:  Four-twenty-eight p.m.  We're

8       going off the record.

9           (Whereupon, a short recess was then taken.)

10  THE VIDEOGRAPHER:  Four-thirty-four p.m.  We're back

11      on the record.

12  MR. GLAZER:  I believe the question was did you call

13      Lowry an asshole during the course of his

14      arrest, Mr. Achtyl didn't recall, and then Mr.

15      D'Aquino asked me to show him the video.  Can you

16      read it back just so that I know where we're

17      going?

18          (Whereupon, the above-requested previous

19      question was then read back by the reporter.)

20  BY MR. GLAZER:

21  Q.  All right.  Let's move on from there.

22          Mr. Achtyl, I'm going to show you Deposition

23      Exhibit 11, which is the video.  I'm going to

188

1       scrub to seventeen twenty thirty.

2           (Whereupon, video footage was played.)

3   MR. GLAZER:  It's twenty-one.  I'm sorry.  Hold on.

4           (Whereupon, video footage was played.)

5   BY MR. GLAZER:

6   Q.  So at seventeen twenty thirty, it sounds like

7       Lowry says something to the effect of I smashed

8       the fucking can, and you say well, you hit me

9       with it, asshole, is that fair?

10  A.  That's fair.

11  Q.  Okay.  Let's talk about Mr. Belsito a little

12      more.  Would you agree with me that part of the

13      duty of a law enforcement officer is to protect

14      and serve the public?

15  A.  Yes.

16  Q.  And we've established that you do have a duty to

17      respond to reasonable requests for advice or

18      information from citizens, is that true?

19  A.  Yes.

20  Q.  You've given testimony to the effect of you knew

21      who Nick Belsito was when he walked up to your

22      car, is that correct?

23  A.  I'm not sure.  I mean, I -- yes.

189

1   Q.   Let me ask you a better question.

2   A.   Sure.

3   Q.   When Nick Belsito walked up to your car, did you

4        know who he was?

5   A.   Immediately?

6   Q.   Yes.

7   A.   No, it didn't click for a little bit after.  When

8        he first I believe -- I don't know if he knocked

9        on my window, I don't recall, or if I was just

10       startled when I looked up to see someone standing

11       by my window.

12  Q.   When did you recognize Mr. Belsito?

13  A.   I would say maybe roughly probably midway through

14       the conversation that he was having at the window

15       with me.

16  Q.   Okay.  And how did you come to recognize him at

17       that point?

18  A.   I believe -- I mean, I recalled what had just

19       happened earlier and I may have made a comment,

20       do you want to go to the jail with your friend.

21  Q.   Okay.  But my specific question is, how was it

22       that you didn't recognize him at first and then

23       at some point during your conversation you were

190

1       able to recognize him?

2   A.  I wasn't expecting to have a person standing at

3       the door of my police car.

4   Q.  Okay.  Do you know at what point in your

5       conversation you recognized him?

6   A.  Roughly around the point I asked him if he wanted

7       to go to jail.

8   Q.  Okay.  I'm going to ask you some questions about

9       what Mr. Belsito said to you, but first, up until

10      the point that he came up to your window, you had

11      not arrested him for any criminal offense, is

12      that correct?

13  A.  That is correct.

14  Q.  And you had not arrested him for a violation of

15      the Penal Law either, is that correct?

16  A.  That's correct.

17  Q.  And we agree that swearing at a police officer is

18      not a crime in New York State?

19  A.  That is correct.

20  Q.  And that swearing at a police officer is not even

21      a Penal Law violation in New York State?

22  A.  That is correct.

23  Q.  Mr. Belsito walked up to your cruiser and tapped

191

1          on the window, or knocked, is that correct?
2    A.    Yeah.  I would have to see the video to recall,
3          but I think there may have been a tap, which kind
4          of, under those set of circumstances, kind of --
5          I don't want to say startled me but kind of, you
6          know, made me like look, like who's knocking on
7          my door, you know, is there something else going
8          on.
9    Q.    Let's go to that point in the video.  We'll start
10         a little bit before.
11             Let me ask you this before we do that.  Do
12         you know how long it was between the time that
13         you placed Mr. Lowry into custody and the time
14         that Mr. Belsito walked up and knocked on your
15         window?
16   A.    I'm not sure.  I'm not sure.
17   Q.    If I told you that it was about six or seven
18         minutes, would you have a reason to disagree with
19         that?
20   A.    No, I would not.
21   Q.    Okay.  Can you see the screen?
22   A.    Yes, I can.
23   Q.    I'm going to scrub it to seventeen twenty-five

192

1        even.  Well, seventeen twenty-five o two, and

2        play it from here.

3             (Whereupon, video footage was played.)

4   BY MR. GLAZER:

5   Q.   So is it fair to say that you get back into the

6        police car around seventeen twenty-five

7        twenty-three?

8   A.   I'm not sure if that's me or if that's Deputy

9        Flowers.  I can't tell by this picture.

10  Q.   All right.  Well, we're looking at Deputy

11       Flowers' body cam, that's not moving.

12  A.   Correct.

13  Q.   The other door is opening, is that correct?

14  A.   Yes.  Makes sense, yes.

15  Q.   So can we agree that it's you getting back in the

16       car at seventeen twenty-five twenty-three?

17  A.   Yes.

18            (Whereupon, video footage was played.)

19  BY MR. GLAZER:

20  Q.   Would you agree with me that from seventeen

21       twenty-five twenty-three to seventeen twenty-five

22       forty-three, there's not much going on other than

23       you and Deputy Flowers are sitting in your

193

1       cruiser?

2   A.  Yes.

3           (Whereupon, video footage was played.)

4   BY MR. GLAZER:

5   Q.  And now we're at seventeen twenty-six zero zero.

6       Would you agree that still you're just sitting in

7       the cruiser with Deputy Flowers?

8   A.  Yes.

9           (Whereupon, video footage was played.)

10  BY MR. GLAZER:

11  Q.  Okay.  Now, at seventeen twenty-six o six, can

12      you see Mr. Belsito sort of come into the frame

13      and now it looks like he's walking up to your

14      window?

15  A.  Yes.

16  Q.  Okay.

17          (Whereupon, video footage was played.)

18  BY MR. GLAZER:

19  Q.  Did you just hear the knock at seventeen

20      twenty-six o eight?

21  A.  Yes.

22  Q.  Okay.  When you heard the knock, did you look up?

23  A.  I would imagine I looked up.  I would have to say

194

```
 1        yes.
 2   Q.   And when you looked up, is it fair to say that
 3        you didn't immediately recognize who Belsito was?
 4   A.   Yes.
 5   Q.   Okay.
 6            (Whereupon, video footage was played.)
 7   BY MR. GLAZER:
 8   Q.   Is it fair to say that right there at seventeen
 9        twenty-six twelve, Belsito says uh, I'm sorry,
10        I'm just wondering where you guys are going
11        because I'm going to meet my friend?
12   A.   Yes.
13   Q.   I can play it again.  Okay.  That's fair?  Is
14        that fair?
15   A.   Yes.
16   Q.   Okay.
17            (Whereupon, video footage was played.)
18   BY MR. GLAZER:
19   Q.   And your response is who is your friend, is that
20        correct?
21   A.   Correct.
22   Q.   Had you recognized who Belsito was at the time
23        you said who is your friend?
```

195

1  A.  I believe I -- from what I recall, earlier I

2      stated once I realized it was Mr. Belsito, that's

3      when I made the comment about asking him if he

4      wanted to go to jail too.  So I don't think that

5      happened at this point yet.

6  Q.  Okay.  So you had not yet recognized Mr. Belsito

7      when you said who's your friend?

8  A.  It did not -- I don't believe it clicked at this

9      point.

10         (Whereupon, video footage was played.)

11 BY MR. GLAZER:

12 Q.  And then Mr. Belsito says the kid in the back, is

13     that right?

14 A.  Correct.

15         (Whereupon, video footage was played.)

16 BY MR. GLAZER:

17 Q.  And your reply is do you want to go to jail with

18     him?

19 A.  Yes.

20 Q.  Okay.

21         (Whereupon, video footage was played.)

22 BY MR. GLAZER:

23 Q.  Nick says no, I'm just, is that correct?

196

1    A.   Sounds like that, yes.

2    Q.   And you cut that off with, quote, beat it,

3         unquote, is that correct?

4    A.   Yes.

5             (Whereupon, video footage was played.)

6    BY MR. GLAZER:

7    Q.   And then Nick says no, again, is that right?

8    A.   That's what it sounds like, yes.

9    Q.   And you say he's going to jail, is that correct?

10   A.   Yes.

11   Q.   Okay.  Can we agree that from the --

12   A.   I'm sorry.  Just -- you were referring to Mr.

13        Lowry going to jail, is that correct?  I just

14        want to make sure that's what I'm -- that's the

15        question I'm answering.

16   Q.   Well, I'm only asking you, you responded to Mr.

17        Belsito by saying he's going to jail?  Are those

18        the words that you used?

19   A.   Yes.

20   Q.   Okay.  Can we agree that at least from the point

21        that Mr. Belsito walked up to your vehicle and

22        tapped on the glass up until right now, he's

23        committed no crime?

197

1   A.  Correct.

2   Q.  Okay.

3          (Whereupon, video footage was played.)

4   BY MR. GLAZER:

5   Q.  Then Nick says okay, could you tell me the

6       location, is that correct?

7   A.  Correct.

8          (Whereupon, video footage was played.)

9   BY MR. GLAZER:

10  Q.  Your response is 10 Delaware, beat it, is that

11      correct?

12  A.  Yes.

13  Q.  Okay.  Now, let me just ask you a few questions

14      in the meantime.

15  A.  Sure.

16  Q.  You didn't know Nick before that date and you

17      didn't know where he was from, is that correct?

18  A.  Correct.

19  Q.  You didn't know he wasn't a Buffalo boy born and

20      raised, is that fair?

21  A.  Correct.

22  Q.  Okay.  So you didn't know if he knew what 10

23      Delaware was, is that true?

198

```
1    A.   I can't answer for what Mr. Belsito knows and
2         doesn't know.
3    Q.   That's specifically my point.  You just didn't
4         know him at all, correct?
5    A.   That is correct.
6    Q.   So you wouldn't know that he was from a town
7         that's three hundred and fifty some-odd miles
8         away from here, true?
9    A.   That is correct, yes.
10   Q.   How could you?  I'm not trying to trick you.
11   A.   No.  I understand.
12            (Whereupon, video footage was played.)
13   BY MR. GLAZER:
14   Q.   Next Nick says what do you mean, tell me the
15        location, is that true?
16   A.   Yes.
17   Q.   Okay.
18            (Whereupon, video footage was played.)
19   BY MR. GLAZER:
20   Q.   And then you say 10 Delaware, beat it, again, is
21        that correct?
22   A.   Yes.
23   Q.   And I'm going to rewind this ten seconds so you
```

199

1        can hear what Nick says after you say 10

2        Delaware, beat it, for the second time.

3              (Whereupon, video footage was played.)

4    BY MR. GLAZER:

5    Q.   At some point around seventeen twenty-six

6         twenty-six, does it appear that Mr. Belsito

7         figures out what you're saying and says thank

8         you?

9    A.   I didn't hear the thank you, but I believe at

10        some point, yes.

11   Q.   Okay.  Well, let me play it again and see if you

12        can hear it.

13   A.   Sure.

14   Q.   Thank you.

15              (Whereupon, video footage was played.)

16   BY MR. GLAZER:

17   Q.   Did you hear the thank you?

18   A.   I'm sorry, I did not catch the thank you.  No, I

19        did not hear it.

20   Q.   Did you hear the thank you that day?

21   A.   I did not hear the thank you that day, no, I did

22        not.

23   Q.   During your conversation with Belsito at the

200

1     cruiser, did you ever say leave the area?

2  A.  No.

3  Q.  You said beat it, and by beat it you meant leave

4     the area?

5  A.  Correct.

6  Q.  Did you ever tell him 10 Delaware in the City of

7     Buffalo?

8  A.  I did not refer to the City of Buffalo since we

9     were in Buffalo, no.

10  Q.  Well, you were in Orchard Park, is that right?

11  A.  Well, yes, but you're at a Buffalo Bills game.

12     So I did not specify and tell him Buffalo, I did

13     not.

14  Q.  Okay.  Did you say street, ave., road?

15  A.  I don't recall saying if it was a street or

16     avenue.  I just merely stated 10 Delaware.

17  Q.  All right.  Well, if I told you that nowhere on

18     the video did you say street, road, avenue or

19     anything else, would you have a reason to

20     disagree with me?

21  A.  I would not.

22  Q.  Okay.  Did you ever tell him his friend was going

23     to the holding center?

201

1   A.  I don't believe I referred to it as the holding

2       center.  As we heard in the video, I believe I

3       said jail.

4   Q.  You said he's going to jail, is that fair?

5   A.  Correct.

6   Q.  Did you tell Belsito that Mr. Lowry was going to

7       the Erie County Holding Center?

8   A.  At this point, no.  I didn't believe there was a

9       reason to.

10  Q.  You know, I really don't want to go on too much

11      longer, but it will just help --

12  A.  I understand.

13  Q.  -- if you just answer my questions without --

14  A.  Absolutely.  Okay.  Fair enough.

15  Q.  Just so that I get an answer to my question, did

16      you tell him he was going to the Erie County

17      Holding Center?

18  A.  No, I did not.

19  Q.  Did you tell him that the place that he was going

20      to was in Buffalo?

21  A.  No, I did not.

22  Q.  Did you tell him what town it was in?

23  A.  No, I did not.

202

1    Q.   The description that you gave was 10 Delaware
2         followed by beat it, is that fair?
3    A.   Yes.
4    Q.   Do you know how many 10 Delawares there are in
5         Erie County?
6    A.   I'm not sure.
7    Q.   Okay.  If I told you that there was a 10 Delaware
8         in Buffalo, a 10 Delaware in Kenmore, a 10
9         Delaware in Tonawanda, a 10 Delaware in Clarence,
10        would you have any reason to disagree with that?
11   A.   No, I would not, if you said there was.
12   Q.   Well, let me ask you another question.
13   A.   Sure.
14   Q.   You're a Buffalo boy born and raised, is that
15        correct?  Or Buffalo man.  I don't mean offense
16        by that.  Buffalo man, true?
17   A.   Yes.
18   Q.   You know that Delaware runs through Buffalo,
19        North Buffalo, Kenmore, Tonawanda, et cetera, is
20        that fair?
21   A.   Yes.
22   Q.   And you know there's a Delaware Avenue and a
23        Delaware Road, is that fair?

203

1   A.   Yes.

2   Q.   And again, you had no way to know whether Mr.

3        Belsito was from Buffalo or whether he was from

4        California, true?

5   A.   That is correct.

6   Q.   You indicated that you didn't hear Mr. Belsito

7        say thank you, but is it fair to say that your

8        conversation ended at some point and he turned to

9        walk away from your cruiser?

10  A.   At some point, yes, he did.

11  Q.   And at the point that he turned to walk away from

12       your cruiser, the doors on your cruiser were

13       closed, is that fair?

14  A.   Yes.

15  Q.   And you indicated to us what the atmosphere was

16       like outside of the vehicle at that time,

17       correct?

18  A.   Correct.

19  Q.   Very loud and hard to hear, is that true?

20  A.   Yes.  Yes.

21  Q.   I'll scrub to seventeen twenty-six twenty-nine.

22       I'll just let it play since it's at seventeen

23       twenty-six twenty-seven.

204

```
 1              (Whereupon, video footage was played.)
 2   BY MR. GLAZER:
 3   Q.  At seventeen twenty-six twenty-nine, does Mr.
 4       Belsito turn back toward the cruiser and say
 5       something to you?
 6   A.  I believe he did, yes.
 7   Q.  Do you know what he said?
 8   A.  I would have to watch the video to recall, but I
 9       believe it was some sort of a profanity or
10       utterance.
11   Q.  Okay.  Let's watch it.
12              (Whereupon, video footage was played.)
13   BY MR. GLAZER:
14   Q.  Do you know what he said there?
15   A.  It sounded something to the effect of do your
16       fucking job, or something similar.
17   Q.  Okay.  So is it fair to say that you don't know
18       exactly what he said?
19   A.  I knew he used profanity and I knew he said
20       something to the effect of do your fucking job.
21   Q.  But as you sit here today, you don't know exactly
22       what he said, is that fair?
23   A.  The exact words, no, I do not.
```

205

1    Q.   Okay.  And on the date of the incident, you

2         didn't know the exact words, is that fair?

3    A.   I knew he had stated something to the effect of

4         do your fucking job.

5    Q.   All right.  And I'm not taking you to task about

6         whether or not he didn't use a profanity, I'm not

7         trying to make it look like that didn't happen.

8    A.   Right.

9    Q.   I'm just asking you, with regard to whatever he

10        said, profanity or not, you didn't know exactly

11        the words he used, correct?

12   A.   Correct.

13   Q.   At seventeen twenty-six twenty-nine, he says

14        whatever profanity he said, and at that point

15        your cruiser doors are still closed, is that

16        correct?

17   A.   Yes.

18   Q.   And then after he makes those comments, he then

19        turns around again and begins to walk away from

20        the cruiser, is that correct?

21   A.   I guess if I watched the video I could probably

22        answer that question for you.

23   Q.   Let's start it at seventeen twenty-six

206

```
 1        twenty-nine.
 2             (Whereupon, video footage was played.)
 3   BY MR. GLAZER:
 4   Q.  So does he start to walk away?
 5   A.  Yes.
 6   Q.  Okay.  Here's what I want to ask you.  At some
 7        point you say come here, is that correct?
 8   A.  Yes.
 9   Q.  Did you say come here while his back was to you?
10   A.  I believe he had -- was in the process of turning
11        around when I yelled come here to him.
12   Q.  Let's watch it again.
13             (Whereupon, video footage was played.)
14   BY MR. GLAZER:
15   Q.  Is he walking away from you at seventeen
16        twenty-six thirty?
17   A.  Yes.
18   Q.  Okay.  And at seventeen twenty-six thirty, have
19        you said come here yet?
20   A.  I don't believe so.
21   Q.  Okay.
22             (Whereupon, video footage was played.)
23   BY MR. GLAZER:
```

207

1   Q.  At seventeen twenty-six, we'll call it

2       twenty-nine or thirty, did you say come here?

3   A.  I did, yes.

4   Q.  All right.  And we've confirmed that he was

5       walking away from you at that time, correct?

6   A.  Correct.

7   Q.  All right.  Did you say come here before or after

8       you opened your cruiser door?

9   A.  I'm not certain.  It may have been right at the

10      same time.  I might have yelled out the window

11      because the window was down from just having a

12      conversation with him, and I was in the process

13      of exiting the patrol car.

14  Q.  All right.  Well, let's break that down.  How far

15      down was the window?

16  A.  The window would have been down probably I'd say

17      maybe halfway, if --

18  Q.  Your window was down half --

19  A.  Yeah.  Three quarters or half the way down, yes.

20  Q.  So your testimony is that at that time when you

21      said come here, your window was down halfway to

22      three quarters of the way down?

23  A.  Well, no.  Halfway down or three quarters of the

208

```
 1        way -- a quarter of the way down, I should say,
 2        to about halfway down.
 3   Q.   I'm sorry.  I may have misunderstood you.
 4   A.   Yes.
 5   Q.   Your testimony is that from the top, the top
 6        meaning all the way rolled up, your window was
 7        rolled down one quarter of the way down to one
 8        half of the way down, is that correct?
 9   A.   Yes.
10   Q.   All right.  Let's watch this again to see when
11        you said come here.
12             (Whereupon, video footage was played.)
13   BY MR. GLAZER:
14   Q.   So having watched that again, does it appear that
15        you say come here, and then a split second later
16        open up your cruiser door?
17   A.   I would say it was almost simultaneously.  When I
18        open the door I yell out come here.
19   Q.   Do you want to watch it again just to make sure?
20   A.   Sure.  My interpretation of what you're asking me
21        is what I'm observing right now.
22   Q.   Let's watch it one more time.
23   A.   Sure.
```

209

```
 1            (Whereupon, video footage was played.)
 2   BY MR. GLAZER:
 3   Q.  So does it appear that you open the door after
 4       the word here comes out of your mouth?
 5   A.  Yeah.  I mean, it's very close.  It appears to me
 6       that the door is opening and I'm telling him to
 7       come here.
 8   Q.  All right.  On what word?
 9   A.  I'm sorry?  What word?
10   Q.  Had you already said come by the time you opened
11       the door?
12   A.  I would say towards the end of come.  If you're
13       breaking it down, the door opened simultaneously,
14       in my viewing of the video here.
15   Q.  All right.  So your testimony is that you said
16       come here at the approximate time that you opened
17       up the door to the police cruiser, is that fair?
18   A.  I would say I'm opening up the door and saying
19       those words at the same time, yes.
20   Q.  Okay.  And you've indicated to us that it was
21       extremely loud outside?
22   A.  Yes.  It was loud outside, yup.
23   Q.  Do you know if Mr. Belsito heard you say that?
```

210

1    A.   I'm not sure.

2    Q.   Okay.  Had you determined that you were going to

3         arrest him before you opened up your cruiser

4         door?

5    A.   I did not.

6    Q.   When was it that you determined that you were

7         going to arrest him?

8    A.   During the interactions with Mr. Belsito when I

9         finally, when I finally caught up to him.

10   Q.   All right.  So when you finally caught up to him,

11        let's talk about that.

12   A.   Sure.

13   Q.   So when you said come here, you had not yet

14        determined that you were going to arrest him, is

15        that correct?

16   A.   Correct, because there's other options.

17   Q.   Okay.  And at that point we know that Belsito was

18        walking away from you, is that correct?

19   A.   Correct.

20   Q.   Did you say anything else to him between the time

21        you got out of the vehicle and the time that you

22        made physical contact with him?

23   A.   Not that I recall, no.

211

```
 1   Q.   When you made physical contact with him, he was
 2        facing away from you, is that correct?
 3   A.   Correct.
 4   Q.   Okay.  Tell me what you did.
 5   A.   I believe when I finally caught up to him --
 6        prior to catching up to him, I heard someone
 7        yell, from the crowd, run.  At that point I
 8        thought Mr. Belsito was going to take off and
 9        run.  At that point I reached up and I believe I
10        grabbed his sweatshirt or his hooded area to pull
11        him to me and try to get in front of him.
12   Q.   When you were sitting in the patrol car before
13        the interaction with Belsito even started, where
14        was the baton?
15   A.   I'm not sure.  From looking at the video -- I
16        don't recall, but from watching the video I don't
17        believe it would have been at my left side.  I'm
18        believing it would have been either sitting in my
19        lap or it would have been alongside my right
20        side.  I'm not sure.  I don't recall.
21   Q.   Do you know if you took out the baton when you
22        got out of the vehicle?
23   A.   Yeah.  Whenever I leave the patrol car in these
```

1    set of circumstances, I always take my baton with

2    me.

3  Q.  Would the baton have been in your right hand or

4    your left hand?

5  A.  It most likely would have been in my right hand.

6  Q.  All right.  And you said that you thought Belsito

7    was going to run, so you went up and you grabbed

8    him by the sweatshirt and hoodie area?

9  A.  I heard somebody make a comment he's coming for

10    you, run.  And yes, at that point I kind of moved

11    a little faster and reached towards his hoodie or

12    sweatshirt from his like rear shoulder area.

13  Q.  Which hand did you use to do that?

14  A.  I would say most likely -- if my baton was in my

15    right, I would have to say it would have been my

16    left hand.

17  Q.  Did you reach over Mr. Belsito's right shoulder

18    and put your baton around his throat?

19  A.  I reached my baton around -- not around his

20    throat but I put my baton as I grabbed him by the

21    rear and I stuck my baton in front of him.

22    There's quite a bit of height difference, I think

23    it would look kind of awkward if my baton was up

213

```
 1        on his throat at that point in time.
 2    Q.  All right.  So we agree, then, that you grabbed
 3        him with your left hand and that you reached
 4        around with your baton hand and your baton at
 5        that point was in front of him to some extent?
 6    A.  Yes.  Kind of like hand behind him to pull him
 7        backwards, baton in front of him to kind of bring
 8        him back or stop him so we could have a
 9        discussion.
10    Q.  All right.  And he was facing away from you at
11        that point?
12    A.  At that point in time he was facing away, yes.
13    Q.  Okay.  All right.  And at the time that you did
14        that, you had not yet determined that you were
15        going to arrest Mr. Belsito, is that true?
16    A.  At that point in time I determined there was two
17        options.  The first option being ejection, as the
18        Bills have requested throughout the years for
19        unruly fans and patrons.
20    Q.  All right.  Let me --
21    A.  Sorry.  To finish answering your question, the
22        other option was to arrest him.
23    Q.  Okay.  So when you're sitting in the vehicle,
```

214

1       you've not yet decided to arrest him, is that

2       correct?

3   A.  Correct.

4   Q.  Was that because you didn't feel you had probable

5       cause to arrest at that point?

6   A.  No.  I mean, based upon his actions earlier, he

7       was given a break, and you just can't arrest

8       everybody.  So I don't feel that it was a matter

9       of probable cause or not.  It was a matter of

10      dealing with the one subject already in custody.

11  Q.  All right.  Well, let's just take a step back.

12  A.  Sure.

13  Q.  You testified that before you got out of the car

14      you did not intend to arrest him, is that

15      correct?

16  A.  Correct.

17  Q.  Okay.  And you testified that you got out of the

18      car as he was walking away and grabbed him with

19      your left hand and then put your right hand

20      around the front of him with your baton, is that

21      correct?

22  A.  Yes.

23  Q.  When, between the time you got out of the vehicle

215

```
1      and the time that you put your baton around the
2      right of him, did you determine that you were
3      going to arrest him, if you did?
4   A. It would be shortly thereafter I would say.
5   Q. Well, that's my question.
6   A. Sure.
7   Q. When you grabbed him with your left hand before
8      the baton goes around, you haven't yet determined
9      you're going to arrest him, is that true?
10  A. Yes.
11  Q. Then the right hand goes around with the baton in
12     front of him, and you haven't yet determined
13     you're going to arrest him, is that true?
14  A. True.
15  Q. And then a short time later you determine that
16     you are going to arrest him, is that fair?
17  A. Yes.
18  Q. Okay.  Let me ask you a few questions about the
19     short period of time after you put your right
20     hand around him with the baton.  When you said
21     come here and got out of the vehicle, do you feel
22     that you lost your temper?
23  A. I would say no.
```

216

```
 1   Q.   When you got out of the vehicle after saying come

 2        here, were you angry?

 3   A.   No.

 4   Q.   When you -- strike that.  Do you know how long it

 5        took Deputy Flowers to exit the cruiser after you

 6        got out of the cruiser?

 7   A.   I'm not sure.

 8   Q.   I could show you the video if you want, but if I

 9        told you that it was about ten seconds, would you

10        have a reason to disagree with that?

11   A.   I would not, no.

12   Q.   Okay.  Did you ever ask Deputy Flowers why he

13        waited ten seconds to get out of the vehicle to

14        come to assist you?

15   A.   I don't think I needed to ask him.  I think it's

16        a matter of there's a rifle in the car and that

17        he has a prisoner back there.

18   Q.   Okay.  But the prisoner is separated from the

19        front of the vehicle where the rifle is, correct?

20   A.   Correct.

21   Q.   No way for him to reach up and get the rifle,

22        true?

23   A.   Yes, that's true.
```

217

1    Q.   So the rifle is irrelevant, is that correct?

2    A.   Well, your patrol car is surrounded by a lot of

3         people and there's a prisoner in the back of the

4         car and a rifle in the front of the car.  And

5         under the set of circumstances, there's some

6         cause for concern, yes.

7    Q.   Okay.  Did you have cause for concern because you

8         thought that Mr. Lowry was somehow going to be

9         able to get into the front to get the rifle?

10   A.   No, I did not.

11   Q.   Okay.  Did you have cause for concern because you

12        thought some fan was going to try to get into

13        your sheriff's vehicle and get the rifle?

14   A.   To get the rifle, no.

15   Q.   Okay.  So when I asked you if you ever asked

16        Deputy Flowers why he waited ten seconds to get

17        out, was the answer to that question no, you

18        never asked him?

19   A.   Yeah.  I never asked him why he spent ten seconds

20        to get out of the car.

21   Q.   But your testimony was that you thought that he

22        had concerns about the rifle inside of the

23        vehicle, is that fair?

218

1   A.   A prisoner and a rifle, yes.  I mean, in a

2        crowded situation, it would raise concerns for

3        me.

4   Q.   Okay.  So is it your belief that Deputy Flowers

5        didn't get out of the vehicle for ten seconds

6        because he had concerns about the prisoner and

7        the rifle?

8   A.   Yes.

9   Q.   Okay.  Let's -- strike that.  Mr. Achtyl, I think

10       we're wrapping up.  I appreciate your patience.

11       I'm certainly well beyond halfway done.

12            I want to ask you some questions about the

13       time period after your left hand grabbed Mr.

14       Belsito and your right hand went around the front

15       of him.  What happened at that point?

16  A.   From what I recall, there was a point where I

17       believe I told him to back up.

18  Q.   When you told him to back up, did you also begin

19       to push him?

20  A.   After he said no, why, and I believe at that

21       point I said back up, and then I started to push

22       him back.

23  Q.   All right.  So when you're pushing him back, are

219

| | | |
|---|---|---|
| 1 | | you pushing him toward your police cruiser? |
| 2 | A. | Yes, I am, out of what I perceived as a crowd of |
| 3 | | unruly people or fans, to push him more towards |
| 4 | | my patrol car. |
| 5 | Q. | All right.  Again, I really want to finish this |
| 6 | | up. |
| 7 | A. | I'm sorry.  I'm sorry.  Yes.  Yes. |
| 8 | Q. | It's okay.  Mr. D'Aquino is free to ask you as |
| 9 | | many questions as he wants when I'm done asking |
| 10 | | you questions, and he may ask about the unruly |
| 11 | | crowd.  You've made that perfectly clear. |
| 12 | A. | Sure. |
| 13 | Q. | But if you want this to get done more |
| 14 | | efficiently, you've just got to answer my |
| 15 | | questions as directly as you can.  Okay? |
| 16 | A. | Okay.  Fair enough. |
| 17 | Q. | So at some point you're pushing Mr. Belsito |
| 18 | | backwards, is that correct? |
| 19 | A. | Yes. |
| 20 | Q. | Do you know where the baton is at this point? |
| 21 | A. | Towards the -- his midsection. |
| 22 | Q. | Okay.  So you're pushing him backwards and you're |
| 23 | | moving forwards, is that correct? |

220

1    A.  Correct.

2    Q.  Okay.  And are you pushing him backwards toward

3        your vehicle?

4    A.  Yes.

5    Q.  Okay.  Did you eventually push him into your

6        vehicle?

7    A.  Yes, at the point we reached the vehicle.

8    Q.  Okay.  Can you describe the impact between Mr.

9        Belsito's body and the cruiser?  And here's what

10       I'm asking.  Was it a light impact, was it a

11       medium impact, heavy or something else?

12   A.  I don't recall how the impact -- you know, I was

13       pushing him, he was pushing forward, I was

14       pushing back.  So I can't really testify to what

15       kind of impact it was.  At some point we reached

16       the car in that location.

17   Q.  Okay.  And you were pushing him toward the car

18       and that stopped when he hit the vehicle, is that

19       fair?

20   A.  Yes.

21   Q.  Okay.  At some point later did you strike him in

22       the face with your baton?

23   A.  At some point, yes, my baton hit his nose.

221

1   Q.  Okay.  Can you describe for me how it came to

2      pass that your baton hit his nose?

3   A.  Well, at some point in time he had his hands on

4      my baton.  At one point in time he had my baton

5      stretched out over my head, from what I recall,

6      and there was a, from what I perceived, a

7      struggle where he was -- where he had his hands

8      on my baton.

9   Q.  All right.  At some point after you pushed him

10     into the vehicle, was your baton on his neck?

11   A.  My baton was on his midsection.  As he went into

12     the vehicle he went backwards, he was bent

13     backwards, and my baton rode up his chest.

14   Q.  Onto his neck?

15   A.  Not that I recall.  His neck is -- my baton would

16     never be specifically in his neck for any reason.

17     It was a matter of -- I don't recall if it was in

18     his neck.

19   Q.  All right.  So I guess is the answer you don't

20     recall if the baton was ever on his neck while he

21     was against the car?

22   A.  Yes.

23   Q.  Okay.  Do you know if he was trying to push the

222

1       baton off of his neck?

2   A.  I do not know.  At that time I did not know.

3   Q.  And at some point after that you struck him in

4       the face with your baton, is that accurate?

5   MR. D'AQUINO:  Object to the form.

6   BY MR. GLAZER:

7   Q.  Do you understand the question?

8   A.  As I stated earlier, at some point in time my

9       baton did strike his nose and maybe lip area.

10  Q.  Okay.  Well, did you swing it at him, did you hit

11      him with it?  How did that happen?

12  A.  That was from -- as how I stated earlier, it slid

13      up his midsection.  And as he was -- had his

14      hands on my baton, there's a push and pull

15      struggle as I'm trying to turn him around to

16      place handcuffs on him.  And that baton slid up

17      and kind of twisted and at that point caught his

18      -- I believe his nose, maybe his lip at that

19      time.

20  Q.  So is it your testimony under oath that the baton

21      slipped onto his nose?

22  A.  My testimony is that as we were struggling over

23      the baton, the baton hit him in the nose, yes.

223

1   Q.   Okay.  Well, if I asked you yes or no did the
2        baton slip onto his nose, what would your answer
3        be?
4   A.   I would say no in regards to that question.
5   Q.   Well, then my next question would be, if it
6        didn't slide onto his nose, how did it get onto
7        his nose?
8   A.   My wording that I used earlier when we were
9        struggling over the baton was it slid up his
10       chest as he was bending backwards.  And during
11       that struggle there was twisting and pulling.
12       And during that twisting and pulling, from what I
13       recall, is when that baton, the end of the baton,
14       caught him in his nose area.
15  Q.   Well, did you hit him with the baton or did he
16       hit himself with the baton?
17  MR. D'AQUINO:  Form.
18  BY MR. GLAZER:
19  Q.   If you know.
20  A.   I don't know.  I'm not sure.  I know there was a
21       struggle over the baton.
22  Q.   Was there ever a time when your hand, your --
23       strike that.  Was there ever a time when your

224

```
 1        right hand was extended with the baton and your
 2        baton was directly on the bridge of Mr. Belsito's
 3        nose?
 4   A.   I believe there was a -- I believe the video does
 5        show that, yes.
 6   Q.   Was there ever a time when your right hand was
 7        extended and the baton was directly on the bridge
 8        of Mr. Belsito's nose while his hands were both
 9        down at his side?
10   A.   I believe so, yes.
11   Q.   Did the baton strike cause Mr. Belsito some
12        injury?
13   A.   I believe there was an injury, yes.
14   Q.   And you saw blood and such coming from his nose
15        and mouth area?
16   A.   I believe it was from his nose area, once we
17        positioned him to the ground.
18   Q.   Did you see a fair amount of blood?
19   A.   There was blood, yes.  I'm not sure -- there was
20        blood, yes.
21   Q.   Was it a lot?
22   A.   I would say that there was -- I wouldn't say a
23        fair amount.  I would say there was an average
```

225

1    amount of blood from possibly a bloody nose.

2  Q.  All right.  Was the entire right side of his face

3      covered in blood?

4  A.  Yes.

5  Q.  So at some point Mr. Belsito was handcuffed, is

6      that true?

7  A.  Yeah.  I believe Deputy Flowers did handcuff him,

8      yes.

9  Q.  And then at some point after that he was taken to

10     the ground, is that fair?

11 A.  No.

12 Q.  Okay.  How did he come to be on the ground?

13 A.  He was struggling at the side of the patrol car,

14     he had his phone in his hand.  I believe at that

15     point in time that Deputy Flowers could not get

16     the handcuffs on him, at which time Deputy

17     Flowers made the suggestion to just take him to

18     the ground.  At that point in time -- I'm sorry?

19 Q.  That's what I'm asking you.

20 A.  Sure.

21 Q.  At some point in time --

22 A.  He was taken to the ground, yes.

23 Q.  Do you recall him asking you if he could put his

226

1        cell phone away before he was taken to the
2        ground?
3    A.  I do not, no.
4    Q.  Okay.  When you started taking him to the ground,
5        do you recall him saying okay, okay, okay?
6    A.  I do not recall that, no.
7    Q.  At some point he was taken down to the ground,
8        and was he in -- well, strike that.  Once you got
9        him down onto the ground, was he then handcuffed?
10   A.  Yes.  He was eventually handcuffed, yes.
11   Q.  Do you know how long he was face down on the
12       ground in handcuffs?
13   A.  I do not know how long he was face down on the
14       ground in handcuffs because there was a crowd of
15       people around us.
16   Q.  Okay.  Do you know if it was more or less than
17       five minutes?
18   A.  I'm not sure.
19   Q.  Is it more difficult to breathe when you're face
20       down with blood coming out of your nose?
21   A.  I would imagine, yes.
22   Q.  Let me ask you a general question.
23   A.  Sure.

227

1   Q.   If you don't understand it, just let me know.

2   A.   Yes.

3   Q.   Is everything you did from the time that you got

4        out of the patrol vehicle to approach Mr. Belsito

5        from behind until the time he was taken to the

6        ground consistent with the training you received

7        from the Erie County Sheriff's Department?

8   A.   I would say yes.

9   Q.   Let's talk about the dent in the vehicle.  You

10       indicated that you pushed Mr. Belsito backward

11       into your police cruiser, is that correct?

12  A.   Correct.

13  Q.   Did that cause a dent to the vehicle?

14  A.   Yes, it did.

15  Q.   So the act of pushing his body back into the

16       vehicle and impacting the vehicle caused a dent?

17  A.   Yes.

18  Q.   When did you become certain of that fact?

19  A.   I'm not sure.  I'm not sure when.

20  Q.   Well, was it on December the 3rd of 2017?

21  A.   Yes.  It was I believe somewhere around while Mr.

22       Belsito was on the ground to -- somewhere between

23       that and the conversation with Sergeant Dusza.

228

1  Q.  Okay.  So somewhere between the time that Mr.
2      Belsito was on the ground and the time that you
3      had the conversation with Sergeant Dusza, you
4      became certain that the dent was caused by the
5      impact when you pushed Belsito into the vehicle?
6  A.  Yes.
7  Q.  Did you indicate in the use of force report that
8      the dent was caused while Mr. Belsito was
9      fighting with you?
10 A.  I'm not -- I don't know.  I'm not sure.  I'd have
11     to see the use of force report to see what
12     exactly it states.
13 Q.  If you did indicate that, is that inaccurate?
14 A.  I'm sorry.  Repeat the question?
15 Q.  If you did indicate in the use of force report
16     that the dent was caused while Mr. Belsito was
17     fighting, is that inaccurate?
18 A.  It would not be inaccurate because that's how it
19     happened.
20 Q.  Okay.  So in your mind, pushing someone back into
21     a vehicle causing a dent is the same thing as
22     that person fighting with you?
23 MR. D'AQUINO:  Object to the form.

229

1   BY MR. GLAZER:

2   Q.   Do you understand the question?

3   A.   Can you repeat the question?

4   Q.   Yes.  You told us a few minutes ago that the dent

5        was caused when you pushed Mr. Belsito back into

6        the vehicle and he impacted with the vehicle, is

7        that correct?

8   A.   Correct.

9   Q.   All right.  So that's pushing somebody into a

10       vehicle and causing a dent when you slam them

11       into the vehicle, is that fair?

12  A.   There was a continuous struggle, yes, that's

13       fair.

14  Q.   So there was a struggle while you grabbed him

15       from behind, pushed him into the vehicle and

16       caused a dent, there was a struggle?

17  MR. D'AQUINO:  You leave out some facts there, so I'm

18       objecting to the form.

19  BY MR. GLAZER:

20  Q.   Okay.  What would be the answer to that question?

21  A.   It would be after, it would be after I grabbed

22       Mr. Belsito from behind and started my

23       conversation with him is when the -- when that

230

1     altercation started.

2   MR. GLAZER:  Could you read that answer back for me,

3       please?

4           (Whereupon, the above-requested previous

5       answer was then read back by the reporter.)

6   BY MR. GLAZER:

7   Q.  I've just got to take a step back for a minute.

8       So you grabbed Belsito with your left hand and

9       then put your right hand around his front with

10      the baton, is that correct?

11  A.  Yes.

12  Q.  And you were behind him, so you wouldn't have

13      known exactly where the baton was, is that true?

14  A.  Well, I knew that it was around his midsection.

15  Q.  Okay.  And the conversation that you just

16      mentioned --

17  A.  Yes.

18  Q.  -- had it begun at that point?

19  A.  Once I got into the -- either -- pulled him back

20      enough to get in front of him, that's when I

21      believe I stated to him back up.

22  Q.  Okay.  So you pulled him back enough to get in

23      front of him, and that's when the conversation

231

```
1        started, is that correct?
2    A.  That's when, yeah.  I told him or ordered him to
3        back up, yes.
4    MR. D'AQUINO:  Can we go back to regular screen if
5        you're not using the video?
6    MR. GLAZER:  I'm sorry.  I apologize.  Sorry about
7        that.
8    MR. D'AQUINO:  No problem.  Thank you.
9    BY MR. GLAZER:
10   Q.  How long was it between the time that your
11       conversation started and the time that you began
12       to push him backward toward the vehicle?
13   A.  Somewhere between maybe fifteen and thirty
14       seconds.
15   Q.  It was over?
16   A.  It was a quick incident, yes.
17   Q.  So you put the baton around his neck -- I'm
18       sorry.  Strike that.  That's not what you said.
19       You get the baton around the front of him and
20       then you turn him to face you, is that correct?
21   A.  I pulled him backwards so I could either get in
22       front of him or maneuver myself so he could see
23       at that point in time who I was.
```

232

1   Q.   And then there was a conversation between you and
2        Belsito for fifteen to thirty seconds before you
3        started pushing him, is that true?
4   A.   I wouldn't say the conversation lasted for
5        fifteen to thirty seconds.  I would say I gave
6        him a couple verbal commands.  I believe, from
7        what I recall, it was back up, back up.  And then
8        I want to say that at some point he said no, why.
9        And I said back up.  And at that point he was
10       like -- I believe I stated then, you're under
11       arrest.  And at that point he said no, I'm not
12       and what for.
13  Q.   Okay.  So when was it specifically that you
14       determined you were going to arrest him during
15       that series of events?
16  A.   When he -- when I pushed him backwards and told
17       him to back up, and at that point in time he
18       raised his hands up.  At that point is when I
19       told him that he was under arrest.
20  Q.   When you say he raised his hands up, describe the
21       manner in which he raised his hands up.
22  A.   He had his like -- almost like closed fists, he
23       brought his hands up.

233

1   Q.  Like the Fighting Irish?

2   A.  I wouldn't say -- not as much as the Fighting

3       Irish, but he brought his hands up midsection,

4       closed fists.

5   Q.  Okay.  So how long was your exchange with him

6       where you said back up and he said no and you

7       said you're under arrest and he said what for,

8       how long was that exchange?

9   A.  That would be roughly the fifteen seconds-ish I

10      would say.  It was a relatively quick exchange.

11      I don't have an exact time, but that was -- it

12      was a short period of time for that exchange.

13  Q.  So at that point was his back to your patrol

14      vehicle?

15  A.  Yes.

16  Q.  Okay.  So the exchange happens, you said it was,

17      give or take, fifteen seconds.  After it was

18      over, did you then begin to push him toward the

19      patrol vehicle?

20  A.  Yes.

21  Q.  Did you ever tell Officer -- I'm sorry, Deputy

22      Flowers that Belsito kicked the vehicle?

23  A.  I did not, no.

234

1    Q.   I'm going to show you Deposition Exhibit 11 for
2         identification, and I'm going to scrub it to
3         seventeen fifty-two fourteen.  We'll start at
4         seventeen fifty-two o seven.
5              (Whereupon, video footage was played.)
6    MR. D'AQUINO:  We're not seeing it.
7    MR. GLAZER:  I'm sorry.  Did you say something, Al?
8    MR. D'AQUINO:  Yes.  We're not seeing it.
9    MR. GLAZER:  Oh, I'm sorry.  That's a problem.  Hold
10        on one second.
11             Do you see it now?
12   MR. D'AQUINO:  Yes.  Thank you.
13   MR. GLAZER:  Thank you.
14             We're at seventeen fifty-two o three.  I
15        just scrolled it back.  We'll start from
16        seventeen fifty-one fifty-three.
17             (Whereupon, video footage was played.)
18   BY MR. GLAZER:
19   Q.   Do you hear Mr. Belsito at approximately
20        seventeen fifty-two twelve say I didn't touch
21        shit?
22   A.   I did hear him say that, yes.
23   Q.   Okay.  And then do you hear Deputy Flowers say

235

1       you didn't kick the car, question mark?  I can
2       play it again if you'd like.
3   A.  Yeah, if you could play it again I can --
4   Q.  No problem.
5           (Whereupon, video footage was played.)
6   BY MR. GLAZER:
7   Q.  Did you hear you didn't kick the car?
8   A.  Yes, I heard him say -- yes, I heard that.
9           (Whereupon, video footage was played.)
10  BY MR. GLAZER:
11  Q.  Did you hear you didn't kick the car, again?
12  A.  Yes.
13  Q.  And then yet again, at seventeen fifty-two
14      nineteen, do you hear you didn't kick the car,
15      again?
16  A.  Yes.
17          (Whereupon, video footage was played.)
18  BY MR. GLAZER:
19  Q.  Do you hear so he walked up and hit you in the
20      head with a fucking baton just because?
21  A.  No, I did not hear that.
22  Q.  Let's scrub it back a little bit.
23          (Whereupon, video footage was played.)

236

1  BY MR. GLAZER:

2  Q.  Did you hear so he walked up and hit you in the

3      head with a fucking baton just because?

4  A.  I did hear that, yes.

5  Q.  And that was at approximately seventeen fifty-two

6      twenty-three?

7  A.  Yes.

8  Q.  Okay.

9          (Whereupon, video footage was played.)

10 BY MR. GLAZER:

11 Q.  Hold on one second.  I may have missed the part I

12     want to ask you a question about.

13 A.  Sure.

14 Q.  Yes, I have missed it.  No, I haven't.  Let's

15     keep going.  We're at seventeen fifty-two

16     thirty-eight.

17         (Whereupon, video footage was played.)

18 BY MR. GLAZER:

19 Q.  Do you hear Deputy Flowers say I find that hard

20     to believe?

21 A.  I heard that, yes.

22 Q.  And that was at approximately seventeen fifty-two

23     forty-four.

237

1   A.   Yes.

2   Q.   Do you know how Deputy Flowers would have come to

3        believe that Mr. Belsito kicked the patrol

4        vehicle?

5   A.   I don't know.  The only --

6   Q.   Okay.  That's the only answer I need.

7   A.   Okay.

8   Q.   Did you tell Deputy Flowers that Belsito kicked

9        your vehicle?

10  A.   I'm not sure at that point in time if I had told

11       him that I thought maybe either he kicked it or

12       it was caused during the altercation.

13  Q.   But you know now that that's not the case, is

14       that correct?

15  A.   Yes, now I know that that's not the case and it

16       was just a matter of just being pushed backwards.

17  Q.   When did you figure that out?

18  A.   I would have to say the same day, after having an

19       opportunity to kind of, you know, look at what

20       was going on with it.  You know, there's a dent

21       there; there wasn't a dent there before the start

22       of my shift.

23  Q.   Okay.  But how did you believe at some point that

238

1       it was a result of a kick and then come to the

2       understanding that it wasn't a result of a kick?

3    A. Because during the struggle I'm not sure if he

4       put his foot up behind his back and like was

5       trying to kick off the car, like he was using his

6       foot to kick backwards.

7    Q. And when did you realize that he had not done

8       that?

9    A. I would say probably a little -- minutes after.

10      A couple, five minutes, five, ten minutes after

11      what you had on video there.  I'm not certain on

12      the time frame, but it was sometime relatively

13      shortly thereafter the incident.

14   Q. Let me show you Deposition Exhibit 11 again.  I'm

15      going to scrub it to seventeen thirty

16      twenty-four.  Just give me a minute.

17          (Whereupon, video footage was played.)

18   BY MR. GLAZER:

19   Q. So at seventeen thirty twenty-five, Deputy

20      Flowers says to you did that just happen, points

21      at the dent, and you say I think so, is that

22      true?

23   A. Yes.

239

```
 1              (Whereupon, video footage was played.)
 2    BY MR. GLAZER:
 3    Q.   At seventeen thirty fifty-three, can you hear
 4         somebody from the crowd yell you can get off his
 5         fucking head?
 6    A.   I did hear that, yes.
 7    Q.   I'll go to seventeen thirty-two fifteen.
 8              (Whereupon, video footage was played.)
 9    BY MR. GLAZER:
10    Q.   Is that, at seventeen thirty-two fifteen,
11         Sergeant Dusza?
12    A.   Yes, it's Sergeant Dusza.  It's D-U-S-Z-A, from
13         your earlier question.
14    Q.   I believe we both messed that one up.
15    A.   Yes.
16    Q.   Seventeen thirty-two fifteen, we're looking at
17         Sergeant Dusza with the helmet and the glasses?
18    A.   Yes.
19              (Whereupon, video footage was played.)
20    MR. GLAZER:  I'll scroll back to seventeen thirty-two
21         ten.  Bear with me.
22              (Whereupon, video footage was played.)
23    BY MR. GLAZER:
```

240

1    Q.   Okay.  At seventeen thirty-two eighteen, Dusza

2         asks Flowers did he do that, and Flowers says I

3         don't know, I think so, is that correct?

4    A.   Yes.  I believe that's what he said, yes.

5    Q.   And then seventeen thirty-two twenty-six is the

6         next portion I want to ask you a question about.

7              (Whereupon, video footage was played.)

8    BY MR. GLAZER:

9    Q.   Seventeen thirty-two twenty-six, Dusza says

10        Kenny, did he dent the fucking fender, and you

11        respond yeah, is that correct?

12   A.   Yes.  That's correct, yes.

13   Q.   So by seventeen thirty-two twenty-seven, you had

14        determined that Nick caused the dent in the

15        fender, correct?

16   A.   Yes, that's correct.

17   Q.   Do you have a system in your vehicle that --

18        well, strike that.  Do you have a system in your

19        vehicle computer known as CHARMS?

20   A.   Yes.

21   Q.   Or did you, rather?

22   A.   Yes.

23   Q.   And did CHARMS assist you in the drafting of

241

1          accusatory instruments?

2     A.   Yes.

3     Q.   Okay.  Who drafted the accusatories regarding the

4          charges levied against Mr. Belsito?

5     A.   I did.

6     Q.   Did Flowers participate in the drafting of the

7          accusatories?

8     A.   There was discussion prior to drafting of the

9          accusatories, but the answer to your question

10         would be no.

11    Q.   Okay.  So you discussed the accusatories with

12         Flowers, but you drafted them, correct?

13    A.   Yes.

14    Q.   Did you have enough time to draft the

15         accusatories properly?

16    A.   No, I did not.

17    Q.   Okay.  Explain that to me.

18    A.   Well, there was a matter of circumstances of the

19         day, there was a matter of getting Mr. Belsito

20         and Mr. Lowry down to the holding center, there

21         was a matter of the computer in the car not

22         properly working and trying to get the documents

23         either to type up or to print off, because those

242

```
 1        documents needed to go to court immediately in
 2        the event of an arraignment.  And at that point
 3        in time we ended up I believe going out to the
 4        Town of Alden to a substation where they had a
 5        printer that was working that we could do the
 6        draft documents and then get back to the stadium
 7        because of being shorthanded.
 8   Q.   So how much time did you have to draft these
 9        accusatories?
10   A.   I'm not certain on the amount of time.  I just
11        recall being hurried later in the day when we
12        were doing it.
13   Q.   How long does it typically take you to draft a
14        violation level information on a complaint?
15   A.   Five minutes or so, as long as everything is
16        working properly with the equipment.
17   Q.   So you didn't have five minutes to draft these
18        properly?
19   A.   Five minutes for the disorderly conduct.  I would
20        say it was more than five minutes to do it, yes.
21   Q.   I'm confused.  How long does it take to draft a
22        typical disorderly conduct complaint?
23   A.   Well, to complete it, there's more than just
```

243

1      drafting the document, I guess if you're -- if

2      that's the question you're asking me, there's a

3      process to the arrest process, and it takes some

4      time to complete to get everything done so you

5      can get it to court.

6   Q.  That's not what I'm asking.  What I'm asking

7      you --

8   A.  Can you just repeat the question, then?

9   Q.  Sure.  At some point you arrest people in the

10     course of your employment, is that correct?

11  A.  Yes.

12  Q.  Once they're arrested and in the back of your

13     car, you have to draft an accusatory, is that

14     correct?

15  A.  Yes.

16  Q.  And you have a system in your vehicle that

17     assists you in doing that called CHARMS, right?

18  A.  Yes.

19  Q.  Okay.  How long does it take you to draft the

20     typical disorderly conduct complaint?

21  A.  I would say an average between five and ten

22     minutes.

23  Q.  And your testimony under oath is that you didn't

244

1      have enough time to properly draft these

2      accusatory instruments?

3   A. I believe I stated that I was rushed to get them

4      done to get back to the stadium under the set of

5      circumstances that day.

6   Q. And what was the result of your being rushed,

7      were they affected in some way?

8   A. I don't believe that they were affected in

9      regards to what I put down as to what has

10     happened, but it's, I mean, it's -- there's been

11     an outcome because of it that was -- negatively

12     impacted me.

13  Q. So the outcome that's been effectuated is because

14     you didn't have enough time to draft the

15     accusatories?

16  MR. D'AQUINO:  Object to the form.

17  BY MR. GLAZER:

18  Q. Is that what you're saying?

19  A. I'm stating that I, under the set of

20     circumstances, I rushed through those documents.

21  Q. Okay.  But is your testimony that the fact that

22     you didn't have enough time to draft these

23     accusatories, did that cause you to be charged

245

1      and then convicted?

2   MR. D'AQUINO:  Object to the form.

3   THE WITNESS:  I guess what I'm stating, to answer

4        your question, is that there was a negative

5        outcome because of -- apparently because of those

6        charging documents.

7   BY MR. GLAZER:

8   Q.  Is that the only reason for the negative outcome?

9   A.  I'm not sure what you're like -- the only reason

10       as to what?

11  Q.  Well, what's the negative outcome that you're

12       referring to?

13  A.  That I was charged.

14  Q.  Okay.  Do you think you had anything to do with

15       your being charged?

16  A.  Do I -- no, I do not.

17  Q.  You think you did nothing wrong at all?

18  A.  I think that I acted that day and effected an

19       arrest, yes.  I think I did -- under the set of

20       circumstances, that no, I did not do anything

21       wrong that day.

22  Q.  Everything you did that day was consistent with

23       your training?

1   A.   Yes.

2   Q.   Okay.  Let's just talk a bit more about CHARMS.

3        When you draft accusatories using CHARMS, you

4        input the section number, am I correct, of the

5        offense?

6   A.   No.  From what I recall, you -- give me a minute

7        here to think about this.  You put in -- I think

8        you like search the charge and then it comes up,

9        and then you select on the charge and that you're

10        filling in the narrative of the body of the

11        instrument or the charging instrument.

12   Q.   I didn't ask you a specifically tailored

13        question.  That's my fault.  That's exactly what

14        I'm saying.  You look for a charge and you input

15        the charge into the computer, you select it, is

16        that fair?

17   A.   Yes.  That's fair, yes.

18   Q.   And then does the computer then populate the

19        screen with the statutory language?

20   A.   Yes, it does.

21   MR. GLAZER:  Okay.  So let's look at -- Sue Ann, can

22        we go off the record for one second?

23   THE VIDEOGRAPHER:  It is five-forty-four p.m.  Going

247

1      off the record.

2           (Discussion off the record.)

3   THE VIDEOGRAPHER:  Five-forty-five p.m.  We are back

4      on the record.

5   BY MR. GLAZER:

6   Q.  Mr. Achtyl, I'm going to show you Deposition

7      Exhibit 7 again, for identification.  These are

8      the accusatories, true?

9   A.  Yes.

10  Q.  All right.  So when you select the charge that

11     you're going to levy, you indicated to me that

12     the computer populates the statutory language

13     into the screen, is that fair?

14  A.  That's fair, yes.

15  Q.  All right.  And the statutory language in this

16     criminal mischief complaint is what we see in all

17     caps, correct?

18  A.  Correct.

19  Q.  After you drafted the accusatories, did you

20     discuss them with Deputy Flowers?

21  A.  No.

22  Q.  Who drafted the use of force report?

23  A.  I did.

248

```
 1   Q.  Did he assist you?

 2   A.  No, he did not.

 3   Q.  Did you discuss it with him afterward?

 4   A.  Not that I recall.

 5   Q.  Back to Deposition Exhibit 7 for identification.

 6       We've agreed that the all caps portion is the

 7       information populated into the accusatory by the

 8       computer automatically, is that fair?

 9   A.  Yes.

10   Q.  So let's go up to -- down, rather, to the

11       disorderly conduct charge.  So is it fair to say

12       that when you selected disorderly conduct, 240.20

13       subdivision 1 of the Penal Law of New York State,

14       that the computer automatically populated into

15       the accusatory, quote, the said Defendant, at the

16       aforesaid time and place, with intent to cause

17       public inconvenience, annoyance or alarm, or

18       recklessly creating a risk thereof, did engage in

19       fighting or in violent, tumultuous or threatening

20       behavior?  Is that what it says?

21   A.  Yes.

22   Q.  So that was automatically inputted by the

23       computer, is that fair?
```

249

1   A.   Yes.

2   Q.   All right.  What would you define violent as?

3   A.   Violent could be anything from raising your fist

4        to physically fighting to pretty much upwards of

5        serious actions, crimes, shootings, stabbings,

6        any kind like that.  It's violence.

7   Q.   If I told you that Webster's defines violent as,

8        quote, using or involving physical force intended

9        to hurt, damage or kill someone or something,

10       would you have reason to disagree with that?

11  A.   No, I would not.

12  Q.   What does tumultuous mean?

13  A.   More of like a chaotic type of behavior or --

14  Q.   That's pretty good.  I don't know that I would

15       have been able to answer that.  But if I told you

16       that Webster's defines tumultuous as, quote,

17       making a loud, confused noise, uproarious, close

18       quote, would you have a reason to disagree with

19       that?

20  A.   No, I would not.

21  Q.   All right.  So we know that violent and

22       tumultuous or threatening behavior was

23       automatically inputted by the computer, is that

250

1       correct?

2   A.   Yes.

3   Q.   Those aren't your words, is that true?

4   A.   That's true.

5   Q.   And then there's a to wit portion?

6   A.   Correct.

7   Q.   What does to wit mean?

8   A.   To wit means what substantiates or what took

9        place.

10  Q.   To wit means what took place?

11  A.   Yes.  Like your narrative of the charge.  To wit,

12       what's coming forth I guess.

13  Q.   And is that where you describe the arrestee's

14       conduct?

15  A.   Yes.

16  Q.   In your use of force report, do you indicate that

17       Mr. Belsito was swinging his fists?

18  A.   I'm not sure.  I don't recall.

19  Q.   Let me show it to you.

20            Can you see the document that's up on the

21       screen right now?

22  A.   I see a blue version of disorderly conduct.

23  Q.   Okay.  Hold on one second.

251

1            Can you see another blue document now that

2       says Orchard Park Town Court on the top?

3   A.   Yes.

4   Q.   Okay.  I'll scroll down to page two.  Do you see

5       Erie County Sheriff's Office use of firearms

6       slash force report?

7   A.   Yes.

8   Q.   All right.  I'm going to scroll down here.  Third

9       line in the narrative.  Starting on the second

10      line.  Defendant did become combative towards

11      reporting deputy by swinging Defendant's arms and

12      fists towards reporting deputy.

13  A.   Yes.

14  Q.   Did I read that accurately?

15  A.   That is correct.

16  Q.   So in your use of force report you indicated that

17      Mr. Belsito was swinging his fists at you, is

18      that fair?

19  A.   I believe I testified earlier to our initial

20      encounter that there was fists raised up, yes.

21  Q.   Okay.  Fists raised up.  Did Mr. Belsito swing

22      his fists at you when he raised his fists up?

23  A.   His arms were swinging up and down when I pushed

252

```
 1        him backwards with the baton.
 2   Q.   Okay.  Well, I'm talking about what you just
 3        testified to, which was when Mr. Belsito put his
 4        fists into the air, as you called it.  That was
 5        before you started to push him, is that correct?
 6   A.   I'm sorry.  Can you just ask that question again?
 7        I kind of lost what --
 8   Q.   Let's start from the beginning.
 9   A.   Sure.
10   Q.   In your use of force report, did you indicate
11        that Mr. Belsito was swinging his arms and fists
12        toward the reporting deputy?
13   A.   Yes.
14   Q.   And you're the reporting deputy, is that correct?
15   A.   Yes.
16   Q.   So when was it that Mr. Belsito swung his fists
17        at you?
18   A.   During our encounter that -- after I grabbed to
19        pull him backwards.  And it was during that
20        encounter that he raised up his fists and then he
21        would be pushed back and he would raise up and
22        swing his arms up again.
23   Q.   When did he swing his fists?
```

1   A.   When he raised his fists up in the air and I

2        pushed him backwards and he raised them up again,

3        I would say that -- I mean, that would be

4        swinging to me.  He's swinging his arms down,

5        they're coming back up, he's swinging his arms

6        down, they're coming back up.  That's what I

7        interpreted as swinging.

8   Q.   So when a person raises up his arms in the air,

9        that's the same thing as swinging a fist?

10  A.   Yeah.  He brought his fists up.  They came

11       upwards.  You know, he was swinging them upwards,

12       they went back down, he was swinging upwards

13       again.

14  Q.   Did he bring his fists up or did he swing them?

15  A.   I would say he did both.

16  Q.   Okay.  Explain to me how he did that.

17  A.   Because his arms were swinging up from where they

18       were at down by his side, coming up.  I mean,

19       that was a swinging motion upwards.

20  Q.   Like he was doing a curl?

21  A.   I wouldn't say you curl with your fists closed.

22       It was more of a --

23  Q.   I'm just asking about the motion.  Sorry.

254

1  A.  Sure.

2  Q.  I'm just trying to figure out what in the world

3      you're talking about.  Are you --

4  MR. D'AQUINO:  Hold on.  Can we just skip the

5      editorializing, please, and just ask a question?

6  MR. GLAZER:  It's just if I would get an answer it

7      wouldn't be so frustrating.

8  BY MR. GLAZER:

9  Q.  You've conceded that in your use of force report

10     you indicated that Mr. Belsito was swinging his

11     fists, is that correct?

12 A.  Correct.

13 Q.  You used the word fists, true?

14 A.  Used the word fists, yes.

15 Q.  And by fists you mean closed hands, correct?

16 A.  Yes.

17 Q.  Can you see what you're talking about anywhere on

18     Deputy Flowers' body cam footage?

19 A.  No, you cannot.

20 Q.  Okay.  Fists is an important detail, is that

21     true?

22 A.  Yes.  That's why I included it in the use of

23     force report.

255

1   Q.   Right.  Did you include fists or the word fists
2        anywhere in any of the accusatories that you
3        drafted?
4   A.   I don't recall without seeing them.
5   Q.   All right.  I can show them to you.
6            Start with the criminal mischief in the
7        fourth degree.  Can you see the narrative up on
8        the screen?
9   A.   I see you right now.
10  Q.   That's not good.  Hold on.
11           Can you see it now?
12  A.   I can see, yes.  Criminal mischief, yup.
13  Q.   I'll give you as much time as you need.  Let me
14       know if you ever mention the word fist in that
15       narrative.
16  A.   I just can't read what's at the right of my
17       screen because of the videos.  I guess I can
18       minimize them without losing it.
19  Q.   How about that?
20  A.   Is that fair?
21           Yeah, that's better.
22  Q.   Okay.
23  A.   I've read it.

256

1   Q.   Do you see the word fists in there?

2   A.   I do not see the word fists.

3   Q.   I'll scroll down now to the obstruction charge.

4        I pulled up the narrative for you.  Can you see

5        that?

6   A.   Yes.

7   Q.   Is the word fists in there?

8   A.   Is there a way you can just move it over a little

9        bit?  I'm missing the words under the --

10  Q.   Do you want me to move it to the left or the

11       right?

12  A.   To the left I would say, my left, whatever that

13       means for you.

14  Q.   Is that working or is that the wrong way?

15  A.   That's better, yes.  Thank you.

16  Q.   Tell me if you see fist.

17  A.   I do not see the word fist.

18  Q.   I'm going to scroll down to the disorderly

19       conduct charge.  And I want to represent to you

20       that the word fist is nowhere in that accusatory,

21       but if you'd like to look at it for yourself and

22       confirm that for me, that's fine with me.

23  A.   The only -- that's correct, the word fist is not

257

1       there.

2   Q.  Okay.  And lastly, the resisting arrest

3       accusatory, 205 point 30 of the Penal Law, did

4       you indicate anywhere in this resisting arrest

5       complaint the word fist?

6   A.  I do not see the word fist.

7   Q.  Let me ask you a couple questions about the dis

8       con.  You and I know what that means, disorderly

9       conduct.  We agreed already that the information

10      in all caps is automatically populated into the

11      accusatory by the computer, is that fair?

12  A.  That's fair.

13  Q.  And the portion where you indicate the conduct

14      starts with while deputies were attempting, is

15      that fair?

16  A.  Correct.

17  Q.  You say while deputies were attempting to process

18      a separate arrest in the bus parking lot of

19      Buffalo Bills stadium, the Defendant did approach

20      a marked Erie County Sheriff's patrol car asking

21      where his friend was going, and after deputies

22      provided the Defendant the information, being the

23      Erie County Holding Center, the Defendant did

258

1          refuse to leave the area, and when the Defendant

2          did back away from the patrol car, the Defendant

3          did yell profanities, at which time deputies

4          advised the Defendant he was under arrest for

5          disorderly conduct.

6               Did I read that properly?

7     A.   Yes, you did.

8     Q.   Okay.  So this accusatory indicates that the

9          Defendant yelled profanities, at which time you

10         advised him he was under arrest for disorderly

11         conduct, is that true?

12    A.   That's what it states, yes.

13    Q.   Okay.  It doesn't say anything about your

14         conversation after you grabbed him from behind,

15         is that correct?

16    A.   It does not, no.

17    Q.   One more question about the use of force report.

18         Did you indicate in the use of force report that

19         the dent in your vehicle was caused when you

20         pushed Mr. Belsito back into your vehicle, which

21         would be consistent with your testimony today?

22    A.   I would have to say yes, I did.

23    Q.   Did you talk to Deputy Flowers after the arrest

259

1      at any length about the arrest?

2   A.  There was, from what I recall, there was a

3      discussion in regards to the charging

4      instruments.  We had a discussion in the car on

5      the way downtown, if that's what you're referring

6      to.

7         I'm sorry?

8   Q.  I'm not really referring to anything.  I'm just

9      trying to get information.

10  A.  Sure.

11  Q.  So that's a fair answer.

12  A.  Right.

13  Q.  Was Flowers in agreement with all of the charges

14     that were levied?

15  A.  Yes, because he signed his name to the charging

16     paperwork.

17  Q.  Did he voice any concerns to you about the

18     arrest?

19  A.  No, he did not.

20  Q.  Following the incident, did you discuss it with

21     Sheriff Howard?

22  A.  Not that I recall.

23  Q.  Up until the date of the criminal trial, which

260

1    we've already established, did you ever discuss

2    the matter with Sheriff Howard?

3  A.  Not that I recall.

4  Q.  Following the arrest, did you take Mr. Belsito

5    for medical treatment?

6  A.  Yes.

7  Q.  Okay.  And that's because he had some injuries,

8    that you discussed before?

9  A.  Yeah.  I think there was an offer of -- twice on

10    the scene and then once to Southside Medical.

11  Q.  And he refused at some point?

12  A.  He refused initially.  I believe, my memory from

13    the video, if I recall, and initially from my

14    memory, that he refused twice at the scene with

15    Deputy Dusza, who is a medic, the Windom Fire

16    Department, who had their -- and possibly even --

17    I'm not sure if Rural Metro was there on the

18    scene when it came to the volunteer ambulance,

19    and then at Southside Medical.

20  Q.  I'm just asking you if he refused --

21  A.  Sure.

22  Q.  Mr. Achtyl, just so that we're clear, at some

23    point, whether it was once or twice or how many

261

```
 1        times, Mr. Belsito did refuse medical treatment?
 2   A.   Yes, he did.
 3   Q.   Did it appear to you that he was pissed, that he
 4        was angry?
 5   A.   Yes.
 6   Q.   And he's bloody at that point, is that fair?
 7   A.   Yes.
 8   Q.   At some point after he did get the treatment that
 9        we've discussed, did he -- did you, rather,
10        transport him with Deputy Flowers to the Erie
11        County Holding Center?
12   A.   Yes.
13   Q.   And he was confined in handcuffs at that time, is
14        that correct?
15   A.   Yes.
16   Q.   And confined to the rear of your police cruiser?
17   A.   Yes.
18   Q.   And Deputy Flowers was driving at that time, is
19        that correct?
20   A.   Correct.
21   Q.   Do you know if Mr. Belsito was belted at that
22        time?
23   A.   I'm not sure.
```

262

1   Q.   Have you heard of the professional standards

2       division of the Erie County Sheriff's Department?

3   A.   Yes.

4   Q.   Can you tell me what it is?

5   A.   Professional standards would be the I guess

6       internal investigations that take place within

7       the department.

8   Q.   Okay.  Do you know if the December the 3rd of

9       2017 incident at the Bills stadium was

10      investigated by the internal affairs division, as

11      you term it?

12   A.   I'm not aware.

13   Q.   Did they ever meet with you?

14   A.   No, they did not.

15   Q.   Did anyone ever take a statement from you with

16      regard to the 12/3 of '17 incident?

17   A.   No, they did not.

18   Q.   Were you ever -- well, strike that.  Do you know

19      what a Garrity letter is, G-A-R-R-I-T-Y?

20   A.   Yes.

21   Q.   Did you ever get a Garrity letter in connection

22      with this incident?

23   A.   Not that I recall.

263

1   Q.   Okay.  Is it your understanding that all of the

2        charges, each and every one of the charges

3        against Mr. Belsito, were eventually dismissed?

4   A.   Yes.

5   Q.   If I told you that that happened in June of 2018,

6        would you have a reason to disagree with that?

7   A.   I'm not -- no, I would not have a reason to

8        disagree with you.  I'm not sure when they were

9        dismissed.

10  Q.   And at some point you were charged with a variety

11       of criminal offenses regarding the 12/3 of '17

12       incident, is that correct?

13  A.   Yes.

14  Q.   Were you charged with official misconduct?

15  A.   Yes.

16  Q.   And were you charged with assault in the third

17       degree?

18  A.   Yes.

19  Q.   Were you charged with falsifying business records

20       in the second degree?

21  A.   Yes.

22  Q.   And as we've discussed, were those charges tried

23       to a jury between the 17th of September and the

264

1       23rd of September, 2019?

2   A.  Yes.

3   Q.  Did the jury convict you on the 27th of those

4       three counts?

5   A.  Yes.

6   Q.  Maybe ten more minutes.

7   A.  Okay.

8   Q.  Thank you.

9           Did -- well, strike that.  We talked about

10      Sheriff Howard's presence at your trial.  And did

11      you indicate to me whether or not he was in

12      uniform when you would see him there?

13  A.  I believe he was in uniform.

14  Q.  Did he stay the whole day each and every day that

15      he was there?

16  A.  I'm not sure.  I don't recall.

17  Q.  We discussed the times that you spoke with the

18      sheriff during your criminal trial.  And refresh

19      my recollection.  Did you ever go outside the

20      building to talk to him or into your car or into

21      a private room or anything like that?

22  A.  No.

23  Q.  Do you have Sheriff Howard's cell phone number?

265

1   A.   I don't believe so.

2   Q.   Have you ever called or texted Sheriff Howard on

3        his cell phone?

4   A.   I don't recall.

5   Q.   Is there a possibility that you have done that?

6   A.   It's possible, yes.

7   Q.   When would that have been?

8   A.   It would have been after my conviction.

9   Q.   What did you text or call him about after your

10       conviction?

11  A.   From what I can recall, it wasn't a matter of me

12       -- he might have texted me.  And in regards to

13       like how I was doing, what was going on, you

14       know, if there was -- what he may have thought of

15       like possible grounds for an appeal type of

16       stuff.

17  Q.   Do you still have those -- I'm sorry.  Go ahead.

18  A.   I don't believe I still have them, no.

19  Q.   If you do, I'm just asking that you keep them and

20       not delete any of those from your phone.

21            How many --

22  A.   I believe I changed my cell phone since then, so

23       I don't think I have them anymore, but if I do

```
 1        have them I have no problem saving them.
 2   Q.   When did you change your cell phone?
 3   A.   Well, I believe I upgraded in possibly August of
 4        last year.
 5   Q.   August of 2020?
 6   A.   No.  Wait a second.  I'm sorry.  I don't recall
 7        now.  It was either August of 2020 or August of
 8        -- no, it wouldn't have been August of 2019.  It
 9        would have been August of 2020.
10   Q.   So you now have a different physical cell phone,
11        is that what you're saying?
12   A.   Yeah.  I upgraded from an iPhone 7 or 8 to an
13        iPhone 11.
14   Q.   Do you still have the same number?
15   A.   Yes, I do.
16   Q.   And the same provider?
17   A.   Yes.
18   Q.   Okay.
19   A.   I did switch providers for about twenty days, and
20        then I found out that the carrier that I switched
21        to, their coverage wasn't sufficient.
22   Q.   What carrier -- I'm sorry.  Go ahead.
23   A.   I believe it was Sprint.
```

267

1  Q.  So for approximately twenty days you had Sprint
2      as a carrier as opposed to Verizon?
3  A.  Correct.
4  Q.  When you were with Sprint, did you have the same
5      phone number?
6  A.  Yes.
7  Q.  Give me your best estimate as to when this
8      twenty-day period was.
9  A.  Sometime around the end of -- either the end of
10     July or the end of August of 2020.
11 Q.  How many times do you believe the sheriff texted
12     you after the criminal trial was over?
13 A.  I don't have a number.
14 Q.  More or less than five times?
15 A.  I would say yes.
16 Q.  More or less?
17 A.  I'm sorry.  I heard you say more than five times.
18     Yes, I would say more than five times.
19 Q.  More than ten times?
20 A.  I would say it was roughly around -- could be
21     around that amount.  I don't know.
22 Q.  Did these texts come on different days or on the
23     same day?

268

1   A.   I would say they were different days.

2   Q.   If this incident had never taken place, how long

3        had you intended to work for the sheriff's

4        department?

5   A.   I would say roughly twenty-four, twenty-five

6        years total.  Not for the sheriff's office but

7        total with my previous time, if that makes any

8        sense.  So from 1995 when I started in law

9        enforcement to whatever twenty-five years after

10       1995 is.

11  Q.   That's 2020.

12  A.   2020, 2021-ish.

13  Q.   Okay.  So you were intending to cease employment

14       from or with the sheriff's department right

15       around now, is that fair?

16  A.   Yeah.  I would say that's a fair surmise, yes.

17  Q.   What's the reason that you were going to do that?

18  A.   Well, to do something different I guess you could

19       say, start a second career.

20  Q.   Such as what?

21  A.   I mean, I didn't have a specific career in mind

22       at the time.

23  Q.   Are you working?

269

| | |
|---|---|
| 1 | A.   I'm sorry.  What? |
| 2 | Q.   I'm cutting you off.  Go ahead. |
| 3 | A.   I'm sorry.  I didn't hear your -- |
| 4 | Q.   I was just going to ask you, are you working now? |
| 5 | A.   Yes, I am. |
| 6 | Q.   What are you doing? |
| 7 | A.   I work for -- well, I'm a data annotation |
| 8 | specialist. |
| 9 | Q.   Whereabouts? |
| 10 | A.   For Tesla. |
| 11 | Q.   Do you like it? |
| 12 | A.   It's different.  Yes.  Yes. |
| 13 | Q.   So you just told me that you were going to work |
| 14 | twenty-four or twenty-five years and that was |
| 15 | your plan, is that correct? |
| 16 | A.   Yes.  My rough plan, yes. |
| 17 | Q.   All right.  And you told me that was including |
| 18 | time from 1995 to 2000, is that fair? |
| 19 | A.   Yes. |
| 20 | Q.   So you got some County time in during those |
| 21 | years? |
| 22 | A.   I'm not sure what you mean by County time. |
| 23 | Q.   Well, you said including your time between '95 |

270

```
 1       and 2000.  What did you mean by including your
 2       time from '95 to 2000?
 3   A.  My previous time from those departments.
 4   Q.  Was your previous time in those departments in
 5       the same pension system as the County job?
 6   A.  I'm not sure how -- it was in the same -- it was
 7       a different tier I guess, to try to explain it
 8       properly.  There's police and fire and then
 9       there's a different tier that the sheriffs fall
10       under.  Very similar, yes.  So time was
11       transferred over, yes.
12   Q.  So am I to understand that to mean, then, that
13       you received credit for time worked before you
14       went into the sheriff's department?
15   A.  Yes.
16   Q.  In terms of your current pension with the
17       sheriff's department?
18   A.  Yes.
19   Q.  So in 2000, you started as if you'd been working
20       for the sheriffs for five years in a way?
21   A.  I wouldn't agree to your statement.  I would say
22       that I started with time in the New York State
23       retirement system, yes.
```

271

1  Q.  Okay.  So was the '95 to 2000 employment in the
2      New York State retirement system?
3  A.  Yes.
4  Q.  And was the 2000 to 2019 time in the New York
5      retirement system?
6  A.  Yes.
7  Q.  Okay.  So same system from '95 to 2019?
8  A.  Same system, yes.  But it's a different tier,
9      yes.
10 Q.  Okay.  So does the tier change from twenty-four
11     years to twenty-five years?
12 A.  I'm not sure exactly what you're asking me.
13     Twenty-four, twenty-five of the tier?
14 Q.  Here's what I mean.  If I retire from the state
15     system with twenty-four years in versus
16     twenty-five years in, am I doing myself a
17     disservice in terms of my pension?
18 A.  Yes, because it's an additional year you could
19     work and there's -- however the state retirement
20     system figures it out, there is additional credit
21     for working longer, yes.
22 Q.  So if this incident had not happened, can we
23     agree that you would have continued to work for

272

```
 1       the sheriff's department for some period of time?
 2  A.   I would say yes.  For a short period of time,
 3       yes.
 4  Q.   How much time would you say?
 5  A.   Maybe roughly two to three years.
 6  Q.   Okay.  Are you collecting a pension now based on
 7       your employment at the sheriff's department?
 8  A.   I am collecting a New York State retirement, yes.
 9  Q.   All right.  And officially you've resigned from
10       the Erie County Sheriff's Department, is that
11       correct?
12  A.   That is correct, yes.
13  Q.   Were you receiving benefits from the sheriff's
14       department up until the day of your resignation?
15  A.   Yes.
16  Q.   Okay.  No salary but some benefits?
17  A.   I had to pay my own benefits after I was arrested
18       in May, if I recall correctly.
19  Q.   Did you receive salary up until the time you were
20       -- well, that's not my question.  Strike that.
21       Did you receive salary after you were arrested?
22  A.   No, I did not.
23  Q.   When did you resign?
```

273

1   A.   I believe it was the week of my trial.

2   Q.   Do you know what day?

3   A.   Towards the end of my trial maybe.

4   Q.   Was it before the verdict?

5   A.   I don't recall.

6   Q.   If I told you that the database reflects that you

7        resigned on 9/26 of '21 (sic), would you have a

8        reason to disagree with that?

9   A.   No, I would not.

10  Q.   And if I told you that that was the day before

11       the jury returned the verdict in your criminal

12       trial, would you have a reason to disagree with

13       that?

14  A.   No, I would not.

15  Q.   So you resigned from a job you intended to work

16       for another three years before you knew what the

17       jury's verdict was?

18  A.   I resigned --

19  Q.   I apologize for interrupting you, but when I ask

20       you that question, it sounds like a yes or no

21       question to me.  So if you want to elaborate, Mr.

22       D'Aquino can ask you a further question.

23  A.   Fair enough.  I was getting ready to give you my

274

```
 1        answer and I was trying to respond to you, you
 2        cut me off.  I apologize that I didn't come quick
 3        enough, but --
 4   Q.   Hold on one second.  Just try to respond to my
 5        question with a yes or no.
 6   A.   Fair enough.
 7   MR. GLAZER:  Please read the question back.
 8             (Whereupon, the above-requested question at
 9        page 273, line 15, was then read back by the
10        reporter.)
11   BY MR. GLAZER:
12   Q.   Is your answer yes or no?
13   A.   Yes.
14   Q.   Did you resign by letter?
15   A.   I believe I did, yes.  I'm not sure.
16   Q.   When and where did you draft the letter?
17   A.   Honestly, I don't recall.  I don't recall.
18   Q.   Did someone else write it for you?
19   A.   No.
20   Q.   Whom did you deliver the letter to?
21   A.   I don't recall if it would have been Chief
22        Greenan at the time.  I'm not sure.  He would
23        have been the personnel, in charge of
```

275

1          administrative stuff.

2    Q.   Did you deliver it in person?

3    A.   Yes, I delivered it in person.

4    Q.   Prior to your resignation, did you discuss your

5         resignation specifically with Sheriff Howard?

6    A.   Not with Sheriff Howard that I recall, no.

7    Q.   Did you discuss your resignation -- well, let me

8         ask a clearer question.  Strike that, please.

9         Prior to your resignation, did you discuss your

10        resignation with the undersheriff?

11   A.   I'm sorry.  Prior to -- could you just repeat the

12        question?

13   Q.   Prior to your resignation, did you discuss it

14        with the undersheriff?

15   A.   Yes, I did.

16   Q.   What was the discussion regarding?

17   A.   It was earlier in the year, in regards to what

18        the outcome would be under the -- what charges

19        were placed against me, if they were violations

20        or misdemeanors and if I could continue to work

21        or not.

22   Q.   Was there an agreement between you and the

23        sheriff that if you were convicted your

276

```
 1      resignation would be effective the day before the
 2      verdict?
 3   A. With the sheriff, no.
 4   Q. Was there an agreement with someone from the
 5      sheriff's department that if you were convicted
 6      your resignation would be effective the day
 7      before the verdict?
 8   A. I wouldn't say there was an agreement.  I believe
 9      I understood that what -- if there was a negative
10      outcome, what the consequences would be, so I
11      offered a resignation letter at that point in
12      time.
13   Q. So there was an agreement that if you got
14      convicted your resignation would be effective the
15      day before?
16   A. I wouldn't say there was an agreement for the day
17      before, no, but that would be -- I wouldn't be
18      able to continue working.
19   Q. Well, you said that you discussed your
20      resignation with the undersheriff and that you
21      discussed the ramifications of the charges.  And
22      we've confirmed that you resigned effective the
23      day before the jury verdict.  Is that all fair?
```

1   A.   Yes.

2   Q.   Okay.  Did you resign because you believed you

3        were going to be convicted?

4   A.   There was a few reasons why I chose to resign and

5        move forward.

6   Q.   What were they?

7   A.   Well, I was -- in August of 2018 I was involved

8        in an officer-involved shooting where the subject

9        was shot and he survived.  That took a lot of

10       toll on me.  In regards to this incident as well.

11       I kind of made a decision -- it got to a point

12       where I have family and I've been doing this job

13       for, at that point in time, close to twenty-five

14       years, and I made a decision maybe it's time to

15       move forward.

16  Q.   But you indicated that if this incident had not

17       taken place you would have worked another two to

18       three years?

19  A.   Yes.

20  Q.   And you confirmed for me that your resignation

21       was effective the day before the jury verdict, is

22       that correct?

23  A.   Yes.  Yes.

278

1  Q.  Did you talk with anybody from the sheriff's

2      department about backdating your resignation

3      letter?

4  A.  I did not, no.

5  Q.  Do you know how your pension would have been

6      affected had you been fired as opposed to

7      resigning?

8  A.  I am not sure, but I don't think there would have

9      been an effect on it.

10 Q.  Zero effect, firing versus resigning?

11 A.  I believe if you have the time in the system, at

12     any time you can retire.  I believe that's how it

13     works.  I'm not sure.

14 Q.  Okay.  You're not sure it sounds like?

15 A.  I'm sorry?

16 Q.  Is you're not sure the answer?

17 A.  I'm not sure, but I don't believe it's affected.

18 Q.  If you had been acquitted, would you have

19     returned to the sheriff's department?

20 A.  That's a hard question to answer.  I honestly

21     don't know.  There's a good possibility that I

22     would have went and done something else, and

23     there's a possibility that I may have returned

```
1        and maybe asked to do something different within
2        the department.
3    Q.  So when did you make the decision to resign?
4    A.  I think it was the week of the trial.  As I
5        stated and testified earlier, there was the -- if
6        you want to call it a near-death incident where I
7        was involved, and then received an award for
8        doing that in December, and then a week later I'm
9        up on the news reels everywhere.  I would have to
10       say that week of the trial I thought pretty hard
11       about it.
12   Q.  All right.  Do you know what day it was during
13       the trial that you made --
14   A.  I do not know what day it was.  I could not tell
15       you that.  The weight of the trial and everything
16       that I went through previously, it was a great
17       weight.  And I don't know what day I came to a
18       conclusion that I maybe could do something
19       different.
20   Q.  Were you sentenced on the criminal convictions in
21       January of 2020, was it?
22   A.  I believe that sounds accurate, yes.
23   Q.  And after you were sentenced, was Sheriff Howard
```

280

1      publicly critical of your behavior during the

2      incident?

3   A.  I don't know.  I'm not sure.

4   Q.  If I told you that he was, would that surprise

5      you?

6   A.  No, it wouldn't surprise me.

7   Q.  Did the sheriff tell you after the trial in any

8      of those text messages that he disagreed with the

9      jury's verdict?

10  A.  I don't recall.  I don't recall if it was a -- if

11     he came out and said those words.

12  Q.  Are you aware that the Plaintiff's lawsuit is

13     seeking what are called punitive damages?

14  A.  I guess so, yes.

15  Q.  Has the County advised you whether or not they'll

16     cover punitive damages --

17  MR. D'AQUINO:  I don't think that's a permissible

18     question at this point.

19  MR. GLAZER:  Are you directing him not to answer it?

20  MR. D'AQUINO:  Yes, I am.

21  MR. GLAZER:  Can you index that for -- I stuttered.

22     Can I just ask the question again so it's on the

23     record?

281

1   MR. D'AQUINO:  Sure.

2   BY MR. GLAZER:

3   Q.  Don't answer the question, please.

4   A.  Okay.

5   Q.  Has the County advised you whether they will

6       cover you for punitive damages if a punitive

7       verdict is rendered?  Mr. D'Aquino has directed

8       his client not to answer that question.

9           Are you aware that you have no insurance

10      coverage for punitive damages?

11  MR. D'AQUINO:  I don't know what the relevance of

12      that is to the complaint that you've stated

13      against him.  If you can state it, I'll consider

14      it, but it sounds like you're going way beyond

15      what you need to prove to prove your case.

16  MR. GLAZER:  I have two questions more about this.  I

17      don't know that I need to disclose what I think

18      the relevance is to you.  I understand why you're

19      making an objection, but it has got to be either

20      form, privilege or palpably improper and direct

21      him not to answer.

22  MR. D'AQUINO:  Since the question directly relates to

23      after you've sued him and what has been discussed

282

1           with him about the circumstances of the suit, I

2           don't think it's proper and I'm going to direct

3           him not to answer.

4    MR. GLAZER:  Okay.  Are you aware -- and this is my

5           last question in this regard, Mr. D'Aquino.

6    BY MR. GLAZER:

7    Q.   Are you aware that if a jury returns a punitive

8           award against you, that the money will have to be

9           paid by you personally?

10   A.   I'm not aware of that.

11   MR. D'AQUINO:  Same objection.  That's not something

12          that he has to answer.

13   MR. GLAZER:  All right.  We haven't had too many

14          issues.  So we'll have an index.

15   BY MR. GLAZER:

16   Q.   Wrapping up, Mr. Achtyl, who is Adam Day?

17   A.   He is a deputy with the sheriff's office.

18   Q.   Is he a friend of yours?

19   A.   I would say that everyone I worked with I had a

20          friendship with at the sheriff's office.

21   Q.   Okay.  So if he's one of the sheriffs, then he's

22          your friend?

23   A.   I would say yes.

283

1    Q.   Have you ever socialized with Mr. Day outside of
2         the sheriff's department?
3    A.   Not that I recall.
4    Q.   Do you have his phone number?
5    A.   I am not sure.  I don't know.
6    Q.   Have you ever called him on the phone?
7    A.   No, I have not.
8    Q.   Has he ever called you on the phone?
9    A.   Not that I'm aware of, no.
10   Q.   Would you guys ever have occasion to text each
11        other?
12   A.   I would have to answer your question by saying
13        that years prior, years prior when he was working
14        as a patrol deputy, there may have been occasions
15        to either talk or text while working in that
16        capacity.
17   Q.   Just small talk?
18   A.   Work related conversation.
19   Q.   Would you say that Adam Day is a good deputy?
20   A.   If you're looking for a yes or no answer, I
21        really don't -- I mean, he was promoted.  If he
22        was promoted, I would think he was doing a good
23        job.  And I would say yes, he's a good deputy.

284

1   Q.   Do you know anything about him that would cause
2        you to think he's not an honest guy or a good
3        deputy?
4   A.   No.
5   Q.   How long have you known him?
6   A.   From whenever he started probably working at the
7        sheriff's office through work related.  I would
8        most likely only see him probably at the stadium
9        when we worked together on patrol prior to his --
10       whatever special detail he went off to do.  I may
11       have occasion to see him while working, but after
12       he was in his special detail then I did not -- I
13       couldn't say that I would have occasion to see
14       him hardly at all.
15  Q.   Who is Bradford Ballantyne?
16  A.   He's another sheriff's deputy.
17  Q.   Is he a friend of yours?
18  A.   I would have to say yes, as we previously
19       discussed.
20  Q.   Have you ever talked to him on the cell phone?
21  A.   I would have to say yes.
22  Q.   Have you ever texted back and forth with him?
23  A.   Over the twenty-some years that I've known him, I

285

1      would have to say yes.

2  Q.  Have you ever socialized with him outside of

3      work?

4  A.  Yes.

5  Q.  How often?

6  A.  I would say on a few occasions.

7  Q.  Were both Ballantyne and Day present at the Bills

8      stadium on December 3rd, 2017?

9  A.  I believe they were, yes.

10  Q.  Do you know if Ballantyne or Day were wearing

11      body cameras at the Bills stadium on December 3rd

12      of '17?

13  A.  I am not aware.  I don't know.

14  Q.  If I told you that Ballantyne was wearing a body

15      camera on 12/3 of '17 at the Bills stadium, would

16      you have a reason to disagree with that?

17  A.  No.

18  Q.  Have you ever seen Ballantyne's body cam footage

19      from 12/3 of '17?

20  A.  I'm not certain.  I'm not sure what -- I don't

21      believe so.

22  Q.  Were you aware for any reason that Ballantyne's

23      body camera recorded him saying uh-oh, Kenny is

286

1       over there pushing someone?

2   A.  I'm not aware, no.

3   Q.  Were you aware that Mr. Day responded to Mr.

4       Ballantyne by saying Kenny always pushes people?

5   A.  I'm not aware of that, no.

6   Q.  Do you recall seeing an article on the front page

7       of the Buffalo News that was titled Kenny Always

8       Pushes People?

9   A.  I really don't pay much attention to the Buffalo

10      News since December, whatever date that was, of

11      2018.

12  Q.  So is your answer you do not recall that article?

13  A.  I do not recall the article nor do I know of an

14      article that I've seen.

15  Q.  Have you ever discussed the conversation that I'm

16      asking you about with either Mr. Day or Mr.

17      Ballantyne?

18  A.  Not that I recall, no.

19  Q.  Who is William Granville?

20  A.  Deputy Granville is a sheriff's deputy that I had

21      mentioned earlier.

22  Q.  Is he a friend of yours?

23  A.  I would say yes.

287

1   Q.  Do you socialize with him?

2   A.  No.

3   Q.  Have you ever texted with Deputy Granville or

4       spoken to him on your cell phone?

5   A.  I'm sure across the many years of employment I

6       have spoken with him and then texted him.

7   Q.  Were you aware that Granville was present for the

8       conversation between Ballantyne and Day?

9   A.  I was not.

10  Q.  Were you aware that Granville participated in the

11      conversation?

12  A.  I was not.

13  Q.  Have you ever heard what Granville said during

14      the course of that conversation?

15  A.  I did not.

16  Q.  If I told you that Granville said that, quote,

17      Kenny turned into Kenny, unquote, what would you

18      take that to mean?

19  MR. D'AQUINO:  Objection.  How can he possibly say

20      what somebody else means?  You know that's not a

21      fair question.

22  MR. GLAZER:  It's his friend.  Are you directing him

23      not to answer it?

288

1  MR. D'AQUINO:  Well, sure.  You're literally asking
2      him what did someone else mean by what they said.
3      He's not clairvoyant.  How would he know?
4  MR. GLAZER:  His friend who he socializes with said
5      Kenny turned into Kenny.  And I'm asking him if
6      he has any -- he can say no.  I'm asking him if
7      he has any idea what that means.
8  BY MR. GLAZER:
9  Q.  Kenny turned into Kenny, what does it mean?
10 MR. D'AQUINO:  I'm going to object to the form.  Go
11     ahead and answer.
12 BY MR. GLAZER:
13 Q.  Do you know what he meant?
14 A.  I do not know what he meant.
15 Q.  If I told you that Granville said that Kenny
16     turned into Kenny means the fucking nightstick
17     comes out, close quote, would you have a reason
18     to disagree with that?
19 A.  I don't know what he said, so I am not
20     disagreeing with what you said.  I have not heard
21     that before.
22 Q.  So if Granville said Kenny turning into Kenny
23     means the fucking nightstick comes out, you

289

1      wouldn't have a reason to disagree with that?

2   A.  I don't know why it was said, but I'm not

3       disagreeing that you're saying it.

4   Q.  Does it surprise you that your friend William

5       Granville said that about you?

6   A.  I would say yes.

7   Q.  Last couple questions.  I appreciate your

8       patience.

9           We've established that you told Mr. Belsito

10      several times that his friend was going to 10

11      Delaware, is that correct?

12  A.  Correct.

13  Q.  Before your resignation, you worked for the Erie

14      County Sheriff Department for how long?  Twenty --

15  A.  Nineteen years.

16  Q.  Okay.  Have you been to the jail and the holding

17      center?

18  A.  Yes, I have.

19  Q.  Five hundred times, a thousand times, more than

20      that?

21  A.  The only part of the holding center that I've

22      been to is to drop somebody off at the intake

23      booking area, and obviously that would be done

290

1          whenever a supervisor made that determination

2          that a person was going to the holding center.

3          And I don't have a number of how many times over

4          twenty years that that occurred.

5     Q.   How many times over twenty years do you think you

6          walked in the front door of the holding center

7          and talked to somebody at the front desk?

8     A.   I would say probably, if, maybe once.

9     Q.   But you know you've been to the holding center a

10         variety of times and you drop people off there

11         all the time?

12    A.   At the rear of the holding center, yes.

13    Q.   Obviously you've seen the front of the holding

14         center, you've seen the front of the building,

15         you've parked your car there I assume at times?

16    A.   No.  My -- all the times that I went down to the

17         holding center, I came in from the rear, exited

18         to the side.  And, you know, I don't recall

19         having an opportunity to park in front of the

20         holding center.  It's restricted parking.

21    Q.   But you've seen the front of the holding center

22         and you've walked in the front of the holding

23         center, is that fair?

291

1   A.   Maybe once over twenty-some years, yes.

2   Q.   I've got a picture of the holding center that's

3        going to have to get marked.  It will be I think

4        12.  Do you see the picture of the holding

5        center, at least the top of the sign, up on the

6        front of your screen there?

7   A.   Yeah, I see that.

8   Q.   Okay.  If I scroll down a little bit, do you see

9        the big white letters and numbers that indicate

10       the address to the holding center?

11  A.   Yes, I do.

12  Q.   Can you tell me what the address is?

13  A.   It says 40 Delaware.

14  Q.   Okay.  So the address of the Erie County Holding

15       Center in Buffalo is 40 Delaware Avenue?

16  A.   Right.

17  Q.   Not 10 Delaware, is that correct?

18  A.   Correct.

19  Q.   So after all this, you didn't even give the kid

20       the right address, did you?

21  MR. D'AQUINO:  Object to the form.  Ken, hold on.

22       You don't have to answer that question.

23  THE WITNESS:  All right.

292

```
 1   MR. D'AQUINO:  It's argumentative.
 2   MR. GLAZER:  Well, that's not palpably improper and
 3       that's not privileged, but --
 4   MR. D'AQUINO:  Well, you preface it with after all
 5       this.  So you're obviously making a point which
 6       is by definition argumentative and by definition
 7       not really a question.
 8   MR. GLAZER:  All right.  Well, is it your position
 9       that because it's argumentative, that you can
10       direct him not to answer it?
11   MR. D'AQUINO:  It's my position that you should just
12       rephrase it.  I think he already answered that 40
13       Delaware is not 10 Delaware.
14   BY MR. GLAZER:
15   Q.  So you gave Nick Belsito the wrong address, is
16       that correct?
17   A.  I mis -- I mis -- at that point in time I
18       mistakenly took the sheriff headquarters address
19       as 10 Delaware and gave him that answer, yes.
20   Q.  So we know you made at least one mistake on 12/3
21       of '17, is that fair?
22   A.  In regards to the address?  Yes.
23   MR. GLAZER:  I have nothing further and I appreciate
```

293

1      your time.

2    MR. BLOOM:  Excuse me.  Aaron, can I please speak to

3        you, this is Kevin Bloom, prior to you resting?

4    MR. GLAZER:  Yes.  Give me one second.

5    THE VIDEOGRAPHER:  It is six-forty p.m.  We are going

6        off the record.

7            (Whereupon, a short recess was then taken.)

8    THE VIDEOGRAPHER:  It is six-forty-two p.m.  We are

9        back on the record.

10   BY MR. GLAZER:

11   Q.  We will be two minutes.

12           Mr. Achtyl, why did you state to Mr. Belsito

13       come here, when you were in the patrol car?

14   A.  To eject him.  He was either going to be arrested

15       or ejected.  I thought I stated that earlier.

16   Q.  Did you ask him to come here because he told you

17       do your fucking job or something like that?

18   A.  Under the set of the circumstances involving

19       everything that transpired with him that day,

20       part of my decision at that point in time was to

21       eject him, and that added to the idea of getting

22       him off of the property and stadium area of the

23       Buffalo Bills.

294

 1   Q.  Why did you get out of your car?

 2   MR. D'AQUINO:  You've asked him that question and he

 3       answered.

 4   MR. GLAZER:  Okay.  Well, asked and answered is not a

 5       proper objection.

 6   BY MR. GLAZER:

 7   Q.  So why did you get out of the car?

 8   MR. D'AQUINO:  We're going on the seventh hour of

 9       this deposition and you're asking the same

10       question we went over for probably half an hour?

11   MR. GLAZER:  All right.  Well, I have three questions

12       left.  So we can try to call the judge or you can

13       answer the last three questions.

14   MR. D'AQUINO:  Well, you know we can't call the judge

15       at six-forty-three p.m.  And I guess the proper

16       thing to do is go back in the transcript and find

17       where you asked him that repeatedly and he

18       answered it.  But why are you asking that again?

19   MR. GLAZER:  I'm asking that for reasons that are my

20       own business, but I'm just telling you that we

21       have three questions left.  And if he's answered

22       them already, it should be really easy.  So you

23       can let him do it or not.  And if you don't want

295

```
1       to let him do it, that's fine, we'll just --
2    MR. D'AQUINO:  Well, I'm not clear on what's
3       happening here.  You said you had no more
4       questions, the videographer (sic) then asked to
5       speak with you, you muted your line, and then you
6       came back on and said I have five more questions.
7       And the current one is one you asked already.
8    MR. GLAZER:  Well, not that I have to give you this
9       information, but I am not the only attorney that
10      represents Mr. Belsito.  Only one attorney can
11      ask questions and only one attorney can object on
12      behalf of one party.  So I spoke to another
13      attorney, and now I have three more questions.
14      That's all the information that I was not
15      obligated to give you but that I have given you.
16      So I'm going to ask the questions or just direct
17      him not to answer.
18   MR. D'AQUINO:  All right.  I'm objecting asked and
19      answered to your first of the last three
20      questions you have.
21   BY MR. GLAZER:
22   Q.  Okay.  Why did you get out of the car, Mr.
23      Achtyl?
```

296

1    A.   As I stated earlier, it was -- at that point in

2         time there was either going to be an ejection or

3         an arrest.

4    MR. GLAZER:  Okay.  I'm not going to ask any more

5         questions.  That's it.  I'm done.  I appreciate

6         you answering that last question.  I am done

7         officially.

8    MR. D'AQUINO:  Okay.  Sue Ann, anything we've got to

9         say to wrap this up or are we done?

10   THE VIDEOGRAPHER:  It is six-forty-five p.m. and we

11        are going off the record.

12

13        (A Photograph was received and marked as

14        Exhibit 12, for identification.)

15

16                    *    *    *    *    *

17

18

19

20

21

22

23

297

1    I HEREBY CERTIFY that I have read the

2    foregoing 296 pages and that, except as to those

3    changes set forth in the attached errata form(s),

4    they are a true and accurate transcript of the

5    testimony given by me in the above-entitled

6    action on April 14, 2021.

7

8

9

10                     _____

11                     KENNETH P. ACHTYL, JR.

12

13

14   Sworn to before me this

15

16   _____ day of _____ 2021.

17

18

19   _____

20       Notary Public.

21

22

23

298

1     STATE OF NEW YORK)

2                    SS:

3     COUNTY OF ERIE)

4

5          I, Sue Ann Simonin, a Notary Public in and

6     for the State of New York, County of Erie, DO

7     HEREBY CERTIFY that the testimony of KENNETH P.

8     ACHTYL, JR. was taken down by me in a verbatim

9     manner by means of Machine Shorthand, on April

10    14, 2021.  That the testimony was then reduced

11    into writing under my direction.  That the

12    testimony was taken to be used in the

13    above-entitled action.  That the said deponent,

14    before examination, was duly sworn by me to

15    testify to the truth, the whole truth and nothing

16    but the truth, relative to said action.

17         I further CERTIFY that the above-described

18    transcript constitutes a true and accurate and

19    complete transcript of the testimony.

20

21                    _____

                           SUE ANN SIMONIN,
22                         Notary Public.

23

**'17** [24] - 16:2, 119:9, 119:20, 126:18, 131:15, 132:21, 133:1, 133:4, 133:15, 133:18, 134:5, 135:16, 137:21, 138:16, 139:2, 139:14, 147:20, 182:17, 262:16, 263:11, 285:12, 285:15, 285:19, 292:21
**'19** [5] - 112:6, 112:7, 112:8, 121:18, 121:19
**'21** [1] - 273:7
**'94** [1] - 21:17
**'95** [6] - 21:22, 22:1, 269:23, 270:2, 271:1, 271:7
**'96** [1] - 24:9
**'97** [3] - 23:12, 23:14, 24:9
**'98** [4] - 22:20, 23:14, 25:16

**1**

**1** [14] - 2:5, 2:5, 2:7, 2:8, 2:10, 2:13, 6:2, 6:4, 6:6, 6:7, 6:13, 37:19, 248:13
**10** [19] - 2:18, 6:21, 114:7, 197:10, 197:22, 198:20, 199:1, 200:6, 200:16, 202:1, 202:4, 202:7, 202:8, 202:9, 289:10, 291:17, 292:13, 292:19
**100** [2] - 101:5, 101:19
**11** [9] - 2:19, 7:1, 149:16, 153:15, 183:22, 187:23, 234:1, 238:14, 266:13
**112** [1] - 114:7
**114** [1] - 5:11
**11th** [2] - 30:8, 30:9
**12** [4] - 2:21, 101:19, 291:4, 296:14
**12/2** [1] - 134:5
**12/25/1972** [1] - 18:23
**12/3** [14] - 16:2, 126:17, 132:20, 135:16, 138:16, 139:2, 139:14, 147:19, 182:17, 262:16, 263:11,

285:15, 285:19, 292:20
**124** [2] - 4:6, 126:6
**12553** [1] - 5:7
**12:35** [1] - 1:18
**14** [6] - 1:18, 2:11, 4:5, 6:10, 297:6, 298:10
**14075** [1] - 9:19
**142** [1] - 143:14
**14202** [1] - 5:4
**14203** [1] - 5:10
**14th** [1] - 7:5
**15** [2] - 126:6, 274:9
**16** [1] - 176:20
**174** [1] - 176:20
**17th** [5] - 112:7, 120:20, 120:23, 122:4, 263:23
**19** [1] - 3:6
**1991** [4] - 19:11, 19:16, 19:17, 99:4
**1992** [1] - 22:20
**1994** [2] - 19:18, 19:23
**1995** [5] - 19:20, 19:23, 268:8, 268:10, 269:18
**1997** [3] - 22:11, 22:20, 25:16

**2**

**2** [3] - 2:6, 6:4, 96:16
**20** [1] - 4:6
**2000** [18] - 25:7, 25:10, 25:11, 25:13, 25:17, 35:18, 35:20, 36:20, 75:6, 77:4, 117:7, 123:13, 269:18, 270:1, 270:2, 270:19, 271:1, 271:4
**2000's** [1] - 126:17
**2001** [1] - 123:13
**2005** [1] - 22:8
**2006** [5] - 22:8, 24:16, 25:2, 25:22, 26:13
**2009** [1] - 117:8
**2010** [11] - 13:10, 14:5, 87:1, 87:3, 87:21, 91:10, 91:12, 91:15, 93:12, 96:14
**2011** [3] - 17:23, 18:16, 18:21
**2014** [4] - 18:13, 18:17, 18:19, 80:9
**2015** [2] - 2:8, 6:6
**2016** [8] - 2:5, 2:7, 2:10, 2:13, 6:2, 6:4,

6:8, 6:13
**2017** [16] - 10:4, 118:19, 118:23, 119:10, 119:12, 120:1, 120:6, 120:9, 120:12, 127:7, 130:5, 130:21, 156:18, 227:20, 262:9, 285:8
**2018** [5] - 2:11, 6:10, 263:5, 277:7, 286:11
**2019** [17] - 17:16, 75:6, 75:8, 75:14, 77:6, 104:13, 104:17, 105:3, 105:20, 111:12, 120:23, 122:4, 160:5, 264:1, 266:8, 271:4, 271:7
**2020** [12] - 21:11, 30:8, 30:9, 31:11, 77:5, 266:5, 266:7, 266:9, 267:10, 268:11, 268:12, 279:21
**2021** [5] - 1:18, 7:5, 297:6, 297:16, 298:10
**2021-ish** [1] - 268:12
**205** [1] - 257:3
**23** [1] - 176:20
**23rd** [5] - 21:10, 112:6, 112:7, 120:20, 264:1
**240.20** [1] - 248:12
**265** [1] - 3:6
**26th** [1] - 121:6
**27** [1] - 3:5
**273** [1] - 274:9
**27th** [4] - 105:3, 105:20, 121:6, 264:3
**281** [2] - 4:7, 4:9
**282** [1] - 4:11
**296** [2] - 2:21, 297:2

**3**

**3** [6] - 2:8, 6:6, 43:23, 47:19, 49:11, 114:7
**30** [1] - 257:3
**35** [9] - 60:13, 60:14, 73:2, 73:4, 73:21, 73:23, 74:2, 74:11, 74:13
**350** [1] - 7:6
**36** [1] - 44:6
**3rd** [25] - 10:3, 118:19, 118:21, 118:23, 119:9, 119:10, 119:12, 119:20, 120:1, 120:5, 120:12, 127:7, 130:5, 130:21, 131:15,

133:1, 133:4, 133:15, 133:18, 137:21, 156:18, 227:20, 262:8, 285:8, 285:11

**4**

**4** [6] - 2:9, 4:7, 6:8, 65:16, 65:20, 65:21
**40** [3] - 291:13, 291:15, 292:12
**421** [2] - 1:17, 7:16

**5**

**5** [2] - 2:11, 6:11
**530** [1] - 5:6
**5438** [1] - 9:19

**6**

**6** [15] - 2:5, 2:6, 2:8, 2:9, 2:11, 2:12, 2:14, 2:15, 2:16, 2:18, 2:19, 4:11, 6:13, 154:9
**665** [1] - 5:9
**69** [2] - 4:5, 5:3

**7**

**7** [6] - 2:14, 6:15, 172:3, 247:7, 248:5, 266:12
**716-574-0829** [1] - 123:8
**716-649-1487** [1] - 123:11

**8**

**8** [6] - 2:15, 3:5, 6:17, 117:8, 126:6, 266:12

**9**

**9** [5] - 2:16, 4:9, 6:19, 101:5, 143:14
**9/17** [1] - 121:18
**9/23** [1] - 121:19
**9/26** [1] - 273:7
**900** [1] - 5:3
**911** [1] - 76:12
**95** [1] - 95:16

**A**

**A-1** [2] - 2:6, 6:3
**A-36** [2] - 2:8, 6:5
**A-42** [2] - 2:11, 6:9
**A-5** [2] - 2:5, 6:1
**a.m** [4] - 131:21, 134:16, 134:18, 134:22

**aaron** [1] - 7:21
**AARON** [1] - 5:2
**Aaron** [2] - 10:1, 293:2
**Abbott** [3] - 128:6, 128:8, 140:2
**abide** [1] - 11:13
**ability** [1] - 57:9
**able** [13] - 8:5, 10:15, 37:15, 43:18, 67:7, 67:11, 125:13, 148:1, 155:12, 190:1, 217:9, 249:15, 276:18
**above-described** [1] - 298:17
**above-entitled** [2] - 297:5, 298:13
**above-requested** [14] - 59:23, 95:15, 101:4, 101:18, 114:6, 126:5, 143:13, 176:6, 176:19, 177:8, 185:20, 187:18, 230:4, 274:8
**absolutely** [10] - 92:1, 92:5, 92:12, 93:5, 133:12, 152:15, 175:16, 175:17, 176:17, 201:14
**academy** [8] - 19:22, 21:17, 21:19, 21:21, 21:23, 54:18, 60:23, 61:3
**Acadis** [2] - 2:18, 6:20
**accept** [2] - 10:6, 23:21
**accepted** [1] - 23:17
**access** [1] - 30:1
**account** [6] - 26:19, 26:20, 27:2, 28:15, 29:22, 30:2
**accounts** [5] - 26:16, 26:18, 27:14, 28:9, 28:12
**accurate** [8] - 77:19, 104:17, 121:12, 156:7, 222:4, 279:22, 297:4, 298:18
**accurately** [1] - 251:14
**accusatories** [15] - 158:20, 172:2, 172:6, 241:3, 241:7, 241:9, 241:11, 241:15, 242:9, 244:15, 244:23, 246:3, 247:8, 247:19, 255:2
**accusatory** [15] - 156:3, 156:7, 156:14,

158:18, 170:10,
177:13, 241:1,
243:13, 244:2, 248:7,
248:15, 256:20,
257:3, 257:11, 258:8
**Achtyl** [34] - 7:10,
7:13, 8:4, 9:8, 9:10,
10:1, 11:4, 14:4,
20:12, 28:8, 35:1,
37:16, 48:11, 49:10,
49:11, 60:4, 71:13,
73:20, 82:20, 101:23,
114:10, 126:9,
137:15, 149:7,
149:23, 169:15,
187:14, 187:22,
218:9, 247:6, 260:22,
282:16, 293:12,
295:23
**ACHTYL** [5] - 1:2,
1:10, 1:15, 297:11,
298:8
**Achtyl's** [1] - 13:20
**acknowledge** [1] -
39:5
**acquaintance** [2] -
142:15, 156:19
**acquaintances** [2] -
157:1, 178:1
**acquitted** [1] -
278:18
**act** [1] - 227:15
**acted** [2] - 49:21,
245:18
**action** [2] - 297:6,
298:13, 298:16
**actions** [8] - 81:6,
158:8, 173:19,
173:22, 174:14,
174:20, 214:6, 249:5
**activity** [1] - 145:6
**actual** [1] - 56:14
**Adam** [2] - 282:16,
283:19
**add** [2] - 24:5,
101:23
**added** [2] - 9:11,
293:21
**addition** [1] - 75:22
**additional** [4] - 26:9,
79:2, 271:18, 271:20
**address** [9] - 11:18,
66:10, 291:10,
291:12, 291:14,
291:20, 292:15,
292:18, 292:22
**adds** [1] - 127:4
**administration** [3] -
38:2, 44:5, 172:11
**Administration** [8] -

2:5, 2:6, 2:8, 2:11,
6:1, 6:3, 6:5, 6:9
**administrative** [2] -
39:8, 275:1
**advance** [1] - 10:6
**advice** [3] - 48:13,
49:17, 188:17
**advised** [6] - 4:7,
90:16, 258:4, 258:10,
280:15, 281:5
**affairs** [1] - 262:10
**affect** [1] - 136:9
**affected** [4] - 244:7,
244:8, 278:6, 278:17
**affecting** [2] - 66:12,
66:18
**affidavits** [1] - 94:5
**afield** [1] - 136:13
**aforesaid** [1] -
248:16
**afternoon** [3] - 10:1,
11:7, 24:22
**agencies** [1] -
132:16
**agency** [3] - 41:15,
66:21, 89:17
**aggravating** [1] -
78:22
**ago** [10] - 20:4, 20:7,
29:12, 114:15, 117:1,
158:15, 171:8,
174:16, 186:8, 229:4
**agree** [4] - 8:6, 42:6,
55:19, 56:6, 57:1,
59:11, 60:15, 65:6,
67:14, 68:10, 70:16,
70:18, 71:13, 74:11,
103:12, 113:1, 130:9,
130:17, 133:13,
138:15, 142:5, 156:6,
156:9, 162:16, 167:8,
167:11, 167:12,
167:17, 168:10,
186:1, 188:12,
190:17, 192:15,
192:20, 193:6,
196:11, 196:20,
213:2, 270:21, 271:23
**agreed** [2] - 248:6,
257:9
**agreement** [7] -
13:16, 259:13,
275:22, 276:4, 276:8,
276:13, 276:16
**agrees** [1] - 186:23
**ahead** [24] - 9:16,
16:9, 16:10, 47:7,
76:6, 81:16, 84:18,
99:7, 113:18, 128:19,
129:4, 130:16,

134:11, 140:20,
141:22, 143:12,
176:3, 176:18,
185:15, 265:17,
266:22, 269:2, 288:11
**aid** [1] - 58:22
**air** [3] - 252:4, 253:1,
253:8
**AI** [2] - 13:19, 234:7
**alarm** [1] - 248:17
**Albert** [1] - 7:23
**ALBERT** [1] - 5:9
**Alden** [1] - 242:4
**allegation** [1] -
183:10
**alleged** [2] - 184:18,
185:10
**alleges** [1] - 85:7
**allow** [5] - 10:11,
45:7, 46:6, 90:6,
90:12
**allowed** [4] - 63:16,
73:11, 147:20
**almost** [4] - 142:20,
144:22, 208:17,
232:22
**alongside** [1] -
211:19
**altercation** [2] -
230:1, 237:12
**ambulance** [1] -
260:18
**amount** [5] - 224:18,
224:23, 225:1,
242:10, 267:21
**anger** [6] - 135:8,
135:10, 135:18,
137:1, 137:3, 137:9
**angered** [1] - 137:19
**angry** [14] - 71:15,
71:17, 71:18, 71:21,
72:1, 72:5, 72:8,
72:10, 72:12, 98:8,
136:1, 216:2, 261:4
**Ann** [15] - 7:14, 7:15,
8:13, 9:14, 13:23,
27:5, 95:13, 101:2,
101:16, 114:4,
121:16, 178:17,
246:21, 296:8, 298:5
**ANN** [3] - 1:16, 1:19,
298:21
**annotation** [1] -
269:7
**annoyance** [1] -
248:17
**annual** [2] - 66:9,
66:11
**annually** [1] - 66:17
**answer** [114] - 10:8,

10:13, 10:17, 10:20,
10:23, 20:2, 31:4,
31:13, 33:6, 34:18,
46:6, 46:8, 47:21,
48:4, 49:2, 51:6,
54:22, 57:19, 60:1,
64:16, 67:4, 70:12,
70:20, 71:5, 73:8,
78:20, 80:1, 87:8,
95:5, 98:5, 101:8,
101:15, 101:16,
101:18, 103:12,
103:14, 103:15,
106:22, 111:19,
114:7, 124:23, 126:3,
126:6, 127:15,
128:16, 128:17,
128:18, 128:21,
129:10, 130:2, 132:8,
135:11, 135:20,
136:2, 136:20,
141:19, 141:23,
143:5, 143:6, 143:17,
147:16, 162:19,
171:6, 172:13,
175:16, 175:21,
175:22, 176:11,
176:15, 176:20,
177:1, 177:2, 177:11,
182:3, 185:15, 198:1,
201:13, 201:15,
205:22, 217:17,
219:14, 221:19,
223:2, 229:20, 230:2,
230:5, 237:6, 241:9,
245:3, 249:15, 254:6,
259:11, 274:1,
274:12, 278:16,
278:20, 280:19,
281:3, 281:8, 281:21,
282:3, 282:12,
283:12, 283:20,
286:12, 287:23,
288:11, 291:22,
292:10, 292:19,
294:13, 295:17
**answered** [13] - 49:2,
102:7, 106:7, 175:14,
176:3, 176:9, 176:15,
292:12, 294:3, 294:4,
294:18, 294:21,
295:19
**answering** [7] - 12:8,
76:12, 103:9, 167:23,
196:15, 213:21, 296:6
**answers** [7] - 34:8,
58:2, 102:17, 103:17,
103:18, 129:1, 178:10
**anticipate** [1] - 10:16
**anytime** [1] - 110:1

**apologize** [13] -
12:20, 13:12, 77:8,
98:15, 112:1, 114:13,
120:18, 130:16,
143:1, 159:10, 231:6,
273:19, 274:2
**apology** [1] - 10:6
**appeal** [1] - 265:15
**appeals** [1] - 63:11
**appear** [4] - 199:6,
208:14, 209:3, 261:3
**APPEARANCES** [1] -
5:1
**appearances** [1] -
8:15
**appeared** [2] -
104:12, 157:6
**Appearing** [2] - 5:4,
5:7
**appearing** [1] - 5:10
**Appellate** [1] - 63:11
**application** [2] -
100:4, 100:5
**applies** [3] - 74:2,
74:5, 155:3
**apply** [3] - 61:10,
78:15, 155:21
**appreciate** [8] - 20:2,
20:4, 20:9, 78:20,
218:10, 289:7,
292:23, 296:5
**approach** [4] - 46:13,
108:5, 227:4, 257:19
**appropriate** [8] -
10:23, 40:6, 77:15,
90:11, 92:22, 98:10,
124:10, 134:1
**approximate** [4] -
22:18, 127:9, 127:12,
209:16
**April** [8] - 1:18, 7:5,
19:20, 19:21, 19:22,
21:16, 297:6, 298:9
**Arcade** [2] - 23:19,
24:1
**area** [69] - 66:18,
76:11, 78:23, 88:11,
139:6, 139:8, 141:2,
141:4, 141:6, 145:18,
155:17, 157:13,
157:16, 157:19,
158:4, 158:12,
158:22, 159:3, 159:7,
159:16, 159:18,
159:22, 161:5, 161:9,
161:16, 161:22,
162:4, 163:23, 164:1,
164:2, 164:4, 164:5,
164:8, 164:14,
164:15, 165:4, 165:7,

165:14, 165:21,
166:6, 166:9, 166:13,
166:20, 167:11,
167:14, 167:20,
168:12, 168:18,
169:3, 169:17, 170:2,
172:20, 175:2, 175:7,
175:12, 177:16,
179:11, 200:1, 200:4,
211:10, 212:8,
212:12, 222:9,
223:14, 224:15,
224:16, 258:1,
289:23, 293:22
  **areas** [1] - 140:11
  **argumentative** [4] -
53:4, 292:1, 292:6,
292:9
  **arise** [1] - 79:2
  **arises** [1] - 125:16
  **arising** [1] - 171:9
  **arm** [2] - 168:23,
169:7
  **arms** [8] - 251:11,
251:23, 252:11,
252:22, 253:4, 253:5,
253:8, 253:17
  **arraignment** [1] -
242:2
  **arrest** [72] - 61:17,
61:21, 61:23, 62:6,
62:8, 62:9, 62:11,
67:15, 67:22, 71:14,
91:6, 92:12, 92:18,
127:6, 127:18,
155:11, 156:4,
156:11, 156:19,
157:2, 157:5, 157:7,
162:15, 162:22,
163:21, 165:11,
166:12, 166:20,
171:1, 171:10,
171:14, 171:18,
171:20, 173:13,
173:17, 173:23,
174:12, 175:3,
183:13, 184:9,
186:16, 187:14,
210:3, 210:7, 210:14,
213:15, 213:22,
214:1, 214:5, 214:7,
214:14, 215:3, 215:9,
215:13, 215:16,
232:11, 232:14,
232:19, 233:7, 243:3,
243:9, 245:19, 257:2,
257:4, 257:18, 258:4,
258:10, 258:23,
259:1, 259:18, 260:4,
296:3

  **Arrest** [2] - 2:19,
6:22
  **arrested** [21] - 92:19,
128:4, 130:6, 142:14,
157:15, 160:17,
163:1, 166:11,
166:17, 171:16,
172:21, 174:23,
177:19, 179:14,
190:11, 190:14,
243:12, 272:17,
272:21, 293:14
  **arrestee's** [1] -
250:13
  **arresting** [1] -
173:12
  **arrests** [2] - 91:23,
127:9
  **arrive** [2] - 91:20,
131:9
  **arrived** [1] - 89:10
  **Article** [9] - 60:13,
60:14, 73:1, 73:4,
73:21, 73:23, 74:2,
74:11, 74:13
  **article** [5] - 73:7,
286:6, 286:12,
286:13, 286:14
  **aside** [11] - 21:3,
43:20, 110:13,
116:11, 116:12,
117:17, 145:17,
146:19, 148:22, 163:5
  **asleep** [2] - 137:17,
137:18
  **asphyxia** [2] - 57:5,
57:10
  **assault** [1] - 263:16
  **assaults** [1] - 129:12
  **asshole** [4] - 186:15,
186:19, 187:13, 188:9
  **assigned** [21] -
74:17, 74:21, 75:1,
75:2, 75:18, 75:23,
77:1, 130:22, 131:2,
131:4, 131:10, 132:2,
133:5, 134:15, 139:8,
139:14, 140:18,
140:19, 140:21,
141:4, 146:16
  **assignment** [6] -
74:15, 74:18, 74:19,
75:13, 117:20, 127:22
  **assignments** [1] -
66:11
  **assist** [5] - 141:6,
141:18, 216:14,
240:23, 248:1
  **assistance** [1] -
49:17

  **assisting** [1] - 91:4
  **assists** [1] - 243:17
  **Associate's** [1] -
19:15
  **Association** [1] -
76:4
  **assume** [6] - 10:10,
15:2, 87:12, 145:16,
177:23, 290:15
  **assumed** [1] -
177:18
  **atmosphere** [2] -
145:21, 203:15
  **attached** [1] - 297:3
  **attempt** [2] - 128:10,
148:11
  **attempting** [2] -
257:14, 257:17
  **attend** [1] - 19:5
  **attendance** [1] - 7:14
  **attention** [1] - 286:9
  **attorney** [11] - 15:17,
15:18, 16:13, 110:14,
111:5, 122:13, 186:4,
295:9, 295:10,
295:11, 295:13
  **attorney's** [1] - 186:4
  **attorneys** [3] - 7:17,
10:2, 16:17
  **audience** [1] -
115:10
  **audio** [1] - 112:21
  **audiotaping** [2] -
13:15, 13:17
  **August** [14] - 13:10,
14:5, 19:17, 87:1,
87:3, 87:20, 266:3,
266:5, 266:7, 266:8,
266:9, 267:10, 277:7
  **Authority** [2] - 23:16,
25:14
  **automatically** [5] -
248:8, 248:14,
248:22, 249:23,
257:10
  **availability** [2] -
24:19, 24:23
  **ave** [1] - 200:14
  **Avenue** [3] - 5:3,
202:22, 291:15
  **avenue** [2] - 200:16,
200:18
  **average** [3] - 79:23,
224:23, 243:21
  **award** [3] - 4:11,
279:7, 282:8
  **aware** [36] - 4:9,
4:11, 17:19, 21:3,
21:7, 28:10, 28:13,
29:10, 30:3, 30:10,

85:18, 85:19, 100:8,
117:19, 118:3, 118:5,
118:6, 122:14,
122:17, 122:18,
156:21, 158:23,
262:12, 280:12,
281:9, 282:4, 282:7,
282:10, 283:9,
285:13, 285:22,
286:2, 286:3, 286:5,
287:7, 287:10
  **awful** [1] - 152:9
  **awkward** [2] - 212:23
  **awoken** [1] - 137:16

## B

  **babysitter** [2] - 83:3,
83:13
  **backdating** [1] -
278:2
  **background** [2] -
11:9, 36:14, 88:23
  **backup** [2] - 13:21,
146:21
  **backward** [2] -
227:10, 231:12
  **backwards** [14] -
213:7, 219:18,
219:22, 220:2,
221:12, 221:13,
223:10, 231:21,
232:16, 237:16,
238:6, 252:1, 252:19,
253:2
  **bad** [3] - 18:18,
53:22
  **bagel** [1] - 153:3
  **Ballantyne** [7] -
284:15, 285:7,
285:10, 285:14,
286:4, 286:17, 287:8
  **Ballantyne's** [2] -
285:18, 285:22
  **ballistic** [2] - 180:11,
180:13
  **Bank** [2] - 22:16,
23:8
  **based** [13] - 24:19,
24:23, 58:15, 77:14,
78:4, 79:9, 79:10,
80:1, 103:17, 158:3,
214:6, 272:6
  **basis** [4] - 32:6, 58:6,
59:12, 185:12
  **bathroom** [7] -
81:14, 81:20, 82:1,
82:3, 82:13, 85:8
  **bathrooms** [1] -
82:15
  **baton** [83] - 54:3,

55:14, 146:18, 147:8,
147:9, 147:12,
147:13, 147:14,
147:15, 147:19,
148:1, 148:12,
148:17, 148:19,
148:23, 149:8, 154:6,
154:13, 154:20,
155:9, 155:16, 167:4,
183:13, 183:17,
184:1, 184:3, 184:5,
211:14, 211:21,
212:1, 212:3, 212:14,
212:18, 212:19,
212:20, 212:21,
212:23, 213:4, 213:7,
214:20, 215:1, 215:8,
215:11, 215:20,
219:20, 220:22,
220:23, 221:2, 221:4,
221:8, 221:10,
221:11, 221:13,
221:15, 221:20,
222:1, 222:4, 222:9,
222:14, 222:16,
222:20, 222:23,
223:2, 223:9, 223:13,
223:15, 223:16,
223:21, 224:1, 224:2,
224:7, 224:11,
230:10, 230:13,
231:17, 231:19,
235:20, 236:3, 252:1
  **batons** [1] - 147:20
  **bear** [1] - 239:21
  **beat** [7] - 196:2,
197:10, 198:20,
199:2, 200:3, 202:2
  **became** [3] - 117:5,
117:10, 228:4
  **become** [3] - 137:9,
227:18, 251:10
  **beer** [24] - 4:5, 69:13,
69:16, 70:7, 70:15,
142:17, 142:18,
179:14, 179:16,
179:18, 179:20,
180:2, 180:6, 180:16,
180:21, 181:2, 181:3,
181:7, 181:16,
182:21, 183:2,
183:11, 184:19,
185:10
  **began** [1] - 231:11
  **begin** [3] - 7:9,
218:18, 233:18
  **beginning** [6] -
77:23, 168:9, 168:15,
169:18, 169:21, 252:8
  **begins** [1] - 205:19

Kenneth P. Achtyl, Jr.

4

**begun** [1] - 230:18
**behalf** [4] - 8:3, 108:21, 113:7, 295:12
**behavior** [4] - 248:20, 249:13, 249:22, 280:1
**behind** [12] - 115:19, 115:20, 115:22, 116:1, 183:3, 213:6, 227:5, 229:15, 229:22, 230:12, 238:4, 258:14
**belief** [1] - 218:4
**believes** [1] - 86:12
**bell** [1] - 18:11
**Belsito** [116] - 2:20, 5:11, 5:12, 6:23, 7:11, 8:17, 8:18, 10:3, 113:7, 113:8, 114:2, 142:6, 142:11, 144:11, 156:17, 156:22, 157:1, 157:5, 157:10, 158:2, 158:8, 158:11, 158:21, 159:2, 159:21, 160:23, 162:8, 165:21, 166:19, 167:3, 167:5, 167:10, 167:20, 168:11, 168:18, 169:16, 170:1, 170:21, 171:9, 171:13, 171:21, 173:17, 177:15, 177:19, 178:2, 178:23, 180:18, 181:1, 181:11, 182:17, 183:10, 188:11, 188:21, 189:3, 189:12, 190:9, 190:23, 191:14, 193:12, 194:3, 194:9, 194:22, 195:2, 195:6, 195:12, 196:17, 196:21, 198:1, 199:6, 199:23, 201:6, 203:3, 203:6, 204:4, 209:23, 210:8, 210:17, 211:8, 211:13, 212:6, 213:15, 218:14, 219:17, 224:11, 225:5, 227:4, 227:10, 227:22, 228:2, 228:5, 228:8, 228:16, 229:5, 229:22, 230:8, 232:2, 233:22, 234:19, 237:3, 237:8, 241:4, 241:19, 250:17, 251:21, 252:3, 252:11, 252:16, 254:10, 260:4, 261:1,

261:21, 263:3, 289:9, 292:15, 293:12, 295:10
**BELSITO** [3] - 1:6, 113:16, 113:19
**belsito** [2] - 251:17, 258:20
**Belsito's** [12] - 159:6, 159:15, 173:12, 173:22, 174:11, 175:2, 175:11, 179:10, 212:17, 220:9, 224:2, 224:8
**Belsitos** [1] - 113:5
**belt** [1] - 146:19
**belted** [1] - 261:21
**bending** [1] - 223:10
**benefits** [3] - 272:13, 272:16, 272:17
**benign** [1] - 162:16
**bent** [1] - 221:12
**best** [5] - 8:12, 31:13, 114:15, 131:14, 267:7
**better** [7] - 109:22, 118:13, 125:14, 159:10, 189:1, 255:21, 256:15
**between** [23] - 5:17, 12:23, 68:3, 105:12, 109:19, 139:20, 148:8, 165:1, 178:22, 191:12, 210:20, 214:23, 220:8, 227:22, 228:1, 231:10, 231:13, 232:1, 243:21, 263:23, 269:23, 275:22, 287:8
**beyond** [5] - 19:19, 70:23, 102:22, 218:11, 281:14
**big** [5] - 164:8, 164:14, 164:17, 164:18, 291:9
**Bills** [25] - 117:17, 123:12, 123:18, 123:21, 126:9, 126:12, 126:14, 127:6, 127:10, 128:4, 129:9, 130:6, 130:22, 132:2, 132:6, 132:23, 138:17, 200:11, 213:18, 257:19, 262:9, 285:7, 285:11, 285:15, 293:23
**birth** [1] - 18:22
**bit** [16] - 14:19, 114:13, 116:2, 137:7,

137:11, 141:23, 142:4, 148:7, 189:7, 191:10, 212:22, 235:22, 246:2, 256:9, 291:8
**black** [3] - 29:9, 29:20, 35:14
**blanket** [1] - 64:3
**blood** [7] - 224:14, 224:18, 224:19, 224:20, 225:1, 225:3, 226:20
**bloody** [2] - 225:1, 261:6
**Bloom** [6] - 5:12, 8:2, 8:18, 293:3
**BLOOM** [7] - 5:5, 5:6, 8:2, 113:4, 113:7, 293:2
**Blooming** [1] - 5:6
**blue** [2] - 250:22, 251:1
**Body** [2] - 2:19, 6:22
**body** [24] - 16:2, 16:19, 17:4, 17:10, 17:14, 149:17, 149:20, 151:5, 151:6, 151:7, 151:9, 159:5, 159:13, 159:20, 180:8, 192:11, 220:9, 227:15, 246:10, 254:18, 285:11, 285:14, 285:18, 285:23
**booking** [1] - 289:23
**born** [3] - 19:3, 197:19, 202:14
**boss** [2] - 108:6, 108:7
**bottom** [1] - 55:9
**bound** [4] - 50:5, 52:9, 52:18, 52:21
**box** [1] - 138:9
**boy** [3] - 132:6, 197:19, 202:14
**Bradford** [1] - 284:15
**break** [4] - 45:10, 59:15, 207:14, 214:7
**breakfast** [2] - 139:11, 152:10
**breaking** [1] - 209:13
**breathe** [2] - 57:9, 226:19
**bridge** [2] - 224:2, 224:7
**briefly** [2] - 46:21, 147:8
**bring** [2] - 213:7, 253:14
**bringing** [2] - 84:9,

84:12
**brother** [3] - 99:4, 99:8, 99:13
**brought** [11] - 17:20, 18:19, 18:20, 35:8, 84:13, 124:17, 164:3, 181:6, 232:23, 233:3, 253:10
**Buffalo** [24] - 1:17, 5:4, 5:10, 7:16, 19:4, 197:19, 200:7, 200:8, 200:9, 200:11, 200:12, 201:20, 202:8, 202:14, 202:15, 202:16, 202:18, 202:19, 203:3, 257:19, 286:7, 286:9, 291:15, 293:23
**building** [2] - 264:20, 290:14
**Building** [1] - 74:21
**bulletins** [2] - 38:7, 38:17
**Bummer** [1] - 21:5
**bunch** [1] - 144:16
**bus** [6] - 139:9, 139:13, 139:14, 139:22, 140:10, 257:18
**business** [2] - 263:19, 294:20
**bust** [1] - 124:10
**busy** [1] - 78:14
**BY** [128] - 9:23, 14:3, 17:12, 27:12, 28:7, 31:3, 31:19, 33:3, 34:23, 43:5, 43:12, 45:15, 47:14, 48:10, 49:9, 51:11, 60:3, 63:1, 64:15, 71:12, 73:19, 87:7, 94:19, 95:1, 95:10, 95:20, 96:6, 101:7, 101:22, 102:3, 102:13, 103:23, 106:15, 108:19, 109:15, 114:9, 126:8, 129:3, 132:7, 136:23, 137:13, 143:16, 149:6, 149:22, 150:3, 150:20, 151:14, 151:21, 152:5, 153:19, 159:12, 160:22, 161:4, 161:8, 161:15, 161:21, 162:3, 162:18, 166:23, 168:8, 169:9, 169:14, 171:3, 172:17, 173:4, 177:10, 178:20,

185:4, 185:23, 186:7, 187:20, 188:5, 192:4, 192:19, 193:4, 193:10, 193:18, 194:7, 194:18, 195:11, 195:16, 195:22, 196:6, 197:4, 197:9, 198:13, 198:19, 199:4, 199:16, 204:2, 204:13, 206:3, 206:14, 206:23, 208:13, 209:2, 222:6, 223:18, 229:1, 229:19, 230:6, 231:9, 234:18, 235:6, 235:10, 235:18, 236:1, 236:10, 236:18, 238:18, 239:2, 239:9, 239:23, 240:8, 244:17, 245:7, 247:5, 254:8, 274:11, 281:2, 282:6, 282:15, 288:8, 288:12, 292:14, 293:10, 294:6, 295:21

**C**

**caliber** [1] - 147:7
**California** [1] - 203:4
**cam** [16] - 16:19, 17:4, 17:10, 17:14, 149:17, 149:20, 151:5, 151:6, 151:7, 151:9, 159:5, 159:13, 159:20, 192:11, 254:18, 285:18
**Camera** [2] - 2:19, 6:22
**camera** [3] - 16:2, 285:15, 285:23
**cameras** [2] - 37:21, 285:11
**canister** [1] - 146:18
**cannot** [8] - 41:9, 42:23, 63:21, 65:11, 67:15, 71:13, 167:9, 254:19
**cans** [2] - 142:18, 180:2
**capacity** [1] - 283:16
**caps** [3] - 247:17, 248:6, 257:10
**car** [53] - 83:21, 84:10, 84:14, 87:22, 131:11, 131:13, 138:19, 141:1, 141:17, 142:1, 144:4, 158:9, 164:7, 166:13, 179:3, 183:19, 184:8,

Sue Ann Simonin Court Reporting

Kenneth P. Achtyl, Jr.

5

188:22, 189:3, 190:3, 192:6, 192:16, 207:13, 211:12, 211:23, 214:13, 214:18, 216:16, 217:2, 217:4, 217:20, 219:4, 220:16, 220:17, 221:21, 225:13, 235:1, 235:7, 235:11, 235:14, 238:5, 241:21, 243:13, 257:20, 258:2, 259:4, 264:20, 290:15, 293:13, 294:1, 294:7, 295:22

**care** [2] - 103:21, 182:12

**career** [3] - 77:19, 268:19, 268:21

**carried** [1] - 148:17

**carrier** [3] - 266:20, 266:22, 267:2

**carry** [3] - 147:12, 147:14, 147:21

**carrying** [1] - 147:19

**cars** [2] - 140:19, 140:21

**case** [17] - 32:18, 62:18, 64:7, 64:8, 64:12, 64:21, 64:23, 65:8, 66:12, 66:17, 70:3, 70:16, 124:19, 172:23, 237:13, 237:15, 281:15

**cases** [4] - 63:7, 63:10, 63:14, 63:21

**cash** [4] - 152:18, 152:19, 152:20

**catch** [3] - 122:8, 153:23, 199:18

**catching** [1] - 211:6

**categorized** [1] - 70:4

**category** [1] - 55:15

**caught** [8] - 48:16, 48:20, 49:7, 210:9, 210:10, 211:5, 222:17, 223:14

**caused** [9] - 227:16, 228:4, 228:8, 228:16, 229:5, 229:16, 237:12, 240:14, 258:19

**causing** [6] - 92:20, 166:14, 166:15, 166:16, 228:21, 229:10

**cease** [2] - 23:1, 268:13

**ceased** [4] - 23:12,

24:13, 25:2, 26:2

**cell** [23] - 11:23, 12:1, 12:2, 118:22, 119:2, 119:5, 119:8, 119:20, 119:23, 120:5, 120:8, 122:22, 122:23, 123:5, 123:7, 226:1, 264:23, 265:3, 265:22, 266:2, 266:10, 284:20, 287:4

**Center** [5] - 201:7, 201:17, 257:23, 261:11, 291:15

**center** [18] - 132:15, 200:23, 201:2, 241:20, 289:17, 289:21, 290:2, 290:6, 290:9, 290:12, 290:14, 290:17, 290:20, 290:21, 290:23, 291:2, 291:5, 291:10

**Central** [1] - 19:8

**certain** [23] - 15:11, 37:10, 55:19, 56:21, 61:5, 61:10, 74:22, 75:16, 76:16, 96:16, 97:11, 116:8, 140:9, 145:4, 147:12, 158:8, 207:9, 227:18, 228:4, 238:11, 242:10, 285:20

**certainly** [2] - 46:4, 218:11

**Certificate** [2] - 2:15, 6:16

**certification** [1] - 5:19

**CERTIFY** [3] - 297:1, 298:7, 298:17

**cetera** [4] - 11:5, 66:14, 87:5, 202:19

**chambers** [1] - 125:11

**chance** [5] - 45:7, 45:21, 46:9, 46:12, 95:5

**change** [5] - 65:1, 75:13, 179:7, 266:2, 271:10

**changed** [2] - 20:16, 265:22

**changes** [1] - 297:3

**chaotic** [2] - 110:16, 249:13

**characteristics** [1] - 53:14

**characterize** [1] - 8:12

**characterized** [3] -

70:4, 105:17, 106:13

**charge** [18] - 128:13, 129:14, 158:2, 163:15, 172:1, 174:1, 174:13, 175:12, 246:8, 246:9, 246:14, 246:15, 247:10, 248:11, 250:11, 256:3, 256:19, 274:23

**charged** [21] - 84:23, 85:12, 129:7, 129:9, 129:15, 129:23, 130:2, 158:10, 170:23, 171:9, 171:21, 174:15, 183:7, 184:9, 244:23, 245:13, 245:15, 263:10, 263:14, 263:16, 263:19

**charges** [27] - 85:14, 85:21, 85:23, 86:2, 86:3, 86:7, 86:11, 86:14, 96:22, 97:2, 129:11, 175:10, 184:11, 184:15, 184:20, 185:6, 185:9, 186:5, 186:9, 186:12, 241:4, 259:13, 263:2, 263:22, 275:18, 276:21

**charging** [8] - 84:20, 84:21, 174:19, 177:14, 245:6, 246:11, 259:3, 259:15

**CHARMS** [5] - 240:19, 240:23, 243:17, 246:2, 246:3

**chasing** [2] - 97:16, 97:17

**check** [2] - 36:14, 138:11

**chest** [2] - 221:13, 223:10

**Chestnut** [8] - 80:10, 82:5, 82:7, 82:13, 82:15, 131:11, 131:16, 134:23

**chief** [1] - 99:5

**Chief** [1] - 274:21

**child** [9] - 89:12, 89:18, 89:19, 89:22, 90:12, 90:18, 93:4, 93:23, 94:3

**children** [3] - 80:8, 80:19, 81:2

**chops** [1] - 124:11

**chose** [3] - 75:10, 101:23, 277:4

**circumstance** [1] - 90:11

**circumstances** [20] - 79:10, 81:10, 91:16, 130:12, 135:7, 141:14, 158:6, 165:2, 165:7, 174:21, 175:5, 191:4, 212:1, 217:5, 241:18, 244:5, 244:20, 245:20, 282:1, 293:18

**citizen** [9] - 42:2, 51:1, 51:6, 67:8, 67:12, 71:14, 98:7, 164:12

**citizens** [4] - 91:22, 97:5, 165:6, 188:18

**City** [5] - 22:11, 22:15, 23:4, 200:6, 200:8

**Civil** [1] - 1:16

**civil** [1] - 66:13

**claims** [1] - 86:16

**clairvoyant** [1] - 288:3

**Clarence** [1] - 202:9

**clarify** [2] - 112:2, 112:3

**class** [1] - 54:18

**clear** [11] - 11:6, 11:7, 18:18, 35:11, 51:19, 74:8, 111:21, 116:2, 219:11, 260:22, 295:2

**clearer** [1] - 275:8

**click** [1] - 189:7

**clicked** [1] - 195:8

**client** [1] - 281:8

**client's** [1] - 125:20

**clip** [1] - 169:5

**close** [5] - 142:20, 209:5, 249:17, 277:13, 288:17

**closed** [10] - 179:22, 179:23, 180:2, 180:15, 203:13, 205:15, 232:22, 233:4, 253:21, 254:15

**clothing** [1] - 180:7

**coarse** [1] - 53:9

**coffee** [6] - 139:10, 139:17, 140:3, 153:3, 153:9, 153:11

**collecting** [2] - 272:6, 272:8

**collective** [1] - 91:5

**College** [1] - 19:16

**colloquy** [1] - 102:21

**colon** [2] - 169:12

**color** [1] - 63:15

**combative** [1] - 251:10

**combination** [1] - 141:13

**combined** [1] - 132:17

**coming** [14] - 80:11, 93:11, 93:23, 116:19, 149:3, 151:1, 158:9, 212:9, 224:14, 226:20, 250:12, 253:5, 253:6, 253:18

**commands** [2] - 55:11, 56:9, 232:6

**commencing** [1] - 1:18

**commensurate** [1] - 77:15

**comment** [7] - 31:11, 35:5, 45:6, 137:12, 189:19, 195:3, 212:9

**comments** [4] - 28:11, 48:20, 49:6, 205:18

**commit** [1] - 67:23

**committed** [7] - 67:8, 67:12, 67:16, 71:23, 166:19, 170:22, 196:23

**common** [2] - 79:5, 79:8, 79:9

**communicate** [3] - 12:7, 119:19, 119:23

**communication** [1] - 16:16

**community** [1] - 41:23

**Community** [1] - 19:16

**compelled** [1] - 123:19

**Complaint** [2] - 2:16, 6:18

**complaint** [12] - 32:2, 32:9, 49:17, 70:4, 71:4, 171:17, 242:14, 242:22, 243:20, 247:16, 257:5, 281:12

**complete** [5] - 66:8, 169:4, 242:23, 243:4, 298:19

**completed** [2] - 19:15, 21:21

**computer** [11] - 79:3, 240:19, 241:21, 246:15, 246:18, 247:12, 248:8, 248:14, 248:23, 249:23, 257:11

**con** [1] - 257:8

**conceded** [2] -

Kenneth P. Achtyl, Jr.

6

33:20, 254:9
**concern** [4] - 73:14, 217:6, 217:7, 217:11
**concerning** [2] - 53:12, 67:21
**concerns** [4] - 217:22, 218:2, 218:6, 259:17
**conclusion** [1] - 279:18
**condoned** [1] - 31:15
**conduct** [49] - 42:8, 42:9, 42:16, 42:21, 43:1, 43:7, 43:10, 43:14, 44:8, 45:5, 45:17, 47:15, 48:12, 50:2, 50:5, 50:8, 50:19, 51:10, 51:15, 52:12, 52:15, 70:3, 71:2, 171:9, 171:22, 173:11, 173:12, 173:14, 173:22, 174:2, 174:11, 174:13, 175:4, 175:13, 177:14, 183:9, 186:10, 242:19, 242:22, 243:20, 248:11, 248:12, 250:14, 250:22, 256:19, 257:9, 257:13, 258:5, 258:11
**conducted** [3] - 8:7, 8:11, 88:7
**conducting** [1] - 7:8
**conducts** [1] - 129:13
**confine** [1] - 102:17
**confined** [2] - 261:13, 261:16
**confirm** [5] - 13:13, 112:20, 113:4, 113:14, 256:22
**confirmed** [4] - 13:18, 207:4, 276:22, 277:20
**confirming** [1] - 113:6
**confuse** [1] - 119:18
**confused** [4] - 31:10, 135:11, 242:21, 249:17
**confusing** [2] - 67:18, 67:19
**confusion** [1] - 112:4
**congregating** [1] - 145:11
**connection** [3] - 36:8, 182:7, 262:21
**consequences** [1] -

276:10
**consider** [1] - 281:13
**considered** [2] - 61:12, 123:22
**consisted** [2] - 146:17, 148:9
**consistent** [5] - 49:22, 147:20, 227:6, 245:22, 258:21
**constitutes** [1] - 298:18
**construed** [1] - 157:21
**contact** [4] - 33:20, 97:4, 210:22, 211:1
**contain** [2] - 45:17, 47:16
**container** [3] - 4:5, 69:12, 69:16
**content** [4] - 28:20, 28:21, 29:2, 46:11
**contents** [1] - 35:5
**context** [1] - 14:10
**continuation** [1] - 34:20
**continue** [4] - 32:10, 129:4, 275:20, 276:18
**continued** [2] - 24:6, 271:23
**continues** [1] - 34:15
**continuing** [1] - 58:5
**continuous** [1] - 229:12
**continuously** [2] - 77:3, 77:9
**continuum** [5] - 55:4, 55:7, 55:18, 56:15, 56:20
**contract** [1] - 77:16
**contractual** [1] - 77:14
**contrary** [1] - 94:5
**contributing** [1] - 145:20
**control** [4] - 52:5, 53:2, 56:12, 148:12
**convenience** [1] - 125:21
**conversation** [37] - 10:11, 34:15, 104:7, 104:11, 104:15, 104:16, 105:7, 105:10, 107:2, 108:8, 108:9, 109:3, 109:4, 110:4, 111:1, 111:4, 111:8, 189:14, 189:23, 190:5, 199:23, 203:8, 207:12, 227:23, 228:3, 229:23,

230:15, 230:23, 231:11, 232:1, 232:4, 258:14, 283:18, 286:15, 287:8, 287:11, 287:14
**conversations** [9] - 108:1, 108:4, 109:1, 109:11, 109:13, 109:19, 110:15, 110:17
**convict** [1] - 264:3
**convicted** [6] - 21:12, 245:1, 275:23, 276:5, 276:14, 277:3
**conviction** [2] - 265:8, 265:10
**convictions** [2] - 21:10, 279:20
**cooperating** [1] - 79:13
**corner** [3] - 37:19, 149:20, 150:22
**corners** [1] - 32:8
**correct** [201] - 14:6, 14:7, 16:15, 19:21, 23:10, 23:11, 23:13, 23:18, 24:3, 26:1, 26:4, 26:15, 41:3, 41:8, 44:3, 44:4, 44:7, 44:8, 44:9, 44:13, 44:14, 44:19, 44:22, 44:23, 50:3, 50:7, 50:16, 52:19, 56:16, 56:17, 56:18, 63:12, 63:13, 63:18, 65:12, 68:2, 68:12, 68:19, 68:20, 69:11, 72:11, 72:14, 72:15, 72:16, 72:18, 76:4, 78:21, 80:14, 80:17, 80:18, 82:14, 83:7, 85:1, 85:2, 85:4, 86:9, 86:10, 99:14, 102:1, 104:4, 108:21, 111:18, 113:9, 115:4, 115:5, 120:23, 121:2, 121:12, 139:3, 145:16, 147:9, 147:10, 149:1, 155:3, 156:15, 157:17, 158:13, 158:18, 160:18, 160:19, 160:23, 161:12, 161:13, 163:10, 163:11, 163:13, 163:14, 163:23, 166:1, 171:12, 172:7, 172:8, 172:9, 174:3, 179:15, 183:11, 183:12, 184:3,

188:22, 190:12, 190:13, 190:15, 190:16, 190:19, 190:22, 191:1, 192:12, 192:13, 194:20, 194:21, 195:14, 195:23, 196:3, 196:9, 196:13, 197:1, 197:6, 197:7, 197:11, 197:17, 197:18, 197:21, 198:4, 198:5, 198:9, 198:21, 200:5, 201:5, 202:15, 203:5, 203:17, 203:18, 205:11, 205:12, 205:16, 205:20, 206:7, 207:5, 207:6, 208:8, 210:15, 210:16, 210:18, 210:19, 211:2, 211:3, 214:2, 214:3, 214:15, 214:16, 214:21, 216:19, 216:20, 217:1, 219:18, 219:23, 220:1, 227:11, 227:12, 229:7, 229:8, 230:10, 231:1, 231:20, 237:14, 240:3, 240:11, 240:12, 240:15, 240:16, 241:12, 243:10, 243:14, 246:4, 247:17, 247:18, 250:1, 250:6, 251:15, 252:5, 252:14, 254:11, 254:12, 254:15, 256:23, 257:16, 258:15, 261:14, 261:19, 261:20, 263:12, 267:3, 269:15, 272:11, 272:12, 277:22, 289:11, 289:12, 291:17, 291:18, 292:16
**correctional** [1] - 132:15
**Corrections** [2] - 89:6, 92:2
**corrections** [1] - 86:20
**correctly** [7] - 66:7, 83:2, 105:1, 107:17, 124:3, 180:20, 272:18
**council** [1] - 22:17
**counsel** [1] - 5:17
**counts** [1] - 264:4
**county** [1] - 75:3

**County** [65] - 2:20, 4:7, 6:23, 7:11, 18:4, 25:4, 26:14, 31:7, 31:12, 39:17, 39:23, 40:12, 40:22, 41:6, 41:19, 42:7, 42:21, 44:16, 44:18, 44:22, 50:6, 50:15, 52:10, 52:17, 52:23, 53:17, 57:11, 58:8, 60:7, 62:12, 62:16, 65:22, 74:5, 74:9, 74:12, 77:3, 77:16, 97:5, 98:18, 99:21, 100:6, 100:9, 117:5, 133:19, 147:21, 154:19, 201:7, 201:16, 202:5, 227:7, 251:5, 257:20, 257:23, 261:11, 262:1, 269:20, 269:22, 270:5, 272:10, 280:15, 281:5, 289:14, 291:14, 298:6
**COUNTY** [2] - 1:9, 298:3
**couple** [6] - 134:9, 142:14, 232:6, 238:10, 257:7, 289:7
**course** [12] - 14:14, 15:4, 54:15, 88:12, 107:23, 111:11, 125:20, 156:1, 186:16, 187:13, 243:10, 287:14
**courses** [1] - 19:19
**Court** [4] - 7:15, 71:9, 114:23, 251:2
**COURT** [2] - 1:3, 1:17
**court** [4] - 7:14, 7:19, 242:1, 243:5
**courteous** [8] - 45:1, 45:18, 49:20, 50:12, 50:16, 50:21, 51:9, 52:3
**courtesy** [5] - 45:5, 47:16, 50:10, 51:15, 52:3
**courtroom** [10] - 107:7, 107:9, 115:1, 115:6, 115:8, 115:14, 115:16, 115:22, 115:23, 116:4
**courts** [2] - 63:8, 63:15
**Courts** [1] - 63:11
**cover** [4] - 4:8, 176:22, 280:16, 281:6
**coverage** [3] - 4:10,

266:21, 281:10
**covered** [2] - 43:9, 225:3
**covering** [1] - 37:21
**covers** [1] - 125:23
**CPR** [1] - 58:22
**create** [1] - 27:5
**created** [1] - 84:3
**creating** [1] - 248:18
**credit** [2] - 270:13, 271:20
**crime** [22] - 67:8, 67:12, 67:16, 68:1, 68:4, 68:11, 71:17, 71:18, 71:20, 72:21, 84:20, 84:23, 85:13, 157:20, 157:21, 157:22, 158:11, 163:16, 166:19, 170:22, 190:18, 196:23
**crimes** [3] - 71:23, 76:16, 249:5
**criminal** [34] - 16:8, 16:12, 16:13, 62:18, 63:7, 64:7, 64:12, 64:21, 64:23, 65:8, 67:23, 68:7, 68:8, 68:9, 114:19, 114:20, 120:19, 120:22, 122:15, 122:20, 172:7, 182:6, 182:9, 182:13, 190:11, 247:16, 255:6, 255:12, 259:23, 263:11, 264:18, 267:12, 273:11, 279:20
**Criminal** [1] - 62:19
**critical** [1] - 280:1
**Crosby** [1] - 7:22
**CROSBY** [1] - 5:2
**crowd** [9] - 141:19, 142:18, 142:19, 181:7, 211:7, 219:2, 219:11, 226:14, 239:4
**crowded** [3] - 145:1, 145:3, 218:2
**cruiser** [23] - 131:17, 133:22, 134:1, 190:23, 193:1, 193:7, 200:1, 203:9, 203:12, 204:4, 205:15, 205:20, 207:8, 208:16, 209:17, 210:3, 216:5, 216:6, 219:1, 220:9, 227:11, 261:16
**crummy** [1] - 132:6
**curl** [2] - 253:20,

253:21
**current** [3] - 23:6, 270:16, 295:7
**curse** [5] - 130:7, 130:10, 130:18, 163:4, 163:6
**cursing** [1] - 130:12
**custody** [4] - 165:18, 178:3, 191:13, 214:10
**cut** [5] - 82:19, 82:21, 128:17, 196:2, 274:2
**cutting** [1] - 269:2

# D

**d'Aquino** [1] - 282:5
**D'Aquino** [9] - 7:23, 10:10, 15:19, 15:20, 132:9, 187:15, 219:8, 273:22, 281:7
**D'AQUINO** [133] - 5:9, 7:23, 8:4, 8:10, 8:19, 8:23, 9:5, 9:13, 9:16, 13:11, 13:22, 17:8, 27:16, 31:2, 31:17, 31:23, 32:6, 32:13, 32:16, 33:5, 33:9, 33:15, 34:3, 34:10, 34:16, 42:17, 43:8, 45:6, 45:19, 46:8, 46:19, 47:8, 47:10, 47:18, 47:23, 48:2, 48:19, 49:6, 51:4, 59:14, 62:20, 64:14, 69:17, 69:20, 70:3, 70:13, 70:23, 71:7, 73:13, 87:6, 94:7, 94:10, 94:16, 94:23, 95:4, 95:22, 96:1, 101:10, 101:14, 102:2, 102:12, 102:21, 103:8, 103:13, 103:16, 106:9, 108:12, 109:10, 112:12, 112:19, 113:5, 113:8, 113:22, 124:22, 125:5, 125:8, 125:22, 128:16, 128:20, 132:4, 136:12, 136:17, 137:10, 159:8, 162:17, 166:22, 167:21, 169:11, 171:2, 172:13, 172:23, 175:14, 175:21, 176:1, 176:8, 176:14, 177:4, 184:22, 185:12, 185:18, 186:2, 186:21, 222:5,

223:17, 228:23, 229:17, 231:4, 231:8, 234:6, 234:8, 234:12, 244:16, 245:2, 254:4, 280:17, 280:20, 281:1, 281:11, 281:22, 282:11, 287:19, 288:1, 288:10, 291:21, 292:1, 292:4, 292:11, 294:2, 294:8, 294:14, 295:2, 295:18, 296:8
**DA** [2] - 86:11, 86:14
**DA's** [3] - 15:1, 185:8, 186:9
**damage** [2] - 137:22, 138:6, 138:13, 138:15, 138:18, 249:9
**damages** [6] - 4:8, 4:10, 280:13, 280:16, 281:6, 281:10
**Daoust** [3] - 13:3, 13:7, 14:5
**dash** [2] - 38:3, 44:6
**data** [1] - 269:7
**database** [1] - 273:6
**date** [11] - 9:11, 18:22, 28:14, 105:7, 117:3, 117:7, 180:8, 197:16, 205:1, 259:23, 286:10
**dated** [12] - 2:5, 2:7, 2:8, 2:10, 2:11, 2:13, 6:1, 6:3, 6:5, 6:7, 6:9, 6:12
**dates** [8] - 20:3, 20:7, 20:9, 21:15, 22:18, 121:5, 122:8
**daughter** [1] - 12:22
**DAUST** [1] - 13:5
**David** [2] - 5:12, 7:5
**days** [14] - 8:4, 30:20, 68:6, 107:16, 107:23, 109:2, 109:7, 110:1, 110:10, 111:17, 266:19, 267:1, 267:22, 268:1
**de** [3] - 54:7, 54:9, 55:1
**de-escalation** [3] - 54:7, 54:9, 55:1
**deadly** [3] - 55:16, 57:2, 66:22
**deal** [1] - 123:22
**dealing** [2] - 96:15, 214:10
**dealt** [2] - 59:5, 75:20
**death** [1] - 279:6
**decades** [1] - 63:4

**deceased** [1] - 21:3
**December** [31] - 10:3, 19:18, 19:23, 118:19, 118:21, 118:23, 119:9, 119:10, 119:11, 119:20, 120:1, 120:5, 120:9, 120:12, 120:13, 127:7, 130:5, 130:21, 131:15, 132:23, 133:4, 133:15, 133:18, 137:21, 156:18, 227:20, 262:8, 279:8, 285:8, 285:11, 286:10
**decided** [2] - 173:19, 214:1
**decision** [7] - 173:13, 174:12, 175:12, 277:11, 277:14, 279:3, 293:20
**decisions** [1] - 63:15
**declined** [1] - 23:4
**Defendant** [11] - 1:15, 17:17, 248:15, 251:10, 257:19, 257:22, 257:23, 258:1, 258:2, 258:4, 258:9
**Defendant's** [1] - 251:11
**Defendants** [4] - 1:12, 5:10, 7:13, 8:1
**defense** [1] - 16:13
**defensive** [1] - 54:5
**define** [1] - 249:2
**defines** [2] - 249:7, 249:16
**definitely** [4] - 79:14, 144:2, 152:19, 152:20
**definition** [2] - 292:6
**degree** [4] - 19:15, 255:7, 263:17, 263:20
**Delaware** [22] - 5:3, 197:10, 197:23, 198:20, 199:2, 200:6, 200:16, 202:1, 202:7, 202:8, 202:9, 202:18, 202:22, 202:23, 289:11, 291:13, 291:15, 291:17, 292:13, 292:19
**Delawares** [1] - 202:4
**delete** [6] - 3:6, 28:18, 29:1, 29:4, 30:8, 265:20
**deleted** [2] - 28:14, 28:16
**deliver** [2] - 274:20,

275:2
**delivered** [1] - 275:3
**delivery** [1] - 41:17
**delve** [1] - 87:10
**demand** [1] - 27:22
**dent** [18] - 138:20, 138:23, 227:9, 227:13, 227:16, 228:4, 228:8, 228:16, 228:21, 229:4, 229:10, 229:16, 237:20, 237:21, 238:21, 240:10, 240:14, 258:19
**Department** [33] - 22:2, 23:16, 23:20, 24:8, 24:12, 25:15, 31:8, 39:18, 39:23, 40:13, 40:22, 41:6, 42:8, 42:22, 52:10, 53:18, 57:12, 58:8, 60:8, 62:12, 62:16, 74:10, 98:18, 99:21, 100:6, 100:10, 133:19, 147:22, 227:7, 260:16, 262:2, 272:10, 289:14
**department** [34] - 14:21, 21:8, 25:9, 25:23, 30:11, 30:18, 35:18, 36:9, 44:21, 63:20, 64:5, 64:19, 65:7, 74:14, 99:1, 103:11, 117:11, 123:15, 147:11, 154:6, 156:2, 262:7, 268:4, 268:14, 270:14, 270:17, 272:1, 272:7, 272:14, 276:5, 278:2, 278:19, 279:2, 283:2
**departmental** [1] - 146:16
**departments** [2] - 270:3, 270:4
**depended** [1] - 153:13
**deponent** [1] - 298:13
**deposition** [13] - 7:8, 7:10, 8:5, 8:7, 13:15, 17:11, 45:13, 46:13, 46:21, 47:4, 114:3, 180:23, 294:9
**Deposition** [11] - 65:16, 149:15, 153:15, 154:9, 172:3, 183:22, 187:22, 234:1, 238:14, 247:6, 248:5

**depth** [1] - 108:7
**deputies** [9] - 132:1, 132:13, 132:15, 164:10, 164:13, 257:14, 257:17, 257:21, 258:3
**Deputy** [68] - 49:10, 90:20, 91:2, 91:7, 91:8, 111:2, 111:8, 111:11, 112:5, 114:11, 114:12, 117:6, 118:20, 119:8, 120:4, 121:23, 122:5, 122:10, 122:13, 122:16, 122:19, 123:14, 131:2, 131:8, 133:1, 139:1, 149:23, 150:10, 150:12, 150:14, 151:6, 151:7, 151:8, 151:10, 152:11, 153:5, 153:20, 159:5, 159:13, 163:12, 178:4, 180:18, 181:4, 181:9, 192:8, 192:10, 192:23, 193:7, 216:5, 216:12, 217:16, 218:4, 225:7, 225:15, 225:16, 233:21, 234:23, 236:19, 237:2, 237:8, 238:19, 247:20, 254:18, 258:23, 260:15, 261:10, 261:18, 287:3
**deputy** [43] - 14:20, 14:23, 39:18, 60:16, 62:13, 62:17, 63:4, 64:6, 64:20, 74:5, 75:19, 76:8, 76:10, 84:17, 90:20, 90:21, 90:22, 91:4, 91:11, 91:14, 91:18, 100:13, 124:2, 141:6, 142:17, 155:4, 155:21, 168:23, 169:8, 178:5, 180:17, 251:11, 251:12, 252:12, 252:14, 282:17, 283:14, 283:19, 283:23, 284:3, 284:16, 286:20
**describe** [10] - 14:13, 19:14, 58:13, 139:22, 145:5, 148:1, 220:8, 221:1, 232:20, 250:13
**described** [3] - 43:6, 55:20, 298:17
**describing** [1] - 97:19
**Description** [1] - 3:4

**description** [1] - 202:1
**desk** [1] - 290:7
**detail** [13] - 60:14, 124:15, 131:21, 132:13, 132:14, 132:18, 132:20, 133:8, 134:17, 148:2, 254:20, 284:10, 284:12
**details** [4] - 132:12, 156:10, 158:16, 179:7
**determination** [3] - 174:1, 175:3, 290:1
**determine** [8] - 34:4, 67:8, 67:11, 90:2, 90:4, 127:15, 215:2, 215:15
**determined** [10] - 88:22, 210:2, 210:6, 210:14, 213:14, 213:16, 215:8, 215:12, 232:14, 240:14
**determines** [1] - 86:14
**developed** [1] - 106:2
**developments** [3] - 64:7, 64:12, 64:20
**device** [1] - 12:6
**diameter** [1] - 148:9
**dictates** [2] - 51:10, 51:17
**difference** [2] - 68:3, 212:22
**different** [24] - 14:22, 31:6, 34:21, 43:8, 77:12, 129:13, 145:10, 145:11, 145:13, 146:3, 147:16, 158:1, 159:8, 166:8, 266:10, 267:22, 268:1, 268:18, 269:12, 270:7, 270:9, 271:8, 279:1, 279:19
**difficult** [5] - 106:18, 108:18, 135:6, 168:1, 226:19
**dining** [1] - 11:19
**direct** [9] - 46:5, 70:19, 95:7, 124:23, 176:23, 281:20, 282:2, 292:10, 295:16
**directed** [3] - 39:9, 90:14, 281:7
**directing** [5] - 34:18, 70:12, 141:7, 280:19, 287:22

**direction** [4] - 33:5, 52:22, 71:5, 298:11
**directions** [1] - 34:4
**directive** [1] - 37:9
**directives** [2] - 47:16, 48:11
**directly** [6] - 55:18, 116:4, 219:15, 224:2, 224:7, 281:22
**dis** [1] - 257:7
**disagree** [36] - 18:14, 29:22, 50:20, 56:2, 81:4, 81:8, 81:11, 81:21, 85:3, 85:10, 86:4, 105:3, 121:20, 170:17, 170:19, 172:22, 182:14, 182:18, 183:4, 183:5, 184:16, 185:1, 186:20, 191:18, 200:20, 202:10, 216:10, 249:10, 249:18, 263:6, 263:8, 273:8, 273:12, 285:16, 288:18, 289:1
**disagreed** [1] - 280:8
**disagreeing** [3] - 163:2, 288:20, 289:3
**disagrees** [1] - 187:1
**disclose** [1] - 281:17
**discourteous** [1] - 51:3
**discovery** [1] - 27:22
**discretion** [3] - 52:7, 53:3, 90:6
**discuss** [15] - 119:16, 122:5, 122:10, 122:13, 122:16, 170:7, 178:21, 247:20, 248:3, 259:20, 260:1, 275:4, 275:7, 275:9, 275:13
**discussed** [16] - 11:13, 53:19, 100:19, 122:20, 136:6, 178:3, 241:11, 260:8, 261:9, 263:22, 264:17, 276:19, 276:21, 281:23, 284:19, 286:15
**Discussion** [3] - 125:7, 149:5, 247:2
**discussion** [6] - 61:9, 213:9, 241:8, 259:3, 259:4, 275:16
**discussions** [1] - 53:4
**dismiss** [3] - 185:9, 186:5, 186:9

**dismissed** [15] - 85:17, 85:21, 85:23, 86:4, 86:7, 86:11, 86:14, 96:23, 97:3, 184:15, 184:20, 185:6, 186:12, 263:3, 263:9
**disorderly** [19] - 129:12, 173:11, 173:14, 174:1, 174:13, 175:4, 175:13, 177:14, 183:9, 242:19, 242:22, 243:20, 248:11, 248:12, 250:22, 256:18, 257:8, 258:5, 258:10
**dispatch** [3] - 78:14, 79:4, 139:7
**dispatched** [1] - 90:17
**Disposition** [2] - 2:15, 6:16
**disservice** [1] - 271:17
**distinction** [1] - 17:9
**distribution** [1] - 38:16
**DISTRICT** [2] - 1:3, 1:4
**district** [3] - 76:11, 186:3, 186:4
**districts** [1] - 75:3
**diver** [1] - 76:2
**Divers** [1] - 76:4
**division** [3] - 39:8, 262:2, 262:10
**divorce** [3] - 93:3, 106:19, 106:21
**divorced** [6] - 13:7, 13:9, 14:4, 87:5, 87:12, 87:13
**DO** [1] - 298:6
**document** [37] - 37:15, 37:18, 37:21, 37:23, 38:2, 38:7, 38:10, 39:4, 43:11, 43:16, 43:17, 43:18, 43:22, 44:5, 45:8, 46:11, 46:12, 46:15, 46:20, 47:2, 47:5, 47:6, 47:13, 47:19, 47:20, 48:2, 48:15, 48:17, 49:5, 50:1, 66:3, 73:16, 172:18, 173:1, 243:1, 250:20, 251:1
**documents** [10] - 11:20, 15:14, 15:21, 37:1, 170:11, 241:22,

242:1, 242:6, 244:20, 245:6
**Documents** [4] - 2:14, 2:17, 6:14, 6:18
**dollar** [1] - 148:8
**domestic** [5] - 75:18, 75:19, 75:20, 75:21, 93:21
**done** [20] - 40:10, 47:8, 60:23, 70:1, 78:16, 118:7, 131:19, 140:3, 218:11, 219:9, 219:13, 238:7, 243:4, 244:4, 265:5, 278:22, 289:23, 296:5, 296:6, 296:9
**door** [14] - 190:3, 191:7, 192:13, 207:8, 208:16, 208:18, 209:3, 209:6, 209:11, 209:13, 209:17, 209:18, 210:4, 290:6
**doors** [2] - 203:12, 205:15
**double** [3] - 124:13, 153:4
**down** [58] - 4:5, 8:16, 10:15, 38:5, 38:9, 38:12, 49:12, 51:9, 66:2, 69:12, 69:15, 70:6, 70:14, 88:15, 97:20, 121:3, 128:6, 129:6, 154:15, 155:6, 155:15, 184:1, 207:11, 207:14, 207:15, 207:16, 207:18, 207:19, 207:21, 207:22, 207:23, 208:1, 208:2, 208:7, 208:8, 209:13, 224:9, 226:7, 226:9, 226:11, 226:13, 226:20, 241:20, 244:9, 248:10, 251:4, 251:8, 251:23, 253:4, 253:6, 253:12, 253:18, 256:3, 256:18, 290:16, 291:8, 298:8
**downtown** [2] - 74:22, 259:5
**draft** [15] - 156:3, 156:7, 241:14, 242:6, 242:8, 242:13, 242:17, 242:21, 243:13, 243:19, 244:1, 244:14, 244:22, 246:3, 274:16
**drafted** [6] - 158:21, 241:3, 241:12,

Kenneth P. Achtyl, Jr.

9

247:19, 247:22, 255:3
**drafting** [6] - 156:13, 158:18, 240:23, 241:6, 241:8, 243:1
**dragged** [2] - 128:6, 129:5
**Drive** [1] - 9:19
**drive** [3] - 131:8, 141:11, 141:16
**driver** [5] - 18:4, 78:11, 90:1, 90:2, 128:8
**driving** [5] - 80:10, 83:3, 83:4, 83:14, 261:18
**drop** [2] - 289:22, 290:10
**drunk** [2] - 18:3, 142:22
**drunks** [2] - 127:18, 127:20
**due** [3] - 23:6, 43:21, 70:9
**duly** [2] - 9:20, 298:14
**during** [52] - 14:21, 16:5, 16:11, 24:21, 39:22, 61:8, 77:11, 79:11, 81:3, 87:13, 91:22, 92:20, 97:4, 99:23, 100:9, 102:9, 107:23, 108:17, 109:2, 110:9, 111:11, 114:20, 115:7, 115:18, 119:16, 121:23, 156:19, 157:2, 157:4, 162:10, 170:7, 171:10, 173:23, 174:11, 183:13, 186:15, 187:13, 189:23, 199:23, 210:8, 223:10, 223:12, 232:14, 237:12, 238:3, 252:18, 252:19, 264:18, 269:20, 279:12, 280:1, 287:13
**DUSZA** [1] - 239:12
**Dusza** [15] - 178:4, 178:5, 178:10, 178:13, 178:22, 179:8, 179:10, 227:23, 228:3, 239:11, 239:12, 239:17, 240:1, 240:9, 260:15
**duties** [5] - 41:5, 50:18, 53:8, 76:9, 156:3

**duty** [3] - 41:8, 188:13, 188:16
**DUZ** [1] - 178:13
**DUZA** [1] - 178:14
**DWI** [7] - 79:11, 124:18, 128:14, 129:7, 129:10, 129:12, 129:19
**DWI's** [1] - 15:4
**Dylan** [3] - 179:13, 180:15

# E

**e-mail** [1] - 46:23
**early** [2] - 126:17, 135:4
**easier** [1] - 146:9
**easily** [2] - 145:9, 176:12
**easy** [6] - 49:2, 51:19, 61:2, 137:19, 187:2, 294:22
**eat** [2] - 152:6, 152:12
**eating** [1] - 154:2
**ECC** [1] - 20:1
**Eden** [6] - 19:8, 24:7, 24:12, 99:2, 99:6
**edit** [1] - 103:16
**editorializing** [1] - 254:5
**education** [4] - 19:12, 19:19, 21:16, 58:6
**effect** [10] - 62:6, 162:14, 180:20, 188:7, 188:20, 204:15, 204:20, 205:3, 278:9, 278:10
**effected** [1] - 245:18
**effective** [5] - 276:1, 276:6, 276:14, 276:22, 277:21
**effectively** [1] - 41:16
**effectuated** [1] - 244:13
**efficient** [1] - 41:17
**efficiently** [2] - 11:14, 219:14
**eight** [9] - 19:2, 20:22, 126:20, 136:3, 150:21, 161:19, 187:7, 193:20, 236:16
**eighteen** [8] - 127:2, 149:19, 150:21, 152:3, 153:16, 153:20, 153:21, 240:1
**either** [18] - 49:18,

70:19, 91:3, 122:1, 176:23, 190:15, 211:18, 230:19, 231:21, 237:11, 241:23, 266:7, 267:9, 281:19, 283:15, 286:16, 293:14, 296:2
**eject** [2] - 293:14, 293:21
**ejected** [1] - 293:15
**ejection** [2] - 213:17, 296:2
**elaborate** [2] - 127:21, 273:21
**elbow** [5] - 180:5, 180:22, 181:2, 181:8, 181:20
**electronic** [1] - 12:6
**eleven** [2] - 47:2, 139:20
**Elizabeth** [3] - 12:15, 12:17, 13:2
**emergency** [1] - 76:13
**emphasis** [1] - 42:2
**employed** [6] - 24:14, 26:2, 39:22, 100:12, 117:10, 123:15
**employee** [2] - 44:12, 44:15
**employees** [5] - 50:12, 52:5, 53:9, 66:7, 97:18
**Employment** [2] - 2:18, 6:20
**employment** [18] - 11:10, 14:10, 22:19, 25:11, 35:19, 54:16, 57:11, 60:7, 88:12, 99:20, 99:23, 100:9, 156:1, 243:10, 268:13, 271:1, 272:7, 287:5
**empty** [2] - 182:21, 183:2
**encounter** [3] - 251:20, 252:18, 252:20
**encourage** [1] - 30:14
**end** [13] - 77:23, 124:18, 140:22, 140:23, 148:9, 176:5, 209:12, 223:13, 267:9, 267:10, 273:3
**ended** [9] - 18:3, 18:10, 64:3, 71:1, 78:1, 112:1, 176:2, 203:8, 242:3

**enforcement** [20] - 14:11, 41:14, 56:5, 63:17, 66:13, 66:18, 67:7, 67:11, 67:14, 72:12, 74:2, 76:12, 76:13, 130:10, 130:19, 184:19, 185:11, 188:13, 268:9
**engage** [2] - 53:4, 248:18
**ensure** [5] - 9:2, 138:6, 138:7, 138:9, 138:13
**entail** [1] - 36:11
**entailed** [1] - 60:11
**entails** [1] - 138:3
**entered** [1] - 5:15
**entire** [2] - 168:6, 225:2
**entities** [1] - 24:14
**entitled** [2] - 297:5, 298:13
**entrance** [2] - 82:5, 83:5
**environment** [1] - 42:1
**equipment** [5] - 74:19, 79:3, 138:6, 138:8, 242:16
**equitable** [1] - 41:17
**Era** [4] - 10:4, 18:2, 132:2, 133:17
**ERIE** [2] - 1:9, 298:3
**Erie** [57] - 2:20, 6:23, 7:12, 19:15, 25:4, 26:13, 31:7, 31:12, 39:17, 39:23, 40:12, 40:21, 41:6, 41:18, 42:7, 42:21, 44:16, 44:22, 50:6, 50:15, 52:10, 52:17, 52:23, 53:17, 57:11, 58:8, 60:7, 62:12, 62:16, 65:22, 74:5, 74:9, 74:12, 77:3, 97:5, 98:17, 99:21, 100:6, 100:9, 117:5, 133:19, 147:21, 154:19, 201:7, 201:16, 202:5, 227:7, 251:5, 257:20, 257:23, 261:10, 262:2, 272:10, 289:13, 291:14, 298:6
**errata** [1] - 297:3
**escalation** [3] - 54:7, 54:9, 55:1
**Esq** [1] - 5:12
**ESQ** [3] - 5:2, 5:6, 5:9
**established** [9] -

17:2, 17:4, 87:3, 88:6, 89:21, 135:12, 188:16, 260:1, 289:9
**establishment** [1] - 41:13
**estimate** [4] - 133:7, 142:9, 148:4, 267:7
**et** [4] - 11:5, 66:14, 87:5, 202:19
**evening** [1] - 24:22
**event** [4] - 102:9, 107:18, 156:4, 242:2
**events** [5] - 111:9, 116:12, 163:18, 179:2, 232:15
**eventual** [1] - 170:23
**eventually** [6] - 84:4, 89:19, 174:14, 220:5, 226:10, 263:3
**everywhere** [1] - 279:9
**evidence** [1] - 62:10
**evolving** [1] - 56:23
**exact** [2] - 14:16, 117:7, 133:6, 162:13, 204:23, 205:2, 233:11
**exactly** [15] - 27:2, 40:7, 47:10, 47:18, 58:18, 103:2, 153:1, 157:9, 204:18, 204:21, 205:10, 228:12, 230:13, 246:13, 271:12
**EXAMINATION** [1] - 9:23
**examination** [2] - 70:22, 298:14
**Examination** [1] - 1:14
**except** [2] - 5:21, 297:2
**exchange** [5] - 233:5, 233:8, 233:10, 233:12, 233:16
**excuse** [9] - 19:20, 38:13, 48:19, 49:10, 62:20, 69:17, 128:16, 167:22, 293:2
**exercise** [2] - 52:6, 53:3
**Exhibit** [28] - 6:2, 6:4, 6:6, 6:8, 6:11, 6:13, 6:15, 6:17, 6:19, 6:21, 7:1, 37:19, 43:23, 47:19, 49:11, 65:16, 65:20, 149:15, 153:15, 154:9, 172:3, 183:22, 187:23, 234:1, 238:14, 247:7, 248:5, 296:14

exhibit [9] - 37:12,
37:14, 43:23, 44:1,
44:2, 45:20, 48:2,
65:14, 154:11
exhibits [7] - 15:16,
17:3, 46:1, 46:2,
46:16, 46:20, 47:2
EXHIBITS [1] - 2:1
Exhibits [1] - 2:4
exists [1] - 68:15
exit [2] - 140:7, 216:5
exited [1] - 290:17
exiting [1] - 207:13
expect [2] - 28:5,
79:22
expected [1] - 65:3
expecting [1] - 190:2
experience [3] -
15:1, 77:21, 79:5
explain [6] - 64:2,
70:10, 166:9, 241:17,
253:16, 270:7
explained [3] -
102:7, 181:4
explanation [3] -
94:6, 94:12, 94:16
express [1] - 53:11
extendable [2] -
147:14, 147:15
extended [2] - 224:1,
224:7
extent [2] - 20:8,
213:5
extenuating [1] -
91:17
extreme [1] - 53:5
extremely [2] -
149:17, 209:21
eye [1] - 181:10

**F**

face [9] - 13:20, 53:5,
220:22, 222:4, 225:2,
226:11, 226:13,
226:19, 231:20
Facebook [7] -
26:19, 26:21, 27:3,
27:13, 29:12, 30:1,
30:9
faced [1] - 116:4
facets [1] - 54:19
facing [6] - 115:1,
115:2, 115:10, 211:2,
213:10, 213:12
fact [6] - 48:1,
135:17, 150:9,
169:17, 227:18,
244:21
factors [2] - 145:20,

146:8
facts [1] - 229:17
failure [1] - 79:18
fair [110] - 39:1,
39:15, 41:17, 46:3,
47:23, 49:1, 53:5,
56:9, 56:13, 57:22,
60:19, 62:23, 63:5,
66:19, 67:21, 69:13,
72:19, 72:20, 73:12,
74:3, 74:4, 76:19,
87:14, 89:23, 97:1,
99:11, 99:12, 105:8,
105:19, 107:4, 107:5,
107:21, 112:8, 112:9,
118:12, 121:11,
121:17, 122:2, 122:3,
125:22, 126:15,
127:3, 127:18,
127:19, 128:2,
129:10, 130:3,
130:11, 130:23,
131:3, 134:23,
135:13, 145:21,
157:4, 163:2, 163:17,
173:10, 177:20,
188:9, 188:10, 192:5,
194:2, 194:8, 194:13,
194:14, 197:20,
201:4, 201:14, 202:2,
202:20, 202:23,
203:7, 203:13,
204:17, 204:22,
205:2, 209:17,
215:16, 217:23,
219:16, 220:19,
224:18, 224:23,
225:10, 229:11,
229:13, 246:16,
246:17, 247:13,
247:14, 248:8,
248:11, 248:23,
251:18, 255:20,
257:11, 257:12,
257:15, 259:11,
261:6, 268:15,
268:16, 269:18,
273:23, 274:6,
276:23, 287:21,
290:23, 292:21
fairness [1] - 42:3
fall [4] - 19:16,
137:16, 137:17, 270:9
falsifying [1] -
263:19
familiar [16] - 40:11,
40:17, 42:7, 42:9,
55:3, 57:4, 60:4,
62:13, 63:20, 64:6,
64:20, 73:3, 74:10,

74:13, 82:10, 149:17
familiarity [2] -
60:16, 62:17
familiarize [1] -
73:21
family [8] - 26:7,
26:8, 26:9, 89:19,
89:20, 89:21, 98:22,
277:12
fan [2] - 132:6,
217:12
fans [2] - 213:19,
219:3
far [6] - 11:6, 115:21,
136:12, 141:17,
159:9, 207:14
fashion [1] - 130:18
faster [2] - 102:19,
212:11
father [1] - 89:7
fault [1] - 246:13
favor [1] - 103:21
February [1] - 59:2
Federal [1] - 1:16
feedback [1] - 125:6
feet [6] - 148:5,
164:21, 164:22,
165:1, 165:4, 165:14
felonies [1] - 68:18
felony [10] - 15:8,
15:10, 21:12, 68:16,
72:15, 129:16,
129:18, 129:20,
129:23, 130:3
felt [2] - 26:11, 184:5
female [1] - 128:7
fender [4] - 138:21,
138:23, 240:10,
240:15
Ferreri [2] - 12:15,
12:17
few [15] - 32:21,
32:23, 43:3, 75:10,
114:11, 135:16,
142:13, 158:15,
165:1, 165:4, 197:13,
215:18, 229:4, 277:4,
285:6
fiancee [1] - 12:13
fiancee's [1] - 12:16
Field [4] - 10:4, 18:2,
132:2, 133:18
fifteen [16] - 78:12,
78:16, 78:23, 79:4,
80:4, 117:1, 144:3,
144:9, 231:13, 232:2,
232:5, 233:9, 233:17,
239:7, 239:10, 239:16
fifty [15] - 112:17,
150:21, 153:16,

198:7, 234:3, 234:4,
234:14, 234:16,
234:20, 235:13,
236:5, 236:15,
236:22, 239:3
fifty-eight [1] -
150:21
fifty-one [1] - 234:16
fifty-three [2] -
234:16, 239:3
fifty-two [8] - 234:3,
234:4, 234:14,
234:20, 235:13,
236:5, 236:15, 236:22
fighting [5] - 228:9,
228:17, 228:22,
248:19, 249:4
Fighting [2] - 233:1,
233:2
figure [3] - 178:17,
237:17, 254:2
figures [2] - 199:7,
271:20
filed [1] - 32:2
filing [1] - 5:19
fill [2] - 24:10, 124:1
filling [1] - 246:10
film [1] - 150:17
final [1] - 175:9
finally [6] - 174:22,
210:9, 210:10, 211:5
financially [1] -
26:11
fine [10] - 59:17,
68:5, 103:12, 119:18,
136:16, 146:12,
176:11, 185:3,
256:22, 295:1
finish [6] - 70:20,
95:8, 128:16, 144:7,
213:21, 219:5
finished [2] - 20:1,
139:16
fire [1] - 270:8
Fire [1] - 260:15
firearm [1] - 97:22
firearms [4] - 54:1,
59:2, 59:5, 251:5
fired [1] - 278:6
firing [2] - 97:16,
278:10
first [34] - 10:11,
21:19, 21:22, 37:23,
38:6, 41:21, 56:4,
58:14, 58:22, 59:1,
65:17, 74:17, 99:20,
100:20, 101:14,
102:8, 102:10,
102:14, 102:23,
103:10, 107:20,

122:9, 122:12,
122:15, 123:12,
154:10, 156:17,
156:21, 171:13,
189:8, 189:22, 190:9,
213:17, 295:19
firsthand [1] - 106:1
fist [9] - 249:3,
253:9, 255:14,
256:16, 256:17,
256:20, 256:23,
257:5, 257:6
fists [28] - 232:22,
233:4, 250:17,
251:12, 251:17,
251:20, 251:21,
251:22, 252:4,
252:11, 252:16,
252:20, 252:23,
253:1, 253:10,
253:14, 253:21,
254:11, 254:13,
254:14, 254:15,
254:20, 255:1, 256:1,
256:2, 256:7
fit [1] - 45:14
five [60] - 7:4, 15:12,
15:13, 20:6, 20:22,
21:1, 21:6, 38:3,
54:12, 56:1, 57:16,
59:15, 107:18,
107:23, 109:2, 110:1,
110:10, 111:12,
111:16, 125:19,
131:23, 132:18,
133:10, 133:11,
133:13, 143:21,
191:23, 192:1, 192:6,
192:16, 192:21,
226:17, 238:10,
238:19, 242:15,
242:17, 242:19,
242:20, 243:21,
246:23, 247:3,
267:14, 267:17,
267:18, 268:5, 268:9,
269:14, 270:20,
271:11, 271:13,
271:16, 277:13,
289:19, 295:6, 296:10
five-day [2] - 107:18,
111:12
five-forty-five [1] -
247:3
five-forty-four [1] -
246:23
flowers [6] - 7:13,
111:5, 118:1, 118:6,
118:9, 118:10
Flowers [64] - 111:2,

Kenneth P. Achtyl, Jr.

111:8, 111:11, 112:5, 114:11, 114:12, 116:7, 116:9, 116:10, 116:12, 117:5, 118:20, 119:8, 120:4, 121:23, 122:5, 122:10, 122:13, 122:16, 122:20, 123:15, 131:2, 131:8, 131:15, 133:1, 133:14, 133:17, 139:1, 150:10, 150:12, 150:14, 151:6, 151:10, 152:11, 153:5, 153:20, 159:20, 163:12, 192:9, 192:23, 193:7, 216:5, 216:12, 217:16, 218:4, 225:7, 225:15, 225:17, 233:22, 234:23, 236:19, 237:2, 237:8, 238:20, 240:2, 241:6, 241:12, 247:20, 258:23, 259:13, 261:10, 261:18

**FLOWERS** [1] - 1:11
**Flowers'** [7] - 16:1, 151:7, 151:9, 159:5, 159:13, 192:11, 254:18
**focused** [1] - 110:16
**folder** [1] - 121:4
**follow** [12] - 11:11, 37:9, 52:22, 58:7, 58:9, 58:10, 59:11, 66:10, 76:15, 86:1, 90:1, 118:4
**follow-up** [6] - 58:7, 58:9, 58:10, 59:11, 86:1, 90:1
**followed** [2] - 75:19, 202:2
**following** [5] - 5:15, 29:7, 181:14, 259:20, 260:4
**follows** [1] - 9:21
**foot** [2] - 238:4, 238:6
**footage** [69] - 16:1, 16:19, 17:5, 17:10, 17:14, 149:17, 149:20, 149:21, 150:2, 150:19, 151:7, 151:9, 151:13, 151:19, 152:4, 153:18, 159:13, 159:20, 160:7, 160:21, 161:3, 161:7,

161:14, 161:20, 162:2, 167:19, 168:20, 188:2, 188:4, 192:3, 192:18, 193:3, 193:9, 193:17, 194:6, 194:17, 195:10, 195:15, 195:21, 196:5, 197:3, 197:8, 198:12, 198:18, 199:3, 199:15, 204:1, 204:12, 206:2, 206:13, 206:22, 208:12, 209:1, 234:5, 234:17, 235:5, 235:9, 235:17, 235:23, 236:9, 236:17, 238:17, 239:1, 239:8, 239:19, 239:22, 240:7, 254:18, 285:18
**Footage** [2] - 2:19, 6:22
**force** [39] - 55:3, 55:7, 55:15, 55:17, 55:18, 55:20, 55:23, 56:2, 56:4, 56:12, 56:15, 56:20, 57:1, 57:2, 61:12, 61:13, 61:14, 66:22, 66:23, 74:1, 155:10, 155:12, 159:1, 170:13, 170:14, 228:7, 228:11, 228:15, 247:22, 249:8, 250:16, 251:6, 251:16, 252:10, 254:9, 254:23, 258:17, 258:18
**foregoing** [1] - 297:2
**forget** [1] - 28:3
**forgot** [1] - 124:16
**form** [27] - 5:21, 31:2, 31:17, 31:23, 32:4, 42:17, 51:4, 64:14, 69:17, 87:6, 94:23, 102:2, 102:12, 112:5, 162:17, 166:22, 171:2, 186:2, 222:5, 223:17, 228:23, 229:18, 244:16, 245:2, 281:20, 288:10, 291:21
**form(s** [1] - 297:3
**forth** [4] - 120:11, 250:12, 284:22, 297:3
**forty** [17] - 19:2, 59:21, 112:14, 147:7, 165:20, 165:23, 167:9, 167:18, 168:10, 192:22,

236:23, 246:23, 247:3, 293:5, 293:8, 294:15, 296:10
**forty-eight** [1] - 19:2
**forty-four** [1] - 236:23
**forty-three** [6] - 165:20, 165:23, 167:9, 167:18, 168:10, 192:22
**forward** [2] - 159:17, 168:22, 220:13, 277:5, 277:15
**forwarded** [3] - 15:17, 15:22, 17:3
**forwards** [1] - 219:23
**four** [30] - 30:19, 32:8, 38:5, 38:9, 38:15, 55:23, 87:22, 90:3, 90:4, 90:6, 90:12, 92:23, 107:19, 109:7, 109:8, 112:14, 140:19, 148:6, 152:3, 187:7, 187:10, 236:23, 238:16, 246:23, 268:5, 269:14, 271:10, 271:13, 271:15
**four-thirty-four** [1] - 187:10
**four-twenty-eight** [1] - 187:7
**four-year-old** [4] - 90:3, 90:6, 90:12, 92:23
**four-year-old's** [1] - 90:4
**fourteen** [4] - 45:8, 46:20, 47:1, 234:3
**fourteen-page** [3] - 45:8, 46:20, 47:1
**fourth** [2] - 56:11, 255:7
**frame** [7] - 24:6, 116:8, 117:8, 139:21, 143:20, 193:12, 238:12
**Franklin** [2] - 1:17, 7:16
**free** [1] - 219:8
**freezer** [1] - 97:18
**frequently** [2] - 97:4, 97:7
**Friday** [2] - 104:23, 134:16
**friend** [21] - 98:22, 142:15, 156:19, 162:8, 162:22, 177:22, 189:20, 194:11, 194:19,

194:23, 195:7, 200:22, 257:21, 282:18, 282:22, 284:17, 286:22, 287:22, 288:4, 289:4, 289:10
**friends** [5] - 156:22, 156:23, 177:23, 178:1, 180:1
**friendship** [1] - 282:20
**front** [34] - 11:20, 82:11, 83:21, 84:10, 121:3, 128:7, 138:21, 138:23, 166:11, 172:19, 211:11, 212:21, 213:5, 213:7, 214:20, 215:12, 216:19, 217:4, 217:9, 218:14, 230:9, 230:20, 230:23, 231:19, 231:22, 286:6, 290:6, 290:7, 290:13, 290:14, 290:19, 290:21, 290:22, 291:6
**Frontier** [2] - 23:15, 25:14
**frowned** [1] - 123:23
**frustrating** [1] - 254:7
**fuck** [2] - 92:3, 93:15
**fucking** [11] - 188:8, 204:16, 204:20, 205:4, 235:20, 236:3, 239:5, 240:10, 288:16, 288:23, 293:17
**full** [23] - 10:12, 16:21, 16:23, 22:16, 23:3, 23:5, 23:14, 25:1, 25:12, 25:17, 136:7, 178:7, 178:12, 179:16, 179:17, 180:2, 180:15, 181:2, 181:3, 181:7, 181:16, 184:18, 185:10
**full-time** [8] - 22:16, 23:3, 23:5, 23:14, 25:1, 25:12, 25:17, 136:7
**function** [3] - 44:20, 136:4, 136:5
**furthest** [1] - 115:3

# G

**gallery** [1] - 115:18
**Gallivan** [2] - 35:22, 36:2
**game** [10] - 123:12,

126:12, 127:6, 128:4, 129:9, 130:6, 130:22, 131:3, 132:3, 200:11
**games** [10] - 117:18, 123:18, 123:19, 123:21, 126:9, 126:14, 126:16, 127:10, 132:23, 133:14
**Garrity** [2] - 262:19, 262:21
**GARRITY** [1] - 262:19
**gas** [1] - 97:17
**gear** [1] - 146:13
**general** [33] - 22:5, 35:9, 37:6, 37:9, 38:3, 38:19, 38:22, 39:2, 39:13, 39:16, 40:1, 40:18, 40:21, 44:6, 61:15, 76:11, 91:21, 116:23, 138:2, 139:8, 140:11, 145:18, 146:11, 164:5, 164:8, 164:14, 165:4, 165:13, 166:8, 166:20, 169:17, 170:2, 226:22
**General** [12] - 2:5, 2:6, 2:8, 2:9, 2:11, 2:12, 6:1, 6:3, 6:5, 6:7, 6:9, 6:12
**generally** [4] - 60:4, 73:3, 76:15, 76:17, 105:17, 106:13, 108:16, 116:20
**George** [1] - 9:19
**gestures** [1] - 53:11
**GIBSON** [1] - 5:2
**Gibson** [1] - 7:21
**given** [8] - 14:8, 14:15, 94:4, 135:12, 188:20, 214:7, 295:15, 297:5
**glass** [1] - 196:22
**glasses** [1] - 239:17
**Glazer** [13] - 7:21, 10:2, 11:7, 13:11, 14:1, 27:16, 32:1, 45:20, 46:19, 59:14, 93:2, 112:19, 113:22
**GLAZER** [240] - 5:2, 7:21, 8:9, 9:23, 13:18, 14:2, 14:3, 17:12, 27:5, 27:8, 27:11, 27:12, 28:1, 28:7, 31:3, 31:19, 32:3, 32:10, 32:15, 32:21, 33:3, 33:8, 33:11, 33:18, 34:7, 34:13,

Kenneth P. Achtyl, Jr.

12

34:23, 42:20, 43:5,
43:12, 45:12, 45:15,
45:23, 46:14, 47:7,
47:9, 47:12, 47:14,
47:22, 48:1, 48:6,
48:8, 48:10, 48:23,
49:9, 51:11, 59:17,
60:3, 63:1, 64:15,
69:22, 70:9, 70:18,
71:5, 71:8, 71:11,
71:12, 73:18, 73:19,
87:7, 94:14, 94:18,
94:19, 95:1, 95:6,
95:10, 95:13, 95:20,
96:3, 96:6, 100:23,
101:7, 101:12,
101:21, 101:22,
102:3, 102:13, 103:4,
103:12, 103:14,
103:18, 103:23,
106:15, 108:14,
108:19, 109:15,
112:13, 113:2,
113:10, 113:18,
113:21, 114:1, 114:4,
114:9, 125:3, 125:14,
126:1, 126:8, 128:18,
128:23, 129:3, 132:5,
132:7, 136:16,
136:20, 136:23,
137:13, 143:4, 143:7,
143:11, 143:16,
149:3, 149:6, 149:22,
150:3, 150:20,
151:14, 151:21,
152:5, 153:19,
159:10, 159:12,
160:22, 161:4, 161:8,
161:15, 161:21,
162:3, 162:18,
166:23, 168:7, 168:8,
169:9, 169:14, 171:3,
172:15, 172:17,
173:2, 173:4, 175:16,
175:22, 176:4,
176:11, 176:17,
176:22, 177:5,
177:10, 178:17,
178:20, 185:3, 185:4,
185:19, 185:23,
186:7, 187:2, 187:12,
187:20, 188:3, 188:5,
192:4, 192:19, 193:4,
193:10, 193:18,
194:7, 194:18,
195:11, 195:16,
195:22, 196:6, 197:4,
197:9, 198:13,
198:19, 199:4,
199:16, 204:2,
204:13, 206:3,

206:14, 206:23,
208:13, 209:2, 222:6,
223:18, 229:1,
229:19, 230:2, 230:6,
231:6, 231:9, 234:7,
234:9, 234:13,
234:18, 235:6,
235:10, 235:18,
236:1, 236:10,
236:18, 238:18,
239:2, 239:9, 239:20,
239:23, 240:8,
244:17, 245:7,
246:21, 247:5, 254:6,
254:8, 274:7, 274:11,
280:19, 280:21,
281:2, 281:16, 282:4,
282:6, 282:13,
282:15, 287:22,
288:4, 288:8, 288:12,
292:2, 292:8, 292:14,
292:23, 293:4,
293:10, 294:4, 294:6,
294:11, 294:19,
295:8, 295:21, 296:4
**Glock** [2] - 146:16,
147:6
**glove** [1] - 138:8
**goals** [1] - 41:5
**GOLDBERG** [1] - 5:8
**Goldberg** [1] - 7:23
**governmental** [1] -
172:10
**Gowanda** [14] - 22:1,
22:3, 22:6, 22:7,
22:10, 22:14, 22:22,
23:10, 24:1, 24:15,
25:3, 25:9, 25:20,
26:3
**grab** [1] - 139:10
**grabbed** [12] -
211:10, 212:7,
212:20, 213:2,
214:18, 215:7,
218:13, 229:14,
229:21, 230:8,
252:18, 258:14
**graduated** [2] - 19:8,
99:4
**grand** [1] - 68:17
**grandfather** [4] -
21:4, 90:5, 90:7,
90:13
**Granville** [14] -
180:17, 180:19,
181:4, 181:10,
286:19, 286:20,
287:3, 287:7, 287:10,
287:13, 287:16,
288:15, 288:22, 289:5

**great** [2] - 9:16,
279:16
**Greenan** [1] - 274:22
**grip** [1] - 148:10
**ground** [15] - 176:22,
224:17, 225:10,
225:12, 225:18,
225:22, 226:2, 226:4,
226:7, 226:9, 226:12,
226:14, 227:6,
227:22, 228:2
**grounds** [2] - 177:1,
265:15
**group** [1] - 118:17
**groups** [2] - 145:10,
145:13
**Grove** [1] - 5:6
**Grover** [9] - 87:1,
87:20, 87:21, 88:21,
89:3, 89:13, 93:10,
96:9, 96:11
**Grover's** [1] - 89:7
**guess** [33] - 20:14,
32:4, 33:1, 34:4,
34:14, 57:21, 57:23,
60:20, 64:1, 70:9,
75:11, 78:3, 78:15,
81:16, 96:21, 106:7,
108:8, 134:20, 136:8,
146:1, 147:15,
157:14, 205:21,
221:19, 243:1, 245:3,
250:12, 255:17,
262:5, 268:18, 270:7,
280:14, 294:15
**guideline** [1] - 45:4
**guidelines** [1] -
45:18
**gun** [2] - 51:9, 97:20
**guy** [3] - 97:14,
136:3, 284:2
**guys** [7] - 95:8,
99:18, 118:14,
118:15, 119:19,
194:10, 283:10

# H

**half** [14] - 37:22,
38:1, 45:9, 65:17,
121:15, 124:13,
124:14, 144:14,
148:8, 154:10,
207:18, 207:19,
208:8, 294:10
**halfway** [5] - 207:17,
207:21, 207:23,
208:2, 218:11
**Hamburg** [1] - 9:19
**hand** [33] - 37:19,
50:22, 56:12, 65:20,

78:5, 108:6, 108:11,
149:19, 150:22,
159:17, 168:22,
183:17, 212:3, 212:4,
212:5, 212:13,
212:16, 213:3, 213:4,
213:6, 214:19, 215:7,
215:11, 215:20,
218:13, 218:14,
223:22, 224:1, 224:6,
225:14, 230:8, 230:9
**handbook** [2] -
36:19, 40:9
**handcuff** [2] -
183:19, 225:7
**handcuffed** [8] -
159:18, 164:11,
165:5, 165:15, 166:7,
225:5, 226:9, 226:10
**handcuffing** [38] -
157:13, 157:16,
157:19, 158:4,
158:12, 158:22,
159:3, 159:6, 159:15,
159:22, 161:5, 161:9,
161:16, 161:22,
162:4, 163:23, 164:2,
164:4, 164:14,
164:20, 165:4,
165:14, 165:21,
166:9, 166:21,
167:11, 167:20,
168:12, 168:18,
169:3, 169:17, 170:2,
172:20, 175:2, 175:7,
175:11, 177:15,
179:11
**handcuffs** [11] -
146:19, 164:1, 164:5,
164:9, 167:14, 169:2,
222:16, 225:16,
226:12, 226:14,
261:13
**handgun** [1] - 146:16
**handle** [1] - 148:9
**handled** [2] - 40:8,
76:19
**hands** [18] - 55:13,
89:16, 159:6, 159:15,
159:21, 161:11,
163:9, 163:12, 221:3,
221:7, 222:14, 224:8,
232:18, 232:20,
232:21, 232:23,
233:3, 254:15
**happy** [1] - 32:22
**harassment** [1] -
32:7
**harassments** [1] -
129:12

**hard** [7] - 136:7,
145:23, 146:1,
203:19, 236:19,
278:20, 279:10
**hardly** [5] - 100:12,
101:10, 102:7,
103:14, 284:14
**head** [13] - 11:1,
40:17, 42:12, 155:18,
183:20, 184:1, 184:3,
184:4, 184:6, 221:5,
235:20, 236:3, 239:5
**headquarters** [1] -
292:18
**health** [1] - 182:12
**hear** [38] - 113:11,
113:16, 128:21,
145:23, 146:2, 146:9,
151:16, 151:23,
152:1, 153:20, 154:1,
154:5, 182:20,
186:18, 193:19,
199:1, 199:9, 199:12,
199:17, 199:19,
199:20, 199:21,
203:6, 203:19,
234:19, 234:22,
234:23, 235:7,
235:11, 235:14,
235:19, 235:21,
236:2, 236:4, 236:19,
239:3, 239:6, 269:3
**heard** [21] - 95:4,
101:14, 150:9,
151:15, 151:16,
151:20, 151:23,
152:1, 153:23,
193:22, 201:2,
209:23, 211:6, 212:9,
235:8, 236:21, 262:1,
267:17, 287:13,
288:20
**hearing** [2] - 125:5,
146:9
**heavy** [1] - 141:15,
220:11
**height** [1] - 212:22
**Held** [3] - 90:21,
91:2, 91:8
**held** [1] - 14:22
**hello** [5] - 105:10,
109:8, 109:11, 110:14
**helmet** [1] - 239:17
**help** [4] - 91:20,
148:11, 168:17,
201:11
**hereby** [1] - 5:17
**HEREBY** [2] - 297:1,
298:7
**herself** [4] - 81:17,

85:4, 85:5, 85:9
**hesitated** [2] - 137:7, 137:11
**high** [3] - 19:5, 19:12, 99:4
**High** [1] - 19:8
**Highmark** [1] - 132:4
**himself** [2] - 163:21, 223:16
**hinder** [1] - 167:6
**hired** [8] - 22:11, 25:17, 100:2, 116:10, 116:14, 116:16, 116:22, 117:1
**hiring** [2] - 36:9, 36:17
**hit** [15] - 80:14, 180:5, 180:21, 181:2, 181:8, 188:8, 220:18, 220:23, 221:2, 222:10, 222:23, 223:15, 223:16, 235:19, 236:2
**hold** [15] - 69:18, 76:3, 94:7, 94:8, 124:22, 160:10, 184:1, 188:3, 234:9, 236:11, 250:23, 254:4, 255:10, 274:4, 291:21
**holding** [19] - 97:22, 132:14, 200:23, 201:1, 241:20, 289:16, 289:21, 290:2, 290:6, 290:9, 290:12, 290:13, 290:17, 290:20, 290:21, 290:22, 291:2, 291:4, 291:10
**Holding** [5] - 201:7, 201:17, 257:23, 261:11, 291:14
**home** [11] - 12:10, 12:21, 89:12, 123:3, 123:9, 126:16, 133:14, 134:10, 134:22, 135:4, 135:23
**honest** [2] - 105:14, 284:2
**honestly** [7] - 27:4, 40:23, 57:19, 91:8, 110:17, 274:17, 278:20
**honor** [1] - 41:8
**honored** [1] - 100:17
**hooded** [1] - 211:10
**hoodie** [2] - 212:8, 212:11
**hope** [1] - 41:15
**hopefully** [1] - 78:16

**horse** [1] - 142:22
**Horton's** [6] - 139:11, 152:9, 152:14, 152:17, 153:1, 154:2
**hour** [12] - 46:22, 47:3, 58:16, 58:17, 58:18, 79:6, 79:22, 81:3, 81:7, 144:14, 294:8, 294:10
**hours** [14] - 24:22, 30:19, 61:5, 61:8, 66:9, 82:16, 103:21, 119:17, 121:15, 134:9, 135:16, 136:3, 136:5, 186:8
**house** [1] - 12:23
**Howard** [28] - 3:6, 7:12, 36:1, 36:5, 98:13, 98:17, 98:19, 99:5, 99:7, 99:8, 99:9, 99:10, 99:13, 99:15, 99:16, 99:18, 99:22, 100:7, 110:3, 110:9, 110:22, 122:17, 259:21, 260:2, 265:2, 275:5, 275:6, 279:23
**HOWARD** [1] - 1:10
**Howard's** [4] - 99:13, 104:3, 264:10, 264:23
**HSBC** [6] - 22:16, 22:19, 22:22, 23:8, 23:10, 23:12
**huhs** [1] - 11:1
**human** [1] - 136:9
**hundred** [12] - 21:1, 118:14, 126:21, 126:23, 127:3, 127:4, 127:13, 132:11, 132:19, 198:7, 289:19
**hundreds** [3] - 14:17, 127:13
**hurling** [1] - 180:1
**hurried** [1] - 242:11
**hurt** [1] - 249:9

**I**

**idea** [7] - 94:20, 95:2, 96:1, 96:4, 137:4, 288:7, 293:21
**ideal** [1] - 53:1
**ideally** [3] - 156:16, 164:19, 164:23
**Identification** [1] - 2:4
**identification** [11] - 7:2, 49:11, 65:16, 149:16, 154:9, 172:4, 183:23, 234:2, 247:7, 248:5, 296:14

**identify** [1] - 7:17
**ideologies** [4] - 31:1, 31:8, 31:16, 35:2
**illegal** [1] - 130:18
**imagine** [3] - 152:22, 193:23, 226:21
**immediately** [4] - 167:2, 189:5, 194:3, 242:1
**impact** [6] - 220:8, 220:10, 220:11, 220:12, 220:15, 228:5
**impacted** [2] - 229:6, 244:12
**impacting** [1] - 227:16
**impede** [1] - 166:11
**important** [9] - 60:15, 67:6, 67:10, 156:6, 156:9, 156:13, 158:16, 168:2, 254:20
**improper** [4] - 46:5, 86:12, 281:20, 292:2
**in-depth** [1] - 108:7
**in-service** [1] - 66:9
**inaccurate** [3] - 228:13, 228:17, 228:18
**inches** [1] - 148:6
**incident** [34] - 10:4, 10:5, 11:11, 18:21, 28:15, 28:17, 75:8, 83:6, 83:8, 93:18, 96:22, 100:18, 129:21, 146:15, 175:9, 178:3, 178:9, 179:7, 180:9, 183:8, 205:1, 231:16, 238:13, 259:20, 262:9, 262:16, 262:22, 263:12, 268:2, 271:22, 277:10, 277:16, 279:6, 280:2
**incidentally** [1] - 124:16
**incidents** [1] - 144:1
**include** [5] - 22:14, 60:12, 156:10, 158:16, 255:1
**included** [1] - 254:22
**including** [4] - 66:22, 269:17, 269:23, 270:1
**income** [1] - 124:9
**inconvenience** [1] - 248:17
**incumbent** [1] - 39:18
**INDEX** [3] - 2:1, 3:1, 4:1

**index** [5] - 27:5, 71:8, 125:3, 280:21, 282:14
**indicate** [13] - 37:2, 52:5, 162:7, 228:7, 228:13, 228:15, 250:16, 252:10, 257:4, 257:13, 258:18, 264:11, 291:9
**indicated** [23] - 8:10, 14:4, 38:15, 51:16, 52:1, 85:12, 93:2, 105:20, 105:22, 106:19, 106:23, 116:13, 121:22, 135:3, 149:7, 203:6, 203:15, 209:20, 227:10, 247:11, 251:16, 254:10, 277:16
**indicates** [3] - 39:4, 41:13, 258:8
**indicating** [1] - 170:21
**indication** [4] - 29:16, 94:2, 105:6, 124:11
**individual** [6] - 66:11, 86:15, 155:11, 155:17, 166:10, 166:12
**information** [25] - 3:5, 27:9, 27:19, 27:20, 28:3, 48:13, 49:19, 51:2, 78:13, 87:17, 89:1, 96:23, 97:2, 132:9, 144:16, 171:23, 173:11, 188:18, 242:14, 248:7, 257:9, 257:22, 259:9, 295:9, 295:14
**Information/ Complaint** [2] - 2:14, 6:14
**informed** [1] - 84:1
**infraction** [7] - 69:4, 69:5, 77:22, 80:9, 80:12, 82:18, 82:23
**infractions** [3] - 69:9, 79:18, 79:21
**infringe** [2] - 30:21, 30:23
**initial** [2] - 39:5, 251:19
**initialing** [1] - 40:4
**injured** [4] - 80:16, 126:12, 181:16, 181:18
**injuries** [1] - 260:7
**injury** [3] - 18:7,

224:12, 224:13
**input** [2] - 246:4, 246:14
**inputted** [2] - 248:22, 249:23
**inquiring** [1] - 60:12
**inside** [5] - 104:1, 104:5, 132:14, 140:6, 217:22
**insolent** [1] - 53:10
**Instagram** [6] - 3:5, 26:19, 26:23, 27:1, 27:9, 27:13
**instance** [1] - 89:14
**instances** [1] - 154:20
**Institute** [1] - 76:5
**instructed** [1] - 84:6
**instrument** [1] - 177:14, 246:11
**instruments** [7] - 156:3, 156:7, 156:14, 174:19, 241:1, 244:2, 259:4
**insufficient** [1] - 86:12
**insurance** [2] - 4:9, 281:9
**intake** [1] - 289:22
**integrity** [2] - 41:9, 42:3
**intend** [1] - 214:14
**intended** [3] - 249:8, 268:3, 273:15
**intending** [1] - 268:13
**intent** [1] - 248:16
**interaction** [2] - 42:2, 211:13
**interactions** [1] - 210:8
**interested** [4] - 157:2, 157:6, 157:9, 157:11
**interfere** [1] - 92:16
**interfered** [2] - 171:14, 173:17
**interfering** [3] - 92:11, 92:14, 171:17
**interjected** [2] - 163:20, 163:22
**internal** [2] - 262:6, 262:10
**interpretation** [3] - 163:18, 169:1, 208:20
**interpreted** [3] - 106:13, 108:17, 253:7
**interrupt** [7] - 9:16, 13:11, 14:1, 27:16, 27:23, 59:14, 143:1

**interrupted** [2] - 12:18, 49:3
**interrupting** [2] - 76:6, 273:19
**interruption** [1] - 113:23
**interval** [1] - 58:10
**interview** [3] - 36:8, 36:15, 99:23
**intoxicated** [1] - 128:7
**introduce** [1] - 99:15
**investigate** [1] - 76:16
**investigated** [1] - 262:10
**investigation** [1] - 106:2
**investigations** [1] - 262:6
**invoke** [1] - 46:3
**involved** [6] - 8:6, 89:18, 91:17, 277:7, 277:8, 279:7
**involving** [2] - 249:8, 293:18
**iPhone** [2] - 266:12, 266:13
**Irish** [2] - 233:1, 233:3
**irrelevant** [1] - 217:1
**ish** [2] - 139:20, 233:9
**issue** [3] - 32:8, 33:13, 136:14
**issued** [1] - 38:22
**issues** [9] - 26:7, 84:3, 92:20, 119:16, 166:14, 166:15, 166:16, 282:14
**itself** [2] - 72:5, 127:22

## J

**jacket** [2] - 180:11, 180:13
**jail** [25] - 66:13, 68:6, 74:16, 77:1, 84:15, 84:17, 85:1, 85:13, 89:13, 89:17, 90:2, 92:10, 92:23, 93:5, 93:15, 189:20, 190:7, 195:4, 195:17, 196:9, 196:13, 196:17, 201:3, 201:4, 289:16
**jam** [1] - 20:8
**James** [3] - 7:13, 116:7, 116:9
**JAMES** [1] - 1:11

**January** [7] - 19:23, 21:10, 21:22, 21:23, 58:15, 59:1, 279:21
**Jim** [2] - 116:10, 116:12
**job** [18] - 21:19, 21:22, 25:1, 26:12, 66:11, 70:10, 70:13, 74:18, 76:17, 156:2, 204:16, 204:20, 205:4, 270:5, 273:15, 277:12, 283:23, 293:17
**jobs** [2] - 136:7
**Joseph** [2] - 5:12, 8:18
**JR** [4] - 1:2, 1:15, 297:11, 298:8
**judge** [21] - 8:10, 32:12, 32:19, 32:22, 33:2, 33:7, 33:10, 33:13, 34:1, 34:5, 34:12, 34:19, 34:21, 46:18, 115:1, 115:2, 115:11, 125:10, 294:12, 294:14
**judgment** [1] - 91:5
**judiciously** [1] - 49:21
**Julie** [1] - 80:5
**July** [3] - 2:8, 6:6, 267:10
**juncture** [1] - 166:19
**June** [18] - 2:5, 2:7, 2:10, 2:13, 6:2, 6:4, 6:7, 6:12, 25:6, 25:9, 25:17, 30:8, 30:9, 35:18, 35:20, 36:20, 77:4, 263:5
**jurisdiction** [1] - 91:19
**jury** [10] - 4:11, 107:20, 115:4, 115:11, 263:23, 264:3, 273:11, 276:23, 277:21, 282:7
**jury's** [2] - 273:17, 280:9
**justification** [1] - 74:1
**justified** [1] - 154:22

## K

**Kara** [3] - 181:21, 182:2, 182:5
**Keep** [1] - 3:6
**keep** [7] - 103:20, 114:16, 116:18, 181:10, 183:18, 236:15, 265:19

**Kelly** [3] - 18:10, 18:12, 124:17
**Ken** [8] - 20:13, 62:20, 69:17, 94:8, 95:22, 106:9, 186:21, 291:21
**Kenmore** [2] - 202:8, 202:19
**Kenneth** [8] - 7:10, 7:12, 20:12, 20:14, 26:22, 27:3, 29:11, 29:18
**KENNETH** [5] - 1:2, 1:10, 1:15, 297:11, 298:7
**Kenny** [15] - 20:13, 240:10, 285:23, 286:4, 286:7, 287:17, 288:5, 288:9, 288:15, 288:16, 288:22
**KEVIN** [1] - 5:6
**Kevin** [3] - 5:12, 8:2, 293:3
**kick** [8] - 235:1, 235:7, 235:11, 235:14, 238:1, 238:2, 238:5, 238:6
**kicked** [4] - 233:22, 237:3, 237:8, 237:11
**kid** [3] - 21:4, 195:12, 291:19
**kids** [6] - 26:8, 26:10, 83:17, 83:21, 84:11, 93:3
**kill** [2] - 51:7, 249:9
**kind** [25] - 31:10, 64:3, 67:19, 78:1, 79:1, 109:12, 112:1, 116:17, 116:18, 129:18, 147:12, 148:15, 191:3, 191:4, 191:5, 212:10, 212:23, 213:6, 213:7, 220:15, 222:17, 237:19, 249:6, 252:7, 277:11
**knock** [3] - 48:21, 193:19, 193:22
**knocked** [4] - 142:7, 189:8, 191:1, 191:14
**knocking** [1] - 191:6
**known** [10] - 20:11, 116:7, 116:9, 116:14, 116:15, 116:21, 230:13, 240:19, 284:5, 284:23
**knows** [2] - 42:20, 198:1

## L

**laced** [1] - 29:4
**lack** [1] - 136:9
**lady** [3] - 91:6, 142:21, 142:22
**language** [4] - 53:10, 246:19, 247:12, 247:15
**languages** [1] - 53:10
**lap** [1] - 211:19
**large** [1] - 153:3
**last** [37] - 9:5, 13:5, 14:14, 15:9, 15:12, 15:13, 17:9, 17:13, 54:9, 54:12, 54:14, 54:23, 57:16, 57:18, 79:15, 104:10, 104:14, 104:15, 104:20, 104:21, 114:4, 121:14, 124:1, 136:13, 160:1, 160:4, 176:4, 177:2, 177:7, 178:7, 178:13, 266:4, 282:5, 289:7, 294:13, 295:19, 296:6
**lasted** [1] - 232:4
**lastly** [1] - 257:2
**latter** [2] - 73:17, 177:4
**lavatory** [1] - 82:11
**law** [28] - 14:11, 56:5, 62:18, 63:16, 64:7, 64:8, 64:12, 64:21, 64:23, 65:8, 66:12, 66:18, 67:7, 67:10, 67:14, 69:1, 72:10, 72:12, 72:13, 74:2, 130:10, 130:19, 184:19, 185:11, 188:13, 268:8
**Law** [22] - 60:5, 60:9, 60:17, 60:22, 61:4, 61:6, 61:7, 61:15, 62:14, 62:19, 67:17, 67:20, 67:22, 68:11, 68:23, 72:5, 72:6, 73:2, 190:15, 190:21, 248:13, 257:3
**laws** [8] - 61:10, 61:13, 66:12, 69:10, 76:12, 76:14
**lawsuit** [10] - 17:17, 17:20, 18:1, 18:7, 18:9, 18:19, 18:20, 124:17, 125:2, 280:12
**lawyers** [1] - 58:5
**learn** [1] - 85:16
**least** [6] - 68:18,

97:5, 177:20, 196:20, 291:5, 292:20
**leather** [1] - 148:10
**leave** [11] - 90:6, 90:12, 113:20, 129:5, 129:7, 141:6, 200:1, 200:3, 211:23, 229:17, 258:1
**leaving** [1] - 18:2, 113:11
**led** [2] - 100:1, 145:16
**left** [19] - 114:2, 114:23, 115:2, 138:10, 160:14, 176:22, 211:17, 212:4, 212:16, 213:3, 214:19, 215:7, 218:13, 230:8, 256:10, 256:12, 294:12, 294:21
**legal** [2] - 58:6, 89:22
**length** [5] - 58:19, 148:3, 148:4, 148:6, 259:1
**less** [14] - 55:14, 56:12, 126:23, 133:10, 133:12, 136:4, 136:5, 143:21, 143:23, 148:4, 148:7, 226:16, 267:14, 267:16
**lethal** [3] - 55:14, 56:12, 154:21
**letter** [8] - 108:20, 262:19, 262:21, 274:14, 274:16, 274:20, 276:11, 278:3
**letters** [1] - 291:9
**level** [10] - 56:4, 56:8, 57:1, 57:2, 68:5, 68:21, 69:6, 76:1, 242:14
**levels** [4] - 55:19, 55:23, 56:1, 56:11
**levied** [2] - 241:4, 259:14
**levy** [1] - 247:11
**lick** [3] - 29:9, 29:20, 35:13
**life** [2] - 71:3, 87:11
**lifestyles** [1] - 53:13
**lifting** [1] - 184:7
**light** [2] - 180:11, 220:10
**likely** [6] - 130:4, 153:2, 153:3, 212:5, 212:14, 284:8
**likewise** [1] - 67:10
**Line** [2] - 3:4, 4:4

line [10] - 41:21, 95:16, 101:5, 101:19, 136:22, 143:14, 251:9, 251:10, 274:9, 295:5

lines [4] - 114:7, 126:6, 162:15, 176:20

lip [2] - 222:9, 222:18

Lisa [1] - 13:2

list [2] - 33:6, 125:16

listed [1] - 52:13

listen [1] - 31:13, 46:19, 167:15

listening [1] - 79:14

literally [2] - 69:6, 288:1

litigated [1] - 63:7

live [2] - 12:10, 12:12

living [1] - 12:21

LLP [2] - 5:2, 5:8

loaded [1] - 97:15

located [3] - 7:6, 7:15, 11:17

location [6] - 139:9, 140:9, 144:10, 197:6, 198:15, 220:16

locked [1] - 82:17

log [3] - 39:6, 39:8

long-sleeved [1] - 180:10

look [9] - 10:7, 191:6, 193:22, 205:7, 212:23, 237:19, 246:14, 246:21, 256:21

looked [4] - 17:2, 189:10, 193:23, 194:2

looking [11] - 43:4, 43:6, 48:15, 56:14, 124:10, 169:11, 173:9, 192:10, 211:15, 239:16, 283:20

looks [3] - 113:8, 113:10, 193:13

loop [1] - 148:11

lose [1] - 57:9

losing [2] - 148:12, 255:18

lost [2] - 215:22, 252:7

loud [6] - 144:20, 146:5, 203:19, 209:21, 209:22, 249:17

lower [3] - 68:21, 69:6, 160:14

Lowry [40] - 156:20, 156:22, 157:3, 157:14, 157:15,

159:18, 160:17, 164:6, 166:6, 166:21, 167:7, 171:22, 172:21, 173:13, 173:23, 174:12, 177:19, 179:13, 180:1, 180:15, 180:21, 181:3, 181:6, 181:14, 181:15, 182:21, 183:2, 183:7, 183:14, 184:12, 186:15, 187:13, 187:21, 191:13, 196:13, 201:6, 217:8, 241:20

Lowry's [7] - 157:5, 157:6, 166:20, 171:10, 171:14, 171:18, 171:20

## M

Machine [1] - 298:9

mad [1] - 121:16

magazines [1] - 146:17

magistrate [1] - 8:10

mail [1] - 46:23

Main [1] - 5:9

maintenance [1] - 41:14

majority [1] - 60:22

man [6] - 51:12, 51:20, 140:21, 141:1, 202:15, 202:16

maneuver [1] - 231:22

manner [4] - 49:20, 49:21, 232:21, 298:9

manual [1] - 36:23

March [2] - 2:11, 6:10

Marinaro [10] - 80:5, 80:7, 80:21, 81:1, 81:13, 83:1, 83:10, 83:20, 83:22, 84:10

Marinaro's [1] - 81:6

mark [1] - 235:1

marked [22] - 6:2, 6:4, 6:6, 6:8, 6:10, 6:13, 6:15, 6:17, 6:19, 6:21, 7:1, 65:15, 133:21, 134:2, 134:3, 137:20, 139:3, 149:15, 154:8, 257:20, 291:3, 296:13

MARKED [1] - 4:1

married [1] - 13:3

Massotti [5] - 181:21, 182:2, 182:5, 182:20, 183:1

materials [4] - 36:19, 36:22, 39:19, 53:17

math [1] - 127:4

matter [17] - 7:10, 68:8, 103:19, 122:13, 122:16, 125:1, 125:9, 214:8, 214:9, 216:16, 221:17, 237:16, 241:18, 241:19, 241:21, 260:2, 265:11

matters [1] - 68:9

McAskill [2] - 5:2, 7:21

mean [41] - 15:18, 42:5, 50:23, 55:6, 62:5, 73:3, 78:3, 80:2, 105:14, 105:16, 110:11, 119:13, 123:18, 125:17, 125:19, 158:7, 163:22, 174:17, 176:11, 188:23, 189:18, 198:14, 202:15, 209:5, 214:6, 218:1, 244:10, 249:12, 250:7, 253:3, 253:18, 254:15, 268:21, 269:22, 270:1, 270:12, 271:14, 283:21, 287:18, 288:2, 288:9

meaning [1] - 208:6

means [10] - 62:3, 250:8, 250:10, 256:13, 257:8, 287:20, 288:7, 288:16, 288:23, 298:9

meant [5] - 140:8, 174:20, 200:3, 288:13, 288:14

meantime [1] - 197:14

media [12] - 26:16, 27:14, 28:9, 28:12, 28:15, 30:5, 30:11, 30:22, 31:1, 31:9, 31:16, 33:12

medic [1] - 260:15

medical [2] - 260:5, 261:1

Medical [1] - 260:10, 260:19

medium [2] - 113:15, 220:11

meet [3] - 131:12, 194:11, 262:13

meeting [1] - 118:11

member [11] - 31:7, 31:11, 44:16, 44:20, 52:10, 58:7, 89:20,

89:21, 98:22, 147:21

members [2] - 38:23, 39:5

membership [1] - 39:17

memoranda [1] - 38:7

memorized [1] - 47:1

memory [5] - 18:15, 83:2, 180:19, 260:12, 260:14

mention [5] - 158:20, 159:1, 172:19, 177:15, 255:14

mentioned [4] - 30:4, 182:7, 230:16, 286:21

Merchants [1] - 7:7

mere [2] - 56:5, 155:12

merely [1] - 200:16

messages [1] - 280:8

messed [2] - 120:18, 239:14

met [3] - 117:12, 117:15, 131:16

Metro [1] - 260:17

Michaels [13] - 86:21, 89:7, 89:10, 92:3, 92:5, 93:10, 93:14, 94:4, 94:21, 96:7, 96:8, 96:9

Michelle [6] - 87:1, 87:18, 87:20, 88:2, 93:10, 96:9

mid [1] - 128:17

middle [4] - 10:18, 20:19, 20:20, 128:8

midsection [5] - 219:21, 221:11, 222:13, 230:14, 233:3

midway [1] - 189:13

might [7] - 10:22, 41:19, 96:18, 101:14, 157:13, 207:10, 265:12

miles [1] - 198:7

millimeter [1] - 147:6

mind [1] - 101:16, 228:20, 268:21

minimize [1] - 255:18

minimum [1] - 66:8

minus [2] - 79:1, 131:23

minute [5] - 95:22, 124:1, 230:7, 238:16, 246:6

minutes [33] - 29:12, 49:3, 59:16, 78:12,

78:16, 78:23, 79:4, 80:4, 124:4, 125:19, 137:16, 142:13, 142:14, 143:21, 143:23, 144:3, 144:9, 158:15, 174:16, 187:5, 191:18, 226:17, 229:4, 238:9, 238:10, 242:15, 242:17, 242:19, 242:20, 243:22, 264:6, 293:11

mis [2] - 292:17

mischief [4] - 172:7, 247:16, 255:6, 255:12

misconduct [1] - 263:14

misdemeanor [5] - 15:4, 21:13, 68:15, 72:17, 128:15

Misdemeanor [2] - 2:16, 6:18

misdemeanors [2] - 68:18, 275:20

miss [4] - 10:13, 25:8, 71:8, 82:19

Miss [24] - 13:4, 13:7, 14:5, 48:6, 80:7, 80:21, 81:1, 81:13, 83:1, 83:10, 83:19, 83:22, 84:9, 87:21, 88:21, 89:2, 89:7, 89:12, 125:3, 126:3, 175:19, 177:6, 182:20, 183:1

missed [2] - 236:11, 236:14

missing [1] - 256:9

mission [9] - 40:11, 40:15, 40:21, 41:5, 41:7, 41:10, 41:12, 41:22, 42:4

mistake [1] - 292:20

mistakenly [1] - 292:18

misunderstood [1] - 208:3

mom [1] - 93:1

mom's [2] - 12:23, 13:1

moment [2] - 112:20, 169:2

money [2] - 4:12, 282:8

monitor [1] - 64:11

month [1] - 24:18

months [3] - 23:2, 36:14, 75:1

morning [1] - 15:16, 15:22, 46:1, 46:15,

Kenneth P. Achtyl, Jr.

16

152:6, 152:17, 153:9
**most** [16] - 15:2,
15:6, 57:1, 73:5, 76:7,
115:9, 126:16, 128:3,
129:8, 130:4, 148:18,
153:2, 153:3, 212:5,
212:14, 284:8
**mother** [2] - 93:5,
93:10
**motion** [2] - 253:19,
253:23
**mouth** [4] - 10:13,
10:20, 209:4, 224:15
**move** [18] - 11:10,
48:8, 55:11, 70:12,
70:21, 103:22,
125:15, 128:1,
136:21, 140:8,
140:17, 167:4, 177:3,
187:21, 256:8,
256:10, 277:5, 277:15
**moved** [2] - 46:23,
212:10
**moving** [3] - 142:4,
192:11, 219:23
**MR** [375] - 7:21, 7:23,
8:2, 8:4, 8:9, 8:10,
8:19, 8:23, 9:5, 9:13,
9:16, 9:23, 13:11,
13:18, 13:22, 14:2,
14:3, 17:8, 17:12,
27:5, 27:8, 27:11,
27:12, 27:16, 28:1,
28:7, 31:2, 31:3,
31:17, 31:19, 31:23,
32:3, 32:6, 32:10,
32:13, 32:15, 32:16,
32:21, 33:3, 33:5,
33:8, 33:9, 33:11,
33:15, 33:18, 34:3,
34:7, 34:10, 34:13,
34:16, 34:23, 42:17,
42:20, 43:5, 43:8,
43:12, 45:6, 45:12,
45:15, 45:19, 45:23,
46:8, 46:14, 46:19,
47:7, 47:8, 47:9,
47:10, 47:12, 47:14,
47:18, 47:22, 47:23,
48:1, 48:2, 48:6, 48:8,
48:10, 48:19, 48:23,
49:6, 49:9, 51:4,
51:11, 59:14, 59:17,
60:3, 62:20, 63:1,
64:14, 64:15, 69:17,
69:20, 69:22, 70:3,
70:9, 70:13, 70:18,
70:23, 71:5, 71:7,
71:8, 71:11, 71:12,
73:13, 73:18, 73:19,

87:6, 87:7, 94:7,
94:10, 94:14, 94:16,
94:18, 94:19, 94:23,
95:1, 95:4, 95:6,
95:10, 95:13, 95:20,
95:22, 96:1, 96:3,
96:6, 100:23, 101:7,
101:10, 101:12,
101:14, 101:21,
101:22, 102:2, 102:3,
102:12, 102:13,
102:21, 103:4, 103:8,
103:12, 103:13,
103:14, 103:16,
103:18, 103:23,
106:9, 106:15,
108:12, 108:14,
108:19, 109:10,
109:15, 112:12,
112:13, 112:19,
113:2, 113:4, 113:5,
113:7, 113:8, 113:10,
113:18, 113:21,
113:22, 114:1, 114:4,
114:9, 124:22, 125:3,
125:5, 125:8, 125:14,
125:22, 126:1, 126:8,
128:16, 128:18,
128:20, 128:23,
129:3, 132:4, 132:5,
132:7, 136:12,
136:16, 136:17,
136:20, 136:23,
137:10, 137:13,
143:4, 143:7, 143:11,
143:16, 149:3, 149:6,
149:22, 150:3,
150:20, 151:14,
151:21, 152:5,
153:19, 159:8,
159:10, 159:12,
160:22, 161:4, 161:8,
161:15, 161:21,
162:3, 162:17,
162:18, 166:22,
166:23, 167:21,
167:8, 168:8, 169:9,
169:11, 169:14,
171:2, 171:3, 172:13,
172:15, 172:17,
172:23, 173:2, 173:4,
175:14, 175:16,
175:21, 175:22,
176:1, 176:4, 176:8,
176:11, 176:14,
176:17, 176:22,
177:4, 177:5, 177:10,
178:17, 178:20,
184:22, 185:3, 185:4,
185:12, 185:18,
185:19, 185:23,

186:2, 186:7, 186:21,
187:2, 187:12,
187:20, 188:3, 188:5,
192:4, 192:19, 193:4,
193:10, 193:18,
194:7, 194:18,
195:11, 195:16,
195:22, 196:6, 197:4,
197:9, 198:13,
198:19, 199:4,
199:16, 204:2,
204:13, 206:3,
206:14, 206:23,
208:13, 209:2, 222:5,
222:6, 223:17,
223:18, 228:23,
229:1, 229:17,
229:19, 230:2, 230:6,
231:4, 231:6, 231:8,
231:9, 234:6, 234:7,
234:8, 234:9, 234:12,
234:13, 234:18,
235:6, 235:10,
235:18, 236:1,
236:10, 236:18,
238:18, 239:2, 239:9,
239:20, 239:23,
240:8, 244:16,
244:17, 245:2, 245:7,
246:21, 247:5, 254:4,
254:6, 254:8, 274:7,
274:11, 280:17,
280:19, 280:20,
280:21, 281:1, 281:2,
281:11, 281:16,
281:22, 282:4, 282:6,
282:11, 282:13,
282:15, 287:19,
287:22, 288:1, 288:4,
288:8, 288:10,
288:12, 291:21,
292:1, 292:2, 292:4,
292:8, 292:11,
292:14, 292:23,
293:2, 293:4, 293:10,
294:2, 294:4, 294:6,
294:8, 294:11,
294:14, 294:19,
295:2, 295:8, 295:18,
295:21, 296:4, 296:8
**multiple** [1] - 54:19
**multiply** [1] - 126:20
**multiplying** [1] -
127:1
**multitude** [1] -
129:13
**music** [2] - 145:14,
145:19
**muted** [2] - 113:10,
295:5

# N

**nah** [1] - 150:14
**name** [22] - 3:5, 10:1,
12:16, 13:1, 13:3,
13:5, 18:12, 20:11,
20:16, 20:19, 20:20,
26:21, 27:9, 29:11,
139:2, 148:21,
148:23, 178:7,
178:12, 178:13,
259:15
**named** [7] - 80:5,
86:20, 86:23, 87:20,
90:20, 181:21, 182:5
**names** [1] - 20:15
**nanny** [3] - 80:8,
80:18, 81:2
**narrative** [7] -
176:12, 246:10,
250:11, 251:9, 255:7,
255:15, 256:4
**national** [1] - 53:12
**near** [5] - 88:3,
88:10, 91:15, 164:13,
279:6
**near-death** [1] -
279:6
**necessarily** [1] -
153:13
**necessary** [3] -
34:14, 55:13, 138:8
**neck** [9] - 155:18,
221:10, 221:14,
221:15, 221:16,
221:18, 221:20,
222:1, 231:17
**need** [21] - 28:4,
48:8, 48:19, 125:9,
127:23, 128:1, 140:7,
141:5, 141:6, 141:7,
141:18, 159:19,
162:22, 165:9,
167:22, 173:5,
178:12, 237:6,
255:13, 281:15,
281:17
**needed** [6] - 24:10,
24:19, 140:12, 184:5,
216:15, 242:1
**needs** [1] - 136:3
**negative** [4] - 245:4,
245:8, 245:11, 276:9
**negatively** [1] -
244:11
**Neil** [3] - 90:20,
90:21, 91:2
**NEIL** [1] - 90:20
**never** [10] - 87:11,
93:4, 116:10, 116:11,

118:9, 126:11,
217:18, 217:19,
221:16, 268:2
**NEW** [2] - 1:4, 298:1
**new** [1] - 116:18
**New** [45] - 1:17, 5:4,
5:7, 5:10, 7:7, 7:16,
9:19, 10:4, 18:2, 19:4,
19:9, 22:1, 60:5, 60:9,
60:17, 61:3, 61:23,
62:17, 64:12, 64:21,
65:8, 67:17, 67:21,
68:11, 69:1, 69:7,
72:4, 72:21, 73:2,
74:1, 74:3, 82:6,
130:9, 130:17, 132:2,
133:17, 190:18,
190:21, 248:13,
270:22, 271:2, 271:4,
272:8, 298:6
**news** [1] - 279:9
**News** [2] - 286:7,
286:10
**next** [9] - 12:1, 52:4,
165:17, 172:10,
173:11, 178:6,
198:14, 223:5, 240:6
**NFTA** [1] - 24:1
**Niagara** [2] - 23:15,
25:14
**Nicholas** [6] - 2:20,
5:11, 6:23, 7:11,
113:8, 114:2
**NICHOLAS** [3] - 1:6,
113:16, 113:19
**Nick** [10] - 8:17,
188:21, 189:3, 196:7,
197:5, 197:16,
198:14, 199:1,
240:14, 292:15
**nick** [2] - 113:13,
195:23
**nickname** [1] -
148:19
**nicknames** [2] -
21:2, 21:7
**night** [4] - 134:8,
134:13, 134:21,
135:22
**nightstick** [2] -
288:16, 288:23
**nine** [7] - 36:13,
147:6, 203:21, 204:3,
205:13, 206:1, 207:2
**nineteen** [21] - 75:5,
77:7, 77:8, 77:9,
127:2, 160:14,
161:18, 162:1,
165:20, 165:22,
167:8, 167:18,

168:10, 168:16, 169:12, 169:16, 169:22, 169:23, 171:1, 235:14, 289:15
**noise** [2] - 145:16, 249:17
**non** [7] - 55:14, 67:23, 68:7, 76:13, 120:2, 143:2, 154:21
**non-criminal** [2] - 67:23, 68:7
**non-emergency** [1] - 76:13
**non-lethal** [1] - 154:21
**non-responsive** [1] - 143:2
**non-work** [1] - 120:2
**none** [1] - 92:5
**normal** [3] - 91:16, 93:22, 155:10
**normally** [5] - 134:9, 134:17, 135:3, 139:8, 140:10
**north** [1] - 140:22
**North** [1] - 202:19
**nos** [1] - 111:22
**nose** [16] - 220:23, 221:2, 222:9, 222:18, 222:21, 222:23, 223:2, 223:6, 223:7, 223:14, 224:3, 224:8, 224:14, 224:16, 225:1, 226:20
**Notary** [4] - 1:19, 297:20, 298:5, 298:22
**note** [1] - 27:22
**noted** [2] - 32:4, 45:21
**notes** [2] - 9:1, 10:7
**nothing** [9] - 34:1, 70:15, 71:3, 94:1, 125:1, 138:10, 245:17, 292:23, 298:15
**noticed** [1] - 157:5
**notified** [1] - 90:15
**nowhere** [3] - 177:13, 200:17, 256:20
**number** [30] - 14:16, 27:8, 38:15, 43:23, 61:5, 66:11, 66:21, 68:6, 118:22, 119:2, 119:5, 123:5, 123:7, 123:9, 126:11, 127:5, 127:12, 132:17, 133:5, 133:7, 167:22, 168:2, 171:17, 246:4, 264:23, 266:14,

267:5, 267:13, 283:4, 290:3
**numbers** [1] - 291:9
**numerous** [5] - 83:23, 84:1, 127:13, 136:5, 144:1
**nurse** [1] - 182:9

**O**

**O-47** [2] - 2:12, 6:12
**oath** [8] - 5:18, 151:22, 165:3, 165:13, 166:18, 175:1, 222:20, 243:23
**object** [29] - 17:8, 31:2, 31:17, 31:23, 32:17, 42:17, 51:4, 64:14, 69:17, 69:18, 87:6, 94:7, 94:23, 102:2, 102:12, 102:21, 137:10, 162:17, 166:22, 171:2, 185:12, 186:2, 222:5, 228:23, 244:16, 245:2, 288:10, 291:21, 295:11
**objecting** [6] - 32:4, 32:6, 34:6, 49:6, 229:18, 295:18
**objection** [7] - 33:5, 45:19, 70:21, 281:19, 282:11, 287:19, 294:5
**objections** [2] - 5:21, 27:19
**objective** [1] - 44:18
**objectives** [1] - 41:16
**obligated** [1] - 295:15
**observed** [1] - 142:15
**observing** [1] - 208:21
**obstructed** [1] - 43:21
**obstructing** [3] - 157:23, 158:2, 172:10
**obstruction** [2] - 84:21, 256:3
**obtain** [1] - 41:16
**obtained** [1] - 49:19
**obviously** [10] - 16:12, 25:22, 33:19, 56:22, 79:12, 148:11, 179:2, 289:23, 290:13, 292:5
**occasion** [3] - 283:10, 284:11, 284:13

**occasions** [2] - 283:14, 285:6
**occupation** [1] - 182:10
**occur** [1] - 93:20
**occurred** [8] - 18:21, 100:19, 110:5, 129:22, 168:14, 169:2, 175:10, 290:4
**odd** [2] - 20:4, 198:7
**oddball** [1] - 134:18
**OF** [4] - 1:4, 1:9, 298:1, 298:3
**offense** [15] - 68:5, 68:7, 68:21, 69:6, 128:3, 128:12, 128:14, 129:6, 129:8, 129:9, 158:17, 171:21, 190:11, 202:15, 246:5
**offenses** [5] - 15:4, 76:17, 129:14, 174:15, 263:11
**offer** [2] - 23:5, 260:9
**offered** [8] - 23:3, 23:14, 23:18, 24:9, 34:21, 105:22, 157:14, 276:11
**offhand** [1] - 119:2
**Office** [9] - 2:20, 6:23, 25:4, 31:12, 44:16, 65:23, 74:12, 154:19, 251:5
**office** [25] - 14:23, 15:1, 25:6, 25:12, 25:18, 25:20, 26:12, 30:17, 35:19, 43:2, 54:20, 59:10, 75:16, 75:18, 77:7, 88:13, 104:1, 104:3, 104:6, 185:8, 186:5, 268:6, 282:17, 282:20, 284:7
**officer** [30] - 22:2, 22:3, 22:12, 54:16, 63:17, 67:7, 67:11, 67:15, 72:12, 74:3, 74:23, 75:4, 75:15, 75:23, 76:18, 84:3, 86:15, 86:20, 91:18, 91:19, 99:3, 130:11, 130:19, 138:12, 184:19, 185:11, 188:13, 190:17, 190:20, 277:8
**Officer** [5] - 16:1, 89:6, 92:3, 121:23, 233:21
**officer-involved** [1] - 277:8
**officers** [2] - 132:15,

132:16
**offices** [1] - 186:4
**official** [3] - 49:20, 49:22, 263:14
**officially** [2] - 272:9, 296:7
**often** [5] - 100:10, 102:6, 103:1, 103:8, 285:5
**old** [6] - 19:1, 87:22, 90:3, 90:6, 90:12, 92:23
**old's** [1] - 90:4
**once** [15] - 24:17, 24:18, 24:21, 89:20, 111:7, 115:19, 195:2, 224:16, 226:8, 230:19, 243:12, 260:10, 260:23, 290:8, 291:1
**one** [37] - 10:2, 13:16, 16:20, 17:18, 18:7, 24:5, 27:8, 27:18, 29:8, 29:19, 35:12, 41:1, 42:20, 44:11, 45:9, 46:15, 50:18, 50:19, 55:7, 59:18, 59:21, 65:13, 66:8, 66:11, 76:3, 80:16, 83:4, 88:23, 100:22, 105:11, 109:3, 109:4, 112:20, 115:15, 115:16, 143:5, 148:9, 150:21, 153:16, 155:9, 160:10, 160:13, 167:22, 172:8, 172:11, 175:22, 184:14, 186:13, 188:3, 208:7, 208:22, 214:10, 221:4, 234:10, 234:16, 236:11, 239:14, 246:22, 250:23, 258:17, 263:2, 274:4, 282:21, 292:20, 293:4, 295:7, 295:10, 295:11, 295:12
**one-forty-three** [1] - 59:21
**one-thirty-six** [1] - 59:18
**one-way** [1] - 83:4
**one-word** [1] - 143:5
**online** [3] - 30:15, 35:2, 40:10
**open** [14] - 4:5, 64:3, 69:12, 69:15, 70:6, 70:15, 71:1, 78:1,

112:1, 146:1, 179:22, 208:16, 208:18, 209:3
**open-ended** [4] - 64:3, 71:1, 78:1, 112:1
**opened** [6] - 207:8, 209:10, 209:13, 209:16, 210:3
**opening** [3] - 192:13, 209:6, 209:18
**operating** [1] - 138:7
**Operations** [2] - 2:12, 6:12
**operations** [1] - 66:13
**operator** [1] - 22:17
**opinion** [6] - 30:22, 30:23, 32:16, 33:16, 35:4, 187:1
**opportunity** [4] - 100:21, 163:19, 237:19, 290:19
**opposed** [3] - 186:23, 267:2, 278:6
**opposite** [1] - 140:22
**option** [2] - 213:17, 213:22
**options** [3] - 147:16, 210:16, 213:17
**Orchard** [6] - 82:6, 91:2, 91:6, 114:22, 200:10, 251:2
**Order** [12] - 2:5, 2:6, 2:8, 2:9, 2:11, 2:12, 6:1, 6:3, 6:5, 6:7, 6:9, 6:12
**order** [4] - 37:6, 38:3, 40:4, 44:6
**ordered** [1] - 231:2
**orders** [10] - 38:7, 38:16, 38:20, 38:22, 39:2, 39:13, 39:16, 39:20, 40:1, 40:2
**ordinance** [1] - 69:13
**ordinances** [4] - 69:8, 69:10, 69:22, 76:14
**orientation** [2] - 74:18, 74:20
**origin** [1] - 53:13
**otherwise** [3] - 12:7, 39:9, 155:11
**outcome** [8] - 84:6, 244:11, 244:13, 245:5, 245:8, 245:11, 275:18, 276:10
**outing** [1] - 80:9
**outside** [12] - 118:2, 118:7, 118:10, 132:12, 132:18,

Kenneth P. Achtyl, Jr.

132:20, 203:16,
209:21, 209:22,
264:19, 283:1, 285:2
**outstanding** [2] -
80:21, 89:3
**overtime** [5] -
123:22, 124:6,
124:12, 126:2, 134:20
**own** [7] - 12:10, 28:3,
93:4, 138:12, 145:14,
272:17, 294:20

**P**

**P.C** [2] - 5:5, 8:2
**P.M** [1] - 1:18
**p.m** [15] - 7:4, 59:18,
59:21, 112:14,
112:17, 125:12,
134:15, 187:7,
187:10, 246:23,
247:3, 293:5, 293:8,
294:15, 296:10
**packed** [1] - 146:5
**PADI** [3] - 76:1, 76:3
**page** [27] - 5:11,
30:9, 37:23, 38:5,
38:9, 38:13, 38:15,
44:10, 44:11, 45:8,
45:9, 46:20, 47:1,
65:17, 66:2, 66:3,
95:16, 101:5, 101:19,
114:7, 126:6, 143:14,
154:11, 176:20,
251:4, 274:9, 286:6
**Page** [2] - 3:4, 4:4
**pages** [1] - 297:2
**paid** [5] - 4:12,
124:12, 135:4,
152:21, 282:9
**palpably** [3] - 46:4,
281:20, 292:2
**paper** [1] - 40:9
**paperwork** [2] -
74:19, 259:16
**paragraph** [7] -
44:11, 49:12, 49:13,
49:16, 52:4, 53:6
**parent** [1] - 90:19
**Park** [12] - 80:10,
82:5, 82:6, 82:8,
82:13, 82:15, 91:2,
91:6, 114:22, 131:11,
200:10, 251:2
**park** [2] - 140:5,
290:19
**parked** [6] - 142:10,
143:18, 143:19,
144:4, 144:10, 290:15
**parking** [4] - 140:11,
140:14, 257:18,

290:20
**Parrotta** [3] - 5:12,
7:6
**part** [38] - 12:22,
15:6, 22:2, 22:3,
22:11, 22:12, 22:13,
23:19, 24:9, 24:17,
25:10, 26:12, 27:21,
37:17, 37:20, 50:2,
54:17, 54:18, 56:20,
57:11, 60:17, 67:2,
73:5, 76:7, 99:2,
101:15, 101:23,
112:22, 115:9, 136:6,
148:18, 156:2,
173:18, 173:23,
188:12, 236:11,
289:21, 293:20
**part-time** [13] -
12:22, 22:2, 22:3,
22:11, 22:12, 22:13,
23:19, 24:9, 24:17,
25:10, 26:12, 99:2,
136:6
**participate** [1] -
241:6
**participated** [1] -
287:10
**participating** [1] -
112:21
**particular** [4] -
116:15, 136:21,
164:17, 165:10
**parties** [4] - 5:16,
5:18, 7:18, 8:6
**partner** [3] - 131:4,
133:6, 133:9
**parts** [1] - 16:5
**party** [3] - 33:18,
118:14, 295:12
**pass** [1] - 221:2
**passenger** [1] -
83:11
**past** [1] - 125:12
**Pat** [6] - 99:5, 99:7,
99:8, 99:10, 99:13,
99:15
**patience** [4] - 52:6,
53:3, 218:10, 289:8
**Patrick** [2] - 35:22,
36:2
**patrol** [48] - 14:20,
14:23, 22:5, 74:15,
74:17, 74:22, 75:2,
75:4, 75:14, 75:15,
75:23, 76:7, 76:8,
76:10, 76:11, 76:18,
84:13, 132:13,
133:21, 137:20,
138:19, 139:3, 140:6,

140:18, 140:19,
141:8, 141:9, 141:17,
142:6, 158:9, 179:3,
183:18, 207:13,
211:12, 211:23,
217:2, 219:4, 225:13,
227:4, 233:13,
233:19, 237:3,
257:20, 258:2,
283:14, 284:9, 293:13
**patrolled** [1] - 88:11
**patrons** [1] - 213:19
**Paul** [6] - 20:19,
20:20, 26:22, 27:4,
29:11, 29:19
**pay** [3] - 152:16,
272:17, 286:9
**Penal** [21] - 60:5,
60:9, 60:17, 60:22,
61:4, 61:6, 61:7,
61:15, 62:13, 67:17,
67:20, 67:22, 68:11,
68:23, 72:4, 72:6,
73:2, 190:15, 190:21,
248:13, 257:3
**pending** [2] - 17:18,
32:14
**pension** [5] - 270:5,
270:16, 271:17,
272:6, 278:5
**people** [28] - 29:9,
29:21, 33:17, 35:14,
96:13, 96:16, 97:17,
115:11, 116:18,
116:19, 118:15,
127:18, 142:18,
142:19, 145:5, 145:8,
145:10, 145:13,
145:18, 164:20,
165:1, 165:17, 217:3,
219:3, 226:15, 243:9,
286:4, 290:10
**People** [1] - 286:8
**pepper** [1] - 146:18
**per** [2] - 108:8, 169:5
**perceive** [1] - 92:14
**perceived** [3] -
92:11, 219:2, 221:6
**perfectly** [2] - 58:2,
219:11
**performance** [1] -
53:8
**period** [12] - 37:11,
74:22, 87:4, 87:12,
116:23, 137:18,
215:19, 218:13,
233:12, 267:8, 272:1,
272:2
**permanent** [1] -
37:10

**permissible** [1] -
280:17
**person** [35] - 13:14,
28:22, 33:18, 33:19,
40:6, 49:16, 49:18,
57:8, 78:9, 79:13,
89:15, 89:16, 92:12,
92:16, 92:18, 98:3,
100:11, 110:20,
122:1, 130:7, 137:1,
146:8, 146:14, 165:5,
165:15, 165:17,
166:11, 181:21,
182:5, 190:2, 228:22,
253:8, 275:2, 275:3,
290:2
**personal** [8] - 18:4,
18:7, 53:13, 71:2,
87:10, 108:9, 124:8,
125:1
**personally** [11] -
4:12, 36:2, 36:5,
87:15, 98:20, 98:21,
98:23, 137:6, 137:8,
137:14, 282:9
**Persenius** [9] -
16:14, 16:18, 109:20,
110:3, 110:8, 110:19,
110:20, 110:21, 111:2
**personnel** [1] -
274:23
**pertain** [1] - 61:11
**pertaining** [1] -
93:19
**pertains** [1] - 165:6
**pertinent** [1] - 49:19
**phase** [3] - 59:1,
59:2, 59:4
**phases** [1] - 59:9
**phone** [36] - 3:7,
11:23, 12:1, 12:2,
100:3, 111:14,
118:20, 118:22,
119:2, 119:5, 119:6,
119:20, 119:23,
120:5, 120:8, 122:22,
122:23, 123:3, 123:5,
123:7, 123:9, 124:3,
225:14, 226:1,
264:23, 265:3,
265:20, 265:22,
266:2, 266:10, 267:5,
283:4, 283:6, 283:8,
284:20, 287:4
**Photograph** [2] -
2:21, 296:13
**physical** [8] - 55:17,
57:2, 146:14, 155:12,
210:22, 211:1, 249:8,
266:10

**physically** [1] - 249:4
**pick** [2] - 93:23,
131:5
**picked** [4] - 131:16,
137:20, 138:16,
138:21
**picking** [1] - 94:2
**picture** [5] - 29:15,
55:9, 192:9, 291:2,
291:4
**piece** [1] - 148:10
**Pinewood** [1] - 88:3,
88:10, 91:15
**Pinewoods** [1] -
88:15
**pissed** [1] - 261:3
**pistol** [1] - 147:6
**place** [15] - 91:5,
100:18, 106:1,
127:20, 167:7, 179:3,
186:10, 201:19,
222:16, 248:16,
250:9, 250:10, 262:6,
268:2, 277:17
**placed** [4] - 171:15,
175:10, 191:13,
275:19
**places** [1] - 145:11
**Plaintiff** [8] - 1:7, 5:4,
5:7, 7:11, 7:22, 8:3,
17:20, 18:6
**Plaintiff's** [1] -
280:12
**plan** [2] - 269:15,
269:16
**play** [18] - 150:18,
151:12, 151:18,
152:2, 160:6, 168:15,
173:13, 173:16,
173:23, 174:12,
174:14, 175:12,
192:2, 194:13,
199:11, 203:22,
235:2, 235:3
**played** [59] - 149:21,
150:2, 150:19,
151:13, 151:19,
152:4, 153:18,
160:21, 161:3, 161:7,
161:14, 161:20,
162:2, 168:5, 168:13,
168:20, 169:21,
175:3, 175:9, 188:2,
188:4, 192:3, 192:18,
193:3, 193:9, 193:17,
194:6, 194:17,
195:10, 195:15,
195:21, 196:5, 197:3,
197:8, 198:12,
198:18, 199:3,

199:15, 204:1,
204:12, 206:2,
206:13, 206:22,
208:12, 209:1, 234:5,
234:17, 235:5, 235:9,
235:17, 235:23,
236:9, 236:17,
238:17, 239:1, 239:8,
239:19, 239:22, 240:7
**playing** [1] - 145:14
**plea** [3] - 157:14,
162:8, 162:12
**plus** [1] - 131:22
**point** [114] - 11:11,
23:9, 24:8, 26:10,
29:14, 32:13, 34:5,
34:13, 40:8, 54:22,
57:22, 70:17, 70:18,
70:19, 71:2, 75:16,
83:19, 84:4, 84:9,
84:12, 84:23, 108:20,
111:16, 115:18,
131:5, 131:10,
131:17, 132:5, 140:5,
142:6, 145:4, 163:16,
165:23, 166:2, 166:3,
168:3, 169:6, 173:15,
173:16, 189:17,
189:23, 190:4, 190:6,
190:10, 191:9, 195:5,
195:9, 196:20, 198:3,
199:5, 199:10, 201:8,
203:8, 203:10,
203:11, 205:14,
206:7, 210:17, 211:7,
211:9, 212:10, 213:1,
213:5, 213:11,
213:12, 213:16,
214:5, 218:15,
218:16, 218:21,
219:17, 219:20,
220:7, 220:15,
220:21, 220:23,
221:3, 221:4, 221:9,
222:3, 222:8, 222:17,
225:5, 225:9, 225:15,
225:18, 225:21,
226:7, 230:18,
231:23, 232:8, 232:9,
232:11, 232:17,
232:18, 233:13,
237:10, 237:23,
242:2, 243:9, 257:3,
260:11, 260:23,
261:6, 261:8, 263:10,
276:11, 277:11,
277:13, 280:18,
292:5, 292:17,
293:20, 296:1
**pointed** [1] - 97:14

**points** [1] - 238:20
**Police** [7] - 22:2,
23:16, 23:20, 24:7,
24:12, 25:15, 25:20
**police** [33] - 19:22,
21:17, 21:18, 21:21,
21:22, 22:2, 22:3,
22:12, 42:1, 54:16,
91:18, 99:3, 99:5,
132:16, 134:2, 134:3,
154:13, 154:20,
155:9, 155:16, 164:7,
166:12, 171:15,
180:2, 190:3, 190:17,
190:20, 192:6,
209:17, 219:1,
227:11, 261:16, 270:8
**policies** [1] - 41:15
**policy** [11] - 30:12,
30:14, 30:18, 33:21,
36:23, 58:20, 66:21,
154:16, 154:17,
154:18, 154:19
**politics** [1] - 53:12
**populate** [1] - 246:18
**populated** [3] -
248:7, 248:14, 257:10
**populates** [1] -
247:12
**Portal** [2] - 2:18, 6:20
**portion** [6] - 17:14,
43:20, 240:6, 248:6,
250:5, 257:13
**position** [13] - 22:16,
23:3, 23:6, 23:7,
23:15, 23:19, 24:9,
57:8, 100:2, 103:16,
127:14, 292:8, 292:11
**positional** [2] - 57:4,
57:10
**positioned** [2] -
115:20, 224:17
**positions** [2] - 24:17,
24:20
**positive** [1] - 149:14
**possibility** [1] -
92:17, 120:14, 134:6,
134:8, 265:5, 278:21,
278:23
**possible** [5] - 78:6,
86:17, 92:13, 265:6,
265:15
**possibly** [6] - 117:7,
129:19, 225:1,
260:16, 266:3, 287:19
**post** [8] - 19:12,
30:4, 31:1, 35:2, 35:4,
35:5, 35:7, 35:9
**posted** [5] - 28:8,
29:7, 29:19, 29:22,

35:15
**posting** [4] - 29:23,
31:8, 31:15, 35:12
**posts** [5] - 28:14,
28:16, 28:18, 29:1,
29:4
**pounds** [1] - 21:1
**power** [1] - 45:12
**preface** [1] - 292:4
**preference** [1] -
176:23
**prejudice** [1] - 53:11
**preparation** [3] -
15:14, 17:6, 17:10
**presence** [4] - 56:5,
93:21, 141:19, 264:10
**present** [9] - 8:17,
90:22, 91:3, 91:11,
91:14, 109:17,
114:18, 285:7, 287:7
**PRESENT** [1] - 5:11
**pretty** [11] - 36:16,
46:12, 51:19, 103:2,
110:15, 111:6,
126:13, 162:16,
249:4, 249:14, 279:10
**previous** [11] -
59:23, 138:13,
138:15, 176:6, 177:8,
185:20, 187:18,
230:4, 268:7, 270:3,
270:4
**previously** [3] -
21:12, 279:16, 284:18
**primarily** [2] - 14:20,
107:20
**primary** [2] - 44:17,
44:20
**print** [1] - 241:23
**printer** [1] - 242:5
**Printout** [2] - 2:18,
6:21
**prisoner** [5] -
216:17, 216:18,
217:3, 218:1, 218:6
**private** [11] - 104:7,
104:10, 104:14,
104:15, 105:6,
105:10, 107:8, 108:1,
109:1, 111:1, 264:21
**privately** [4] -
109:16, 110:19,
110:21, 111:4
**privilege** [2] - 46:4,
281:20
**privileged** [1] - 292:3
**privy** [1] - 85:22
**probable** [7] - 61:16,
61:19, 61:23, 62:3,
62:7, 214:4, 214:9

**problem** [9] - 10:19,
14:2, 28:1, 114:1,
173:18, 231:8, 234:9,
235:4, 266:1
**procedure** [6] -
36:23, 58:20, 154:16,
154:17, 155:6, 155:7
**Procedure** [2] - 1:16,
62:19
**procedures** [4] -
38:10, 41:15, 49:22,
65:23
**proceed** [1] - 7:20
**proceedings** [2] -
107:10, 113:15
**process** [14] - 36:8,
36:13, 36:17, 40:8,
74:20, 100:1, 163:21,
167:6, 206:10,
207:12, 243:3, 257:17
**proclamation** [4] -
100:18, 101:12,
102:1, 103:5
**profane** [1] - 53:9
**profanities** [3] -
28:8, 258:3, 258:9
**profanity** [15] - 29:5,
30:14, 91:22, 97:4,
97:10, 97:11, 97:19,
97:21, 98:5, 98:7,
204:9, 204:19, 205:6,
205:10, 205:14
**professional** [4] -
41:18, 76:4, 262:1,
262:5
**professionalism** [1]
- 42:3
**profile** [2] - 29:14,
31:9
**promoted** [2] -
283:21, 283:22
**promoting** [1] - 42:1
**promotion** [2] -
77:11, 77:12
**prompt** [1] - 41:16
**proper** [6] - 70:23,
90:8, 90:10, 282:2,
294:5, 294:15
**properly** [17] - 49:21,
53:14, 66:15, 67:7,
90:17, 138:7, 138:14,
147:17, 155:1,
155:19, 241:15,
241:22, 242:16,
242:18, 244:1, 258:6,
270:8
**property** [1] - 293:22
**prosecutors** [1] -
114:20
**protect** [1] - 188:13

**prove** [2] - 281:15
**provide** [8] - 41:22,
64:8, 64:22, 64:23,
65:2, 65:3, 65:7, 67:3
**provided** [7] - 36:18,
36:22, 39:16, 42:13,
47:3, 53:16, 257:22
**provider** [2] - 123:5,
123:9, 266:16
**providers** [1] -
266:19
**provocation** [1] -
53:5
**Public** [4] - 1:19,
297:20, 298:5, 298:22
**public** [10] - 41:18,
41:23, 45:2, 45:18,
48:14, 50:13, 50:16,
50:21, 188:14, 248:17
**publicly** [1] - 280:1
**pull** [9] - 37:12,
65:13, 73:9, 90:1,
168:23, 211:10,
213:6, 222:14, 252:19
**pulled** [6] - 88:22,
169:7, 230:19,
230:22, 231:21, 256:4
**pulling** [6] - 73:8,
80:7, 86:23, 87:19,
223:11, 223:12
**punched** [1] - 142:22
**punitive** [10] - 4:8,
4:8, 4:10, 4:11,
280:13, 280:16,
281:6, 281:10, 282:7
**purchase** [2] - 153:1,
153:7
**purchased** [1] -
153:6
**pursuant** [1] - 1:15
**push** [9] - 218:19,
218:21, 219:3, 220:5,
221:23, 222:14,
231:12, 233:18, 252:5
**pushed** [12] - 175:8,
221:9, 227:10, 228:5,
229:5, 229:15,
232:16, 237:16,
251:23, 252:21,
253:2, 258:20
**pushes** [1] - 286:4
**Pushes** [1] - 286:8
**pushing** [14] -
218:23, 219:1,
219:17, 219:22,
220:2, 220:13,
220:14, 220:17,
227:15, 228:20,
229:9, 232:3, 286:1
**put** [30] - 8:21, 9:4,

9:13, 27:8, 33:6, 51:8,
57:8, 97:20, 100:18,
134:20, 163:9,
163:12, 164:6, 164:9,
168:3, 170:10,
170:13, 176:5,
212:18, 212:20,
214:19, 215:1,
215:19, 225:23,
230:9, 231:17, 238:4,
244:9, 246:7, 252:3
  **putting** [1] - 83:20
  **pyramid** [3] - 55:16,
56:21, 56:22

**Q**

  **quadrants** [1] -
141:1
  **quality** [1] - 41:23
  **quarter** [3] - 148:8,
208:1, 208:7
  **quarters** [3] -
207:19, 207:22,
207:23
  **questioning** [1] -
71:1
  **questions** [51] -
5:22, 10:5, 10:16,
11:9, 11:12, 12:8,
32:11, 32:20, 32:21,
32:23, 33:16, 33:22,
34:3, 34:9, 34:17,
34:18, 37:13, 44:10,
70:11, 70:14, 73:7,
73:8, 98:12, 102:18,
103:20, 114:10,
114:12, 128:9, 129:2,
190:8, 197:13,
201:13, 215:18,
218:12, 219:9,
219:10, 219:15,
257:7, 281:16, 289:7,
294:11, 294:13,
294:21, 295:4, 295:6,
295:11, 295:13,
295:16, 295:20, 296:5
  **QUESTIONS** [1] - 4:1
  **quick** [9] - 135:8,
135:10, 135:18,
137:1, 137:9, 138:11,
231:16, 233:10, 274:2
  **quickly** [1] - 137:3
  **quite** [2] - 43:2,
212:22
  **quote** [12] - 29:7,
29:19, 35:12, 41:22,
92:3, 196:2, 248:15,
249:8, 249:16,
249:18, 287:16,
288:17

**R**

  **race** [2] - 32:2, 53:12
  **racist** [14] - 28:11,
28:20, 28:21, 28:22,
29:1, 31:1, 31:8,
31:16, 31:20, 31:21,
32:15, 33:4, 35:2,
35:4
  **racists** [1] - 33:17
  **raise** [3] - 77:13,
218:2, 252:21
  **raised** [11] - 197:20,
202:14, 232:18,
232:20, 232:21,
251:20, 251:21,
251:22, 252:20,
253:1, 253:2
  **raises** [3] - 77:14,
77:15, 253:8
  **raising** [1] - 249:3
  **rallies** [3] - 29:8,
29:20, 35:13
  **rambunctious** [1] -
142:20
  **ramifications** [1] -
276:21
  **range** [3] - 59:5,
71:1, 131:23
  **rank** [2] - 77:12,
178:8
  **rapidly** [1] - 56:23
  **rarely** [1] - 126:11
  **Rath** [1] - 74:21
  **rather** [5] - 53:10,
125:16, 240:21,
248:10, 261:9
  **raucous** [1] - 145:21
  **reach** [2] - 212:17,
216:21
  **reached** [22] -
157:12, 157:16,
158:21, 159:2, 161:5,
161:9, 161:16,
161:22, 162:4,
163:23, 164:1,
167:10, 168:23,
169:3, 169:17, 170:1,
211:9, 212:11,
212:19, 213:3, 220:7,
220:15
  **reaching** [18] -
157:19, 158:3,
158:11, 159:6,
159:15, 159:21,
167:14, 167:20,
168:11, 168:18,
169:1, 169:6, 172:20,
175:2, 175:7, 175:11,
177:15, 179:11

  **reaction** [1] - 185:13
  **read** [55] - 8:5, 42:6,
43:11, 44:15, 45:8,
45:10, 45:22, 46:9,
46:12, 47:6, 47:20,
51:23, 53:14,
60:1, 65:3, 65:10,
66:6, 66:15, 95:16,
101:1, 101:5, 101:19,
114:8, 126:4, 126:7,
143:4, 143:8, 143:14,
155:1, 155:19,
172:13, 173:1,
175:19, 176:4, 176:7,
176:9, 176:13,
176:15, 176:21,
177:6, 177:9, 185:18,
185:21, 187:16,
187:19, 230:2, 230:5,
251:14, 255:16,
255:23, 258:6, 274:7,
274:9, 297:1
  **reading** [3] - 53:6,
66:7, 101:16
  **ready** [4] - 97:19,
139:18, 140:12,
273:23
  **realize** [3] - 115:12,
115:14, 238:7
  **realized** [1] - 195:2
  **really** [16] - 27:1,
80:1, 85:23, 108:3,
108:7, 124:22,
127:12, 185:14,
201:10, 219:5,
220:14, 259:8,
283:21, 286:9, 292:7,
294:22
  **rear** [8] - 18:3, 18:10,
124:18, 212:12,
212:21, 261:16,
290:12, 290:17
  **rear-end** [1] - 124:18
  **rear-ended** [2] -
18:3, 18:10
  **reason** [60] - 18:14,
20:17, 26:5, 28:2,
28:19, 29:21, 61:21,
62:6, 62:8, 62:9,
68:14, 81:4, 81:8,
81:11, 81:21, 85:3,
85:10, 86:4, 89:22,
92:4, 95:11, 100:7,
105:3, 116:15,
116:17, 118:5,
121:19, 140:7,
140:17, 163:15,
170:17, 170:19,
172:22, 182:13,
182:18, 183:3, 183:5,

184:16, 185:1, 185:5,
186:20, 191:18,
200:19, 201:9,
202:10, 216:10,
221:16, 245:8, 245:9,
249:10, 249:18,
263:6, 263:7, 268:17,
273:8, 273:12,
285:16, 285:22,
288:17, 289:1
  **reasonable** [2] -
58:2, 188:17
  **reasons** [17] - 75:10,
85:22, 86:8, 95:18,
120:2, 165:16, 173:9,
186:12, 186:13,
277:4, 294:19
  **recalled** [1] - 189:18
  **recalling** [1] - 34:10
  **receipt** [2] - 39:5,
39:6, 39:7
  **receive** [9] - 27:21,
46:15, 57:10, 60:8,
61:3, 77:15, 124:18,
272:19, 272:21
  **received** [19] - 6:2,
6:4, 6:6, 6:8, 6:10,
6:13, 6:15, 6:16, 6:19,
6:21, 7:1, 46:1, 61:5,
103:5, 124:20, 227:6,
270:13, 279:7, 296:13
  **receiving** [2] - 40:1,
272:13
  **recess** [4] - 59:20,
112:16, 187:9, 293:7
  **recite** [1] - 40:16
  **recklessly** [1] -
248:18
  **recognize** [8] -
48:21, 48:23, 49:4,
189:12, 189:16,
189:22, 190:1, 194:3
  **recognized** [3] -
190:5, 194:22, 195:6
  **recollection** [7] -
26:5, 43:10, 73:15,
90:23, 131:14, 160:1,
264:19
  **recommended** [1] -
155:16
  **record** [35] - 8:14,
9:6, 11:2, 13:13,
27:17, 27:23, 32:5,
45:21, 48:6, 49:8,
59:19, 59:22, 103:19,
106:23, 111:21,
112:12, 112:15,
112:18, 125:7, 125:9,
136:21, 149:5, 182:9,
182:13, 187:8,

187:11, 246:22,
247:1, 247:2, 247:4,
280:23, 293:6, 293:9,
296:11
  **recorded** [4] - 7:9,
9:12, 90:17, 285:23
  **recording** [3] -
13:19, 113:14, 113:19
  **recordings** [1] -
13:22
  **records** [1] - 263:19
  **recovery** [2] - 76:1,
76:2
  **reduced** [1] - 298:10
  **reels** [1] - 279:9
  **refer** [5] - 47:19,
153:21, 154:6,
186:22, 200:8
  **Referee** [1] - 5:19
  **referenced** [2] -
37:18, 73:1
  **referred** [4] - 144:22,
148:21, 149:8, 201:1
  **referring** [20] - 18:9,
35:10, 68:23, 84:8,
89:15, 116:1, 150:5,
150:9, 152:8, 152:9,
152:13, 171:20,
172:1, 174:19, 176:1,
182:1, 196:12,
245:12, 259:5, 259:8
  **reflect** [1] - 39:11
  **reflects** [3] - 9:2,
73:14, 273:6
  **refrain** [1] - 91:21
  **refresh** [5] - 26:5,
66:23, 90:23, 160:1,
264:18
  **refreshers** [1] -
60:12
  **refuse** [2] - 258:1,
261:1
  **refused** [5] - 81:20,
260:11, 260:12,
260:14, 260:20
  **regard** [10] - 10:3,
10:21, 32:3, 79:21,
106:6, 118:13,
119:21, 205:9,
262:16, 282:5
  **regarding** [9] - 10:5,
18:1, 21:15, 45:4,
61:3, 124:17, 241:3,
263:11, 275:16
  **regards** [32] - 51:5,
51:14, 51:15, 52:2,
52:20, 58:20, 60:13,
61:5, 61:9, 61:11,
67:16, 81:11, 91:1,
91:9, 97:2, 100:3,

105:9, 111:8, 122:7, 127:21, 133:8, 135:23, 172:1, 173:8, 175:6, 223:4, 244:9, 259:3, 265:12, 275:17, 277:10, 292:22
**regular** [1] - 231:4
**related** [17] - 26:7, 26:8, 28:16, 30:16, 54:19, 55:18, 77:22, 79:3, 79:4, 93:22, 94:1, 119:16, 119:21, 120:2, 120:16, 283:18, 284:7
**relates** [1] - 281:22
**relating** [1] - 174:18
**relative** [6] - 96:22, 139:23, 158:11, 171:18, 171:22, 298:16
**relatively** [2] - 233:10, 238:12
**relevance** [2] - 281:11, 281:18
**relevant** [7] - 70:1, 70:13, 103:13, 156:11, 158:17, 170:23, 185:14
**religion** [1] - 53:12
**reloaded** [2] - 97:16, 97:18
**relocate** [1] - 23:6
**remain** [1] - 140:6
**remarried** [1] - 13:8
**remember** [36] - 20:9, 35:7, 35:9, 36:15, 58:1, 80:7, 81:13, 81:17, 83:6, 83:8, 83:9, 83:10, 83:13, 83:16, 83:19, 83:22, 85:6, 87:18, 87:19, 88:1, 89:2, 89:8, 92:2, 106:17, 106:18, 107:3, 107:5, 107:17, 114:22, 115:17, 115:19, 117:10, 117:14, 153:9, 181:23, 186:8
**remote** [2] - 8:7, 114:2
**Remote** [1] - 1:14
**remotely** [1] - 8:8
**rendered** [2] - 4:8, 281:7
**repatriations** [3] - 29:9, 29:21, 35:14
**repeat** [13] - 31:5, 31:18, 64:18, 94:14, 95:13, 101:1, 122:7,

174:7, 185:16, 228:14, 229:3, 243:8, 275:11
**repeatedly** [1] - 294:17
**repetitive** [1] - 114:14
**rephrase** [18] - 52:20, 53:20, 60:21, 62:22, 63:3, 64:4, 64:17, 71:22, 72:2, 94:18, 104:2, 122:6, 122:7, 174:6, 185:3, 292:12
**reply** [1] - 195:17
**report** [17] - 49:18, 159:2, 170:13, 170:14, 171:15, 228:7, 228:11, 228:15, 247:22, 250:16, 251:6, 251:16, 252:10, 254:9, 254:23, 258:17, 258:18
**REPORTER** [10] - 8:6, 8:17, 8:21, 9:4, 9:15, 13:19, 27:7, 27:10, 48:7, 71:10
**reporter** [16] - 7:14, 7:19, 60:2, 95:17, 101:6, 101:20, 114:8, 126:7, 143:15, 176:7, 176:21, 177:9, 185:21, 187:19, 230:5, 274:10
**REPORTING** [1] - 1:17
**reporting** [4] - 251:11, 251:12, 252:12, 252:14
**Reporting** [1] - 7:15
**reports** [1] - 75:21
**represent** [3] - 7:18, 151:8, 256:19
**representing** [1] - 151:22
**represents** [2] - 10:2, 295:10
**request** [1] - 123:19
**requested** [16] - 59:23, 93:23, 95:15, 101:4, 101:18, 114:6, 126:5, 143:13, 176:6, 176:19, 177:8, 185:20, 187:18, 213:18, 230:4, 274:8
**requests** [7] - 10:9, 27:6, 27:19, 27:20, 48:13, 49:17, 188:17
**REQUESTS** [1] - 3:1

**require** [8] - 62:12, 62:16, 64:5, 64:11, 64:19, 74:10, 74:13, 147:11
**required** [7] - 40:2, 45:1, 58:11, 63:19, 66:8, 73:21, 154:21
**rescue** [1] - 76:2
**reserve** [2] - 24:7, 27:18, 34:7
**reserved** [1] - 5:22
**residence** [1] - 11:17
**residents** [2] - 44:18, 44:21
**resides** [1] - 12:22
**resign** [5] - 272:23, 274:14, 277:2, 277:4, 279:3
**resignation** [15] - 272:14, 275:4, 275:5, 275:7, 275:9, 275:10, 275:13, 276:1, 276:6, 276:11, 276:14, 276:20, 277:20, 278:2, 289:13
**resigned** [7] - 77:5, 77:6, 272:9, 273:7, 273:15, 273:18, 276:22
**resigning** [2] - 278:7, 278:10
**resisting** [6] - 155:11, 158:1, 158:3, 184:9, 257:2, 257:4
**respect** [3] - 32:2, 70:9, 136:13
**respective** [1] - 5:18
**respond** [8] - 28:5, 48:12, 140:12, 140:13, 188:17, 240:11, 274:1, 274:4
**responded** [2] - 196:16, 286:3
**responding** [1] - 128:9
**response** [2] - 194:19, 197:10
**responses** [1] - 10:21
**responsive** [5] - 103:6, 103:7, 143:2, 143:7, 143:11
**rest** [2] - 37:21, 128:22
**restate** [1] - 52:1
**resting** [1] - 293:3
**restricted** [1] - 290:20
**result** [4] - 183:8, 238:1, 238:2, 244:6

**resulted** [2] - 173:19, 174:21
**resulting** [1] - 18:2
**retention** [1] - 38:16
**retire** [2] - 271:14, 278:12
**retired** [2] - 86:20, 89:6
**retirement** [5] - 270:23, 271:2, 271:5, 271:19, 272:8
**return** [1] - 39:6
**returned** [3] - 273:11, 278:19, 278:23
**returns** [2] - 4:11, 282:7
**reverse** [1] - 182:22
**review** [6] - 15:14, 39:13, 39:19, 66:12, 66:17, 163:20
**reviewed** [11] - 15:21, 16:1, 16:3, 16:18, 16:20, 16:22, 17:5, 17:9, 37:2, 46:2, 159:14
**reviewing** [1] - 40:1
**rewind** [1] - 198:23
**Ridge** [8] - 80:10, 82:5, 82:7, 82:13, 82:15, 131:11, 131:16, 134:23
**rifle** [14] - 59:7, 147:4, 216:16, 216:19, 216:21, 217:1, 217:4, 217:9, 217:13, 217:14, 217:22, 218:1, 218:7
**right-hand** [4] - 37:19, 65:20, 149:19, 150:22
**right-sided** [1] - 43:22
**ring** [1] - 18:10
**riot** [2] - 142:21, 146:10
**riotous** [3] - 142:20, 144:22, 146:5
**risk** [1] - 248:18
**road** [6] - 81:2, 128:6, 129:6, 132:13, 200:14, 200:18
**Road** [6] - 7:7, 87:20, 128:6, 128:9, 140:2, 202:23
**roadway** [1] - 128:11
**Rochester** [1] - 7:7
**rode** [1] - 221:13
**role** [3] - 174:14, 175:3, 175:12

**rolled** [2] - 208:6, 208:7
**room** [3] - 11:19, 107:8, 264:21
**rough** [3] - 87:4, 87:13, 269:16
**roughly** [11] - 22:8, 75:22, 132:18, 148:6, 189:13, 190:6, 233:9, 267:20, 268:5, 272:5
**rounds** [1] - 97:16
**routine** [4] - 46:12, 78:22, 79:1, 139:6
**rule** [4] - 37:10, 51:10, 52:12, 52:15
**rules** [18] - 42:8, 42:9, 42:15, 42:21, 43:1, 43:6, 43:9, 43:13, 44:8, 45:5, 45:17, 47:15, 48:11, 50:2, 50:5, 50:8, 50:19, 51:14
**Rules** [1] - 1:16
**ruling** [1] - 71:9, 125:13
**rummage** [1] - 84:2
**run** [4] - 211:7, 211:9, 212:7, 212:10
**running** [2] - 51:6, 51:13
**runs** [1] - 202:18
**Rural** [1] - 260:17
**rushed** [3] - 244:3, 244:6, 244:20

**S**

**safe** [4] - 42:1, 90:8, 90:10, 165:7
**safety** [4] - 41:18, 41:23, 84:3, 138:12, 165:16
**Salamanca** [8] - 22:12, 22:15, 22:22, 23:1, 23:2, 23:4, 24:20
**salary** [3] - 272:16, 272:19, 272:21
**sandwich** [3] - 152:10, 153:2, 153:12
**sat** [2] - 115:6, 115:12
**Saturday** [1] - 134:16
**sausage** [9] - 149:11, 152:6, 152:9, 152:13, 152:16, 153:2, 154:3, 154:6
**saved** [1] - 119:5
**saving** [1] - 266:1
**saw** [15] - 16:5,

16:11, 100:12, 100:16, 102:23, 103:8, 103:10, 156:17, 160:2, 160:3, 163:15, 168:21, 169:6, 170:5, 224:14
**sawed** [1] - 97:15
**sawed-off** [1] - 97:15
**scale** [1] - 68:17
**scenario** [2] - 84:7, 164:20
**scene** [8] - 89:11, 91:4, 91:20, 93:11, 93:18, 260:10, 260:14, 260:18
**schedule** [4] - 24:10, 24:23, 58:15, 153:14
**school** [3] - 19:5, 19:12, 99:4
**School** [1] - 19:8
**schools** [2] - 55:22, 56:1
**scope** [1] - 93:22
**screen** [21] - 3:5, 9:8, 10:14, 27:9, 29:11, 37:16, 38:14, 43:19, 44:2, 49:14, 65:18, 160:8, 173:2, 191:21, 231:4, 246:19, 247:13, 250:21, 255:8, 255:17, 291:6
**scroll** [12] - 38:5, 38:12, 49:12, 50:9, 66:2, 154:15, 239:20, 251:4, 251:8, 256:3, 256:18, 291:8
**scrolled** [1] - 234:15
**scrolling** [2] - 155:6, 155:15
**scrub** [7] - 160:13, 188:1, 191:23, 203:21, 234:2, 235:22, 238:15
**scuba** [1] - 76:2
**se** [2] - 108:8, 169:5
**sea** [1] - 145:5
**seamlessly** [1] - 11:14
**search** [1] - 246:8
**seat** [1] - 90:3
**second** [21] - 56:8, 59:2, 65:13, 76:3, 88:23, 112:12, 114:15, 124:22, 160:10, 199:2, 208:15, 234:10, 236:11, 246:22, 250:23, 251:9, 263:20, 266:6, 268:19, 274:4, 293:4

**seconds** [11] - 198:23, 216:9, 216:13, 217:16, 217:19, 218:5, 231:14, 232:2, 232:5, 233:9, 233:17
**seconds-ish** [1] - 233:9
**section** [3] - 61:12, 155:9, 246:4
**sections** [1] - 61:6
**secure** [2] - 26:11, 183:18
**secured** [1] - 184:7
**security** [1] - 22:16
**see** [81] - 37:15, 37:17, 37:20, 37:22, 38:10, 38:14, 38:19, 42:5, 43:18, 43:22, 44:1, 45:14, 47:13, 49:13, 50:9, 65:17, 66:3, 73:17, 87:18, 89:1, 100:10, 101:3, 103:1, 105:23, 114:19, 143:11, 150:22, 151:1, 154:10, 154:16, 154:17, 154:22, 155:6, 155:13, 159:5, 159:23, 160:7, 160:11, 160:12, 160:15, 161:11, 161:23, 167:9, 172:4, 179:20, 179:21, 183:23, 189:10, 191:2, 191:21, 193:12, 199:11, 208:10, 224:18, 228:11, 231:22, 234:11, 247:16, 250:20, 250:22, 251:1, 251:4, 254:17, 255:7, 255:9, 255:11, 255:12, 256:1, 256:2, 256:4, 256:16, 256:17, 257:6, 264:12, 284:8, 284:11, 284:13, 291:4, 291:7, 291:8
**seeing** [3] - 115:17, 234:6, 234:8, 255:4, 286:6
**seeking** [1] - 280:13
**Segalla** [1] - 7:23
**SEGALLA** [1] - 5:8
**select** [3] - 246:9, 246:15, 247:10
**selected** [1] - 248:12
**selection** [1] - 107:20

**send** [2] - 28:4
**sense** [3] - 35:9, 192:14, 268:8
**sentence** [6] - 39:11, 42:20, 43:1, 43:4, 52:9, 52:18
**sentenced** [2] - 279:20, 279:23
**separate** [3] - 54:18, 132:12, 257:18
**separated** [1] - 216:18
**separately** [1] - 131:9
**September** [16] - 17:15, 77:6, 104:13, 104:17, 105:2, 105:20, 111:12, 112:6, 112:7, 120:19, 120:20, 120:23, 122:4, 263:23, 264:1
**sequence** [1] - 168:4
**sergeant** [1] - 84:5
**Sergeant** [10] - 178:5, 178:9, 178:21, 179:8, 179:10, 227:23, 228:3, 239:11, 239:12, 239:17
**series** [2] - 111:9, 232:15
**serious** [10] - 57:2, 68:9, 68:15, 68:18, 69:23, 128:3, 129:6, 129:8, 249:5
**serve** [1] - 188:14
**serves** [2] - 83:2, 180:19
**service** [2] - 66:9, 131:13
**services** [3] - 39:8, 41:18, 41:23
**serving** [2] - 44:18, 44:21
**set** [17] - 41:14, 114:23, 130:12, 135:7, 158:5, 165:1, 165:6, 174:21, 175:5, 191:4, 212:1, 217:5, 244:4, 244:19, 245:19, 293:18, 297:3
**settlement** [2] - 124:19, 124:20
**seven** [11] - 20:22, 30:20, 49:13, 54:23, 103:21, 162:1, 191:17, 203:23, 234:4, 240:13
**seventeen** [56] - 160:14, 161:18,

162:1, 165:20, 165:22, 167:8, 167:18, 168:10, 168:16, 169:12, 169:16, 169:22, 169:23, 171:1, 188:1, 188:6, 191:23, 192:1, 192:6, 192:16, 192:20, 192:21, 193:5, 193:11, 193:19, 194:8, 199:5, 203:21, 203:22, 204:3, 205:13, 205:23, 206:15, 206:18, 207:1, 234:3, 234:4, 234:14, 234:16, 234:20, 235:13, 236:5, 236:15, 236:22, 238:15, 238:19, 239:3, 239:7, 239:10, 239:16, 239:20, 240:1, 240:5, 240:9, 240:13
**seventh** [1] - 294:8
**seventy** [1] - 132:18
**seventy-five** [1] - 132:18
**several** [2] - 145:13, 289:10
**shake** [2] - 108:6, 108:10
**shall** [7] - 49:19, 49:20, 50:12, 52:5, 53:9, 53:11, 66:7
**shelter** [1] - 82:10
**Sheriff** [29] - 3:6, 7:12, 26:14, 50:6, 50:15, 52:18, 52:23, 77:4, 98:13, 98:16, 98:19, 99:15, 99:18, 99:22, 100:7, 104:3, 110:3, 110:9, 110:22, 122:17, 259:21, 260:2, 264:10, 264:23, 265:2, 275:5, 275:6, 279:23, 289:14
**sheriff** [66] - 25:5, 25:11, 30:19, 31:7, 31:14, 31:15, 31:20, 31:21, 32:15, 33:4, 35:3, 35:21, 39:9, 45:1, 60:16, 62:13, 63:4, 64:6, 71:13, 71:15, 71:17, 71:18, 71:20, 72:5, 72:8, 72:10, 72:22, 73:20, 74:5, 77:9, 97:6, 100:11, 100:12, 100:15, 101:3, 102:6,

102:23, 103:2, 103:9, 104:8, 104:11, 104:16, 105:7, 105:13, 105:19, 106:23, 108:2, 109:1, 109:14, 109:16, 109:20, 111:2, 114:12, 114:18, 114:19, 115:6, 116:5, 155:4, 155:22, 264:18, 267:11, 275:23, 276:3, 280:7, 292:18
**SHERIFF** [1] - 1:10
**sheriff's** [59] - 14:21, 14:23, 21:8, 25:6, 25:9, 25:12, 25:18, 25:19, 25:23, 26:11, 30:11, 30:17, 30:18, 35:17, 35:19, 36:9, 43:2, 44:21, 54:20, 59:10, 63:20, 64:5, 64:19, 65:7, 74:14, 75:15, 75:19, 77:7, 88:12, 99:1, 100:13, 104:1, 104:5, 117:11, 117:21, 123:15, 131:6, 142:22, 147:11, 154:5, 156:2, 217:13, 268:3, 268:6, 268:14, 270:14, 270:17, 272:1, 272:7, 272:13, 276:5, 278:1, 278:19, 282:17, 282:20, 283:2, 284:7, 284:16, 286:20
**Sheriff's** [37] - 2:20, 6:23, 25:4, 31:8, 31:12, 39:17, 39:23, 40:12, 40:22, 41:6, 42:7, 42:22, 44:16, 52:10, 53:17, 57:12, 58:8, 60:8, 62:12, 62:16, 65:22, 74:9, 74:12, 98:18, 99:21, 100:6, 100:10, 117:5, 133:19, 147:21, 154:19, 227:7, 251:5, 257:20, 262:2, 272:10
**sheriffs** [7] - 39:19, 48:12, 62:17, 64:20, 270:9, 270:20, 282:21
**shift** [8] - 58:16, 124:4, 131:12, 134:14, 134:15, 135:13, 138:4, 237:22
**shirt** [1] - 180:10
**shit** [1] - 234:21
**shoes** [3] - 29:9, 29:20, 35:13

Kenneth P. Achtyl, Jr.

23

shooting [2] - 97:22, 277:8
shootings [1] - 249:5
short [11] - 59:15, 59:20, 78:5, 112:16, 137:18, 187:9, 215:15, 215:19, 233:12, 272:2, 293:7
shortened [1] - 20:14
Shorthand [1] - 298:9
shorthanded [1] - 242:7
shortly [2] - 215:4, 238:13
shot [1] - 277:9
shotgun [7] - 51:7, 51:13, 51:21, 59:7, 97:15, 146:23, 147:3
shoulder [5] - 11:1, 182:22, 183:3, 212:12, 212:17
shout [1] - 167:22
show [20] - 43:17, 48:16, 49:4, 93:18, 149:18, 154:8, 159:14, 159:21, 168:11, 170:17, 172:2, 187:15, 187:22, 216:8, 224:5, 234:1, 238:14, 247:6, 250:19, 255:5
showed [1] - 84:5
showing [5] - 49:10, 65:15, 149:15, 169:5, 172:3
shown [2] - 90:5, 159:9
shrugs [1] - 11:1
sic [4] - 88:15, 146:19, 273:7, 295:4
sic) [1] - 13:6
sick [1] - 124:2
side [16] - 65:20, 81:1, 114:23, 115:2, 115:3, 115:8, 115:22, 115:23, 164:6, 211:17, 211:20, 224:9, 225:2, 225:13, 253:18, 290:18
sided [1] - 43:22
sides [2] - 115:13, 115:14
sign [3] - 8:5, 37:1, 291:5
signature [1] - 169:11
signed [2] - 180:22, 259:15

similar [3] - 53:13, 204:16, 270:10
SIMONIN [3] - 1:16, 1:19, 298:21
Simonin [1] - 7:14, 7:15, 10:14, 13:4, 48:6, 71:8, 125:4, 126:3, 175:19, 177:6, 298:5
simple [9] - 45:17, 77:22, 79:17, 80:2, 80:4, 94:1, 167:17, 168:7, 174:9
simpler [1] - 64:5
simply [3] - 71:14, 105:10, 119:19
simultaneously [2] - 208:17, 209:13
single [2] - 43:13, 184:14
sit [2] - 140:16, 204:21
sitting [11] - 11:18, 115:7, 115:17, 115:19, 116:1, 119:3, 192:23, 193:6, 211:12, 211:18, 213:23
situation [17] - 50:22, 51:10, 51:16, 78:5, 79:12, 92:21, 98:3, 98:4, 111:7, 125:17, 164:17, 164:19, 164:23, 165:10, 186:1, 218:2
situations [5] - 51:1, 53:1, 97:12, 97:21, 98:2
six [33] - 23:2, 50:9, 50:10, 52:5, 53:6, 59:18, 66:2, 75:22, 134:15, 134:16, 134:22, 191:17, 193:5, 193:11, 193:20, 194:9, 199:5, 199:6, 203:21, 203:23, 204:3, 205:13, 205:23, 206:16, 206:18, 207:1, 240:5, 240:9, 293:5, 293:8, 294:15, 296:10
six-forty [1] - 293:5
six-forty-five [1] - 296:10
six-forty-three [1] - 294:15
six-forty-two [1] - 293:8
sixteen [2] - 160:15,

168:16
sixty [1] - 126:22
size [1] - 148:9
skip [2] - 81:16, 254:4
slam [1] - 229:10
slash [1] - 251:6
sledding [1] - 80:9
sleep [11] - 134:10, 134:12, 134:22, 135:5, 135:17, 136:9, 137:2, 137:4, 137:5, 137:8, 137:18
sleeved [1] - 180:10
slid [3] - 222:12, 222:16, 223:9
slide [1] - 223:6
slip [1] - 223:2
slipped [1] - 222:21
small [2] - 118:17, 283:17
smaller [1] - 88:16
smashed [1] - 188:7
snake [1] - 29:15
snippet [1] - 150:17
social [12] - 26:16, 27:14, 28:9, 28:11, 28:15, 30:5, 30:11, 30:22, 31:1, 31:9, 31:16, 33:12
socialize [1] - 287:1
socialized [5] - 118:1, 118:9, 118:15, 283:1, 285:2
socializes [1] - 288:4
socializing [2] - 118:6, 118:8
solely [2] - 130:6, 130:19
solid [1] - 148:13
some-odd [1] - 198:7
someone [16] - 11:3, 12:21, 82:22, 97:22, 130:6, 166:16, 171:13, 184:18, 189:10, 211:6, 228:20, 249:9, 274:18, 276:4, 286:1, 288:2
sometime [7] - 24:17, 54:15, 58:15, 139:20, 139:21, 238:12, 267:9
sometimes [9] - 24:18, 63:10, 63:14, 86:11, 96:16, 96:17, 141:14, 186:9
somewhat [7] - 56:16, 56:17, 148:2
somewhere [11] -

24:5, 25:16, 107:8, 117:8, 140:12, 148:8, 178:15, 227:21, 227:22, 228:1, 231:13
son [1] - 87:21
sore [1] - 181:20
sorry [63] - 9:16, 13:2, 13:11, 14:1, 16:9, 19:21, 27:16, 27:23, 31:23, 47:7, 51:18, 59:14, 64:17, 76:6, 82:18, 84:18, 95:9, 99:7, 110:20, 112:6, 113:16, 113:22, 117:3, 120:20, 122:6, 122:8, 134:11, 140:20, 141:21, 144:8, 148:22, 167:16, 180:14, 182:1, 185:16, 188:3, 194:9, 196:12, 199:18, 208:3, 209:9, 213:21, 219:7, 225:18, 228:14, 231:6, 231:18, 233:21, 234:7, 234:9, 252:6, 253:23, 259:7, 265:17, 266:6, 266:22, 267:17, 269:1, 269:3, 275:11, 278:15
sort [14] - 25:10, 36:18, 55:14, 58:7, 58:9, 59:12, 87:3, 114:14, 135:11, 141:7, 145:10, 149:8, 193:12, 204:9
sound [4] - 27:20, 41:19, 42:4, 106:7
sounded [1] - 204:15
sounds [13] - 32:7, 83:6, 130:2, 137:6, 137:10, 168:5, 188:6, 196:1, 196:8, 273:20, 278:14, 279:22, 281:14
south [2] - 140:1, 140:22
Southside [2] - 260:10, 260:19
speaking [7] - 16:14, 30:16, 76:17, 88:9, 104:3, 116:20, 117:3
special [2] - 284:10, 284:12
specialist [1] - 269:8
specific [19] - 28:19, 42:18, 43:4, 45:4, 46:10, 61:22, 75:17,

76:11, 89:14, 98:3, 98:4, 105:9, 127:22, 129:1, 139:19, 140:18, 141:1, 189:21, 268:21
specifically [15] - 11:18, 88:8, 104:3, 105:15, 105:16, 106:4, 106:10, 106:12, 107:5, 174:18, 198:3, 221:16, 232:13, 246:12, 275:5
specifics [1] - 129:21
specify [2] - 119:14, 200:12
speculate [2] - 40:20, 58:1
speeding [6] - 69:5, 78:10, 78:11, 79:18, 80:3, 88:3
spell [2] - 13:4, 178:7
spelled [2] - 13:5, 178:13
spelling [1] - 178:12
spend [1] - 68:6
spent [1] - 217:19
spine [1] - 155:18
split [1] - 208:15
spoken [3] - 118:20, 287:4, 287:6
spot [3] - 142:10, 144:4, 144:6
spots [1] - 145:6
spouses [1] - 118:17
spray [1] - 146:19
Springville [6] - 88:4, 88:11, 88:19, 97:14, 100:17, 103:6
Sprint [3] - 266:23, 267:1, 267:4
squad [2] - 83:21, 84:10
SS [1] - 298:2
stabbings [1] - 249:5
stack [1] - 56:21
stadium [34] - 18:3, 116:12, 119:15, 124:14, 127:14, 127:20, 127:22, 128:7, 129:14, 129:16, 129:22, 130:1, 135:15, 138:17, 139:2, 139:7, 139:13, 139:18, 139:23, 140:1, 140:4, 140:23, 170:8, 173:18, 174:23, 242:6, 244:4, 257:19,

Kenneth P. Achtyl, Jr.

24

262:9, 284:4, 285:8, 285:11, 285:15, 293:22

**stand** [3] - 96:17, 96:18, 129:22

**standardized** [1] - 147:13

**standards** [2] - 262:1, 262:5

**standing** [4] - 164:12, 175:8, 189:10, 190:2

**stands** [2] - 47:22, 166:10

**start** [27] - 10:13, 10:17, 10:20, 11:8, 11:15, 25:10, 58:19, 104:14, 107:9, 112:19, 120:21, 124:4, 131:12, 134:17, 138:4, 162:10, 168:3, 168:15, 191:9, 205:23, 206:4, 234:3, 234:15, 237:21, 252:8, 255:6, 268:19

**started** [37] - 12:18, 19:22, 25:5, 25:6, 35:17, 35:19, 35:21, 36:3, 36:6, 36:20, 55:8, 58:16, 74:14, 98:17, 98:23, 111:7, 117:21, 117:22, 126:17, 127:10, 131:21, 133:8, 168:4, 175:6, 211:13, 218:21, 226:4, 229:22, 230:1, 231:1, 231:11, 232:3, 252:5, 268:8, 270:19, 270:22, 284:6

**starting** [2] - 153:15, 251:9

**startled** [2] - 189:10, 191:5

**starts** [3] - 44:12, 149:18, 257:14

**state** [6] - 65:22, 177:1, 271:14, 271:19, 281:13, 293:12

**STATE** [1] - 298:1

**State** [28] - 60:5, 60:9, 60:17, 61:4, 62:1, 62:18, 64:13, 64:21, 65:8, 67:17, 67:22, 68:11, 69:1, 69:7, 72:4, 72:21, 73:2, 74:1, 74:3, 130:9, 130:18,

190:18, 190:21, 248:13, 270:22, 271:2, 272:8, 298:6

**statement** [13] - 39:1, 40:12, 40:15, 41:8, 41:10, 41:12, 41:22, 42:4, 61:22, 126:15, 185:1, 262:15, 270:21

**states** [3] - 171:23, 228:12, 258:12

**STATES** [1] - 1:3

**stating** [2] - 244:19, 245:3

**station** [1] - 97:17

**status** [2] - 82:16, 100:3

**statutory** [5] - 66:12, 66:17, 246:19, 247:12, 247:15

**stay** [3] - 141:4, 141:10, 264:14

**stayed** [1] - 23:8

**stays** [1] - 146:23

**step** [3] - 180:14, 214:11, 230:7

**stick** [3] - 149:2, 149:8

**still** [11] - 25:23, 30:4, 75:2, 113:11, 125:11, 141:18, 193:6, 205:15, 265:17, 265:18, 266:14

**stipulated** [1] - 5:17

**stipulations** [1] - 5:15

**stood** [2] - 116:3, 167:3

**stop** [26] - 77:21, 78:19, 78:23, 79:1, 79:6, 79:11, 79:15, 80:3, 81:3, 81:5, 82:4, 88:8, 89:5, 91:1, 91:2, 91:9, 91:12, 92:15, 92:17, 92:18, 93:11, 93:12, 140:9, 167:23, 168:19, 213:8

**stopped** [7] - 24:15, 78:9, 82:23, 83:2, 88:3, 128:10, 220:18

**stops** [4] - 76:20, 77:19, 88:7, 96:15

**store** [1] - 97:17

**straight** [1] - 80:11

**straightforward** [1] - 163:3

**street** [11] - 4:5, 69:12, 69:15, 70:6, 70:15, 88:16, 139:12,

140:2, 200:14, 200:15, 200:18

**Street** [4] - 1:17, 5:9, 7:16, 88:14

**stretched** [1] - 221:5

**stricken** [2] - 49:7, 137:12

**strike** [17] - 88:22, 95:12, 147:18, 155:17, 216:4, 218:9, 220:21, 222:9, 223:23, 224:11, 226:8, 231:18, 240:18, 262:18, 264:9, 272:20, 275:8

**struck** [1] - 222:3

**struggle** [8] - 221:7, 222:15, 223:11, 223:21, 229:12, 229:14, 229:16, 238:3

**struggling** [1] - 222:22, 223:9, 225:13

**stuck** [1] - 212:21

**Studio** [1] - 7:6

**stuff** [4] - 20:8, 139:17, 265:16, 275:1

**stuttered** [1] - 280:21

**subdivision** [1] - 248:13

**subdued** [1] - 155:12

**subject** [6] - 38:6, 44:8, 65:22, 164:11, 214:10, 277:8

**submit** [1] - 39:7

**submitted** [1] - 100:5

**substantiates** [2] - 62:11, 250:8

**substation** [1] - 242:4

**sue** [1] - 114:4

**SUE** [3] - 1:16, 1:19, 298:21

**Sue** [14] - 7:14, 7:15, 8:13, 9:14, 13:23, 27:5, 95:13, 101:2, 101:16, 121:16, 178:17, 246:21, 296:8, 298:5

**sued** [1] - 281:23

**sufficient** [1] - 266:21

**suggestion** [2] - 34:16, 225:17

**suit** [1] - 282:1

**Suite** [1] - 5:3

**summarize** [1] - 108:16

**sums** [1] - 76:15

**Sunday** [1] - 134:17

**supervisor** [5] - 39:7, 40:5, 90:15, 91:4, 290:1

**supplement** [1] - 155:10

**support** [12] - 31:7, 105:15, 105:18, 105:21, 105:22, 106:5, 106:6, 106:14, 106:16, 107:1, 108:17, 108:20

**supporting** [1] - 180:22

**suppose** [3] - 38:5, 56:11, 140:8

**supposed** [5] - 39:12, 48:12, 50:15, 52:22, 53:2

**surmise** [1] - 268:16

**surprise** [7] - 85:16, 85:21, 96:21, 185:13, 280:4, 280:6, 289:4

**surprising** [2] - 185:8, 185:22

**surrounded** [1] - 217:2

**surroundings** [2] - 144:17, 144:20

**survived** [1] - 277:9

**Susan** [4] - 93:10, 93:14, 94:20, 96:9

**SUV** [1] - 133:23

**swear** [2] - 7:19, 72:21

**swearing** [2] - 190:17, 190:20

**sweatshirt** [3] - 211:10, 212:8, 212:12

**swing** [5] - 222:10, 251:21, 252:22, 252:23, 253:14

**swinging** [15] - 250:17, 251:11, 251:17, 251:23, 252:11, 253:4, 253:5, 253:7, 253:9, 253:11, 253:12, 253:17, 253:19, 254:10

**switch** [1] - 266:19

**switched** [1] - 266:20

**Sworn** [1] - 297:14

**sworn** [6] - 8:8, 9:20, 14:8, 14:15, 15:3, 298:14

**swung** [1] - 252:16

**system** [12] - 240:17, 240:18, 243:16, 270:5, 270:23, 271:2, 271:5, 271:7, 271:8,

271:15, 271:20, 278:11

## T

**T-2** [2] - 2:9, 6:7

**tab** [2] - 43:23, 154:11

**tactics** [1] - 54:5

**tag** [2] - 37:20, 44:1

**tailored** [1] - 246:12

**tall** [1] - 20:21

**tap** [1] - 191:3

**tapped** [4] - 142:11, 144:11, 190:23, 196:22

**task** [2] - 20:6, 205:5

**team** [2] - 44:17, 76:1

**technical** [1] - 69:8

**techniques** [1] - 55:12

**telephone** [3] - 49:18, 120:4, 122:1

**temper** [1] - 53:2, 215:22

**tempers** [1] - 52:6

**temple** [1] - 155:18

**ten** [27] - 2:16, 6:18, 54:14, 57:18, 58:18, 79:22, 117:1, 124:4, 125:11, 131:21, 134:18, 134:23, 139:20, 143:23, 144:2, 144:9, 198:23, 216:9, 216:13, 217:16, 217:19, 218:5, 238:10, 239:21, 243:21, 264:6, 267:19

**ten-hour** [1] - 58:18

**ten-thirty-ish** [1] - 139:20

**tenor** [1] - 32:20

**term** [8] - 55:3, 57:4, 62:3, 62:7, 134:1, 134:3, 156:22, 262:11

**termed** [1] - 159:22

**terms** [5] - 124:12, 138:2, 148:2, 270:16, 271:17

**Tesla** [1] - 269:10

**testified** [11] - 9:21, 15:8, 45:23, 46:14, 86:9, 183:1, 214:13, 214:17, 251:19, 252:3, 279:5

**testify** [3] - 182:20, 220:14, 298:15

**testifying** [2] - 167:2,

182:6
  **testimony** [34] -
14:8, 14:15, 15:3,
15:9, 15:15, 17:6,
73:1, 112:4, 120:15,
165:3, 165:19,
166:18, 167:1,
169:15, 179:17,
180:20, 181:1,
182:23, 183:6,
188:20, 207:20,
208:5, 209:15,
217:21, 222:20,
222:22, 243:23,
244:21, 258:21,
297:5, 298:7, 298:10,
298:12, 298:19
  **text** [7] - 111:14,
119:11, 122:2, 265:9,
280:8, 283:10, 283:15
  **texted** [7] - 120:17,
265:2, 265:12,
267:11, 284:22,
287:3, 287:6
  **texts** [3] - 3:6,
120:16, 267:22
  **THE** [48] - 7:4, 8:6,
8:17, 8:21, 9:4, 9:10,
9:15, 13:19, 27:7,
27:10, 31:18, 42:23,
48:7, 51:5, 59:18,
59:21, 62:23, 69:19,
71:10, 94:9, 95:8,
95:18, 95:23, 96:4,
106:11, 108:15,
109:12, 112:14,
112:17, 113:3, 143:6,
143:10, 151:20,
168:21, 178:18,
185:16, 185:22,
186:3, 187:6, 187:7,
187:10, 245:3,
246:23, 247:3,
291:23, 293:5, 293:8,
296:10
  **themselves** [1] -
7:18
  **thereafter** [2] -
215:4, 238:13
  **thereof** [1] - 248:18
  **thickness** [1] - 148:2
  **thinking** [1] - 121:1
  **third** [5] - 56:11,
59:4, 121:14, 251:8,
263:16
  **thirteen** [1] - 160:13
  **thirty** [31] - 7:4, 8:4,
59:18, 139:20,
149:19, 150:21,
152:3, 153:16,

153:21, 162:1,
187:10, 188:1, 188:6,
206:16, 206:18,
207:2, 231:13, 232:2,
232:5, 236:16,
238:15, 238:19,
239:3, 239:7, 239:10,
239:16, 239:20,
240:1, 240:5, 240:9,
240:13
  **thirty-eight** [1] -
236:16
  **thirty-one** [2] -
150:21, 153:16
  **thirty-seven** [1] -
162:1
  **thirty-two** [11] -
149:19, 152:3,
153:21, 239:7,
239:10, 239:16,
239:20, 240:1, 240:5,
240:9, 240:13
  **thorough** [1] - 41:14
  **thoroughly** [1] -
175:15
  **thousand** [1] -
289:19
  **thousands** [8] -
76:22, 77:18, 88:6,
88:7, 96:15, 96:16,
145:8, 145:18
  **threatening** [2] -
248:19, 249:22
  **three** [42] - 38:13,
38:15, 49:3, 59:8,
59:9, 59:21, 74:23,
76:2, 110:4, 113:12,
121:15, 125:11,
146:17, 160:14,
165:20, 165:23,
167:9, 167:18,
168:10, 174:15,
192:7, 192:16,
192:21, 192:22,
198:7, 207:19,
207:22, 207:23,
234:14, 234:16,
236:6, 239:3, 264:4,
272:5, 273:16,
277:18, 294:11,
294:13, 294:15,
294:21, 295:13,
295:19
  **three-ten** [1] -
125:11
  **threw** [8] - 180:15,
180:21, 181:1, 181:3,
181:7, 182:21, 183:2,
183:10
  **throat** [4] - 155:18,

212:18, 212:20, 213:1
  **throughout** [3] -
59:9, 75:3, 213:18
  **throwing** [4] -
142:17, 179:14, 183:8
  **thrown** [4] - 179:20,
181:17, 184:18,
185:10
  **ticket** [4] - 69:5,
78:11, 80:3, 89:4
  **tickets** [1] - 79:18
  **tier** [5] - 270:7,
270:9, 271:8, 271:10,
271:13
  **tight** [1] - 118:17
  **Tim** [10] - 36:1, 36:5,
99:8, 99:13, 139:11,
152:9, 152:14,
152:17, 153:1, 154:2
  **Timothy** [7] - 7:12,
86:21, 89:7, 94:20,
96:7, 96:8, 178:10
  **TIMOTHY** [1] - 1:10
  **tired** [6] - 135:2,
135:8, 135:9, 135:12,
136:1, 136:18
  **titled** [2] - 38:2,
286:7
  **titles** [1] - 14:22
  **TO** [3] - 2:1, 3:1, 4:1
  **today** [8] - 14:8,
15:15, 17:3, 17:6,
19:1, 125:11, 204:21,
258:21
  **Today** [1] - 7:5
  **together** [12] - 44:17,
56:12, 110:4, 110:9,
117:17, 118:14,
119:15, 131:8, 133:6,
139:2, 145:11, 284:9
  **toll** [1] - 277:10
  **ton** [2] - 142:5,
145:20
  **Tonawanda** [2] -
202:9, 202:19
  **took** [14] - 21:19,
21:23, 36:13, 81:5,
81:7, 84:17, 179:2,
186:10, 211:21,
216:5, 250:8, 250:10,
277:9, 292:18
  **top** [20] - 10:14,
37:18, 37:22, 38:1,
38:14, 40:16, 42:12,
44:5, 45:9, 49:14,
55:15, 57:1, 65:17,
66:3, 154:10, 154:13,
208:5, 251:2, 291:5
  **topic** [3] - 43:6, 43:9,
43:13

  **topics** [2] - 58:21,
66:10
  **total** [6] - 126:10,
126:11, 158:5,
174:21, 268:6, 268:7
  **totally** [1] - 103:13
  **touch** [1] - 234:20
  **touched** [1] - 157:13
  **tougher** [2] - 146:9,
146:11
  **toward** [11] - 72:22,
91:22, 116:4, 130:7,
204:4, 219:1, 220:2,
220:17, 231:12,
233:18, 252:12
  **towards** [14] -
159:17, 162:9, 164:1,
167:14, 169:1, 169:3,
175:7, 209:12,
212:11, 219:3,
219:21, 251:10,
251:12, 273:3
  **town** [4] - 69:10,
76:14, 198:6, 201:22
  **Town** [6] - 24:7,
24:12, 99:2, 99:5,
242:4, 251:2
  **traffic** [30] - 69:5,
76:12, 76:20, 77:18,
77:22, 78:19, 78:22,
79:1, 79:5, 79:11,
79:15, 79:17, 80:2,
80:8, 80:12, 81:3,
81:5, 82:18, 82:23,
88:7, 89:4, 91:9,
91:12, 92:15, 92:17,
93:12, 96:15, 128:10,
141:7
  **train** [1] - 60:19
  **trained** [2] - 55:8,
147:14
  **Training** [2] - 2:9, 6:7
  **training** [29] - 53:16,
54:1, 54:3, 54:5, 54:7,
54:10, 54:19, 55:1,
57:10, 58:14, 58:17,
58:18, 58:22, 58:23,
59:1, 59:3, 59:4, 59:6,
59:11, 60:8, 60:11,
60:22, 61:2, 61:15,
65:23, 66:9, 67:2,
227:6, 245:23
  **trainings** [2] - 58:7,
58:9, 58:10
  **transcript** [9] - 5:20,
8:20, 8:22, 9:3, 9:4,
294:16, 297:4,
298:18, 298:19
  **transferred** [1] -
270:11

  **Transit** [2] - 23:15,
25:14
  **translate** [1] - 11:2
  **transpired** [1] -
293:19
  **transpiring** [2] -
105:23, 106:3
  **transport** [1] -
261:10
  **tread** [1] - 29:15
  **treatment** [3] -
260:5, 261:1, 261:8
  **trial** [44] - 5:22,
15:10, 16:6, 16:8,
16:12, 16:13, 17:10,
17:15, 104:12,
104:17, 104:19,
105:23, 109:2,
109:17, 110:2,
110:10, 111:12,
114:19, 114:20,
115:18, 120:19,
120:22, 121:18,
122:5, 122:9, 122:10,
122:12, 122:15,
122:20, 160:5, 182:6,
182:20, 259:23,
264:10, 264:18,
267:12, 273:1, 273:3,
273:12, 279:4,
279:10, 279:13,
279:15, 280:7
  **Trial** [1] - 1:15
  **trials** [1] - 15:8
  **triangle** [4] - 55:8,
55:9, 55:10, 55:11
  **trick** [4] - 63:23,
64:1, 78:17, 198:10
  **tried** [1] - 263:22
  **trip** [1] - 121:8
  **true** [38] - 44:6, 63:8,
68:13, 72:17, 74:6,
80:16, 135:2, 144:12,
149:9, 170:3, 171:11,
175:4, 177:16,
188:18, 197:23,
198:8, 198:15,
202:16, 203:4,
203:19, 213:15,
215:9, 215:13,
215:14, 216:22,
216:23, 225:6,
230:13, 232:3,
238:22, 247:8, 250:3,
250:4, 254:13,
254:21, 258:11,
297:4, 298:18
  **trunk** [4] - 83:23,
84:2, 138:9
  **truth** [3] - 298:15,

298:16
 **truthful** [1] - 179:5
 **try** [18] - 20:7, 45:16,
61:1, 64:4, 65:13,
91:21, 102:17, 116:2,
135:5, 139:10,
140:23, 141:4,
141:16, 211:11,
217:12, 270:7, 274:4,
294:12
 **trying** [26] - 60:20,
64:2, 86:18, 87:10,
89:1, 103:20, 115:13,
119:13, 119:18,
121:7, 128:18,
130:16, 136:17,
164:10, 167:6, 184:7,
187:2, 198:10, 205:7,
221:23, 222:15,
238:5, 241:22, 254:2,
259:9, 274:1
 **tumultuous** [4] -
248:19, 249:12,
249:16, 249:22
 **turn** [5] - 12:2, 39:7,
204:4, 222:15, 231:20
 **turned** [8] - 89:19,
116:3, 203:8, 203:11,
287:17, 288:5, 288:9,
288:16
 **turning** [2] - 206:10,
288:22
 **Turnpike** [1] - 5:6
 **turns** [1] - 205:19
 **twelve** [8] - 2:14,
6:14, 7:4, 36:14,
58:16, 58:17, 194:9,
234:20
 **twelve-hour** [2] -
58:16, 58:17
 **twelve-thirty-five** [1]
- 7:4
 **twenty** [85] - 14:14,
20:4, 20:6, 21:1, 21:6,
30:19, 41:1, 49:13,
50:9, 50:10, 52:5,
53:6, 54:23, 66:8,
117:1, 126:21,
126:23, 127:1, 148:6,
161:19, 169:13,
169:16, 169:22,
169:23, 171:1, 187:7,
188:1, 188:3, 188:6,
191:23, 192:1, 192:6,
192:7, 192:16,
192:21, 193:5,
193:11, 193:20,
194:9, 199:5, 199:6,
203:21, 203:23,
204:3, 205:13,

205:23, 206:1,
206:16, 206:18,
207:1, 207:2, 236:6,
238:16, 238:19,
240:5, 240:9, 240:13,
266:19, 267:1, 267:8,
268:5, 268:9, 269:14,
271:10, 271:11,
271:13, 271:15,
271:16, 277:13,
284:23, 289:14,
290:4, 290:5, 291:1
 **twenty-day** [1] -
267:8
 **twenty-eight** [1] -
161:19
 **twenty-five** [17] -
20:6, 21:1, 21:6,
191:23, 192:1, 192:6,
192:16, 192:21,
238:19, 268:5, 268:9,
269:14, 271:11,
271:13, 271:16,
277:13
 **twenty-four** [8] -
30:19, 148:6, 238:16,
268:5, 269:14,
271:10, 271:13,
271:15
 **twenty-nine** [5] -
203:21, 204:3,
205:13, 206:1, 207:2
 **twenty-one** [3] -
41:1, 66:8, 188:3
 **twenty-seven** [5] -
49:13, 54:23, 203:23,
240:13
 **twenty-six** [20] -
50:9, 50:10, 52:5,
53:6, 193:5, 193:11,
193:20, 194:9, 199:5,
199:6, 203:21,
203:23, 204:3,
205:13, 205:23,
206:16, 206:18,
207:1, 240:5, 240:9
 **twenty-some** [2] -
284:23, 291:1
 **twenty-some-odd**
[1] - 20:4
 **twenty-three** [4] -
192:7, 192:16,
192:21, 236:6
 **twice** [4] - 24:21,
260:9, 260:14, 260:23
 **twisted** [1] - 222:17
 **twisting** [2] - 223:11,
223:12
 **two** [63] - 13:22,
19:15, 21:1, 26:8,

29:12, 44:11, 66:21,
80:8, 80:19, 83:16,
97:16, 108:2, 109:5,
112:14, 112:17,
117:11, 117:14,
118:16, 120:11,
121:15, 132:11,
133:18, 137:16,
140:21, 141:1, 148:5,
149:19, 152:3,
153:21, 164:10,
165:14, 167:21,
168:2, 174:16, 186:8,
187:4, 192:1, 213:16,
234:3, 234:4, 234:14,
234:20, 235:13,
236:5, 236:15,
236:22, 239:7,
239:10, 239:16,
239:20, 240:1, 240:5,
240:9, 240:13, 251:4,
272:5, 277:17,
281:16, 293:8, 293:11
 **two-fifty-two** [1] -
112:17
 **two-forty-four** [1] -
112:14
 **two-man** [2] -
140:21, 141:1
 **two-year** [1] - 19:15
 **type** [5] - 8:16,
129:19, 241:23,
249:13, 265:15
 **typical** [3] - 153:11,
242:22, 243:20
 **typically** [3] - 132:1,
137:21, 242:13

## U

 **uh-huhs** [1] - 11:1
 **uh-oh** [1] - 285:23
 **uh-uhs** [1] - 11:1
 **uhs** [1] - 11:1
 **under** [33] - 76:7,
81:10, 81:11, 91:6,
91:16, 130:12, 135:7,
136:5, 151:22, 165:1,
165:3, 165:6, 165:13,
166:12, 166:18,
175:1, 191:4, 217:5,
222:20, 232:10,
232:19, 233:7,
243:23, 244:4,
244:19, 245:19,
256:9, 258:4, 258:10,
270:10, 275:18,
293:18, 298:11
 **undercover** [2] -
142:16, 180:17
 **underlined** [1] -

155:16
 **underneath** [1] -
29:16
 **undersheriff** [5] -
35:23, 39:10, 275:10,
275:14, 276:20
 **understood** [1] -
276:9
 **underwater** [1] -
76:1
 **unfortunately** [1] -
23:7
 **uniform** [2] - 264:12,
264:13
 **union** [1] - 118:11
 **unique** [1] - 186:1
 **unit** [5] - 133:21,
134:2, 134:3, 137:20,
140:6
 **UNITED** [1] - 1:3
 **unless** [9] - 32:11,
67:15, 67:23, 78:21,
93:18, 126:12,
134:18, 140:7, 141:5
 **unmute** [1] - 113:13
 **unquote** [3] - 92:3,
196:3, 287:17
 **unruly** [3] - 213:19,
219:3, 219:10
 **unserious** [1] - 68:13
 **up** [146] - 11:12,
20:8, 22:7, 23:7,
24:14, 28:6, 35:8,
37:12, 37:14, 37:15,
44:2, 50:9, 51:1,
55:11, 55:15, 56:21,
58:7, 58:9, 58:10,
59:11, 63:7, 63:11,
65:14, 65:17, 73:8,
73:9, 75:20, 76:15,
76:16, 78:8, 84:6,
86:1, 90:1, 90:5,
93:18, 93:23, 94:3,
100:1, 106:20,
114:23, 116:3, 118:4,
120:18, 121:8, 127:4,
131:5, 131:16,
137:20, 138:16,
138:21, 139:16,
142:6, 142:11,
144:11, 158:9, 160:7,
163:16, 163:20,
164:3, 167:8, 168:5,
168:9, 169:21, 173:2,
175:9, 188:21, 189:3,
189:10, 190:9,
190:10, 190:23,
191:14, 193:13,
193:22, 193:23,
194:2, 196:21,

196:22, 208:6,
208:16, 209:17,
209:18, 210:3, 210:9,
210:10, 211:5, 211:6,
211:9, 212:7, 212:23,
216:21, 218:10,
218:17, 218:18,
218:21, 219:6,
221:13, 222:13,
222:16, 223:9,
230:21, 231:3, 232:7,
232:9, 232:17,
232:18, 232:20,
232:21, 232:23,
233:3, 233:6, 235:19,
236:2, 238:4, 239:14,
241:23, 242:3, 246:8,
248:10, 250:20,
251:20, 251:21,
251:22, 251:23,
252:20, 252:21,
252:22, 253:1, 253:2,
253:5, 253:6, 253:8,
253:10, 253:14,
253:17, 253:18,
255:7, 256:4, 259:23,
272:14, 272:19,
279:9, 282:16, 291:5,
296:9
 **upcoming** [1] - 122:5
 **Update** [2] - 2:18,
6:20
 **updates** [8] - 58:20,
64:8, 64:22, 64:23,
65:2, 65:3, 65:8,
65:10
 **upgraded** [2] -
266:3, 266:12
 **upper** [4] - 149:19,
150:22, 160:15, 180:8
 **uproarious** [1] -
249:17
 **upset** [1] - 137:17
 **upwards** [5] - 249:4,
253:11, 253:12,
253:19
 **urinated** [2] - 85:4,
85:9
 **urinating** [2] - 81:17,
128:8
 **usual** [1] - 139:6
 **utilize** [1] - 134:19
 **utilized** [1] - 58:23
 **utmost** [2] - 52:6,
53:3
 **utterance** [1] -
204:10

## V

 **varies** [1] - 164:16

Kenneth P. Achtyl, Jr.

**variety** [3] - 86:8, 263:10, 290:10
**various** [15] - 15:8, 55:10, 55:12, 56:23, 58:20, 61:6, 61:9, 61:13, 75:2, 78:14, 85:22, 95:18, 132:15, 145:6, 186:12
**vary** [1] - 58:21
**veered** [1] - 114:15
**vehicle** [74] - 18:4, 83:3, 83:20, 83:23, 131:6, 133:20, 137:23, 138:5, 138:9, 138:11, 138:16, 138:22, 139:3, 140:5, 140:7, 140:9, 140:16, 141:10, 141:11, 142:7, 143:18, 143:19, 144:10, 146:23, 147:1, 147:3, 147:5, 150:11, 150:13, 150:15, 153:22, 196:21, 203:16, 210:21, 211:22, 213:23, 214:23, 215:21, 216:1, 216:13, 216:19, 217:13, 217:23, 218:5, 220:3, 220:6, 220:7, 220:18, 221:10, 221:12, 227:4, 227:9, 227:13, 227:16, 228:5, 228:21, 229:6, 229:10, 229:11, 229:15, 231:12, 233:14, 233:19, 233:22, 237:4, 237:9, 240:17, 240:19, 243:16, 258:19, 258:20
**vein** [1] - 33:9
**venture** [1] - 141:16
**verbal** [4] - 10:21, 55:10, 56:8, 232:6
**verbatim** [1] - 298:8
**verdict** [12] - 4:8, 105:1, 105:2, 273:4, 273:11, 273:17, 276:2, 276:7, 276:23, 277:21, 280:9, 281:7
**Verizon** [3] - 123:7, 123:10, 267:2
**version** [2] - 20:14, 250:22
**versus** [4] - 68:7, 68:8, 271:15, 278:10
**vest** [2] - 180:11, 180:13

**via** [5] - 7:8, 9:21, 119:19, 119:23, 122:2
**victims** [1] - 75:20
**video** [104] - 7:9, 8:7, 8:11, 9:7, 16:11, 43:21, 149:21, 150:2, 150:19, 151:13, 151:19, 152:4, 153:16, 153:17, 153:18, 159:8, 159:23, 160:2, 160:3, 160:21, 161:3, 161:7, 161:14, 161:17, 161:20, 161:23, 162:2, 162:10, 163:16, 163:20, 165:20, 167:9, 167:10, 167:18, 168:3, 168:9, 168:11, 168:13, 168:19, 168:22, 169:2, 169:4, 169:18, 169:21, 171:1, 180:13, 186:18, 186:22, 187:15, 187:23, 188:2, 188:4, 191:2, 191:9, 192:3, 192:18, 193:3, 193:9, 193:17, 194:6, 194:17, 195:10, 195:15, 195:21, 196:5, 197:3, 197:8, 198:12, 198:18, 199:3, 199:15, 200:18, 201:2, 204:1, 204:8, 204:12, 205:21, 206:2, 206:13, 206:22, 208:12, 209:1, 209:14, 211:15, 211:16, 216:8, 224:4, 231:5, 234:5, 234:17, 235:5, 235:9, 235:17, 235:23, 236:9, 236:17, 238:11, 238:17, 239:1, 239:8, 239:19, 239:22, 240:7, 260:13
**videoconference** [2] - 7:8, 9:21
**videographer** [6] - 5:12, 9:5, 13:15, 13:23, 112:23, 295:4
**VIDEOGRAPHER** [13] - 7:4, 9:10, 59:18, 59:21, 112:14, 112:17, 187:7, 187:10, 246:23, 247:3, 293:5, 293:8, 296:10

**videos** [1] - 255:17
**videotape** [1] - 112:22
**videotaping** [2] - 13:14, 13:17
**view** [1] - 151:1
**viewing** [1] - 209:14
**Village** [7] - 22:1, 22:14, 23:19, 88:4, 88:10, 100:17, 103:5
**village** [2] - 69:10, 76:14
**violating** [1] - 83:1
**violation** [12] - 67:16, 67:23, 68:4, 68:5, 68:10, 68:22, 69:7, 72:7, 72:19, 190:14, 190:21, 242:14
**violations** [2] - 68:17, 275:19
**violative** [1] - 72:4
**violence** [5] - 75:18, 75:19, 75:20, 75:21, 249:6
**violent** [6] - 53:9, 248:19, 249:2, 249:3, 249:7, 249:21
**voice** [1] - 259:17
**volunteer** [3] - 24:7, 99:3, 260:18
**vs** [1] - 1:8

---

## W

**wait** [11] - 95:22, 184:22, 186:21, 266:6
**waited** [2] - 216:13, 217:16
**waiting** [2] - 95:6, 95:8
**waived** [2] - 5:19, 5:20
**walk** [11] - 4:5, 69:15, 137:22, 138:3, 138:5, 141:10, 141:15, 203:9, 203:11, 205:19, 206:4
**walk-around** [3] - 137:22, 138:3, 138:5
**walked** [11] - 70:6, 70:14, 188:21, 189:3, 190:23, 191:14, 196:21, 235:19, 236:2, 290:6, 290:22
**walking** [7] - 69:12, 142:1, 193:13, 206:15, 207:5, 210:18, 214:18
**wants** [2] - 89:18,

219:9
**warrant** [4] - 89:4, 89:15, 90:16, 91:17
**warranted** [1] - 92:21
**warrants** [2] - 50:22, 80:22
**waste** [1] - 33:23
**watch** [11] - 153:17, 160:20, 180:18, 183:22, 186:22, 204:8, 204:11, 206:12, 208:10, 208:19, 208:22
**watched** [7] - 16:4, 16:5, 16:9, 17:4, 17:14, 205:21, 208:14
**watching** [1] - 211:16
**Waverly** [6] - 87:20, 88:3, 88:10, 88:14, 88:17, 91:15
**ways** [1] - 158:1
**weapon** [3] - 146:21, 146:23, 154:21
**weaponry** [1] - 146:12
**weapons** [2] - 146:13, 146:20
**wearing** [5] - 151:5, 151:6, 180:8, 285:10, 285:14
**Webster's** [2] - 249:7, 249:16
**Wednesday** [1] - 7:5
**week** [13] - 17:15, 24:18, 24:22, 30:20, 74:20, 110:16, 120:19, 120:22, 122:1, 273:1, 279:4, 279:8, 279:10
**week-long** [1] - 74:20
**weekend** [2] - 135:22, 136:15
**weekends** [3] - 24:21, 134:7, 135:6
**weigh** [1] - 20:23
**weight** [2] - 279:15, 279:17
**welcome** [2] - 20:10, 173:3
**WESTERN** [1] - 1:4
**whatsoever** [2] - 113:15, 136:10
**whereabouts** [2] - 19:7, 269:9
**white** [1] - 291:9
**whole** [2] - 264:14, 298:15
**wife's** [1] - 23:6

**William** [2] - 286:19, 289:4
**Windom** [1] - 260:15
**window** [18] - 142:7, 142:12, 144:11, 158:9, 189:9, 189:11, 189:14, 190:10, 191:1, 191:15, 193:14, 207:10, 207:11, 207:15, 207:16, 207:18, 207:21, 208:6
**windows** [1] - 43:21
**Windsor** [1] - 5:7
**wit** [5] - 250:5, 250:7, 250:8, 250:10, 250:11
**witness** [6] - 7:20, 8:8, 32:7, 34:8, 34:10, 167:23
**WITNESS** [25] - 31:18, 42:23, 51:5, 62:23, 69:19, 94:9, 95:8, 95:18, 95:23, 96:4, 106:11, 108:15, 109:12, 113:3, 143:6, 143:10, 151:20, 168:21, 178:18, 185:16, 185:22, 186:3, 187:6, 245:3, 291:23
**woman** [3] - 80:5, 86:23, 87:19
**wondering** [1] - 194:10
**wood** [2] - 148:13, 148:15
**wooden** [3] - 146:18, 147:9, 149:2
**word** [23] - 41:9, 41:10, 72:22, 130:7, 143:5, 176:2, 177:22, 178:1, 209:4, 209:8, 209:9, 254:13, 254:14, 255:1, 255:14, 256:1, 256:2, 256:7, 256:17, 256:20, 256:23, 257:5, 257:6
**wording** [1] - 223:8
**words** [13] - 10:12, 10:19, 41:7, 105:16, 162:13, 196:18, 204:23, 205:2, 205:11, 209:19, 250:3, 256:9, 280:11
**wordy** [1] - 130:14
**worker** [2] - 136:8, 182:12
**works** [3] - 27:1, 44:17, 278:13

Kenneth P. Achtyl, Jr.

28

**world** [1] - 254:2
**wrap** [1] - 296:9
**wrapping** [2] - 218:10, 282:16
**write** [1] - 274:18
**writing** [4] - 27:21, 28:5, 42:13, 298:11
**written** [5] - 36:18, 36:19, 38:7, 38:16, 121:3
**wrote** [1] - 108:20

## Y

**year** [16] - 17:23, 19:10, 19:15, 58:21, 59:9, 67:1, 75:17, 90:3, 90:4, 90:6, 90:12, 92:23, 266:4, 271:18, 275:17
**yearly** [3] - 58:6, 58:9, 59:12
**years** [49] - 14:14, 15:12, 15:13, 20:4, 20:7, 21:6, 41:2, 43:3, 54:12, 54:14, 54:23, 57:16, 57:18, 75:5, 75:22, 77:7, 77:9, 87:22, 103:11, 117:1, 126:21, 127:2, 127:5, 127:10, 133:11, 133:14, 136:6, 213:18, 268:6, 268:9, 269:14, 269:21, 270:20, 271:11, 271:15, 271:16, 272:5, 273:16, 277:14, 277:18, 283:13, 284:23, 287:5, 289:15, 290:4, 290:5, 291:1
**yell** [4] - 208:18, 211:7, 239:4, 258:3
**yelled** [3] - 206:11, 207:10, 258:9
**yelling** [1] - 51:7
**yellow** [1] - 37:20
**yeses** [1] - 111:22
**yield** [1] - 79:19
**YORK** [2] - 1:4, 298:1
**York** [40] - 1:17, 5:4, 5:7, 5:10, 7:7, 7:16, 9:19, 19:4, 19:9, 22:1, 60:5, 60:9, 60:17, 61:4, 61:23, 62:18, 64:12, 64:21, 65:8, 67:17, 67:22, 68:11, 69:1, 69:7, 72:4, 72:21, 73:2, 74:1, 74:3, 82:6, 130:9,

130:17, 190:18, 190:21, 248:13, 270:22, 271:2, 271:4, 272:8, 298:6
**young** [2] - 26:10, 93:3
**yourself** [8] - 4:5, 62:22, 66:23, 69:16, 73:21, 151:1, 151:23, 256:21
**yup** [2] - 209:22, 255:12

## Z

**Zander** [2] - 87:22, 96:11
**zero** [3] - 193:5, 278:10
**zone** [1] - 140:19
**Zoom** [3] - 13:20, 112:21, 125:18

Sue Ann Simonin Court Reporting